UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————

№ 05-CV-2301 (JFB) (WDW)

———————————

ACORN (THE NEW YORK ASSOCIATION OF COMMUNITY
ORGANIZATIONS FOR REFORM NOW),
NEW YORK ACORN HOUSING COMPANY, INC.,
DAPHNE ANDREWS, VIC DEVITA,
VERNON GHULLKIE, AND NATALIE GUERRIDO,

Plaintiffs,

VERSUS

COUNTY OF NASSAU, INCORPORATED VILLAGE OF GARDEN
CITY, AND GARDEN CITY BOARD OF TRUSTEES,

Defendants.

———————————

MEMORANDUM AND ORDER
July 21, 2006

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiffs ACORN (The New York Association of Community Organizations for Reform Now), New York ACORN Housing Company, Inc., Daphne Andrews, Vic DeVita, Vernon Ghullkie, and Natalie Guerrido, bring this action against defendants County of Nassau, Incorporated Village of Garden City, and Garden City Board of Trustees, alleging that they have engaged in a long-standing pattern and practice of preventing African-American, and other Black and Hispanic persons from residing in predominantly white communities. Specifically, defendants allegedly engaged in exclusionary zoning that prevented affordable multi-family housing opportunities from being developed on a 25-acre parcel of Nassau County-owned property in Garden City, New York, in violation of the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1982, and 1983, the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*, and the Equal Protection Clause of the Fourteenth Amendment. Defendants move pursuant to FED. R. CIV. P. 12(b)(1) and 12(b)(6) to dismiss the amended complaint, arguing that (1) plaintiffs do not have standing and, thus, this Court lacks subject matter jurisdiction, and (2) the amended complaint fails to state a claim upon which relief may be

granted. For the reasons that follow, the motions to dismiss are denied.

I. THE FACTS

The facts are drawn from the amended complaint and are assumed to be true for purposes of these motions to dismiss.

A. THE PARTIES

Plaintiff ACORN is a local chapter of a nationwide nonprofit corporate entity organized and existing under the laws of the State of Arkansas. (Am. Compl. ¶ 9.) ACORN is an advocacy group that endeavors to fight discriminatory local and state government decisions, and to promote more affordable housing and racially integrated housing opportunities for Long Island, New York residents. (*Id.* ¶ 10.) Plaintiff New York ACORN Housing Company, Inc. ("NYAHC"), is a not-for-profit community-based developer of affordable housing. NYAHC is incorporated in New York and was formed to develop, own, and manage affordable housing for families with low and moderate income. (*Id.* ¶ 12.)

All but one of the individually named plaintiffs are minority residents of Nassau County who do not live in Garden City, New York ("Garden City"), but have been seeking affordable residences in Nassau County in such areas as Garden City, and desire to live in Garden City. (*Id.* ¶¶ 5, 6, 7, 8.) Defendant Vic DeVita is a white man who resides in Garden City, and desires to live in a more integrated community. (*Id.* ¶ 4.)

Defendants in this case are County of Nassau, ("Nassau" or "Nassau County"), and Incorporated Village of Garden City and Garden City Board of Trustees (the "Garden City Defendants" or "Garden City"). (*Id.* ¶¶ 15, 16, 17.)

B. ALLEGATIONS OF HISTORICAL PATTERNS AND POLICIES OF HOUSING SEGREGATION BY NASSAU COUNTY

The amended complaint alleges that Nassau County is one of the most racially segregated counties in all of the United States. (*Id.* ¶ 18.) Approximately 80% of Nassau County residents are white, and approximately 17% of Nassau County residents are African-American, other Black, or Hispanic ("minorities"). (*Id.* ¶ 19.) Approximately 84% of white Nassau County residents live in non-integrated, virtually all-white communities, whereas approximately 64% of all minority residents live in minority communities. (*Id.* ¶ 21.)

According to the amended complaint, Nassau County minorities have a disproportionate need for affordable multi-family housing that is not restricted to elderly persons. (*Id.* ¶ 22.) Nassau County is aware of the need for minority residents of affordable multi-family housing. (*Id.*) For many years, however, Nassau County allegedly has an express policy and practice to develop and promote the development of non-age restricted affordable housing only in predominantly minority and low-income areas of Nassau County, and to exclude such affordable housing from predominantly white communities. (*Id.*) This policy and practice was allegedly expressed in a 2000-2004 Nassau County Consolidated Plan, apparently prepared by Nassau County. (*Id.*)

The amended complaint also alleges that Nassau County supports, encourages, facilitates, and acquiesces in the efforts by local zoning authorities to enact exclusionary zoning laws and ordinances. (*Id.* ¶ 23.) This

2

prevents the development of non-age restricted affordable multi-family housing, allegedly done with the "purpose, intent or foreseeable effect of perpetuating racial and ethnic housing segregation throughout Nassau County and creating identifiable enclaves of nearly all-white residential communities, such as Garden City." (*Id.*)

Nassau County has received, and continues to receive federal subsidized housing funds from the Community Development Block Grant program ("CDBG"), and HOME program. (*Id.* ¶ 26.) These programs require, among other things, that Nassau County further fair housing, and use the funds in a manner that promotes racial integration. (*Id.*) Nassau County is required, under these programs, to collect data documenting the impact of its CDBG and HOME expenditures on racial and ethnic housing segregation. (*Id.*) The amended complaint alleges that, in violation of its obligations under CDBG and HOME, Nassau County has directed these funds only to low and moderate income communities with a disproportionate minority population. (*Id.*) This is done, allegedly, with the purpose of perpetuating racial and ethnic housing segregation throughout Nassau County. (*Id.*)

The amended complaint references a January 1974 district court opinion, *Acevedo v. Nassau County*, 369 F. Supp. 1384 (E.D.N.Y. 1974), as support for the proposition that Nassau County has opposed affordable and integrated housing based on race. (*Id.* ¶ 33.) In that opinion, the Court stated:

> By far, however, the most objectionable form of housing has been low-income family housing. It is clear from all the evidence that community opposition to this form of housing had been racially motivated. In Nassau County low-income family housing is predominantly occupied by Blacks. Proposals for the construction of this form of housing have incurred immediate and vehement opposition. As can be expected such heated opposition has not been ignored by the elected officials of Nassau. There is evidence of more than one housing proposal being dropped because of vehement community opposition.

(*Id.* ¶ 33 (quoting *Acevedo*, 369 F. Supp. at 1389)). The amended complaint alleges that, notwithstanding this judicial finding, Nassau County still acquiesces in and impliedly consents to neighborhood and community opposition to the development of affordable multi-family housing and other housing opportunities disproportionately needed by minorities. (*Id.* ¶ 34.)

C. ALLEGATIONS OF HISTORICAL PATTERNS AND POLICIES OF HOUSING SEGREGATION BY GARDEN CITY

According to the amended complaint, Garden City is, and has been for decades, a highly segregated, nearly all-white residential community located in Nassau County. (*Id.* ¶ 36.) The population of Garden City is approximately 95% white, with a total of only twenty-three African-American households (constituting approximately 1% of the Garden City population). (*Id.* ¶ 37.) By contrast, the Village of Hempstead, which directly borders Garden City on the South, has a population of which 84% are minority. (*Id.* ¶ 38.) Uniondale, which is located Southeast of Garden City, has a population of which approximately 79% are minority. (*Id.*) The Village of Westbury, which is located northwest of Garden City, has a population of which 43% are minority. (*Id.*)

3

The amended complaint alleges that Garden City has cooperated with, facilitated, and affirmatively acquiesced in Nassau County's segregative policies and practices. (*Id.* ¶ 35.) The amended complaint alleges that Garden City has continuously acted to reject and obstruct the creation of affordable multi-family housing opportunities by engaging in exclusionary zoning practices. (*Id.* ¶ 39.) In support of this allegation, the amended complaint alleges that, in or about April 1989, developers of an eighteen-acre parcel previously owned by Doubleday & Co., Inc., located at 501 Franklin Avenue in Garden City (the "Doubleday Site") proposed a plan to redevelop the Doubleday Site that would have included fifty-one units of affordable housing under then-current zoning. (*Id.* ¶ 40.) Residents of Garden City objected to the proposed Doubleday Site plan, and Garden City rejected the proposed plan, and adopted a plan that eliminated the possibility of an affordable housing development on the Doubleday Site. (*Id.*)

The amended complaint alleges that although Garden City repeatedly rejects multi-family development projects that would attract minority residents, it has not blocked the development of multi-family development projects that, by their design, are likely to attract white residents. (*Id.* ¶ 41.) As an example, the amended complaint points to the Wyndham, completed in 1989, which is a two-building, nine-story complex consisting of 319 luxury condominiums and rental apartments on twelve acres of land. (*Id.*) According to the amended complaint, the size and density of the Wyndham is significantly greater than the multi-family housing proposal that is at issue in this case. (*Id.*) Thus, Garden City has "encouraged and permitted" the building of certain luxury multi-family housing projects such as the Wyndham, that it knew or should have know would be inhabited only by white residents. (*Id.*)

The amended complaint further alleges that Garden City has engaged in open and notorious conduct to exclude minority persons from Garden City, including (1) denying, in 1970, an application to a church to operate a day care center that would have served low-income families, (2) discriminately excluding minorities from using its public parks, and (3) numerous incidents reported by African-Americans of being harassed by Garden City police while walking, jogging, driving, and shopping in Garden City. (*Id.* ¶ 43.)

D. THE CONSIDERATION FOR DEVELOPMENT OF THE SOCIAL SERVICES SITE

In or about May 2002, Nassau County began drafting a Real Estate Consolidation Plan (the "Consolidation Plan"). (*Id.* ¶ 44.) The purpose of the Consolidation Plan was to inventory the approximately 2,500 County-owned properties and consolidate, and sell as appropriate, those properties that were no longer necessary for County government operations. (*Id.*) One of the properties identified in the Consolidated Plan was in Garden City, and was known as the "Mineola Complex." (*Id.* ¶ 45.) The Mineola Complex is comprised of a courthouse, certain administration buildings, parking facilities, and twenty-five acres of land located at 101 County Seat Drive, Garden City (the "Social Services Site"). (*Id.*) The Social Services Site is comprised of 21.44 acres located on the Eastern side of County Seat Drive on which a social services building and a parking lot are located. (*Id.*) The additional 3.03 acres are located on the Western side of County Seat Drive on which the Old Laboratory Building and County Garage are situated. (*Id.*)

### E. GARDEN CITY CONSIDERS A PLAN FOR THE SOCIAL SERVICES SITE

In response to Nassau County's request, the Garden City Board of Trustees appointed a "P Zone Committee" to address issues relating to the Mineola Complex. (*Id.* ¶ 51.) Specifically, it hired planning consultants, the firm of Buckhurst Fish & Jacquemart, Inc. ("BFJ") to assist the Garden City Defendants in drafting re-zoning proposals in response to Nassau County's plan to sell and redevelop the Social Services Site. (*Id.* ¶ 51.)

During 2003, the P Zone Committee and BFJ held public workshops to discuss the development of the Social Services Site. (*Id.* ¶ 52.) They also met with representatives of Nassau County to discuss issues related to the County's proposed real estate consolidation, including the re-zoning of the Mineola Complex and the Social Services Site. (*Id.* ¶ 53.)

In its final proposal, BFJ recommended that a new zoning designation of "CO-5b" be used for the Social Services Site (the "Proposed Zoning'). (*Id.* ¶ 54.) Under the Proposed Zoning, the CO-5b zoning would use existing residential multi-family zoning controls, commonly referred to as "R-M" zoning, and would allow single-family homes, townhouses, and apartments. (*Id*.)

Under the Proposed Zoning, and consistent with R-M zoning, a multi-family dwelling would be subject, *inter alia*, to the following limitations: (1) a maximum building height of thirty-five feet, or two and a half stories; (2) a restriction that the dwelling cover no more than 25% of the plot; (3) a requirement that at least 25% of the plot be open space; and (4) the maximum number of multi-family housing units be equal to one unit per 3000 square feet, or 14.5 units per acre. (*Id.* ¶ 55.) Hence, the Proposed Zoning allowed for a maximum of 355 affordable multi-family units to be constructed on the twenty-five-acre Social Services Site. (*Id.*) In its proposal, BFJ contemplated the construction of a 311-unit multi-family housing development on the Social Services Site (the "Proposed Plan"). (*Id.* ¶ 56.) Each unit and lot would be sufficiently small in size so as to make it economically feasible for a developer of affordable multi-family housing to develop such housing. (*Id.*) The Proposed Plan stated that the Proposed Zoning permitted the development of housing that fit well with existing uses around the Social Services Site. (*Id.* ¶ 57.)

### F. NEIGHBORHOOD OPPOSITION TO THE PROPOSED ZONING

On January 8 and February 5, 2004, the Garden City Defendants held hearings on the Proposed Zoning of the Mineola Complex and the Social Services Site. (*Id.* ¶ 59.) During these public hearing, Garden City residents objected to the construction of affordable multi-family housing on the Social Services Site, and sought repeated assurances from the Garden City Defendants and Nassau County officials that no such housing would be built on the Social Services Site. (*Id.* ¶ 60.) The amended complaint alleges that this opposition was racially based. (*Id.*)

The amended complaint asserts that Nassau County acquiesced to Garden City and its residents by assuring them that it would not take any action antagonistic to Garden City's wishes and agreed with the Garden City Defendants to reject the Proposed Zoning and to permit only luxury housing to be built on the Social Services Site. (*Id.* ¶ 61.) Nassau County allegedly gave assurances that only luxury housing would be allowed to be developed on the Social Services Site, and

5

gave as a reason that given "the character of Garden City," only such housing "would be appropriate." (*Id.* ¶ 62.)

In June 2004, Garden City rejected the Proposed Zoning and Proposed Plan, and subsequently adopted a new zoning classification for the Social Services Site, designated "R-T," which had not previously existed under Garden City's proposed zoning ordinance ("Special Zoning"). (*Id.* ¶ 64.)

### G. Details of the Special Zoning

According to the amended complaint, the new Special Zoning adopted by Garden City only applied to the Social Services Site. (*Id.* ¶ 64.) The Special Zoning imposed severe restrictions on the construction of multi-family homes. (*Id.*) These restrictions by their effect prohibited the development of affordable multi-family housing on the Social Services Site. (*Id.*) The Special Zoning permits multi-family dwellings only by special permission and only on the 3.03 acre plot on which the Old Laboratory Building and County Garage were located. (*Id.* ¶ 65.) In addition, the Special Zoning permits, at the very most, only thirty-six affordable multi-family housing units. (*Id.*) Even if special permission were obtained, the amended complaint alleges that the Special Zoning only allows one unit per 4000 square feet, as opposed to the one unit per 3000 square feet that was called for under the Proposed Zoning. (*Id.*) The result of the Special Zoning, according to the amended complaint, is that the only economically feasible development on the Social Services Site is for luxury single-family homes and townhouses, which are likely to attract and be inhabited by predominantly white residents. (*Id.*)

In rejecting the Proposed Zoning and adopting the Special Zoning, defendants reasoned that there was a concern that the Proposed Zoning would cause increased traffic, and an increased burden on the school system from additional children that the Proposed Plan would cause. (*Id.* ¶ 70.) This, according to the amended complaint, was not the real reason the defendants rejected the Proposed Plan because Garden City's own consultants projected that the impact on traffic under the Proposed Plan would be negligible, and that there would only be a projected eighty-nine additional school children as a result of the Proposed Plan. (*Id.* ¶ 72.)

In May 2004, Nassau County objected to certain portions of the Proposed Zoning, but it supported and acquiesced in the Garden City Defendants' plan for the Social Service Site. (*Id.* ¶ 74.)

### H. Nassau County Issues a Request for Proposals

In or about July 2004, after the Special Zoning was adopted, Nassau County issued a Request for Proposals ("RFP") for the Social Services Site that set forth an asking price for the Social Services Site of $30 million. (*Id.* ¶ 76.)

The amended complaint alleges that developers of affordable housing, including plaintiff NYAHC, were unable to respond to the RFP because the Special Zoning made it economically infeasible to develop affordable housing. (*Id.* ¶ 77.)

Immediately after NYAHC received the RFP, plaintiffs NYAHC and ACORN met with Nassau County officials to present an alternative proposal for leasing the Social Services Site that would enable Nassau County to meet its financial objectives while still providing affordable multi-family housing in Garden City. (*Id.*) Nassau

6

County and NYAHC conferred and traded financial information about plaintiffs' proposal. (*Id.*)

NYAHC's proposal called for it to lease the Special Services Site from Nassau County and develop multi-family housing containing both affordable and market-rate units. (*Id.* ¶ 78.) The rents for the affordable units would be below market and be based on the tenant's income and family size as compared to the Nassau County area median income. (*Id.*) NYAHC planned to fund this proposal through tax-exempt bonds, the low income housing tax credit, and other subsidies. (*Id.*) Nassau County never responded to NYAHC's proposal.

After NYAHC submitted its alternative proposal to Nassau County, it drafted an alternative development plan that included multiple scenarios that would comply with the Proposed Zoning. (*Id.* ¶ 80.) Under this alternative proposal, NYAHC would purchase the Social Services Site for the asking price of $30 million. (*Id.*) The alternative proposal provided for multi-family housing containing approximately 300 units, some of which would be affordable units for low income families, and others would be market-rate units. (*Id.*)

Nassau County selected a developer to develop the Social Services Site, and to construct only luxury single family dwellings and townhouses likely to attract only or virtually only white residents. (*Id.* ¶ 82.) This plan, according to the amended complaint, perpetuates and reinforces racial and ethnic housing segregation in Garden City and Nassau County. (*Id.* ¶ 84.)

II. THE INSTANT ACTION

Plaintiffs filed a complaint in this case on May 12, 2005, and the case was assigned to the Honorable Leonard D. Wexler. At a pre-motion conference on September 12, 2005, Judge Wexler stayed discovery. Plaintiffs filed an amended complaint on November 30, 2005. The amended complaint alleges that defendants violated (1) the Fair Housing Act (the "FHA"), 42 U.S.C. §§ 3601, 3608 *et seq.*; (2) the Civil Rights Act of 1866 and 1871, 42 U.S.C. §§ 1981, 1982, and 1983; (3) the Equal Protection Clause of the Fourteenth Amendment; and (4) the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* Plaintiffs ask this Court to declare, enjoin, and order that defendants stop discriminating, and develop the Special Services Site consistent with zoning that permits affordable housing, including provisions that will require the development of affordable and integrated housing units at the Social Services Site. On February 9, 2006, this case was reassigned to this Court. On March 10, 2006, defendants moved to dismiss the amended complaint. Oral argument was held on June 26, 2006.

III. DISCUSSION

A. APPLICABLE LAW - STANDING IN ALLEGEDLY DISCRIMINATORY ZONING CASES

Under Article III, standing to bring a lawsuit in federal court is limited to a plaintiff who "show[s] that the conduct of which he complains has caused him to suffer an 'injury in fact' that a favorable judgment will redress." *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 12 (2004); *see also Ziemba v. Rell*, 409 F.3d 553, 555 (2d Cir. 2005). Further, among other standing requirements, "a plaintiff's alleged injury must be an invasion of a concrete and

7

particularized legally protected interest." *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 227 (2003) (opinion of Rehnquist, C.J., for a majority of the court); *see also Ziemba*, 409 F.3d at 554.

A plaintiff alleging "exclusionary zoning practices must allege specific, concrete facts demonstrating that the challenged practices harm him, and that he personally would benefit in a tangible way from the court's intervention."[1] *Warth v. Seldin*, 422 U.S. 490, 508 (1975); *Jaimes v. Toledo Metropolitan Hous. Auth.*, 758 F.2d 1086, 1097 (6th Cir. 1985). The harm does not have to be economic, indeed, "an interest in making suitable low-cost housing available in areas where such housing is scarce" can "support a plaintiff's standing." *Vill. of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 262-63 (1977).

In *Fair Housing in Huntington Comm. Inc. v. Town of Huntington*, the Second Circuit held that "to demonstrate the type of 'particularized injury' necessary for standing [in allegedly discriminatory zoning cases,] plaintiffs 'must allege facts from which it reasonably could be inferred' that, absent defendants' challenged conduct, there is a 'substantial probability' that housing with greater minority occupancy would have been built in the [town]." 316 F.3d 357, 363 (2d Cir. 2003) (quoting *Warth v. Seldin*, 422 U.S. 490, 504 (1975)). As the Second Circuit explained, "[b]ecause construction of such housing largely depends on the actions of third-party builders and factors such as construction and real estate costs, it is not inherently obvious that plaintiffs' claimed injury is fairly traceable to the challenged conduct." *Fair Hous. in Huntington Comm.*, 316 F.3d at 363; *see also Warth*, 422 U.S. at 508 n.18 (noting that to challenge zoning laws a plaintiff does not have to have a "present contractual interest in a particular project and that "[a] particularized interest may be shown in various ways"). Although the government has no constitutional duty to provide low income housing, *see Acevedo v. Nassau County*, 500 F.2d 1078, 1080-81 (2d Cir. 1974), it may not obstruct "private projects beneficial to minority groups." *Acevedo*, 500 F.2d at 1081.

Plaintiffs' standing, or lack thereof, is proper for a court to consider at every stage of the proceedings. *Jackson*, 21 F.3d at 154; *see also Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 116 n.31 (1979) (noting that "it sometimes remains to be seen whether the factual allegations of the complaint necessary for standing will be supported adequately by the evidence adduced at trial").

### C. APPLICATION AS TO PLAINTIFFS' STANDING

Both sides direct this Court to Supreme Court precedent in support of their positions. Plaintiffs argue that *Arlington Heights* controls, and defendants argue that *Warth* is dispositive.

---

[1] The Court uses the same analysis to determine plaintiffs' standing under both the Equal Protection Clause and 42 U.S.C. §§ 1981, 1982, and 1983. *See Huntington Branch, NAACP v. Town of Huntington*, 689 F.2d 391 (2d Cir. 1982); *Jackson v. Okaloosa County*, 21 F.3d 1531, 1539 (11th Cir. 1994). Further, as the parties note in their briefs, standing analysis under the FHA is broader than for the constitutional claims. *See Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972). Hence, the Court does not engage in a separate standing analysis for the FHA claims as to each plaintiff because it finds standing exists under the more stringent constitutional analysis. *See, e.g.*, *Gladstone Relators v. Vill. of Bellwood*, 441 U.S. 91, 111-15 (1979).

8

In *Warth v. Seldin*, the Supreme Court held that the plaintiffs lacked standing because they relied on "little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had [defendants] acted otherwise, and might improve were the court to afford relief." 422 U.S. at 507. In *Warth*, plaintiffs claimed that a town's exclusionary zoning policies prevented them from obtaining affordable housing. Because none of the plaintiffs in *Warth* had "a present interest" in the property, and because plaintiffs' desire to live in the area at issue depended on the actions of third party developers, the Supreme Court found that plaintiffs' lacked standing. *Id*. at 504-07.

In *Arlington Heights*, the plaintiffs claimed the Village of Arlington Heights engaged in exclusionary zoning when it denied a requested zoning change to a particular parcel of land. 429 U.S. at 258-59. The Supreme Court held that the developer's interest in constructing affordable housing, when coupled with the fact that a "specific project" was at issue, sufficiently gave the developer standing. *Id.* at 262. As to the individual plaintiffs in *Arlington Heights*, they had standing because the "particular project" at issue created an "actionable causal relationship" between the Village's zoning practices and the injury. *Id.* 429 U.S. at 264 (quoting *Warth*, 422 U.S. at 507).

At oral argument, defendants conceded that if this Court were to find that *Arlington Heights* controls, then this case would proceed because plaintiffs would have standing. As set forth below, the Court finds that, although neither of these cases are directly on point, the application of relevant Supreme Court and Second Circuit cases lead the Court to conclude that the facts as alleged by the individual and institutional plaintiffs in the amended complaint sufficiently give them standing to pursue this case.

The Court first addresses standing for NYAHC, then ACORN, and then the individual plaintiffs.

### 1. NYAHC

NYAHC alleges, *inter alia*, the following facts in support of its standing argument: (1) NYAHC is an experienced developer that seeks to build affordable housing on the Social Services Site; (2) it developed and submitted a Proposed Plan in consultation with architects, and other developers whereby it would lease the Social Services Site from Nassau County, and it discussed this proposal with the County; (3) it has developed specific proposals to build multi-family low income housing that would conform to the Proposed Zoning and be financially viable; (4) it has expended significant money and resources to develop plans for the Social Services Site; and (5) it was prepared to develop the Social Services Site if the defendants did not discriminate against it by rejecting the Proposed Zoning in favor of the Special Zoning. (*See* Am. Compl. ¶¶ 12-14, 77-81.)

Based on the record before the Court, plaintiffs have successfully pled a particularized injury by defendants that, if remedied by the Court, will bring redress to NYAHC. This case is markedly different than *Warth* because here there is a particular site, and NYAHC alleges not only that it submitted a Proposed Plan, but also that it has developed an alternative plan that includes multiple scenarios for developing the Social Services Site. Indeed, the Supreme Court in *Warth* highlighted the fact that plaintiffs were depending "on the efforts and willingness of third parties to build" the housing. *Warth*, 422 U.S. at 505. Here, plaintiffs do not rely on a "third party" developer's efforts; rather,

9

the developer is NYAHC, a plaintiff in this case. *Jackson*, 21 F.3d at 1538 (distinguishing plaintiffs in *Jackson* from those plaintiffs who base claims upon "speculation about the possible actions of third parties not before the court") (quoting *Arlington Heights*, 429 U.S. at 264). The plaintiffs in *Warth*, therefore, are in a different position than NYAHC, who is challenging, in part, defendants' zoning restriction as it applies to the Social Services Site and NYAHC's Proposed Plan. *See id.* at 507.

Defendants argue that NYAHC lacks standing because it fails to allege that it attempted in any way to acquire a permit, submit a bid, or communicate with defendants regarding the RFP for the Social Services Site. (*See* Garden City Mem. at 12-13.) It is true that the developer plaintiff in *Arlington Heights* had entered into a ninety-nine year lease on the property contingent on securing zoning clearance, arguably giving that developer "more" of a property interest in that property than NYAHC has in the Social Services Site, but the difference is not significant. There is no precise formula for standing, indeed, as the Supreme Court has noted, "particularized personal interest may be shown in various ways." *Warth*, 422 U.S. 508 n. 18. Although NYAHC did not formally submit a bid in response to the RFP, it has alleged that immediately after receiving the RFP, it met with Nassau County to discuss an alternative Proposed Plan.

NYAHC also alleges that it developed specific proposals to build multi-family low income housing that complied with the Proposed Zoning, but apparently not the Special Zoning. Defendants' position is that even if NYAHC developed specific proposals, it still lacks standing because it never "put its foot in the water" by submitting it in response to the RFP. Based on the record before the Court, this argument lacks merit. *See, e.g.*, *Jackson*, 21 F.3d at 1538 (holding that because plaintiffs had a "specific project" they were "easily distinguishable from the line of cases denying standing in housing project cases where no project was at issue"). Plaintiffs allege that submitting its admittedly non-compliant proposal in response to the RFP would have been futile because the discriminatory zoning made it financially impossible to build low income housing on the Social Services Site. Similar to the bidder in *Jackson* who submitted a bid but then did not complete the bidding process because the County policies made it futile, *see Jackson*, 21 F.3d at 1535, NYAHC alleges that it took substantial steps, and expended resources in preparing a plan, but did not formally submit it to defendants because it did not comply with the allegedly discriminatory RFP. NYAHC alleges that it did, however, contact and meet with Nassau County, submit a Proposed Plan, and follow-up with additional information, only to have the County ignore the Plan. Given these alleged facts, NYAHC has alleged a "particularized injury" that can be remedied by this Court. The law of standing is not so rigid as to deny a developer standing, no matter how significant its "injury in fact," merely because it failed to submit a non-conforming proposal, knowing it will be summarily rejected. Thus, like the non-profit developer in *Arlington Heights*, and the plaintiffs in *Jackson*, NYAHC alleges that it has a proposal, expended money on particular plans for the Social Services Site, and "would benefit in a tangible way from the Court's intervention." *Warth*, 422 U.S. at 508.

Of course, the Court is cognizant of the fact that there is a chance that, even if plaintiffs are granted the relief they seek, NYAHC will still not build at the Social Services Site. Defendants correctly point out

that no formal proposal was submitted by NYAHC, and therefore, a complete plan, including financing, has never been reviewed by defendants. Other courts have held, however, that these types of uncertainties always exist in housing development cases, and should not be used as a means to defeat standing. *See*, *e.g.*, *Arlington Heights*, 429 U.S. at 260 ("[A]ll housing developments are subject to some extent to . . . uncertainties . . . . [A] court is not required to engage in undue speculation as a predicate for finding that the plaintiff has the requisite personal stake in the controversy."); *Huntington Branch, NAACP*, 689 F.2d at 394 (holding that on a motion to dismiss plaintiffs need only show that they would benefit from the court's intervention and that to require more "would be to close our eyes to the uncertainties which shroud human affairs").

Hence, based on the facts and claims as alleged in the amended complaint, the Court concludes NYAHC has standing to pursue its claims.

### 2. ACORN

ACORN does not assert claims on its behalf, but only on behalf of its members. (*See* Am. Compl. ¶¶ 9, 10, 11, 12.) An association such as ACORN may properly bring claims on behalf of its members "so long as 'the interests at stake are germane to [its] purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Fair Hous. in Huntington Comm.*, 316 F.3d at 363 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 181 (2000)); *Warth*, 422 U.S. at 490 ("Even in the absence of injury to itself, an association may have standing solely as the representative of its members.").

Defendants' standing arguments as to ACORN are similar to their arguments as to NYAHC, and are rejected by this Court. As articulated *supra*, the amended complaint sufficiently alleges that plaintiffs, including ACORN's members, have an injury in fact in that defendants have discriminately changed the Proposed Zoning, thereby preventing NYAHC from being able to build multi-family affordable housing on the Social Services Site. At this stage of the proceedings, the Court concludes that ACORN has standing to bring suit on behalf of its members.

### 3. INDIVIDUAL PLAINTIFFS

The individual plaintiffs allege, *inter alia*, the following facts in support of their standing argument: (1) all of the individually named plaintiffs who currently do not live in Garden City, seek to live in Garden City, and would probably move to Garden City if affordable housing were constructed; (2) the individually named plaintiff who does live in Garden City lives less than two miles from the Social Services Site and seeks to live in a more integrated community; and (3) if multi-family, low income housing is built on the Social Services Site, the plaintiffs who do not live in Garden City would probably move to the Social Services Site. (*Id.* ¶¶ 4, 5, 6, 7, 8)

Defendants' arguments as to the individual plaintiffs are similar to their arguments as to the institutional plaintiffs. They lack standing, according to defendants, because as a whole they fail to allege an injury in fact because there is no specific housing project in which they have been denied entry, and that their allegations are too speculative to give them standing to bring suit. (*See, e.g.*, Garden City Mem. at 16-17.)

As described *supra*, the individual plaintiffs in this case are in a different position than plaintiffs in cases where there is no developer, or where there is not particular project. *See, e.g.*, *Warth*, 422 U.S. at 508 n. 18 (noting that "the initial focus should be on a particular project"); *Hope, Inc. v. County of DuPage*, 738 F.2d 797, 806 (7th Cir. 1984) (finding lack of standing because plaintiffs failed to show the existence of a particular project); *Jaimes v. Toledo Metro. Hous. Auth.*, 758 F.2d 1086, 1096-97 (6th Cir. 1985) (same). In this case, the individual plaintiffs have asserted an "injury in fact" based on the presence of NYAHC and its commitment to development, as well as the existence of the Special Services Site. In addition, the individual plaintiffs have alleged that they have sufficient financial resources, and a desire to move to, the Social Services Site.[2]

Thus, at least at this stage, there appears to be a "substantial probability" that if this Court grants the relief sought, plaintiffs will be afforded the opportunity to move to the Social Services Site. *See Arlington Heights*, 429 U.S. at 264.

D. MOTION TO DISMISS

1. APPLICABLE LAW

In reviewing a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted, the court must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). Dismissal is warranted only if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Weixel*, 287 F.3d at 145 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). The appropriate inquiry is "not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 106 (2d Cir. 2005).

2. APPLICATION

Defendants' motions to dismiss for a failure to state a claim are based, in part, on the presumption that plaintiffs' claims are similar to those in *Acevedo*, where the Second Circuit held, based on *Palmer v. Thompson*, 403 U.S. 217 (1971), that a town has "no constitutional or statutory duty to provide low income housing." *Acevedo*, 500 F.2d at 1080-81. Defendants contend that plaintiffs fail to state a claim based on their position that plaintiffs have failed to allege that "the plaintiff itself" will build housing. (*See* Nassau County Mem. of Law at 21 (citing *Huntington Branch, NAACP*, 844 F.2d at 936).) The Court rejects this very narrow reading of the amended complaint. Indeed, the amended complaint alleges that NYAHC has a Proposed Plan, and is prepared to build on the Social Services Site, but for defendants' discriminatory interference. *See Arlington Heights*, 429 U.S. 264; *Huntington*

---

[2] Defendants argue that individual plaintiff Vic DeVita lacks standing because his "ostensible injury" is derivative of injuries to others. The Court rejects this position, based on the holdings of *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 210 (1972), and *Jackson*, 21 F.3d at 1539. Indeed, "the loss of important benefits from interracial associations" is an injury in fact to challenge violations of the Fair Housing Act, assuming, *inter alia*, that the "neighborhood in question" is relatively compact. *Jackson*, 21 F.3d at 1539. As DeVita has alleged several claims, including violations of the Fair Housing Act, the Court declines to dismiss his claims based on a lack of standing on defendants' motions to dismiss.

12

*Branch, NAACP*, 844 F.2d at 936. Thus, defendants attempts to align the facts of this case as similar to those where plaintiffs rely on unnamed third parties, where plaintiffs did not have any particular site to build, or where plaintiffs merely speculated about desire to live in a particular area, is unavailing, given the facts as alleged by plaintiffs.[3] For these reasons, defendants' motions to dismiss those claims alleging violations of the FHA, Equal Protection Clause, and the Civil Rights Acts are denied, as plaintiffs have sufficiently stated a cause of action as to each of these claims.

Defendants also argue that plaintiffs have failed to plead intentional discrimination. This argument is rejected. Plaintiffs need only allege that animus against them was a significant factor in the position taken by the defendants in developing the Special Zoning. *See Huntington Branch, NAACP*, 844 F.2d at 936. There can be no dispute that the amended complaint has *alleged* discriminatory animus by defendants. (*See* Am. Compl. ¶¶ 22-24, 27-32). *See U.S. v. Yonkers Bd. of Ed.*, 837 F.2d 1181, 1221 (2d Cir. 1987) (holding that discriminatory animus may be inferred based on the historical background, the sequence of events, statements, and departures from the normal procedures by the government entity). Thus, as *Huntington Branch, NAACP* explains, the burden then shifts to defendants to demonstrate that the zoning decision was taken to further a "legitimate, bona fide governmental interest and that no alternative would serve the interest with less discriminatory intent." *Huntington Branch, NAACP*, 844 F.2d at 936. As the amended complaint has sufficiently alleged discriminatory animus by defendants, and assuming the facts as alleged are true, the burden will shift after discovery, to defendants to show a legitimate government interest. Thus, on a motion to dismiss, the Court finds plaintiffs have sufficiently pled intentional discrimination.

Defendants also argue that plaintiffs have failed to state a claim under 42 U.S.C. § 3608 of the FHA, and failed to state a claim under 42 U.S.C. § 2000d, arguing that plaintiffs must challenge a particular grant under section 3608, and that 42 U.S.C. § 2000d cannot be used to challenge a zoning law. Here, defendants again ask this Court to take a narrow view of the allegations in the amended complaint. As to section 3608, the cases only require that the claims rely on grants that relate to section 3608 "housing or urban development." *See Evans v. Lynn*, 537 F.2d 571, 579 (2d Cir. 1975). Obviously, plaintiffs will not ultimately succeed unless they can show that particular grants were misused by defendants, but *Evans* does not stand for the proposition that a complaint does not state a claim unless a particular grant is identified. *Evans*, 537 F.2d at 578 (holding that the agencies administering grants have "an affirmative duty to encourage fair housing" and that and individual who is

---

[3] Defendant Nassau County takes two different positions regarding the Proposed Plan submitted by NYAHC to the County. On the one hand, the County argues that because NYAHC failed to formally respond to the RFP, even with a proposal that was not in compliance with the Special Zoning, NYAHC lacks standing. On the other hand, however, when the County argues that plaintiffs have failed to state a claim, defendant submits that NYAHC created its own "obstacle" because it submitted a non-responsive proposal. Rather than consider the merits of the Proposed Plan, or the justifications submitted by NYAHC as to why it failed to submit a formal response to the RFP, the Court, at this juncture, assumes the facts as alleged in the amended complaint and finds that plaintiffs have standing, and have stated a claim upon which relief may be granted. *See Warth*, 422 U.S. 508 n.18 (noting that "particularized personal interest may be shown in various ways").

injured has standing to challenge "administrative violations of statutory duties"). As to 42 U.S.C. § 2000d, the amended complaint alleges a historical and systematic pattern of racism by defendants, including the zoning decisions as to the Social Services Site. Thus, to the extent discovery shows defendants have violated the federal CDBG and HOME programs by administering them in a discriminatory manner, plaintiffs have successfully stated a claim upon which relief may be granted. *See Evans*, 537 F.2d at 578 ("Allocation of grants without assessing their impact on integration . . . may also increase the disparity between living styles by supporting 'white enclaves' while diverting funds which otherwise would have been used to alleviate ghettoization.")

The amended complaint sufficiently alleges that NYAHC is prepared to build affordable multi-family housing on the Social Services Site, but for the discriminatory policies and practices of Nassau County and Garden City. It further alleges that ACORN's members, and the individually named plaintiffs have the financial means and desire to move to the Social Services Site, should it be built. In addition, the amended complaint alleges that defendants have violated the FHA, and 42 U.S.C. § 2000d by using federal money in a discriminatory manner. Under the standards for a motion to dismiss, and assuming the facts as alleged in the amended complaint are true, plaintiffs have stated claims upon which relief may be granted.

V. CONCLUSION

For the foregoing reasons, defendants' motions to dismiss the amended complaint are denied. The parties shall proceed with discovery in accordance with the direction of Magistrate Judge Wall.

SO ORDERED.

_____

JOSEPH F. BIANCO
United States District Judge

Dated: July 21, 2006
Central Islip, NY

\* \* \*

Plaintiffs are represented by Frederick K. Brewington, Esq., Law Offices of Frederick K. Brewington, 50 Clinton Street, Ste. 501, Hempstead, New York 11550, and Paul B. Sweeney, Esq., Kim F. Bridges, Esq., Michael Starr, Esq., of Hogan & Hartson LLP, 875 Third Avenue, New York, New York 10022, and Megumi Sakae, Esq., of Proskauer Rose LLP 1585 Broadway, New York, New York Defendant County of Nassau is represented by David B. Goldin, Esq., Nassau County Attorney's Office, One West Street, Mineola, New York 11501. Defendants Incorporated Village of Garden City, and Garden City Board of Trustees are represented by James G. Ryan, Esq., of Cullen & Dykman LLP, 101 Quentin Roosevelt Boulevard, Garden City, New York 11530.