**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
MHANY Management Inc., Vic DeVita, and
Francine McCray,

                       Plaintiffs,         **MEMORANDUM OF**
                                       **DECISION AND ORDER**
              -and-                 05-CV-2301 (ADS) (WDW)

New York Communities for Change, Inc.,

                       Intervenor - Plaintiff,

           -against-

County of Nassau, Incorporated Village of
Garden City, and Garden City Board of Trustees,

                       Defendants.
---------------------------------------------------------X
**APPEARANCES:**

**Hogan & Hartson LLP**
*Attorneys for the Plaintiffs Vic DeVita and Francine McCray*
875 Third Avenue
New York, NY 10022
        By:    Sabrina Helene Cochet, Esq.,
                Jenny Rubin Robertson, Esq.,
                Joanna F. Wasick, Esq.,
                Stanley Joseph Brown, Esq.,
                Toby William Smith, Esq.,
                Peter Joseph Dennin, Esq., of Counsel

**Law Offices of Frederick K. Brewington**
*Attorneys for the former Plaintiff ACORN and the*
*Intervenor-Plaintiff New York Communities for Change, Inc.*
50 Clinton Street, Suite 501
Hempstead, NY 11550
        By:    Frederick K. Brewington, Esq., of Counsel

**Lawyers' Committee for Civil Rights Under Law**
*Attorneys for all Plaintiffs and the Intervenor-Plaintiff*
*New York Communities for Change, Inc.*
1401 New York Avenue, NW
Suite 400
Washington, DC 20005
      By:    Joseph D. Rich, Esq.,
              Linda H. Mullenbach, Esq., of Counsel


**Nassau County Attorney John Ciampoli**
*Attorney for the Defendant County of Nassau*
Office of the Nassau County Attorney
1 West Street
Mineola, NY 11501
      By:    Esther D. Miller, Assistant County Attorney
              Andrew Reginald Scott, Assistant County Attorney
              Ralph J. Reissman, Assistant County Attorney
              Bethany Bresnaider O'Neill, Assistant County Attorney
              David Bruce Goldin, Assistant County Attorney

**Cullen and Dykman, LLP**
*Attorneys for the Defendants Incorporated Village of Garden*
*City and Garden City Board of Trustees*
100 Quentin Roosevelt Boulevard
Garden City, NY 11530
      By:    James G. Ryan, Esq.,
              Jennifer A. McLaughlin, Esq., of Counsel

**SPATT, District Judge.**

In 2005, several individual plaintiffs and organizations commenced a lawsuit

against the Defendants the County of Nassau (the "County Defendant"), the Incorporated

Village of Garden City, and the Garden City Board of Trustees (collectively, the "Garden

City Defendants"). Briefly, the Plaintiffs allege that the Defendants discriminatorily re-

zoned two parcels of Nassau County-owned land that were located in Garden City to

prevent the building of low- and middle-income housing on that site. The Plaintiffs further

allege that this decision was part of a long-standing racially discriminatory policy

2

maintained by the Defendants.  Based on these allegations, the Plaintiffs assert claims

pursuant to the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 et seq.; 42 U.S.C. § 1981; 42

U.S.C. § 1982; 42 U.S.C. § 1983; and 42 U.S.C. § 2000d et seq.  In response, the

Defendants deny any wrongdoing, and assert that they have no racially discriminatory

policies.  Six years have now passed since the suit's initial filing, and there have been

dozens of depositions, the exchange of thousands of documents, expert analyses and

thousands of hours of attorney time.

Now pending before the Court is a series of motions.  First, both the County

Defendant and the Garden City Defendants have separately moved, pursuant to Rule 56(c)

of the Federal Rules of Civil Procedure, for summary judgment dismissing the entirety of

both the Plaintiffs' amended complaint and the intervenor complaint.  In addition, the

Intervenor-Plaintiff New York Communities for Change, Inc. ("NYCC") has moved to

amend its intervenor complaint to include an additional cause of action that was

inadvertently omitted.

## I. BACKGROUND

The Court has taken the facts described below from the parties' depositions,

affidavits, exhibits, and respective Local Rule 56.1 statement of facts.  Upon consideration

of a motion for summary judgment, the Court shall construe the facts in the light most

favorable to the non-moving party.  See Capobianco v. New York, 422 F.3d 47, 50 (2d Cir.

2001).

A. <u>Factual Background</u>

    **1. The Parties**

    Vic DeVita is a white male who resides in Garden City, New York.  (Garden City "GC" 56.1 ¶ 1.)  Francine McCray is an African-American female who seeks affordable housing in a racially integrated and diverse area of Nassau County, including Garden City. (GC 56.1 ¶ 2.)  The Plaintiff MHANY Management Inc. ("MHANY") is a non-profit community based developer of affordable housing incorporated in New York.  (GC 56.1 ¶ 4.)  MHANY was formerly known as New York ACORN Housing Company Inc. ("NYAHC"), which was previously a plaintiff in this action.  The Intervenor-Plaintiff New York Communities for Change, Inc. ("NYCC") is a non-profit entity organized under the laws of the State of New York and formed in December 2009.  (Nassau County "NC" 56.1 ¶ 4; GC 56.1 ¶ 6.)  NYCC is the practical successor to another former plaintiff in this action, the New York Association of Community Organizations for Reform Now ("ACORN").  (NC 56.1 ¶ 6.)

    Nassau County ("the County") is a municipal corporation organized under the laws of the State of New York.  (NC 56.1 ¶ 1.)  The Incorporated Village of Garden City ("Garden City") is a municipal corporation also organized under the laws of the State of New York and located in Nassau County.  (NC 56.1 ¶ 2.)  The Garden City Board of Trustees ("the Board") is an elected governing body in Garden City, from which the Garden City offices responsible for all development in Garden City derive their power. (NC 56.1 ¶ 3.)

## 2. Affordable Housing Options in Nassau County

The Plaintiffs' expert Nancy McArdle, who conducted an analysis of racial change and segregation in Nassau County, reports that as of the year 2000, Nassau County was ranked in the top half of top 1% of all counties in the United States for segregation of African-Americans and in the top 10% of all such counties for segregation of Hispanics. (McArdle Decl. ¶ 6.)  Specifically, the population of Nassau County in 2000 was 74% white, 10.3% African-American and 10% Hispanic.  (Plaintiffs' Amended Statement of Additional Material Facts ("SAMF") ¶ 12.)  Minorities comprised 14.8% of all households in Nassau County, but 31.1% of renter households, 41.4% of very low-income households, and 53.1% of non-elderly, very low-income households.  (McArdle Decl. ¶ 49.)  In Nassau County, family subsidized housing, which serves a predominantly minority population, tends to be located in high-minority areas, while senior citizen housing, which serves a much lower minority population, tends to be located in much lower minority areas. (McArdle Decl. ¶ 52.)  Over half of the County's affordable housing units are located in municipalities with minority shares that are over three times the County average, while two-thirds of subsidized housing for senior citizens are located in municipalities with minority shares below the County average.  (McArdle Decl. ¶ 53.)

While the County has a persistent need for affordable housing, the County has noted that "affordable housing sponsors are often confronted with strong neighborhood opposition to proposed low and moderate income developments."  (SAMF ¶ 244.)  The previous Deputy County Executive for Economic Development, Patrick Duggan, testified that "people who don't want people of different races living in their communities and local

communities elect their elected officials to do the will of the people." (SAMF ¶ 245.) He further stated that "local municipalities have been demonstrated to use zoning to keep out — to use it as a way to keep people out." (Duggan Dep. at 107:12-20.)

### 3. Affordable Housing Options in Garden City

Garden City has a population of approximately 21,750 individuals and has approximately 6,480 residences, of which approximately 1,095 are units contained in multi-family dwellings. (GC 56.1 ¶¶ 104-05.) Garden City's population is over 90% white. (SAMF ¶ 1.) As of the 2000 Census Report, minorities comprised 4.1% of the Garden City population, as opposed to 20.3% of the County's population. (McArdle Decl. at ¶ 17.) Between 1980 and 2000, the minority population of the County increased by 105%, while the minority population of Garden City increased by only 31.4%. (McArdle Decl. at ¶ 17.) It is important to note that according to the Plaintiffs' expert, 61% of the Village's African-American population was living in dormitories in 2000, and thus excluding this population significantly alters these statistics and perhaps paints a more realistic picture of Garden City's demographics. If one looked only at people living in households in 2000, and not in group quarters such as dormitories, the minority share of Garden City's population was just 2.6% of the population (versus the 4.1% above), as compared to 19.7% in the County (versus the 20.3% above).

To the east and south of Garden City are the municipalities of East Garden City, which in 2000 was 67% minority, Hempstead, which in 2000 was 84% minority, and Uniondale, which in 2000 was 79% minority. (SAMF ¶ 5.) In 2000, 2.3% of households in Garden City were headed by an African-American or Hispanic person, compared to

15.3% of Nassau County households.  (SAMF ¶ 7.)  If minorities comprised the same share of Garden City households as they did of Nassau County households, Garden City would have 1,333 African-American or Hispanic households, versus the actual total of 167. (SAMF ¶ 9.)  There are "no low- and moderate-income census tracts or block groups in the Village of Garden City."  (SAMF ¶ 3.)  None of the multi-family dwellings that Barbara K. Miller, the former mayor, identified in Garden City offer affordable housing as an option. (SAMF ¶ 168.)  McArdle reported that because of the lower income distributions of minority families, increasing the number of affordable units in a community would increase the number and share of minority households who could afford to live in that community. (McArdle Decl. ¶ 12.)

Former Nassau County Executive Suozzi has stated that "Garden City . . . historically, has been viewed as a community that didn't want to have affordable housing in it."  (SAMF ¶ 98.)  To that end, Garden City residents have expressed their opposition to affordable housing in Garden City in the past.  (SAMF ¶ 174.)  Garden City asserts that in the past twenty-seven years it has not received any applications from any developer of affordable housing and in the history of the village has no record indicating that any such application has ever been filed,.  (GC 56.1 ¶¶ 106-08.)  The Plaintiff disputes this fact based upon: (1) a news article from April 21, 1989, which stated that "a preliminary application [was] submitted . . . by the owners of Doubleday to develop the 18-acres Franklin Avenue property" (Ex. 78 at PM000005); and (2) a news article from May 26, 1989, which contained quotations from Doubleday's owner and developer that he "applied for a building permit under the existing zoning in accordance with which it would build 51

units of affordable housing at the site." (Ex. 38; Ex. 37.) The Garden City Defendants contest the Court's consideration of these articles as hearsay.

In May 2006, the County announced that it intended to sell a parcel of land located in Garden City, the Ring Road site, for the purpose of developing affordable housing in Garden City and Nassau County. (SAMF ¶ 191.) In order for the project to go forward, the Board needed to rezone the site from commercial to multi-family residential. However, Garden City residents expressed opposition to the construction of affordable housing in the town. (SAMF ¶¶ 193-99.) In 2006, Garden City increased the amount of residential space available in its hotel district to allow for the development of more luxury condominiums. (SAMF ¶ 202.) As of May 2011, there were only three areas zoned for multi-family use in Garden City, none of which contain affordable housing. (SAMF ¶ 203.)

### 4. Allegations of Other Discriminatory Acts in Garden City

In early 1969, the Unitarian Universalist Church of Central Nassau proposed to open a subsidized day care center in Garden City, in which the majority of children served would be African-American. (SAMF ¶ 208.) The proposal led to numerous lawsuits and petitions, in which opponents argued that the center would create traffic problems, reduce property values, and change the character of the neighborhood. (SAMF ¶ 209.) The Plaintiffs also allege that between 1987 and 1989, the Board imposed a moratorium on new construction to gain tighter control over housing development in Garden City. (SAMF ¶ 213.)

As another example of alleged discriminatory acts, in 2004, the New York State Attorney General investigated complaints that Garden City enforced a local requirement

limiting the use of its parks to Garden City residents in a racially discriminatory manner.

(SAMF ¶ 215.)  In a press release dated May 12, 2005, the New York State Attorney

General stated that "Garden City park attendants routinely question black non-residents

about their residency and refuse them entry into the parks, while permitting white non-

residents to enter and use the parks without questioning their residency."  (Pls.' Ex. 43.)  In

the wake of this investigation, Garden City adopted policies and procedures to ensure that

local regulations were not enforced in a racially discriminatory manner.  (Pls.' Ex. 43.)

### 5. The County's Real Estate Consolidation Plan

Former County Executive Thomas R. Suozzi began serving his first term in January

2002, at which time the County faced a severe fiscal crisis.  (NC 56.1 ¶¶ 18, 20.)

Specifically, the County was struggling to address many County facilities that had fallen

into disrepair after years of neglect.  (NC 56.1 ¶¶ 22-24.)  In response to this problem,

County Executive Suozzi created a real estate consolidation plan to sell surplus property

and maximize the revenue from those sales to invest in refurbishing other County facilities.

(NC 56.1 ¶ 25; Cohen Dep. at 16.)  County Executive Suozzi appointed Sheldon Cohen as

Director of the Office of Real Estate Planning and Development for the County.  He

retained the real estate consulting firm Insignia ESG to advise the County on how to sell

surplus and/or underutilized County property and return the profit to the tax rolls.  (NC

56.1 ¶¶ 27-35.)

The consolidation plan included a twenty-five acre parcel of land located within the

boundaries of Garden City, which housed the Nassau County Supreme Court, County

administration buildings, and parking facilities (hereinafter "the Social Services site").

(GC 56.1 ¶ 8; NC 56.1 ¶ 38.)  At this time, the Social Services site was designated as a "Public P-Zone" under Garden City's zoning code and thus only permitted buildings owned by governmental entities for governmental purposes.  (GC 56.1 ¶ 13; NC 56.1 ¶ 37.) The County represents that in selling the Social Services site, its "only concern" was maximizing revenues from the sale of the property and, therefore, it asked Garden City to re-zone the property in a manner consistent with that goal.  (NC 56.1 ¶¶ 39-43, 57; GC 56.1 ¶¶ 11, 14.)  County Executive Suozzi testified that it was his understanding that zoning which permitted multi-family housing and upscale units would maximize revenue.  (NC 56.1 ¶¶ 44-45.)  Suozzi further stated that he did not want single-family homes on the Social Services site because multi-family housing would fetch a higher purchase price. (NC 56.1 ¶¶ 47-48.)  However, Suozzi did not want to build affordable housing on the Social Services site, but rather housing similar to "The Wyndham," an upscale apartment complex located in Garden City that exceeds six stories, as he felt that this type of housing would garner a higher sale price.  (NC 56.1 ¶¶ 49-53.)

### 6. The Re-Zoning of the Social Services Site

Though the County asked Garden City to re-zone the Social Services site, it maintains that Garden City and its Board possessed the sole authority to make zoning determinations over the construction, location and usage of buildings within Garden City, including real property owned by the County located within Garden City.  (NC 56.1 ¶ 54.) Plaintiffs dispute this assertion, arguing that (1) the County initiated the re-zoning process; (2) the County "touted" the fact that it "partnered" with Garden City in that process; and

10

(3) the County admits that it failed to engage in serious negotiations with Garden City regarding the process. (Pls.' NC Resp. at 2-3.)

In June 2002, Garden City created a sub-committee (hereinafter "the Committee") which was comprised of three members of the Board — Peter Bee, chair of the Committee, Gerard Lundquist and Peter Negri.  The Committee was charged with retaining a planner to review zoning options for the Social Services site, (GC 56.1 ¶ 15; NC 56.1 ¶ 58.)  The Committee was also given the task of reviewing the proposed zoning options and making recommendations to the Mayor and the Board.  (NC 56.1 ¶ 58.)  On recommendation of the Committee, Garden City retained Burkhurst Fish and Jacquemart (hereinafter "BFJ") as its planners.  (NC 56.1 ¶ 59; GC 56.1 ¶ 16.)

In September 2002, Garden City Village Administrator Robert Schoelle, Jr. wrote to County Executive Suozzi to advise him that any zoning associated with the proposed development should be in accordance with the goals set forth in the Garden City Zoning Code, i.e. consistent with the surrounding neighborhoods in terms of scale and design.  (NC 56.1 ¶ 60.)  Schoelle further represented that Garden City would cooperate with the County provided that the County "acknowledge the legitimate interests of the Village to control and guide land uses".  (NC 56.1 ¶ 61.)  At a September 24, 2002 address to the Garden City Chamber of Commerce, County Executive Suozzi mentioned multi-family housing as a possible use if the County sold the Social Services site.  (NC 56.1 ¶ 62.)

By memorandum dated October 8, 2002 and addressed to the four Garden City Property Owners Associations, Schoelle stated that the "County Executive's apparent goal is to sell surplus properties and raise the maximum money for the County . . . .  However,

11

the Village's goals are not necessarily identical to the County's goals . . . .  It is apparent that we realize . . . that the County's and Village's interests could conflict and that the Village will work diligently to protect the character and residential quality of our Village." (NC 56.1 ¶ 63.)

By memorandum dated November 15, 2002, titled "Potential Approach to 'P' Zone Changes," and addressed to the Committee, BFJ recommended that Garden City should borrow from its already existing zoning regulations and apply something similar to the "CO-2" zone, allowing for commercial and office use, as well as residential use on the southern part of the property.  (NC 56.1 ¶¶ 64-65.)  Specifically, BFJ suggested that the regulations for residential use include a maximum density of one unit per 2,300 square feet of lot area, which would permit as many as 770 units on the property.  (NC 56.1 ¶¶ 66-68; SAMF ¶ 39.)

Following an April 18, 2003 meeting with the Committee, Schoelle, Special Counsel John Kiernan, and Superintendent of the Garden City Buildings Department Michael Filippon, BFJ issued a memorandum on April 30, 2003 proposing the creation of the "CO-5" zone, which would include a "multifamily residential, group" (hereinafter "R-M") zoning control and ultimately allow for 311 units on the Social Services site.  (NC 56.1 ¶¶ 70-73.)  Under the proposed zoning, the density would allow garden apartments or townhouses.  (NC 56.1 ¶ 73; GC 56.1 ¶ 21.)  BFJ memorialized this recommendation in a report entitled "Village of Garden City – A Zoning Study for Public P District" on May 12, 2003.  (NC 56.1 ¶ 76; GC 56.1 ¶ 20.)  This study stated that the proposed CO-5 zone for the Social Services site "is seen as a transitional area between existing single-family homes

12

neighborhoods and current commercial development. . . . We propose using the existing R-M zoning controls . . . R-M allows 14.5 units per acre.  At the Social Services site this would allow a total of 311 units . . . [and] would also allow single-family homes . . . which would allow a total of approximately 75 units."  (NC 56.1 ¶ 77.)

On May 2, 2003, Village Administrator Schoelle wrote to Nassau County Real Estate Director Cohen, stating, in part, that "[t]he tentative consolidation proposals are cause to remind you that the Village has building and zoning regulations that should be respected.  In particular, we call your attention to . . . the Code of . . . Garden City . . . which requires site plan review and approval . . . It is our belief that the County must comply with the Village's zoning and building regulations and requirements."  (NC 56.1 ¶ 75.)

By memorandum dated May 19, 2003 and addressed to Schoelle, BFJ stated that the "contemplated zoning designation would allow office and residential uses . . . .  Given the weak office market, the site would most likely be developed for either single-family homes or apartments."  (NC 56.1 ¶ 80.)  The memorandum further compared the sales value of the property if sold under the single-family home designation, as opposed to the multi-family designation, and concluded that the sales value of the property under the latter designation far exceeded that of the former.  (NC 56.1 ¶ 81.)  Specifically, the comparison, provided by an appraiser and three local realtors, concluded that the sales value and land value of the property under the multi-family designation would be, respectively, $155.5 million and $31 million dollars, while those figures under the single-family designation would be $86.2 million and $17 million dollars.  (NC 56.1 ¶ 81.)

13

On May 29, 2003, BFJ presented its study to Garden City at a public forum.  (NC 56.1 ¶¶ 82-83; GC 56.1 ¶ 25.)  On July 9, 2003, BFJ issued a revised version of the study, which again included the proposal that Garden City zone the Social Services site under the "CO-5 zone, which would permit residential development of either 311 apartment units or approximately 75 single-family homes."  (NC 56.1 ¶¶ 84-85; GC 56.1 ¶ 31.)  According to the Plaintiffs, R-M zoning controls would permit the construction of affordable housing developments.  (Pls.' GC Resp. at 3.)  On August 19, 2003, County Executive Suozzi, Cohen and other County personnel met with the Committee and Frank Fish of BFJ to discuss the County's concerns with the rezoning proposal; specifically, County Executive Suozzi stated that the County wished to maximize the sale of the land and therefore desired a density of at least 400 more apartment units.  (NC 56.1 ¶¶ 86-87.)

After meeting with the Committee on September 29, 2003, BFJ reported via memorandum that the Committee favored residential development and, specifically, the R-M designation.  (NC 56.1 ¶¶ 87-88.)  Several reasons were stated for this preference, including the ability to "Afford both young and older Garden City residents the ability to either establish themselves as homeowners in Garden City or remain in Garden City after their home may be sold; Transition between single-family housing and the County office buildings . . . ; Reduce the traffic generation . . . ; [and] Moderate impacts on the public school system."  (NC 56.1 ¶ 89.)

On October 17, 2003, a notice was placed in the Garden City News entitled, "Tell Them What You Think About the County's Plan for Garden City," which stated:

> Where is the Benefit to Garden City?  Are We Being Urbanized? . . . The County is asking the Village to change our existing zoning – P (Public use) ZONE – to allow

> the County to sell the building and land . . . now occupied by the Social Services
> Building, to private developers.  Among the proposed plans: Low-density (high-
> rise?) housing – up to 311 apartments . . . These proposals will affect ALL of
> Garden City.

(NC 56.1 ¶ 92.)  On October 23, 2003, BFJ presented its proposal to Garden City at a

second public forum and again stated that single-family homes, townhouses, or apartments

would be permitted under the proposed zoning.  (NC 56.1 ¶¶ 90-91; GC 56.1 ¶¶ 33-34.)

In a memorandum setting forth the agenda for a November 6, 2003 meeting

between BFJ and the Committee, and in a November 10, 2003 memorandum to the

Committee, BFJ again confirmed its proposal for R-M zoning in the Social Services site.

(NC 56.1 ¶¶ 93-94.)  In November 2003, BFJ issued another Zoning Study, its third report,

confirming its proposal for the R-M designation that allowed for a possible 311 apartment

units on the Social Services site.  (NC 56.1 ¶ 95.)  On November 19, 2003, Committee

Chair Peter Bee wrote a letter on the Committee's behalf endorsing the recommendations

contained in BFJ's November 2003 Zoning Study, including that which proposed 311

multi-family apartment units on the Social Services site.  (NC 56.1 ¶ 96.)

On January 8, 2004, Garden City held a public hearing to consider a proposed local

law that would rezone the P-Zone under the CO-5 zone, which would permit office and

courtroom use, as well as both single family and multi-family units.  (GC 56.1 ¶¶ 41-43.)

At the meeting, residents voiced concerns that multi-family housing would generate more

traffic, parking problems, and schoolchildren.  (See generally Pls.' Ex. 53.)  Frank Fish of

BFJ informed the residents that the County had hired a consulting firm to do a full

environmental impact statement, which would include a traffic study, and that residents

would be invited to attend a "scoping session" after the completion of the statement, at which time they could provide their input.  (Pls.' Ex. 53, at 2344-45.)

On January 20, 2004, the Eastern Property Owners' Association held a Board Meeting, at which time Trustee Bee discussed BFJ's recommendation for the Social Services site.  (SAMF ¶ 63.)  The summary of the meeting reports that "Trustee Bee answered many questions from the floor" and, in doing so, expressed the opinions that "Garden City demographically has a need for affordable housing" and that "he would keep an open mind but he still felt the recommended zoning change were appropriate."  (Pls.' Ex. 66 at 3.)  The summary further states that "County Executive Suozzi was reminded that he pledged not to do anything that Garden City residents objected to.  Mr. Souzzi's [sic] commitment still stands."  (Pls.' Ex. 66 at 3.)

On February 5, 2004, County Executive Suozzi attended a public hearing for the residents of Garden City, at which time he presented the County's real estate consolidation plan.  (GC 56.1 ¶¶ 49-50; NC 56.1 ¶ 98.)  County Executive Suozzi stated at his deposition that he wanted Garden City to re-zone the Social Services so as to allow multi-family housing.  (NC 56.1 ¶ 99.)  The County asserts that County Executive Suozzi spoke at the hearing to persuade Garden City to adopt the zoning plan that maximized County revenues. The Plaintiffs maintain that County Executive Suozzi sought to preserve and defend the R-M zoning proposal against changes sought by local residents opposed to the proposed zoning based, in part, on racism.  (NC 56.1 ¶ 100; Pls.' NC Resp. at 3; see Pls.' Ex. 21, Deposition of Thomas Suozzi (hereinafter "Suozzi Dep.") at 62-63 ("SUOZZI: I think there

are some people that are opposed to affordable housing in Garden City based upon racism.").)

Residents at the public hearing voiced their preference for "upscale" housing at the Social Services site.  (See, e.g., Pls.' Ex. 54 ("Hearing Tr.") at 2391 ("TRUSTEE BEE: [N]either the County nor the Village is looking to create a so-called affordable housing at that spot.  UNIDENTIFIED SPEAKER: Can you guarantee that it won't be in that building? . . . I'm in the Cherry Valley apartments and I'm just concerned about a huge amount of apartments that come on and depress the market for any co-op owner in the Village.  How do you guarantee it's going to be upscale . . . ."); id. at 2386 ("UNIDENTIFIED SPEAKER: You say it's supposed to be upscale.  SUOZZI: It's going to be upscale.  If you sell your $2 million home in Garden City and you don't want to take care of that lawn anymore, you can go into . . . who lives in Wyndham for example?  It's a very upscale place.").)

The residents further voiced their opposition to multi-family housing at the Social Services site.  (See, e.g., Hearing Tr. at 2404 ("BRIAN GEMMEL [to SUOZZI]: "I don't think you are hearing a lot of the people.  We're not against residential, we're against multi-level residential."); id. at 2407 ("SUOZZI: You would probably like to see single family housing I presume.  UNIDENTIFIED SPEAKER: Single family. (Applause)."); id. at 2407-08 ("GAIL MADIGAN: I moved here from Brooklyn so that when I walked out of my house I did not turn to my left and see apartment buildings."); id. at 2408 ("SUOZZI: Mayor out of respect, let me stipulate the facts here.  The public of Garden City especially from the eastern civic association does not want to see multi-family housing here.  They'd

rather see single-family housing."); id. at 2409 ("DAVID PICIULO: I don't hear a

compelling argument from anyone here tonight as to why we should have multi-dwelling

homes.  Can we take it out of the proposal?").)

It is undisputed that County Executive Suozzi believed the County could earn the

most revenue from a zoning plan that permitted multi-family housing.  (NC 56.1 ¶ 102.)

County Executive Suozzi clarified at the meeting, however, that "[the County] is absolutely

not interested in building affordable housing there and there is a great need for affordable

housing, but Garden City is not the location."  (NC 56.1 ¶ 105.)  He further stated that

developers

> would love to build upscale housing in Garden City . . . .  We would be willing to
> put deed restrictions on any property that we sold.  The Village would have control
> of their zoning requirements.  We would put on restrictions whatsoever, no ifs ands
> or buts, that it can't be anything but upscale housing.  Put it this way, we generate
> more revenues for the County by selling it for upscale housing.

(NC 56.1 ¶ 106.)  It is further undisputed that Trustee Negri felt that "housing occupied by

low income minorities" was not consistent with "the existing character of the

neighborhood."  (Pls.' Ex. 13, Deposition of Peter Negri (hereinafter "Negri Dep.") at 24-

25.)

A flyer distributed in Garden City prior to a March 18, 2004 meeting of the Board

asked: "WILL GARDEN CITY PROPERTY VALUES DECREASE IF OVER 300

APARTMENTS ARE BUILT AT THE SITE OF THE SOCIAL SERVICES

BUILDING?"  It further stated:

> The Garden City Trustees are close to voting on how to zone this property.  They
> might choose to zone it for multi-family housing (If Senator Balboni's current bill
> passes in June, as many as 30 of those apartments would be considered 'affordable
> housing.'  According to this bill, 'Affordable workforce housing means housing for

18

individuals or families at or below 80% of the median income for Nassau Suffolk primary metropolitan statistical area as defined by the Federal Department of housing and urban development.' . . . NOT JUST GARDEN CITY INCOMES! . . .)

(Pls.' Ex. 32.)

On April 1, 2004, BFJ prepared a document titled "CO-5b Zoning Discussion, Social Services Site," and, under the "Notes for Discussion" section, revised the number of potential multi-family units on the site from 14 units per acre to 10 units per acre, to allow for a maximum of 215 units, versus the prior number of 311.  (NC 56.1 ¶¶ 107-08.)  On April 22, 2004, BFJ presented this revised proposal to the residents of Garden City.  (NC 56.1 ¶ 109; GC 56.1 ¶ 61.)

By memorandum dated May 4, 2004 and addressed to the Board, BFJ proposed eliminating the CO-5b zone altogether, and with it, the potential for multi-family housing on the 21.44 acres of land on the Social Services site located east of County Seat Drive. (NC 56.1 ¶ 110.)  Specifically, BFJ stated:

> [W]e reviewed the public comments with Robert Schoelle, Michael Filippon and Gary Fishberg.  Based upon these discussions we would recommend for your consideration two basic refinements to the recommendations: (1) Elimination of office use for the 101 County Seat Drive area; (2) Provide for multi-family housing in the 101 County Seat Drive area only by special permit and limited to the West Side of County Seat Drive.

(NC 56.1 ¶ 111.)  BFJ suggested renaming the proposed zoning designation as "Residential-Townhouse" (hereinafter "R-T"), which essentially limited the development of multi-family housing to less than 15% of the Social Services site, and only by special permit.  (NC 56.1 ¶ 112.)  BFJ's proposed description of the R-T zone defined "townhouse" as a "single-family dwelling unit."  (NC 56.1 ¶ 114.)

19

On May 20, 2004, proposed Local Law No. 2-2004, which deleted the P-Zone and replaced it with CO-5 and R-T districts, the latter of which encompassed the Social Services site, was considered at a public hearing.  (GC 56.1 ¶¶ 65-67.)  At the meeting, one attendee asked whether Garden City would be "open to affordable housing" or whether it was "going to take litigation."  (Pls.' GC Resp. at 9.)  An ACORN member noted the need for affordable housing on Long Island and asked that Garden City consider "build[ing] affordable housing in their community."  (Pls.' GC Resp. at 8-9.)

By letter dated May 24, 2004 and addressed to Mayor Miller, Cohen wrote:

[T]he County requests that the Village consider applying zoning regulations that would provide more flexibility for development of property consistent with the zoning framework that controls other areas of the Village.  By limiting the density as proposed, the Village is severely impacting her County's potential revenue from the sale of this property and as such, impacts the overall Real Estate Consolidation Plan.

(NC 56.1 ¶ 119; Resissman Dec. Ex. AQ.)  In a memorandum dated June 2, 2004 and addressed to the Board, BFJ expressly stated: "The maximization of profit on land sales was not a zoning criteria for the Village."  (NC 56.1 ¶ 120.)

County Executive Suozzi testified that he represented to the Board that he would not go against their wishes regarding plans for the Social Services site, and that regardless of whether Garden City's wishes were motivated by racism, he was not concerned with that in his role as County Executive, but rather concerned with maximizing revenues for the sale of the property.  (Suozzi Dep. at 83-84.)

**7. Garden City Adopts the R-T Zone for the Social Services Site**

On June 3, 2004, the Board officially adopted Local Law No. 2-2004, which rezoned the P District containing the Social Services site to R-T zoning.  (NC 56.1 ¶¶ 121-

22.)  As enacted, Local Law No. 2-2004 limited construction on the Social Services site to one dwelling unit for each 6,000 square feet of total plot devoted to such use.  (NC 56.1 ¶ 124.)  ACORN representative Ismene Speliotis determined, after reviewing the new zoning, that "it was going to be hard to respond to develop affordable housing given th[e] parameters" in that it "asked for very few housing units . . . [and] a high acquisition price." (Pls.' Ex. 18 (hereinafter "Speliotis Dep.") at 43-44.)  She further noted that "while it is not totally impossible to build affordable housing given that zoning, it certainly does not encourage the building of affordable housing."  (Speliotis Dep. at 183.)

In July 2004, the County issued Requests for Proposals ("RFPs") for the sale of the Social Services site.  (GC 56.1 ¶ 92; NC 56.1 ¶ 128.)  Cohen testified that the RFP was drafted to solicit a purchaser consistent with the new zoning rules that were adopted by Garden City.  (NC 56.1 ¶ 129.)  The RFP stated that the County would not consider bids of less than thirty million dollars.  (GC 56.1 ¶ 93; NC 56.1 ¶ 135.)  Plaintiffs assert that under this RFP, it would have been virtually impossible to build affordable housing and, therefore, it would have been futile for them to submit an affordable housing response to the RFP that complied with the new zoning.  (SAMF ¶¶ 129, 132.)  However, former Plaintiff NYAHC contacted the County to work with them on a proposal that would include multi-family affordable housing, and urged it to withdraw or modify the current RFP to require some part of the property to be affordable housing.  (SAMF ¶¶ 134-35, 143.)  Former Plaintiffs NYAHC and ACORN met with County Executive Suozzi and other County officials to discuss the proposal and the possibility of constructing affordable

housing on the Social Services site.  (SAMF ¶ 141.)  The County did not reissue the RFP.

(SAMF ¶ 144.)

Proposals were due by September 10, 2004 at 12:00 noon, with two copies to be

mailed to Cohen in Mineola and a third copy to be mailed to Martin Lomazow in

Westbury.  (GC 56.1 ¶ 94; NC 56.1 ¶ 136.)  Applicants were further directed to submit a

concept drawing, three bound originals of the proposal, and a good faith deposit of $5,000.

(NC 56.1 ¶¶ 137-39.)  As of 12:00 noon on September 10, 2004, the County received

nineteen bids conforming to the above-mentioned requirements, ranging from $31,070,000

to $56,833,640.  (NC 56.1 ¶ 141.)

### 8. NYAHC Submits a Bid

On September 10, 2004, former Plaintiff NYAHC submitted a six page letter

proposal that did not conform to the technical requirements laid out in the RFP.  (GC 56.1 ¶

95; NC 56.1 ¶¶ 143-45; Pls.' NC Resp. at 7.)  Specifically, NYAHC proposed leasing the

subject property (with an up-front lease payment of $5,000,000) for the development of

rental apartments for mixed incomes.  (NC 56.1 ¶ 148; Pls.' NC Resp. at 11.)  Plaintiffs

maintain that NYAHC's proposal did not follow the specifications laid out in the RFP

because the RFP made the construction of affordable housing on the Social Services site

virtually impossible.  (Pls.' Resp. at 8-9.)  Specifically, NYAHC's proposal stated:

> As the County knows from previous meetings, telephone conversations and
> correspondence with NYAHC and LI ACORN, NYAHC is unable to respond to the
> County's Request for Proposals (RFP) of July 2004 related to the 25 County-owned
> parcel in Garden City (the Parcel) due to the restrictive zoning adopted by the
> Village of Garden City in connection with the County's sale of the Parcel.

(Pls.' NC Resp. at 8.)  At the time of submission, NYAHC had the capacity to pay the $30 million dollar asking price up front and still build affordable housing on the Social Services site, as well as the capacity to pay the County $150 million dollars over thirty years.  (Pls.' NC Resp. at 11.)

On November 17, 2004, the County selected Fairhaven Properties, Inc. as the highest bidder for the purchase of the Social Service site with the bid of $56,500,000.  (GC 56.1 ¶ 101; NC 56.1 ¶¶ 151-54.)

NYAHC developed four proposals for development at the Social Services site under the R-M zoning designation after the contract was awarded to Fairhaven Properties, Inc., with the percentage of affordable and/or Section 8 housing units out of 311 total rental units ranging from 12.5% to 25%.  (SAMF ¶¶ 149-154.)  Plaintiffs' expert McArdle evaluated each proposal in conjunction with the racial/ethnic distribution of the available pool of renters and determined that had NYAHC been able to building housing under any of the four proposals in accordance with the rejected R-M zoning designation, the pool of renters likely to occupy all units, including market rate, affordable and Section 8 units, would have likely been between 18% and 32% minority with minority-households numbering between 56 and 101.  (McArdle Decl. at ¶¶ 59-61.)  McArdle further analyzed the likely racial composition of the pool of homeowners who could afford to purchase units potentially developed by Fairhaven Properties, Inc., based on their proposal as well as available information regarding Garden City property values, and determined that between 3 and 6 minority-households could afford such a purchase.  (McArdle Decl. at ¶ 67.)

### 9. Current Status of the Social Services Site

On January 1, 2010, Thomas R. Suozzi was succeeded by the present County Executive Edward P. Mangano.  (NC 56.1 ¶ 310; GC 56.1 ¶ 111.)  The Mangano Administration decided to relocate the County's Family Court building, currently located in Westbury, New York, to the Social Services site.  (NC 56.1 ¶ 311; GC 56.1 ¶¶ 112-13.)  Thus, although the prior County administration planned to sell the Social Services site to a private developer, the site is currently no longer for sale.  (NC 56.1 ¶ 320; GC 56.1 ¶ 114.)  The County asserts that a primary factor in the decision to build a new Family and Matrimonial Court Complex at the Social Services site is cost, because although moving the building to a new location and renovation will cost approximately the same $100 million, renovation will not "remedy the many deficiencies in the existing building."  (NC 56.1 ¶ 324.)  The Plaintiffs dispute this assertion and state that it will cost tens of millions dollars more to relocate the Family Court to the Social Services site rather than renovate the existing Family Court site in Westbury.  (Pls.' NC Resp. at 19; Carl Schroeter Dep. at 48:9-49:2, 97:5-11.)  According to the Plaintiffs, the estimated cost of relocating the Family Court to the Social Services site is between $110 million and $130 million, while the estimated cost of renovating the current Family Court site is between $85 million and $95 million.  (SAMF ¶¶ 161-62.)  In addition, by building a new Family Court at the Social Services site, the County will lose the revenue it could gain by selling the site.  (SAMF ¶ 163.)

**10. Nassau County's Status as a HUD Grant Recipient**

The United States Department of Housing and Urban Development ("HUD")

administers Community Planning and Development Formula Grant Programs ("CPD

formula grants"), including the Community Development Block Grant Program ("CDBG")

and the HOME Investment Partnerships Program ("HOME").  (NC 56.1 Pt. 2 ¶ 3.)  HUD's

Office of Community Planning & Development ("CPD") distributes the CPD formula

grants to Nassau County as an "Urban County"— one that has a population of 200,000 or

more and is certified by HUD as an Urban County Entitlement.  (NC 56.1 Pt. 2 ¶ 6.)  The

Nassau County Office of Community Development ("OCD") is responsible for

administering HUD funds to the Nassau Urban County Consortium ("the Consortium").

(NC 56.1 Pt. 2 ¶ 1.)

The Consortium includes participating cities, towns, and villages who agree by a

cooperation agreement to apply for HUD funds, including CDBG and HOME funds.  (NC

56.1 Pt. 2 ¶ 7.)  The Consortium applies for HUD recertification every three years, during

which time the County solicits non-participating municipalities to join the Consortium.

(NC 56.1 Pt. 2 ¶ 8.)  The County also provides the participating communities with the

opportunity to "opt out" of the Consortium; those who do not opt out are automatically

retained as members.  (NC 56.1 Pt. 2 ¶ 9.)  Consortium members are considered a

"participating jurisdiction" and HUD funds distributed and administered by the County are

allocated according to the population and demographics of the participating municipalities.

(NC 56.1 Pt. 2 ¶ 11.)  Garden City has never participated in, and has never been a member

of, the Nassau Urban County Consortium.  (NC 56.1 Pt. 2 ¶ 14.)

The County's CPD formula grants are distributed in accordance with the Nassau Urban County Five-Year Consolidated Plan and Annual Action Plan ("Con Plan"), which is prepared by the OCD for the Consortium every five years and serves as the comprehensive housing affordability strategy, community development plan, and submission for funding, including CDBG and HOME grants.  (NC 56.1 Pt. 2 ¶¶ 15-16.) The Con Plan governs the County's decision as to which activities and organizations to fund.  (NC 56.1 Pt. 2 ¶ 16.)  HUD mandates that in preparing a Con Plan that is eligible for HUD funding, the authority must certify that they are "affirmatively furthering fair housing within their jurisdictions."  (NC 56.1 Pt. 2 ¶ 29; See 24 C.F.R. § 91.225.)  Part of this effort is the identification and subsequent reduction and/or elimination of "impediments to fair housing", and the Analysis of Impediments is included in the Con Plan.  (NC 56.1 Pt. 2 ¶¶ 29, 33.)  In addition, OCD prepares an annual Consolidated Annual Performance and Evaluation Report ("CAPER"), which requires the County to evaluate its efforts to affirmatively further fair housing on an annual basis. (NC 56.1 Pt. 2 ¶ 33.)

The County points out that it submitted the 2010 Con Plan and Analysis of Impediments to HUD for approval, and has not been notified of any deficiencies or failures to meet federal requirements.  Also, the County has continued to receive HUD funding up through and including the present day. (NC 56.1 Pt. 2 ¶ 43.)  However, the Plaintiffs dispute any suggestion that a lack of notification by HUD of deficiencies indicates compliance with the federal requirements.  (Pls.' NC Pt. 2 Resp. at 17.)

According to the Plaintiffs, the County has a policy and practice of using federal housing funding, including HOME and CDBG funds, to concentrate affordable housing in

26

high minority areas.  (SAMF ¶ 231.)  The 2005-2009 draft Con Plan anticipated the

locations of planned affordable housing developments to include five municipalities with

minority shares that are several times the County average.  (McArdle Decl. ¶ 55.)  Further,

affordable housing projects anticipated to be completed in 2010 with the assistance of HUD

HOME grants were to be constructed in two municipalities that rank in the top three

highest minority municipalities in the County — Roosevelt and New Cassel.  (McArdle

Decl. ¶ 55.)  The County's 1995, 2000 and 2005 Con Plans stated that "Nassau County

currently targets its comprehensive community development efforts in a number of lower

income and minority areas . . ."  (SAMF ¶ 232.)

The County has never evaluated the impact of CDBG or HOME expenditures on

racial or housing segregation, nor has it examined how centering the construction of

affordable housing in minority communities would impede fair housing.  (SAMF ¶ 258.)

The County notes, however, that the minority communities targeted for the development of

affordable housing have "active programs."  (Pls.' Ex. 14, Deposition Transcript of

Rosemary Anne Olsen (hereinafter "Olsen Dep.") at 218.)

The County Defendant has devoted a large portion of its Rule 56.1 Statement to

describe various aspects of the County's disbursement of federal housing funds, including:

the disbursement of CDBG and HOME funding; analyses of impediments to fair housing;

establishment of fair housing plans; housing training and education programs and

workshops; the County's 10-year plan to end homelessness; the Section 8 Housing Choice

Voucher program; and the emergency shelter grant program.  It appears the County did

this, in part, to establish that affordable housing options do exist in Nassau County in a

nondiscriminatory fashion and that it is affirmatively furthering fair housing within its jurisdictions.  (See NC 56.1 Pts. 2 and 3; Crean Aff.)  For the most part, the Plaintiffs do not dispute any factual allegations in this regard.  However, they contest any implication that the preparation and/or existence of these materials and programs indicate that the County's activities comply with its obligations under fair housing law, related civil rights statutes, and federal funding regulations.

## B.  **Procedural History**

On May 12, 2005, the Plaintiffs ACORN, NYAHC, and several individual Plaintiffs filed the instant action, which was initially assigned to United States District Judge Leonard D. Wexler.  On February 9, 2006, this case was reassigned to United States District Judge Joseph F. Bianco.  On March 10, 2006, the County and the Garden City Defendants moved separately to dismiss the action for lack of standing and failure to state a claim.  By Memorandum and Order dated July 21, 2006, Judge Bianco denied both motions in their entirety and directed the parties to conduct discovery in accordance with the Individual Rules of United States Magistrate Judge William D. Wall.  See ACORN v. County of Nassau, No. 05 Civ. 2301 (JFB) (WDW), 2006 WL 2053732 (E.D.N.Y. July 21, 2006).  In March 2009, both the County Defendant and the Garden City Defendants moved for summary judgment.

On March 2, 2010, Judge Bianco recused himself in this case.  Thereafter, the case was reassigned to this Court for all further proceedings.  Consequently, all pending motions were denied without prejudice and with leave to refile in accordance with this Court's individual motion practice rules.  On April 14, 2010, a motion to intervene as plaintiff

pursuant to Federal Rule of Civil Procedure 24(b) was filed by NYCC, which the Court

subsequently granted on June 15, 2010.  On June 30, 2010, NYCC filed its intervenor

complaint.  On June 25, 2010, Magistrate Judge Wall granted the Plaintiff's request to

reopen discovery.

On July 29, 2011, motions for summary judgment were again filed by both the

Garden City Defendants and the County Defendant.  In addition, on August 26, 2011, the

Intervenor-Plaintiff NYCC filed a motion to amend its intervenor complaint, pursuant to

Rule 15(a)(2), to include an additional cause of action for violation of the Civil Rights Act

of 1871, 42 U.S.C. § 1983, and its rights under the Equal Protection Clause of the

Fourteenth Amendment.  The motions for summary judgment and the motion to amend are

currently pending.

## II. MOTIONS FOR SUMMARY JUDGMENT

### A.  <u>Legal Standard on a Motion for Summary Judgment</u>

It is well-settled that summary judgment under Fed. R. Civ. P. 56(c) is proper only

"if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A

fact is "material" within the meaning of Fed. R. Civ. P. 56 when its resolution "might affect

the outcome of the suit under the governing law."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477

U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  An issue is "genuine" when "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Id.</u>

In determining whether an issue is genuine, "[t]he inferences to be drawn from the

underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) (per curiam), and Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989)).

Once the moving party has met its burden, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e)). However, the nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. Matsushita, 475 U.S. at 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538. Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223–24 (2d Cir. 1994) (citations omitted).

**B.  Mootness**

The threshold issue that the Court must address prior to addressing the substantive merits of the case is mootness. See Aladdin Capital Holdings, LLC v. Donoyan, 438 Fed App'x 14, 15 (2d Cir. 2011) ("We must first address whether we have Article III jurisdiction and resolve an issue of mootness."); see also United States v. Miller, 263 F.3d 1, 4 n.2 (2d Cir. 2001) ("[A] federal court may not . . . decide a case on the merits before resolving whether the court has Article III jurisdiction.").

In its motion for summary judgment, the County asserts that the because the Social Services site is no longer being sold due to plans for a new Family and Matrimonial Court Complex to be built at that location, that the relief the Plaintiffs seek, namely, to enjoin the County from selling the site, can no longer be given.  Moreover, even though the County acknowledges that the case has been rendered moot only by voluntary cessation of its own challenged conduct, it also claims that it has established that the challenged action will never occur again, through the submission of an affidavit from Chief Deputy County Executive Robert Walker to that effect.

The Garden City Defendants similarly assert that because the Social Services site is no longer being sold, that the case has been rendered moot.  According to Garden City, "any such injunctions or orders granted against the Village with the goal of permitting affordable housing on the Site will obviously be ineffective.  Even if the Court were to order that the Village approve zoning ordinances allowing for housing at the Site, the Site is no longer for sale by the County and what is done at the Site is not subject to the control of the Village."  (GC Mem. at 16.)

On the other hand, the Plaintiffs criticize both of these positions as inaccurate and disingenuous.  The Plaintiffs claim that the relief they seek is not limited to the site, so that even if "a meteor fell from the sky and destroyed the Site . . . this case would not be moot." (Pl. Opp. at 15.)  For example, the Plaintiffs' prayer for relief seeks to enjoin all the Defendants and their agents, employees, successors and assigns, from engaging in any other discriminatory acts that perpetuate or contribute to segregation in Garden City and Nassau County.  The Plaintiffs also seek an order that all the Defendants take and/or fund

31

affirmative steps, supervised by this Court, to overcome the effects of past discriminatory

practices, including the funding of remedial activities necessary to overcome the

perpetuation of segregation in Nassau County and Garden City.  In addition, the Plaintiffs

request a declaratory judgment.  In addition, the Plaintiffs contend that the Court can

fashion its own relief to redress the wrongs that the Defendants have allegedly perpetuated

against the Plaintiffs.

### 1.  Legal Standard

"Mootness is a doctrinal restriction stemming from the Article III requirement that

federal courts decide only live cases or controversies." In re Zarnel, 619 F.3d 156, 162 (2d

Cir. 2010).  Under the doctrine of mootness, a court no longer has subject matter

jurisdiction when "the issues presented are no longer live or the parties lack a legally

cognizable interest in the outcome." County of Los Angeles v. Davis, 440 U.S. 625, 631,

99 S. Ct. 1379, 1383, 59 L. Ed. 2d 642 (1979) (quoting Powell v. McCormack, 395 U.S.

486, 496, 89 S. Ct. 1944, 1951, 23 L. Ed. 2d 491 (1969) (internal quotation marks

omitted)).  Thus, for a federal court to have subject matter jurisdiction over a case, "it is not

enough that a dispute was very much alive when suit was filed. . . . The parties must

continue to have a personal stake in the outcome of the lawsuit." Knaust v. City of

Kingston, 157 F.3d 86, 88 (2d Cir. 1998) (quoting Lewis v. Continental Bank Corp., 494

U.S. 472, 477-78, 110 S. Ct. 1249, 108 L. Ed. 2d 400 (1990)) (internal citation and

quotations omitted), cert. denied, 526 U.S. 1131, 119 S. Ct. 1805, 143 L. Ed. 2d 1009

(1999).  "A case might become moot if subsequent events made it absolutely clear that the

allegedly wrongful behavior could not reasonably be expected to recur." Friends of the

Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000) (internal quotation marks omitted); see Church of Scientology of Cal. v. United States, 506 U.S. 9, 12, 113 S. Ct. 447, 121 L. Ed. 2d 313 (1992) ("It has long been settled that a federal court has no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." (internal quotation marks omitted)).

**2.   As to the Whether the Present Case is Moot**

Before proceeding to analyze the potential mootness of this case, it is essential to first comprehend what relief the Plaintiffs are actually seeking.  According to the Prayer for Relief contained in both the Plaintiffs' amended complaint and the intervenor complaint, which are identical, the Plaintiffs seek an injunction that would: (1) enjoin the Nassau County Defendant from proceeding with any sale of the Social Services site, or continuing with any plans for redevelopment of the site, under the discriminatory "Special Zoning" (the R-T zoning); (2) enjoin the Garden City Defendants from enforcing or attempting to enforce in any way the discriminatory or exclusionary provisions of the Special Zoning; (3) order the Garden City Defendants to approve zoning ordinances for the Social Services site that are substantially the same as the "Proposed Zoning" (the R-M zoning) or that otherwise permit affordable housing; (4) order the Nassau County Defendant to issue a Request for Proposals for the sale of the site consistent with the Proposed Zoning or consistent with zoning which otherwise permits affordable housing, including provisions that will require the development of affordable and integrated housing units at the Social Services site; (5) enjoin the Nassau County Defendant from selling the Social Services site

to any person or developer that will not agree or commit to building affordable and integrated housing units at the Social Services site to the maximum extent permitted under the Proposed Zoning; (6) order all defendants to take all actions necessary to assure the redevelopment of the Social Services site so as to maximize the availability of affordable and integrated housing at the site, including taking such steps as the Court deems necessary and appropriate to support and/or subsidize such redevelopment; (7) enjoin the Garden City Defendants from granting, and ordering the Garden City Defendants to withdraw, any permits, letters of approval, or other consents allowing steps toward redevelopment of the Social Services site to continue; (8) enjoin all Defendants and their agents, employees, successors and assigns, from engaging in any other discriminatory acts that perpetuate or contribute to segregation in Garden City and Nassau County; and (9) order all Defendants to take and/or fund affirmative steps, supervised by this Court, to overcome the effects of past discriminatory practices, including the funding of remedial activities necessary to overcome the perpetuation of segregation in Nassau County and Garden City.  The complaints also seek a declaratory judgment, and any other such relief that the Court deems reasonable, necessary and just, as well as the costs and attorneys' fees incurred by the Plaintiffs.

Thus, there are two specific instances of injunctive relief sought by the Plaintiffs against both sets of Defendants that do not relate specifically to the Special Services site itself.  First, the Plaintiffs seek to enjoin all of the Defendants and their agents, employees, successors and assigns, from engaging in any other discriminatory acts that perpetuate or contribute to segregation in Garden City and Nassau County.  Second, the Plaintiffs seek an

34

order that all of the Defendants take and/or fund affirmative steps, supervised by this Court, to overcome the effects of past discriminatory practices, including the funding of remedial activities necessary to overcome the perpetuation of segregation in Nassau County and Garden City.  This is in addition to the declaratory relief and any other relief that the Court deems reasonable, necessary and just.

The preliminary and essential inquiry is whether the relief sought by the Plaintiffs can no longer be given or is no longer needed, so as to make the present case moot.  See Martin-Trigona v. Shiff, 702 F.2d 380, 386 (2d Cir. 1983) ("The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed."); Cook v. Colgate Univ., 992 F.2d 17, 19 (2d Cir. 1993) ("Accordingly, a case that is 'live' at the outset may become moot 'when it becomes impossible for the courts, through the exercise of their remedial powers, to do anything to redress the injury.'") (quoting Alexander v. Yale, 631 F.2d 178, 183 (2d Cir. 1980).

The focus point of this controversy is undoubtedly Garden City's allegedly discriminatory zoning practices as to the specific Social Services site.  Of course, if the Court were to enjoin the Nassau County Defendant from proceeding with any sale of the Social Services site, or continuing with any plans for redevelopment of the site under the discriminatory Special Zoning; or to order the Garden City Defendants to approve zoning ordinances for the Social Services site that are substantially the same as the Proposed Zoning or that otherwise permit affordable housing, such relief could not actually be given if the County refrains from selling the site.  In fact, this is true for most of the relief that the Plaintiffs seek as to both sets of Defendants, although the Court notes that it may not be

impossible for the Court to grant some relief as to the Site.  The County acknowledges in its opposition to NYCC's motion to amend the intervenor complaint that "the County needs finality on the issue of whether plaintiffs' demand for injunctive relief will bar the construction where the decision to build has been made final".  Thus, even the County appears to concede that the Court's injunctive relief as to the Site itself is still a plausible outcome.

Nevertheless, even if relief cannot be granted as to the site itself, it is ultimately irrelevant for purposes of analyzing mootness.  "Where several forms of relief are requested and one of these requests subsequently becomes moot, the Court has still considered the remaining requests."  Powell v. McCormack, 395 U.S. 486, 496, n.8, 89 S. Ct. 1944, 1951, 23 L. Ed. 2d 491 (1969).  The Court finds that the entire controversy is not rendered moot solely because the Social Services site is no longer susceptible to the zoning laws that were alleged to be discriminatory.

Although the relief requested as to the site may have been rendered moot, the broad injunctive relief sought by the Plaintiffs is certainly still a potential outcome of this case. See, e.g., U.S. v. Mass. Maritime Acad., 762 F.2d 142, 157 (1st Cir. 1985) ("Given the evidence of persistent past discrimination, the district court was entitled to enter an injunction permanently enjoining any repeat discriminatory conduct even if the illegal conduct had by then ceased."); South-Suburban Hous. Ctr. V. Greater South Suburban Bd. of Realtors, et al., 935 F.2d 868, 881 (7th Cir. 1991) (finding that an FHA challenge to street plan for damages, declaratory relief, and injunctive relief was not rendered moot

although homes were sold prior to trial, in part because there was still a viable claim for declaratory and injunctive relief).

Moreover, this Court can fashion appropriate relief not specifically requested, such as the building of integrated, affordable housing elsewhere in Garden City, if this Court deems it reasonable, necessary and just.  In a civil FHA case brought by a private person, the court's equitable powers include the power to order such affirmative action as may be appropriate.  42 U.S.C. § 3613(c)(1).  For example, affirmative injunctive relief may be awarded for past discriminatory practices "where the trial court believes that the vestiges of prior discrimination linger and remain to be eliminated."  United States v. DiMucci, 879 F.2d 1488, 1498 (7th Cir.1989) (citations omitted) (internal quotations omitted); see Local 28, Sheet Metal Workers' Int'l Ass'n v. EEOC, 478 U.S. 421, 450, 106 S. Ct. 3019, 92 L. Ed. 2d 344 (1986) ("Affirmative action promptly operates to change the outward and visible signs of yesterday's [discriminatory] distinctions and thus, to provide an impetus to the process of dismantling the barriers, psychological or otherwise, erected by past practices.") (internal quotation omitted); Watkins v. Washington, 472 F.2d 1373, 1376 (D.C. Cir. 1972) ("Where pervasive racial discrimination is demonstrated, the court has not only the power, but also the duty, to render a decree eliminating the effects of past discrimination and ensuring equal opportunity in the future.").

This affirmative action can be appropriate even though the effects of the alleged discrimination cannot be resolved at the particular Social Services site.  See Baltimore Neighborhoods, Inc. v. LOB, Inc., 92 F. Supp. 2d 456, 462 (D. Md. 2000) (finding that affirmative action relief was appropriate because although the effects of the discrimination

could not be solved at the particular site, it was possible to seek affirmative action "elsewhere in the Odenton area").

At this time, the Court cannot determine whether such broad injunctive relief will be needed or will be proper.  Nevertheless, the possibility of this type of relief alone precludes this case from being rendered moot.  See Gautreaux v. Romney, 448 F.2d 731, 736 (7th Cir. 1981) ("Plaintiffs have contended that such 'other and further relief' might include a more vigorous utilization of the several different types of housing programs which HUD administers in the form of a decree aimed at 'remedying the continuing effects of the discrimination of the past.'  Such a decree . . . might facilitate the overall desired goal of desegregating the public housing sites around Chicago metropolitan area.  We express no view on whether such requested relief is either necessary or appropriate. However, as long as a decree utilizing certain HUD programs still remains a possible form of relief not already available through the other case, this Court cannot deem the controversy moot.") (quoting Powell v. McCormack, 395 U.S. 486, 496, n.8, 89 S. Ct. 1944, 1951, 23 L. Ed. 2d 491 (1969)).

Putting aside the non-site related injunctive relief, the Plaintiffs also seek a declaratory judgment, in particular: "Declaring that defendants' acts, practices, and policies complained of herein violated and violate plaintiffs' rights as secured by Fair Housing Act, as amended, 42 U.S.C. § 3601 et seq.; the Civil Rights Act of 1866, 42 U.S.C. § 1981; the Civil Rights Act of 1866, 42 U.S.C. § 1982; the Civil Rights Act of 1871, 42 U.S.C. § 1983; the Equal Protection clause of the Fourteenth Amendment to the U.S. Constitution;

and the 'affirmatively furthering' obligations of the Fair Housing Act, 42 U.S.C. § 3608, and the Civil Rights Act of 1964, 42 U.S.C. §2000d et seq."

Declaratory judgment actions raise particular issues with regard to mootness, and the Supreme Court has explained that "[b]asically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S. Ct. 510, 512, 85 L. Ed. 826 (1941); see Penguin Books USA Inc. v. Walsh, 929 F.2d 69, 72 (2d Cir. 1991). However, a "litigant may not use the declaratory judgment statute to secure judicial relief of moot questions." Christopher P. by Norma P. v. Marcus, 915 F.2d 794, 802 (2d Cir. 1990). For example, the Second Circuit has noted that claims for declaratory relief under Title IX "appear moot" as the result of the plaintiffs' graduation. Alexander v. Yale Univ., 631 F.2d 178, 184 (2d Cir. 1980).

Within the boundaries of these principles and the mootness doctrine, the Court must determine whether it has the power to address the Plaintiffs' request for a declaratory judgment on the issues in this case. In this regard, the Court finds that a determination of whether or not the County and the Village's past conduct violated the Constitution or applicable federal laws remains very much an open question. A legal dispute still exists as to whether any discriminatory practices took place by the Defendants, and whether an injury is still ongoing for every day there is an alleged lack of affordable housing, and hence a lack of racial integration, in the Village of Garden City and Nassau County as a whole. See Young v. Pierce, 628 F. Supp. 1037, 1059-60 (E.D. Tex. 1985) (finding that

part of the heavy burden of demonstrating that discontinuance of the challenged activity has destroyed any controversy between the parties "includes the necessity of showing that there are no present effects of past conduct that require undoing.") (citing Vitek v. Jones, 445 U.S. 480, 487, 100 S. Ct. 1254, 1260, 63 L. Ed. 2d 552 (1980)).

The Supreme Court has stated that "[a] court may grant a declaratory relief even though it chooses not to issue an injunction or mandamus." Powell v. McCormack, 395 U.S. at 499, 89 S. Ct. at 1952. Thus, the granting of a declaratory judgment is still a potential avenue of relief for the Plaintiffs, especially considering that a declaratory judgment may be the premise for any further relief ordered by this Court, such as the broad injunctive relief specifically requested by the Plaintiffs. See id. ("A declaratory judgment can then be used as a predicate to further relief, including an injunction."); Gantreaux, 448 F.2d at 736 ("A determination of whether or not the Secretary's own past conduct violated the Constitution or applicable federal statute remains very much of an open question. The entry of a declaratory judgment here would have significant consequences in determining the extent of any "further relief" deemed necessary, in the event that practices found to be discriminatory were resumed.").

Therefore, because there still is relief that is obtainable by the Plaintiffs against the Defendants, the Court finds that there remains a live controversy in spite of the fact that the Social Services site will no longer be sold. Thus, the case has not been rendered moot and the Court can proceed to analyze the substantive merits of the action.

40

## C.  **FHA Claims Against All Defendants**

Congress enacted the FHA in 1968 to "provide, within constitutional limits, for fair

housing throughout the United States." 42 U.S.C. § 3601.  The law provides that it shall be

unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to

negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any

person because of race, color, religion, sex, familial status, or national origin."  Id.

§ 3604(a).  The Second Circuit has determined that "[c]onduct prohibited by this section

includes discriminatory zoning practices."  Fair Hous. in Huntington Comm. v. Town of

Huntington, 316 F.3d 357, 366 (2d Cir. 2003); see Le Blanc-Sternberg v. Fletcher, 67 F.3d

412, 424 (2d Cir. 1995); Huntington Branch, N.A.A.C.P. v. Town of Huntington, 844 F.2d

926, 938 (2d Cir. 1988).  A claimant may demonstrate that discriminatory zoning practices

were employed by presenting either proof of disparate treatment or disparate impact.  See

Huntington Branch, N.A.A.C.P., 844 F.2d at 934-35; see also LeBlanc-Sternberg, 67 F.3d

at 425.  In the instant case, the Plaintiffs, including the Intervenor-Plaintiff NYCC, advance

their FHA claim against all Defendants under both theories.  As set forth below, the Court

finds that the Plaintiffs have raised genuine issues of material fact sufficient to survive

summary judgment on this claim as asserted against the Garden City Defendants, but not

the County.

### 1.  **Disparate Treatment**

#### a.  **Legal Standard**

Under a theory of disparate treatment, "a plaintiff can establish a prima facie case

by showing that animus against the protected group 'was a significant factor in the position

41

taken' by the municipal decision-makers themselves or by those <u>to whom the decision-makers were knowingly responsive</u>."  <u>LeBlanc-Sternberg</u>, 67 F.3d at 425 (quoting <u>United States v. Yonkers Bd. of Educ.</u>, 837 F.2d 1181, 1217, 1223, 1226 (2d Cir. 1987), <u>cert. denied</u>, 486 U.S. 1055 (1988)) (emphasis added); <u>see also Innovative Health Sys. Inc. v. City of White Plains</u>, 117 F.3d 37, 49 (2d Cir. 1997) ("[A] decisionmaker has a duty not to allow illegal prejudices of the majority to influence the decisionmaking process.  A . . . discriminatory act [is] no less illegal simply because it enjoys broad public support.").

Discriminatory intent may of course be demonstrated by direct evidence.  However, as such evidence is rarely available to plaintiffs, it may also be inferred, as follows:

> "inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another."  <u>Washington v. Davis</u>, 426 U.S. 229, 242 (1976).  Such impact may be an important starting point.  Other probative sources may include the "historical background of the decision . . . , particularly if it reveals a series of official actions taken for invidious purposes"; "[t]he specific sequence of events leading up to the challenged decision," such as zoning changes for a given site enacted upon the decisionmaker's learning of plans for the construction there of integrated housing; "contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports"; "[d]epartures from the normal procedural sequence"; and "[s]ubstantive departures . . . , particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached."  <u>Village of Arlington Heights v. Metropolitan Housing Development Corp.</u>, 429 U.S. 252, 267-68 (1977).

<u>Yonkers Bd. of Educ.</u>, 837 F.2d at 1221 (full internal citations inserted);  <u>see LeBlanc-Sternberg</u>, 67 F.3d at 425 (applying <u>Arlington</u> factors to determine discriminatory intent in FHA claim); <u>see also Rosen v. Thornburgh</u>, 928 F.2d 528, 533 (2d Cir. 1991) (noting that perpetrators of discrimination rarely leave a "smoking gun," and, therefore, "[a] victim of discrimination is . . . seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence.").  Accordingly,

"[w]here there are allegations of discrimination supported by such circumstantial evidence, 'a defendant's intent and state of mind are placed in issue, [and] summary judgment is ordinarily inappropriate.'" The Anderson Group LLC v. City of Saratoga Springs, 557 F. Supp. 2d 332, 340 (N.D.N.Y. 2008) (quoting Rosen, 928 F.2d at 533).

Once plaintiffs have established a prima facie case of housing discrimination, the onus shifts to the defendant to demonstrate "that the same decision would have resulted even had the impermissible purpose not been considered." Vill. of Arlington Heights, 429 U.S. at 270 n.21.

### b.  As to the Plaintiffs' Theory of Disparate Treatment

#### i.  The Garden City Defendants

In the instant matter, the Garden City Defendants argue that the Plaintiffs have failed to identify any factual disputes over whether discriminatory animus was a motivating factor in the zoning decision by the Garden City Defendants, or by those to whom they were knowingly responsive.  The Court disagrees.  Construing the totality of the circumstantial evidence presented in favor of the non-movants and drawing all reasonable inferences therefrom, the Court finds that the Plaintiffs have presented sufficient evidence to raise genuine issues of fact as to their disparate treatment claim, thereby precluding summary judgment in favor of the Garden City Defendants.  In particular, evidence of the impact of the R-T zoning designation, its historical background, and the sequence of events leading up to its adoption, as well as contemporary statements by members of the decisionmaking body, have raised genuine issues of material fact regarding whether the Garden City Defendants bowed to race-based opposition to a proposed zoning regulation

43

that allowed the development of affordable housing and hence, made the influx of minority residents, more likely.

### a. As to Whether the Zoning Bore More Heavily on One Race Than Another

First, the Plaintiffs have presented evidence that raises a genuine issue of fact as to whether the zoning designation "[bore] more heavily on one race than another." Washington v. Davis, 426 U.S. 229, 242, 96 S. Ct. 2040, 2049, 48 L. Ed. 2d 597 (1976). This evidence typically "involves statistical data supporting either a finding of perpetuation of segregation or of disproportionate impact." Thornton v. City of Allegan, 863 F. Supp. 504, 509 (W.D. Mich. 1993). While this contention will be discussed in greater detail below in the context of whether the Plaintiffs have established a question of fact with regard to their theory of disparate impact, the Court will now briefly outline the proffered evidence.

The Plaintiffs' statistical expert set forth evidence that the original zoning proposal, as proffered by BFJ and endorsed by the Committee, would have created a pool of potential renters with a significantly larger percentage of minority households than the pool of potential renters for the zoning proposal ultimately adopted as law by Garden City. Granted, this statistical analysis presumes the development of affordable, not just multi-family, housing on the Social Services site. However, even assuming arguendo that no affordable housing was constructed, the McArdle Report also notes that minorities comprise a disproportionate share of renter, as opposed to owner, households in the County. Therefore, a zoning proposal that permits only 36 multi-family rental units —

44

and only by special permit — versus the 311 contemplated by the original zoning proposal — as-of-right — would have a greater impact upon potential minority residents.  (See McArdle Report, at ¶ 49 ("Minorities made up just 14.8% percent of all households in Nassau County in 2000, but 31.1% of renter households.").)

Therefore, the Plaintiffs have raised issues of fact over whether the change from the proposed R-M zoning to the adopted R-T zoning affected minority residents to a greater degree.  See, e.g., Jim Sowell Const. Co., Inc. v. City of Coppell, 61 F. Supp. 2d 542, 547 (N.D. Tex. 1999) (finding that evidence from an expert demonstrating a disproportionate amount of African-American potential residents lived in multi-family housing "demonstrate[d] that African-American families are much more likely to reside in apartment complexes than are Caucasian families.  By rezoning certain tracts of land from multifamily to single family use . . . the City decreased the number of apartment units available to new residents.  Because African-Americans are more likely to reside in such housing, this reduction in multifamily units had a statistically greater impact on African-American families than on Caucasian families.").

In the Court's view, the Plaintiffs have thus sufficiently raised disputed issues of fact regarding whether the allegedly discriminatory R-T zoning designation impacted minorities to a greater degree than it affected Caucasians.

### b.  As to the Historical Evidence of Racism in Garden City

The Plaintiffs have also raised disputed issues of fact regarding whether the historical background of the R-T zoning designation, such as past instances of

discrimination in the Village, suggest that race-based animus played a role in the zoning's implementation.

First, the Plaintiffs have introduced historical evidence that they contend suggests a pattern and practice of racial segregation in Garden City. By example, the Plaintiffs have introduced evidence that, in 1969, residents opposed the construction of a daycare center that would serve primarily African-American children. In 1989, a building moratorium on new construction was in effect in Garden City to gain tighter control over housing development; an action the Plaintiffs allege was taken to prevent the influx of minority residents. In 2005, the New York State Attorney General determined that Garden City enforced a local requirement limiting the use of its parks to Garden City residents in a racially discriminatory manner. At his deposition, County Executive Suozzi opined that "there are some people that are opposed to affordable housing in Garden City based upon racism."

The Garden City Defendants dispute certain matters of the Plaintiffs' evidence, such as the newspaper article the Plaintiffs rely upon to demonstrate the existence of the above mentioned building moratorium. However, even assuming that this article would not be admissible under the "ancient document" exception to the hearsay rule, there is still some evidence to raise an issue of fact as to whether past instances of discrimination in Garden City suggest that race-based animus played a role in the zoning decision at issue.

The Garden City Defendants also argue that such a patchwork of allegations and inferences is insufficient, especially because claims relating to a day care center and parks have nothing to do with segregated housing practices. The Court disagrees. Previous

instances of racial discrimination, even in different settings, may be taken into account on the issue of an alleged pattern and practice of racial segregation in the Village.

In addition, the Plaintiffs have proffered evidence of discrimination in Garden City that has occurred since the filing of this lawsuit.  In 2006, the County issued an RFP to solicit proposals for the purchase of the "Ring Road" site in Garden City: a mixed-use development which was characterized as "mixed income" and would have included affordably priced residential units.  (Pl. Ex. 61, 62)  However, with regard to this proposal, via anonymous emails, the Garden City residents accused Nassau County Executive Suozzi of "catering to ACORN and black people" (SAMF ¶ 199; Pl. Ex. 63), and begged Suozzi not to "turn GC into Hempstead, Roosevelt, etc. . . ." SAMF ¶ 200; Pl. Ex. 65), citing to two towns with a large percentage of minority residents.  The Plaintiffs submitted a proposal for this site, but it was not accepted and the site still has not been developed.

Q:  Did you award the site to one of the persons that submitted a proposal?

A:  No, we did not.

Q:  Can you tell me why?

A:  I — I think all along we thought it would — if it was done right, it would achieve settlement of the lawsuit.  We're still all sitting here.

(SAMF ¶ 194; Pl. Ex. 100, Schroeter Dep. at 193.)

The Garden City Defendants dispute the relevance of the anonymous emails cited above in opposition to the Ring Road site because they do not demonstrate that "residents" of the Village objected to affordable housing.  However, this raises a factual issue as to whether such a sentiment existed because most of the senders state or clearly imply that they are Garden City residents.  The Garden City Defendants also contend that the Court

47

should not consider the emails because they are inadmissible hearsay.  However, these emails are admissible not for the truth of the matter asserted, but instead to demonstrate that complaints in opposition to Ring Road were made and received, some of which indicate racial animus.  See Stephens v. City of Chicago, No. 98 Civ. 809, 2002 WL 31055078, at *1 n.3 (N.D. Ill. Sept. 13, 2002) ("Defendants objected to these statements on the ground that they were hearsay.  However, they are not being used for the truth of the matter asserted, only as a representation of . . . alleged racial bias."); Sanders v. Dania Inc., No. 01 Civ. 33, 2001 WL 34736295, at *11 (D. Or. Dec. 6, 2001) ("McGrath's statement . . . still is admissible because it is not offered for the truth of the matter asserted . . . but rather as evidence of defendant's racial attitude, that is, as direct evidence of discrimination."); Fincher v. Cnty. Of Westchester, 979 F. Supp. 989, 1005 (S.D.N.Y. 1997) ("To the extent that these are racial epithets and the like, they are not hearsay because they are not relied on to prove the truth of the matter asserted, but only to show that the statements were made."). In any event, even if these emails are inadmissible hearsay, there remains sufficient evidence for this Court to find a question of fact with regard to Garden City's historical background as contributing to the Plaintiffs' allegations of disparate treatment.

Finally, the Garden City Defendants dispute that any of the instances described above are relevant to a disparate treatment analysis, because the relevant inquiry is the zoning decision's historical background, as opposed to the history of the municipality at issue.  However, although that is the way the inquiry is framed, the Defendants have not pointed to any precedent that states that a court's analysis in this regard is limited solely to events in the jurisdiction immediately preceding the challenged decision.  In fact, the

Supreme Court appeared to intend for courts to consider the historical background of the

zoning decision in a broader sense, for it purposefully distinguished between the historical

background of the challenged decision and the specific antecedent events.  <u>Village of</u>

<u>Arlington</u>, 429 U.S. at 267.  Accordingly, the Court will not disregard allegations of

previous acts of discrimination by the Village in other contexts.

Thus, viewing this evidence in its totality and in the light most favorable to the

Plaintiffs, a reasonable finder of fact could conclude that the R-T zoning designation

decision was another act in a series of efforts to prevent minority citizens from moving to

Garden City.  <u>See, e.g.</u>, <u>Dews v. Town of Sunnyvale, Tex.</u>, 109 F. Supp. 2d 526, 571 (N.D.

Tex. 2000) (concluding, after a bench trial on the merits, that defendant town's decisions,

over the years, to adopt one acre zoning, prohibit multi-family housing, and refuse

proposed cooperation agreements with local housing authority demonstrated "history of

discouraging African-Americans from moving within its borders.").

### c.  As to Sequence of Events Underlying the Zoning

Further, as detailed in the Background section above, the Plaintiffs have set forth

evidence that raises genuine issues of disputed fact as to whether the sequence of events

leading to the implementation of the R-T zone give rise to an inference of race-based

animus by the Garden City Defendants.

Garden City retained BFJ to create a zoning proposal for the Social Services site

and BFJ, in turn, proposed the R-M designation, which permitted the development of up to

311 multi-family units.  Both the County and the Board supported this proposal and,

specifically, the inclusion of multi-family housing.  Trustee Bee is a member of the Board

as well as the Committee.  As reflected in a summary of a meeting with local property owners, Trustee Bee expressed the opinions that "Garden City demographically has a need for affordable housing" and that "he would keep an open mind but he still felt the recommended zoning change were appropriate."  However, when it became clear at the public meetings that residents specifically opposed the development of multi-family housing, BFJ and the Board reversed course.  Not long after representing at a January 20, 2004 meeting that the village had a "need" for affordable housing, Trustee Bee stated at the February 5, 2004 public meeting that "neither the County nor the Village is looking to create a so-called affordable housing."  Soon thereafter, the Board and BFJ endorsed a new proposal which banned the development of multi-family housing on all but a small portion of the Social Services site, and then only by special permit.

The Garden City Defendants argue that the changed proposal simply responded to legitimate concerns, but the Plaintiffs have introduced evidence that those concerns, namely traffic, taxes, and schoolchildren, were no more burdensome under the R-M designation than the R-T zone, and that residents were made aware of that fact.  Moreover, the Plaintiffs have directed the Court's attention to a series of comments made, both at public meetings, as well as in notices posted around town or in the local newspaper, which opposed multi-family housing in terms that the Plaintiffs' expert asserts could be construed as euphemisms for race-based animus.  The Plaintiffs further produced evidence which they argue suggests that the decision-makers understood the race-based component of the opposition.  (See, e.g., ("Where is the Benefit to Garden City?  Are We Being Urbanized? . . . The County is asking the Village to change our existing zoning . . . Among the proposed

50

plans: Low-density (high-rise?) housing – up to 311 apartments"); see Hearing Tr. at 2404

("BRIAN GEMMEL [to SUOZZI]: "I don't think you are hearing a lot of the people.

We're not against residential, we're against multi-level residential."); see id. at 2409

("DAVID PICIULO: I don't hear a compelling argument from anyone here tonight as to

why we should have multi-dwelling homes.  Can we take it out of the proposal?"); see id.

at 2408 ("SUOZZI: Mayor out of respect, let me stipulate the facts here.  The public of

Garden City especially from the eastern civic association does not want to see multi-family

housing here.  They'd rather see single-family housing."); see Negri Dep. at 24-25

("QUESTION: Is housing occupied by low income minorities consistent with the character

of [Garden City's] neighborhood?  NEGRI: No."); see Pls.' Ex. 32 ("The Garden City

Trustees . . . might choose to zone [the Social Services site] for multi-family housing . . . as

many as 30 of those apartments would be considered 'affordable housing' . . .  '[a]ffordable

workforce housing means housing for individuals or families at or below 80% of the

median income for Nassau Suffolk primary metropolitan statistical area as defined by the

Federal Department of housing and urban development.' . . . NOT JUST GARDEN CITY

INCOMES!").)

In addition, County Executive Suozzi opined that "Garden City . . . historically, has

been viewed as a community that didn't want to have affordable housing in it,"  (SAMF ¶

98), and the Deputy County Executive for Economic Development in the County

specifically testified that "people who don't want people of different races living in their

communities and local communities elect their elected officials to do the will of the

people."  (SAMF ¶ 245.)  Finally, as detailed above, the Plaintiffs have introduced

evidence that statements made by the decision-makers, namely, Trustee Negri, County Executive Suozzi, and Patrick Duggan, the Deputy County Executive for Economic Development, could suggest that they understood community opposition to the Economic R-M designation to be motivated by unlawful racial animus.  While the Court finds, as detailed below, that County officials had no legal authority to make a decision regarding the zoning for the Social Services site, their reflections on the process as participants at the community meetings are relevant as to how community opposition could have been construed by the lawmakers.

While the Garden City residents did not explicitly reveal that their opposition was fueled by racist sentiments, the Plaintiffs offer a number of cases as precedent as well as the expert report of Dr. Peter Marcuse to demonstrate that euphemisms for race-based bias in housing situations can demonstrate discriminatory intent.  Indeed, "[i]n a discrimination action, a court cannot be satisfied that the absence of overtly discriminatory remarks proves an absence of discrimination."  Huntington Branch, N.A.A.C.P. v. Town of Huntington, N.Y., 668 F. Supp. 762, 786 (E.D.N.Y. 1987), rev'd on other grounds, 844 F.2d 926 (2d Cir. 1988) (noting that findings of discrimination cannot "be avoided by careful use of code words.").  It is to be noted that courts have accepted expert testimony in discrimination cases to assist the trier of fact in determining whether improper motives played a role in a challenged action.  For instance, in Price Waterhouse v. Hopkins, 490 U.S. 228, 235-236, 109 S. Ct. 1775, 1782-83, 104 L. Ed. 2d 268 (1989), the Supreme Court cited expert testimony proffered by a social psychologist to decipher "gender neutral" remarks made by partners in the hiring process, and opine whether such remarks betrayed discriminatory

52

animus, despite the fact that the expert had not actually "met any of the people involved in the decisionmaking process." Id.

Peter Marcuse is an Emeritus Professor of Urban Planning at Columbia University. He has fifty-five years of experience in research, teaching, practice, and public service in the fields of housing and planning, and holds a J.D. in law and a Ph.D. in planning. (See generally Pls.' Ex. 93 (hereinafter the "Marcuse Report").) Marcuse states in his report that "euphemisms for race are in wide-spread use," and include terms and expressions such as "affordable," "inconsistent with village character," "multi-family," "not upscale," "urban character," "high-density," and "rental," which are "used by opponents of housing expected to be occupied by minority-group members." (Marcuse Report, at 2.) He also states that "[t]he presence of affordable housing is thus, in my opinion, opposed by residents and officials of Garden City and Nassau County with the understood effect of discriminating against minority groups . . ." (Marcuse Report, at 3.) In arriving at the conclusions stated in his report, Marcuse reviewed documents provided by the Plaintiffs' counsel involving the instant litigation, as well as a series of academic treatises and studies related to housing and planning.

The Garden City Defendants do not dispute that Marcuse as an academic expert is qualified to render opinions on the subject at issue. However, they do assert that to the extent the Plaintiffs rely on the expert opinion of Marcuse to supply the requisite discriminatory intent element of their claims, such opinions must be precluded because it represents a legal conclusion and usurps the role of this Court. However, the Marcuse Report only purports to decode potential euphemisms similar to those implicated in the

53

Price Waterhouse case.  Accordingly, the entirety of the report will be considered

admissible at this stage and any determination as to the report's credibility is the province

of the finder of fact.  See, e.g., Tuli v. Brigham & Women's Hosp., Inc., 592 F. Supp. 2d

208, 214 (D. Mass. 2009) (finding that professor's proffered expert testimony regarding

"social framework analysis" was admissible, as it did not opine on the ultimate factual

conclusions to be drawn by the jury and was based "not simply on experience, but also

social psychological testing of stereotyping and discrimination over the past thirty or forty

years"); Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC, 470 F. Supp. 2d 345,

355 (S.D.N.Y. 2007) (rejecting movant's argument "that [expert testimony] would not be

helpful to the fact finder in this case because the notion of gender stereotyping is not an

arcane one" as one that goes to weight of expert testimony, not admissibility); Jenson v.

Eveleth Taconite Co., 824 F. Supp. 847, 881 (D. Minn. 1993) (accepting, over defendant's

objection, expert testimony regarding sex stereotyping proffered by social psychologist

who had "performed numerous research studies on the subject of sexual stereotyping and

ha[d] presented his findings in several scholarly articles and at numerous academic

conferences on the issue of gender stereotyping in the workplace").  While the Garden City

Defendants wish to reserve their full arguments as to the admissibility of Marcuse's

opinions, for purposes of this motion, his expert opinion will be taken into consideration by

the Court.

    In addition, the Garden City Defendants raise questions with regard to the

Plaintiff's reliance on the  Marcuse Report in part because Marcuse did not interview

Garden City residents who spoke at a series of public hearings before concluding that their

statements contained euphemisms for racist opinions.  Thus, it appears that the Garden City

Defendants contend that the Marcuse Report is not based upon reliable data.  However, any

argument that Marcuse's testimony should not be considered because he relied upon

newspaper articles and/or transcripts depicting events, without having personal knowledge

of the events described, is without merit.  It is beyond dispute that "an expert is permitted

wide latitude to offer opinions, including those that are not based on firsthand knowledge

or observation."  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 591, 113 S. Ct. 2786,

125 L. Ed. 2d. 469 (1993); see also U.S. v. Mulder, 273 F.3d 91, 102 (2d Cir. 2001)

("Defendants' . . . contention-that the district court impermissibly allowed the experts to

rely on multiple hearsay-lacks merit because 'expert witnesses can testify to opinions based

on hearsay or other inadmissible evidence if experts in the field reasonably rely on such

evidence in forming their opinions.'") (quoting United States v. Locascio, 6 F.3d 924, 938

(2d Cir. 1993)); MacQuesten Gen. Contracting, Inc. v. HCE, Inc., No. 99 Civ. 8598, 2002

WL 31388716, at *2 (S.D.N.Y. Oct. 22, 2002) ("[E]xpert analysis is often based on

reported information rather than firsthand knowledge, and that is no bar to its

admissibility.").

    In this field, witnesses offering expert testimony based in social science and/or

academia frequently rely upon hearsay or otherwise inadmissible evidence, as Marcuse has

in his report.  See United States v. Joseph, 542 F.3d 13, 21 (2d Cir. 2008) ("To the extent

that the District Court was concerned that [the expert's] testimony would rely on hearsay,

that would not be a valid objection.  Social science experts commonly base their opinions

on [hearsay such as] interviews.") (citing Fed. R. Evid. 703).

Finally, beyond the issues of the expressions utilized in opposing the zoning and Marcuse's report, the Garden City Defendants argue against the Court's consideration of the comments described above because they are select quotes that in context are "rather sterile" and "not in any way analogous to those made in the cited FHA cases in which actual, strong community opposition was found." (GC Mem. at 26.)  The Garden City Defendants rely on several cases outside of this circuit to support this contention. However, all these cases are readily distinguishable from the case at hand.

First, although the Garden City Defendants cite to the case of <u>Hallmark Developers, Inc. v. Fulton County</u>, 466 F.3d 1276 (11th Cir. 2006) in support of their position that ambiguous remarks of alleged racial bias cannot sustain a disparate treatment claim, that case is distinct from the present case.  First and foremost, that case affirmed the findings of fact from a bench trial, where credibility assessments of the speakers and their motivations were appropriate.  Second, that court specifically noted that the plaintiffs had set forth no evidence that the decision-makers were aware of the attitudes of the community regarding the proposed zoning change or ratified them.  This is not the case here, as Board members were present at every public hearing where such opposition was voiced.  Moreover, the remarks were the sole evidence of any discriminatory intent before the trier of fact, as the plaintiffs there failed to set forth any evidence regarding a historical background of race-based animus or abnormalities in the sequence of events leading up to the decision.  Here, as discussed above, the Plaintiffs have not simply relied upon such remarks in opposition to summary judgment, but rather have provided other evidence (including statistical evidence, historical evidence, and evidence regarding the sequence of events leading to the zoning

decision at issue).  In the Court's view, when all of this evidence is construed together in the light most favorable to the Plaintiffs, it is sufficient to raise genuine issues of disputed fact as to whether the Garden City Defendants' decision to reject BFJ's R-M zoning proposal, originally endorsed by both the County as well as the Committee, and adopt the more restrictive zoning designation, was motivated by discriminatory intent.

Second, the Garden City Defendants rely on the case of <u>White Oak Property Development, LLC v. Washington Township, Ohio, et al.</u>, 606 F.3d 842 (6th Cir. 2010), for the proposition that mere inquiries about affordable or Section 8 housing do not amount to evidence of an FHA violation.  Thus, they argue that the record here does not present evidence of any bigoted comments or even an inquiry from a member of the Board as to type of housing that the zoning contemplated.  However, unlike in <u>White Oaks</u>, the public opposition here involved more than isolated inquiries, such as statistical and historical evidence.  Moreover, the plaintiff in <u>White Oaks</u> did not present any evidence that minority populations existed in the township or the surrounding areas.  Here, the record clearly indicates that Nassau County's minority populations disproportionately occupy the County's existing affordable housing, none of which exists in Garden City.

The Court agrees with the Garden City Defendants that some of the comments cited by the Plaintiffs, when viewed in context, may be "innocuous and sterile."  (Def. Mem. at 23.)  However, that does not mean that all that remains are "isolated bigoted comments" that are insufficient to create an issue of fact.  <u>United States v. City of Birmingham</u>, 538 F. Supp. at 828.  Under the totality of the circumstances, there is certainly enough evidence put forth by the Plaintiffs to create a triable issue of material fact that strong community

opposition was present and that the zoning decision may have been an effort to appease that resistance.

### d.  As to Whether There Were Departures from Normal Procedural Sequences

Next, the Garden City Defendants argue that there were no departures from normal procedural sequences or substantive criteria, so that these considerations do not weigh in favor of a finding of discriminatory treatment.  The one alleged departure from normal procedural sequences is that BFJ recommended R-M zoning on multiple occasions, which was subsequently adopted by the P-Zone Committee and the Board, but consequently was not the zoning scheme that was adopted by the Village.  Although the Garden City Defendants attempt to articulate a basis for their contradictory choice, which the Court will address in further detail below, it nevertheless is considered as part of the evidence of the Plaintiffs' prima facie case of housing discrimination under a theory of disparate treatment. See Sunrise Dev., Inc. v. Town of Huntington, N.Y., 62 F. Supp. 2d 762, 775, 776 (E.D.N.Y. 1999) (concluding, after a bench trial on the merits, that "[a]lthough the Town did commission the [Citizens' Advisor Committee] to undertake a study and issue recommendations on senior housing, when the time came to enact the Local Law, the Town disregarded the CAC's recommendations," which suggested that "defendants likely were swayed by the anti-disabled animus present in the community"); Dews, 109 F. Supp. 2d at 571 (N.D. Tex. 2000) ("[Defendant's] history of ignoring the recommendations of its planners and proceeding in the face of sound legal and planning advice" weighed towards finding of discriminatory intent).

58

As Judge Bianco previously stated at an oral argument hearing regarding the previous summary judgment motions: "One of the things that's at the core of their case relates to the fact that the Board's own consultant zoned it for R-M, that the County wanted RM, and that the Board changed it to R-T without any objective basis to support that decision.  And that at least creates an issue of fact where . . . the Court should look at the evidence and the experts on both sides and determine whether or not there was discriminatory intent behind that."  (See Hearing Tr., at 64.)

### e.  As to the Defendants' Burden

Weighing the evidence outlined above in its totality, the Court concludes that the Plaintiffs have successfully established a prima facie case of housing discrimination under the theory of disparate treatment.  The burden thus shifts to the Garden City Defendants to demonstrate "that the same decision would have resulted even had the impermissible purpose not been considered."  Vill. of Arlington Heights, 429 U.S. at 270 n.21.

In support of that proposition, the Garden City Defendants offer the expert testimony of Patrick Cleary, who opines that the R-T zoning designation "appropriately fits within the Village's well established zoning and land use framework and is cognizant of the historical significance of that framework."  (Cleary Report, at 2.)  They further argue that the R-T zone was implemented "because of concerns involving traffic generation and to meet the physical character of the neighborhood particularly in this transitional area." (GC Reply, at 10.)  Finally, the Garden City Defendants refer to statements made at a meeting of the Board of Trustees to demonstrate that they had a legitimate reason to restrict multi-family housing to less than 15% of the subject property and to be obtainable only by

special permit as opposed to as of right.  (See Frank Fish, Board of Trustees Meeting

Minutes, May 20, 2004, GC Ex. P at 35) (responding to an inquiry regarding multi-family

housing with a special permit under R-T zoning, by stating that "[t]he P Zone Committee

had been considering this and the Trustees on the entire site, it wasn't an after thought.

This was, this was a conscious decision . . . there was a concern that if the whole 25 acres

were developed for multi-family it would generate too much traffic . . .").

      Thus, the Garden City Defendants submit that legitimate concerns prompted the

Board to reject the initial proposal offered by their consulting company and endorsed by

their P-Zone Committee, and that the Board's goals were met by the R-T zoning.  While

the Plaintiffs challenge the sufficiency of the Garden City Defendants' factual allegations,

the Court finds that they have satisfied their minimal burden of offering a

nondiscriminatory reason for their zoning decision.  See Reeves v. Sanderson Plumbing

Prods., Inc., 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) ("[The burden of

providing a legitimate, nondiscriminatory reason] is one of production, not persuasion; it

can involve no credibility assessment.") (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S.

502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)).

      However, although the Garden City Defendants have offered a nondiscriminatory

reason for their actions, a fact finder could reasonably conclude that the proffered reason is

pretextual and that discrimination was the real reason behind their zoning decision.  "While

the issue of pretext cannot be resolved on summary judgment based on the allegations in

the complaint, [the Court] agree[s] that [the P]laintiffs have come forth with sufficient

evidence of pretext to survive summary judgment."  Wentworth v. Hedson, 493 F. Supp. 2d 559, 570 (E.D.N.Y. 2007).

First, there are factual disputes regarding whether the Board enacted the R-T designation into law based on the belief that this type of zoning created the least amount of traffic and schoolchildren.  (Compare April 22, 2004 Presentation to the Village, GC Ex. I (noting that townhomes produce the least amount of traffic as compared to multi-family and single family homes) with Pl. Ex. 53 at 42-43 ("Michael Filippon:  If I could just add on this point of traffic . . . You have to remember that the existing use on that site now generates a certain amount of traffic, a fair amount of traffic.  That use is going to be vacated.  The two residential uses that are being proposed as one of the alternates, each of which on their face automatically generate far less traffic than the existing use.  That is something to consider also.") and Pl. Ex. 54 at 31-32 ("[Resident]:  But, we would also have more traffic because of more people owning cars and leaving there in and out.  As opposed to . . . [applause]  Thomas Suozzi:  You may want to clap for that, but that's irrational.").)  Although the Plaintiffs do not dispute that the R-T zoning would produce marginally less traffic than the R-M zoning, they allege that both proposals would reduce the amount of traffic currently in the area.  (SAMF ¶¶ 75-76.)  As to the supposed justification regarding the potential overcrowding of schools in the Village, Garden City even concedes that townhomes would have produced the same number of school children as multi-family homes.  (GC Mem. at 36; see also SAMF ¶¶ 71-72.)

Moreover, the Garden City Defendants stress that the R-T designation "furthered the interests of the Village to offer townhouses (an entirely new housing option not

61

previously constructed in the Village) as an option for the site . . . ."  (GC Mem. at 31.)
However, it is undisputed that although townhouses may have been a "new housing option
not previously constructed in the Village," they were also available under the original R-M
zoning proposal, so their desirability and inclusion into the R-T designation does not
definitively support the proposition that the Board would have decided on that designation
regardless of any alleged discriminatory animus.

Accordingly, there are disputed issues of fact as to whether the preferred
nondiscriminatory reasons of the Garden City Defendants are mere pretext and thus
whether the Board would have arrived at the same decision regarding the zoning
designation even if the impermissible purpose had not allegedly been in play.  This
conclusion is bolstered by the fact that at oral argument before Judge Bianco, the Garden
City Defendants' counsel was directly questioned as to the objective basis for the Board's
decision to change the R-M designation to the R-T designation.  Counsel responded that the
citizens raised concerns, but was unable to direct the Court's attention to any objective
evidence supporting those concerns.

> The Court:  What was the objective basis for switching it from RM to RT?  What
> was the objective basis?
>
> Mr. Ryan:  . . . after discussion, after public hearings, after input from the
> community, based on issues of traffic, stated issues of traffic, school crowing [sic],
> increased taxes, increased drain on services, aesthetics, physical character of the
> surrounding neighborhood.  It was felt by the Board that we will consistent with the
> Village make-up . . .
>
> The Court:  What was the expert data that backed up the citizen's complaints?  The
> expert had told the Village the opposite; right?
>
> Mr. Ryan:  Judge, the Village trustees looked all of these factors and weighed
> everything and consistent with the Village —

> The Court:  But other than the complaints of the citizens . . . my question to you is what else in terms of objective data supported the switch from RM to RT?
>
> Mr. Ryan:  Judge, you listen to as an elected official, you listen to your constituents. You look — You listen to your experts.  You weigh what — and You weigh the — what is presented to you.

(See Aug. 21, 2009 Hearing Tr. at 65-66; see also Trustee Lundquist Dep., Pl. Ex. 9 at 239 (stating "I don't know" when asked to offer an explanation as to why the recommended R-M zoning was not adopted by the Board).)

The Garden City Defendants rely on R.J. Investments v. Board of County Commissioners for Queen Anne's County, Maryland, 414 Fed. App'x 551 (4th Cir. 2011), in which the Fourth Circuit upheld a judgment for the defendants where they demonstrated that their decision to prevent the development of affordable housing was based on "legitimate" concerns regarding sewer capacity, and because the plaintiff's case was merely based on "conjecture and supposition".  The Fourth Circuit found that there was not a "scintilla of evidence that the Board . . . acted with racially discriminatory intent."  Id. at 554.  However, unlike in R.J. where the sewage concerns were unquestionably legitimate, in this case, the Plaintiffs have put forth evidence that raises a genuine issue of fact as to whether the non-discriminatory reasons cited by the Garden City Defendants, such as traffic or the increased burden on the school system, were baseless pretext.  Furthermore, the Court finds that the Plaintiffs case is based on more than "conjecture and supposition" and thus sufficient reasons exist to preclude the case's dismissal on summary judgment.

In sum, the Court concludes that, viewing the evidence in the light most favorable to the Plaintiffs, as required on summary judgment — including the alleged impact of the

zoning change on minorities, the historical background of the zoning decision, the sequence of events leading up to it, and statements made by the decision-makers — that the Plaintiffs have raised genuine issues of material fact as to whether the Garden City decision-makers engaged in discriminatory zoning practices in connection with the Social Services site.  Accordingly, the Defendants' motion for summary judgment with regard  to the Plaintiffs' disparate treatment claim as to the Garden City Defendants, is denied.

### ii.  Nassau County

In the County's separate motion for summary judgment, it argues that the Plaintiffs' disparate treatment claim against it must fail, as a matter of law, because, regardless of whether the Plaintiffs can demonstrate racial animus, they have failed to raise any factual issues as to whether the County bears the legally required causal relationship to the complained-of Village zoning action.  The Court agrees.

Although the Plaintiffs' allegations are not entirely consistent in this regard, the allegedly discriminatory act at issue in this case is the rejection of the R-M designation in favor of the R-T designation.  However, the County cannot be held liable for that act, as a matter of law, because the County lacked legal power over the chosen zoning designation for the Social Services site.  While the County did request that the Garden City Defendants rezone the Site so as to facilitate a higher purchase price for the property, the Garden City Defendants were under no legal obligation to do so.  See County Government Law of Nassau County (L 1936, ch 879 § 1606) (stating that "powers with regard to the regulation and restriction of the height, number of stories and size of buildings and other structures, the percentage of the lot that may be occupied, the size of the yards, courts and other open

spaces, the density of population, and the location and use of buildings, structures and land for trade, industry, residence or other purposes shall remain in force in such towns, villages and cities"); see also Village Law § 7-700 (L 1972, ch 892, eff. Sept. 1, 1973, Grant of Power) ("the board of trustees of a village is empowered, by local law, to regulate and restrict the height, number of stories and size of buildings and other structures, the percentage of lot that may be occupied, the size of yards, courts and other open spaces, the density of population, and the location and use of buildings, structures and land for trade, industry, residence or other purposes").

The Plaintiffs dispute the County's asserted lack of legal authority because they claim that the County is essentially empowered to ignore or override a municipality's zoning laws when it is in the best interest of the public.  In support of this proposition, the Plaintiffs cite to a small number of New York state cases and one federal case from the Southern District of New York where either a county itself or a private party working in tandem with a county brought suit against a municipality to challenge its zoning laws. Thus, extrapolating from this precedent, the Plaintiffs claim that the County's deliberate inaction by not bringing such a lawsuit is equivalent to impermissible discrimination.

First, although the Plaintiffs assert that the County could simply ignore a local municipality's zoning ordinance, this is not precisely true.  Rather, if a county's challenge to a zoning law is successful because a court finds that the public interest in a particular land use outweighs the local municipality's interests in preventing that land use, then, and only then, is a county empowered to ignore that zoning.  The Plaintiffs point out that by planning to build a new Family and Matrimonial Court Complex on the Social Services site

65

although the land is no longer zoned as "P" for public governmental use, the County has

acknowledged its authority to ignore the Village's zoning of the Site.  It is not entirely clear

whether Garden City is intending to or would be required to change the site's zoning back

to "P" in order for the County to build the complex.  Carl Schroeter stated in his deposition

that his "opinion—I'm not a lawyer.  My opinion is that the County would have the right to

[renovate or construct a placement for the family court on the Social Services site] without

a rezoning."  (Pl. Ex. 123 at 124.)  The Court finds it strange that the County on one hand

cites to its lack of zoning power to preclude liability in the present case while

simultaneously ignoring this same lack of power if it were to build a government building

on land not zoned for it, arguably in an effort to end the litigation.  However, Schroeter's

statement of belief alone is insufficient to find that the County can ignore Garden City's

zoning to build the Family and Matrimonial Court Complex if Garden City does not change

it on its own initiative, nor does it mean it would have the authority to do so.

Significantly, the Court notes that all of the cases referenced by the Plaintiffs with

regard to the County are distinguishable from the case at hand.  As an initial matter, the

cases cited by the Plaintiffs for the assertion that the County had authority to supersede

Garden City's zoning ordinances are inapplicable, because even if the County were to

achieve such an override, the private developer the site was eventually sold to would still

be subject to Garden City's zoning requirements. Cf. Matter of County of Monroe, 530

N.E.2d 202, 72 N.Y.2d 338, 533 N.Y.S.2d 702 (1988) (addressing the applicability of local

zoning laws where a conflict arises between two governmental entities).  Further, even in

cases where a private developer was not precluded from enjoying such immunity against

local zoning, that party was working together with the state or county to complete a certain project.  In other words, the cases cited by the Plaintiff do not involve the situation where a private developer is merely purchasing land from the county to pursue its own endeavor. See Crown Comm'n N.Y., Inc. v. Dep't of Transp. of N.Y., 4 N.Y.3d 159, 824 N.E.2d 934, 791 N.Y.S.2d 494 (2005).

    Finally, the one federal case from this circuit cited by the Plaintiffs involved an instance where the State had explicit statutory authority under the New York Education law to initiate quasi-judicial proceedings sua sponte to enforce New York's education policies. See U.S. v. City of Yonkers, 96 F.3d 600, 618 (2d Cir. 1996) ("The State defendants contend, however, that the judgment in their favor should be upheld on the basis that, under New York law, they lacked legal authority or responsibility to intervene in Yonkers to remedy the unlawful segregation.  In light of the express provisions of New York statutory law, this contention need not detain us long.").  No such explicit mandate to commence quasi-judicial or judicial proceedings or any other form of statutory override powers exist here.  Cf. id. ("and it provides that he 'shall also have the power and it shall be his duty' to cause to be instituted such proceedings or processes as may be necessary to properly enforce and give effect to any provision in this chapter").

    Even though the cases cited by the Plaintiffs are all distinguishable, the Court recognizes that there is some authority for the proposition that the County hypothetically could initiate a law suit to challenge Garden City's zoning laws.  See Westhab, Inc. v. Village of Elmsford, 151 Misc. 2d 1071, 574 N.Y.S.2d 888 (N.Y. Sup. Ct. 1991) ("Therefore, this court believes that upon a balancing of the public interests test it would be

determined that the County of Westchester . . . would be exempt from the enforcement by the Village of Elmsford of the local regulations at issue."); see also City of Yonkers, 96 F.3d at 613 ("Liability may be premised not only on action but on a refusal to act.").  This ability could potentially extend to a private developer who subsequently purchased the land from the County.  See Crown Comm'n N.Y., 4 N.Y.3d at 165 ("it is not the private status of the Wireless Telephone Providers but, rather, the public nature of the activity sought to be regulated by the local zoning authority that is determinative in this case") (internal quotations omitted).

Nevertheless, even if this Court were to assume that in theory the County could have initiated litigation to challenge Garden City's R-T zoning for an exemption in the public interest, the Court is not persuaded that because such litigation was not taken, the County may now be held liable.  Cf. Doe v. New York City Dep't of Social Services, 649 F.2d 134, 141 (2d Cir. 1981), cert. denied, 464 U.S. 864, 104 S. Ct. 195, 78 L. Ed. 2d 171 (1983) ("Government officials may be held liable under § 1983 for a failure to do what is required.") (emphasis added).

While the County has certain obligations in accepting HUD funds, including that it will affirmatively further fair housing, the Court will not go so far as to say that this duty encompasses an obligation to sue a municipality every time a county believes it might be violating the FHA.  Such a rule would logically mean that a county would need to commence an action against a municipality for any questionable zoning decisions or risk being sued for that municipality's bad acts.  The mere ability to bring a lawsuit against a municipality should not impose upon a county a duty to do so in order to avoid being held

responsible for a municipality's zoning decisions.  It is unsound for this Court to find that a county needs to proactively and preventively bring suit in order to avoid liability.  The Plaintiffs have not pointed to and the Court has not found a case that states that a county may be held liable under the FHA for not actively pursuing litigation against a municipal zoning authority.  In this case, it is simply too attenuated to say that the County had a discriminatory impact on the Plaintiffs by not itself challenging Garden City's zoning decision presently under attack by the Plaintiffs.

Moreover, the Plaintiffs emphasize that the County did not protest Garden City's actions in a more forceful matter, whether formally or informally.  However, the lack of objection alone does not constitute discriminatory conduct in this case.  The Plaintiffs argue that the County could have formally recommended modification or disapproved of the proposed action pursuant to N.Y. Gen. Mun. Law § 239-m(4)(a), such as recommending that R-M zoning be instituted rather than R-T.  Instead the County merely requested that the density of the R-T zone be less severely limited.  However, although the Plaintiffs may find the lack of outrage by the County to be objectionable, that does not constitute a violation of law.  In addition, the County also cannot be held liable for its mere failure to informally and publicly combat the Garden City Defendants' alleged discrimination, as the Plaintiffs contend.

Therefore, while the Plaintiffs submit that County officials were well aware that racism fueled community opposition to the R-M zoning designation and "acquiesced" to that opposition or acted "in concert" with the Village by selling the property under the R-T designation, the County had no legal authority to alter or ignore the Garden City

Defendants' zoning decision once enacted.  The fact that the County could itself bring suit for an exemption to override the zoning decision does not change this result, in light of the Court's discussion above.  The other arguments made by the Plaintiffs to place liability on the County Defendant are also without merit.

Finally, to the extent that the Plaintiffs are alleging that the discriminatory act at issue is not the zoning decision but rather the County's sale of the Social Services site, summary judgment would still be granted as to the County Defendant.  The County's stated goal in selling the land was maximizing profits, and it has demonstrated that though it would have preferred the R-M designation, it acted in furtherance of its stated goal when left with the R-T designation.  The Plaintiffs have provided no evidence from which a rational finder of fact could determine that the County's ultimate selection of Fairhaven Properties, Inc. as the highest bidder for the Social Services site was motivated by any discriminatory intent.

Accordingly, the County's motion for summary judgment dismissing the Plaintiffs' disparate treatment claim against it is granted.

## 2.  Disparate Impact

The Court now turns to the Defendants' respective motions for summary judgment dismissing the Plaintiffs' FHA § 3604 claim brought under a theory of disparate impact. For the reasons outlined below, disputed issues of fact preclude summary judgment on this claim as to the Garden City Defendants, but not the County.

### a.  Legal Standard

In establishing a prima facie case of housing discrimination under a theory of disparate impact, a "plaintiff must show: (1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." Tsombanidis v. W. Haven Fire Dep't, 352 F.3d 565, 574-75 (2d Cir. 2003) (internal quotations omitted). A claimant need not provide proof of discriminatory intent, but must demonstrate that "the challenged practice of the defendant 'actually or predictably results in racial discrimination; in other words that it has a discriminatory effect.'" Huntington Branch, N.A.A.C.P., 844 F.2d 926 at 934 (quoting United States v. City of Black Jack, 508 F.2d 1179, 1184-85 (8th Cir. 1974), cert. denied, 422 U.S. 1042 (1975)) (further noting that sometimes "[facially neutral] rules bear no relation to discrimination upon passage, but develop into powerful discriminatory mechanisms when applied").  "The discriminatory effect of a rule arises in two contexts: adverse impact on a particular minority group and harm to the community generally by the perpetuation of segregation." Huntington Branch, N.A.A.C.P., 844 F.2d at 937.

In establishing "discriminatory impact," the plaintiff must demonstrate a "'causal connection between [a] facially neutral policy . . . and the resultant proportion of minority' group members in the population at issue." Hack v. President & Fellows of Yale Coll., 237 F.3d 81, 90-91 (2d Cir. 2000) (quoting Brown v. Coach Stores, Inc., 163 F.3d 706, 712 (2d Cir. 1998)).  Once a plaintiff has presented a prima facie case of disparate impact, "the burden shifts to the defendant to 'prove that its actions furthered, in theory and in practice,

a legitimate, bona fide governmental interest and that no alternative would serve that
interest with less discriminatory effect.'" Tsombanidis, 352 F.3d at 575 (quoting
Huntington Branch, N.A.A.C.P., 844 F.2d at 936).  The Second Circuit has set forth two
factors that weigh in this analysis; first, although discriminatory intent is not required to
establish a prima facie case of disparate impact housing discrimination, "there can be little
doubt that if evidence of such intent is presented, that evidence would weigh heavily on the
plaintiff's side of the ultimate balance." Huntington Branch, N.A.A.C.P., 844 F.2d at 936.
Second, if the plaintiff is suing "only to require a governmental defendant to eliminate
some obstacle to housing that the plaintiff itself will build," the government must provide a
more substantial justification for its actions than would be the case if a plaintiff was suing
to compel the government to construct housing.  Id.

### b.  As to the Plaintiffs' Theory of Disparate Impact

#### i.  The Garden City Defendants

In the instant case, as set forth in detail above, the Plaintiffs have raised triable
issues of fact with regard to whether an outwardly neutral practice, namely, the adoption of
the R-T zoning designation by the Garden City Defendants, had a disproportionate effect
on potential minority residents.  First, evidence proffered by the Plaintiffs' expert suggests
that the rejection of the R-M zone in favor of the R-T zone significantly decreased the
potential pool of minority residents likely to move into housing developed at the Social
Services site in proportion to the number of non-minorities affected and, therefore, the
enactment of the R-T zone actually resulted in racial discrimination.  See Tsombanidis v.
W. Haven Fire Dep't, 352 F.3d 565, 575-76 (2d Cir. 2003) ("The basis for a successful

disparate impact claim involves a comparison between two groups — those affected and those unaffected by the facially neutral policy.  This comparison must reveal that although neutral, the policy in question imposes a significantly adverse or disproportionate impact on a protected group of individuals . . . .  Statistical evidence is also normally used in cases involving fair housing disparate impact claims.") (internal quotations omitted).

McCardle's report postulates that in a residential development with a multi-family, affordable housing component that was consistent with the rejected R-M zoning classification, the pool of renters who could have afforded to live at the Social Services site would have ranged from 56 minority households (18% of households) to 101 minority households (32% of households).  (SAMF ¶¶ 150-54.)  In comparison, under the R-T zoning compliant luxury housing development that was to be built by Fairhaven, the Social Services site would have been occupied almost exclusively by white households, with only 3 to 6 minority households.  (SAMF ¶ 69.)  See Rivera v. Inc. Vill. Of Farmingdale, 784 F. Supp. 2d 133, 144 (E.D.N.Y. 2011) (finding an issue of fact regarding disparate impact in light of statistical evidence which demonstrated that 21.9% of Hispanic residents would be affected by village project as opposed to only 1.2% of non-Hispanic white residents).

The Garden City Defendants point out that McCardle only compares the number of minorities affected as between the R-M designation and the winning $56 million bid under the R-T zoning, thus excluding a comparison with other potential housing that could have been built at the site under R-T zoning that was not necessarily "high-end".  However, even if a different bidder had been awarded the project, the McArdle Report also notes that minorities comprise a disproportionate share of renter (versus owner) households in the

County and, thus, a zoning proposal that permits only 36 multi-family rental units (and only by special permit) versus the 311 contemplated by the original zoning proposal (as-of-right) would have a greater impact upon potential minority residents.  (See McArdle Report, at ¶ 49 ("Minorities made up just 14.8% percent of all households in Nassau County in 2000, but 31.1% of renter households.").)  Thus, Garden City's attempt to avoid liability under a disparate impact analysis by pointing the finger at Nassau County's price demand is without merit.

The Plaintiffs also produced evidence that the R-T zone's restriction on the development of multi-family housing perpetuates segregation generally because it decreases the availability of housing to minorities in a municipality where minorities constitute approximately 2.6% of the population versus approximately 19.7% in the County overall.  See Davis v. N.Y. City Hous. Auth., 278 F.3d 64, 80-81 (2d Cir. 2002) (stating that district court's determination in disparate impact claim that housing project was segregated where percentage of project's white population was more than four times the system average "was entirely consistent with existing law"); United States v. Inc. Vill. of Island Park, 888 F. Supp. 419, 448 (E.D.N.Y. 1995) (finding that although African-American population in defendant village increased over ten years, it's still relative low share of the overall village population, particularly when considered in contrast with the African-American population of Nassau County Consortium and adjacent town, demonstrated segregation under disparate impact claim).

The Court rejects the Garden City Defendants' argument that the R-T zoning designation does not perpetuate segregation because it creates housing opportunities where

there previously were none under the P zone.  As set forth in the first ACORN decision by Judge Bianco, as well as in the disparate treatment analysis in this Memorandum of Decision and Order, the relevant inquiry here focuses on the housing opportunities available under the rejected R-M designation versus the approved R-T designation.

As the Plaintiffs have established a prima facie case of disparate impact, the burden now shifts to the Defendants to demonstrate that the rejection of the R-M zone for the R-T zone advanced a "legitimate, bona fide governmental interest . . . that no alternative would serve . . . with less discriminatory effect."  Tsombanidis, 352 F.3d 565, 575.  The Garden City Defendants argue that they had such a legitimate, bona fide governmental interest in that the R-T zoning designation "encourages the development of townhomes, a housing option not previously built in the Village."  (GC Mem. at 36.)  However, the Plaintiffs note that the Garden City Defendants fail to identify how those interests were not advanced by the R-M zoning designation, which also allowed for the development of townhouses.  The Garden City Defendants further submit that the R-T zoning designation better balanced the existing residents' concerns about traffic, schools and infrastructure.  However, as the Court has already noted, the Plaintiffs have offered evidence that those concerns were adequately addressed by the R-M framework.  Accordingly, while the Garden City Defendants have identified legitimate governmental interests advanced by the R-T zone, the evidence proffered by the Plaintiffs is sufficient to create genuine issues of disputed fact as to whether those interests truly existed in this case and, if so, whether such interests could be furthered with less discriminatory effect.

Finally, even though the Plaintiffs are not required to set forth evidence of discriminatory intent in order to establish a prima facie case of disparate impact, they also have raised triable issues of fact regarding the Garden City Defendants' complicity in acting on the allegedly race-based community opposition to the R-M zone.  If a rational finder of fact was to find discriminatory intent, that finding would weigh in the Plaintiffs' favor on a disparate impact claim.  As noted above, the Court recognizes that the Garden City Defendants have articulated legitimate, general planning concerns, but there are material issues of fact relating to whether those articulated concerns were a pretext for discriminatory intent.  This issue cannot be resolved on summary judgment.  Accordingly, the Garden City Defendants' motion for summary judgment on the Plaintiffs' FHA disparate impact claim is denied.

### ii.  The County

As with disparate treatment, the Court must initially determine how to frame the alleged discriminatory action in connection with the County.  In the context of disparate impact, the Plaintiffs contend that the action they are condemning is the "acquiesce[ence] to the exclusionary R-T zoning" and that anything that "happened during the RFP process is beside the point for the purposes of this Court's disparate impact analysis."  (Pl. Opp. at 52-54.)  However, as set forth above, under the facts of this case, the County bears no liability for the enactment of the allegedly discriminatory zoning designation, as a matter of law.

In order to advance a claim against this defendant under a theory of disparate impact, the Court finds that the Plaintiffs must set forth evidence from which a rational fact

finder could conclude that the County's other possibly discriminatory action — the outwardly neutral decision to sell the Social Services site to Fairhaven Properties, Inc. — had a disproportionate effect on minority residents, as opposed to other potential proposals that conformed to the strictures of the R-T zoning designation.  In other words, because there is no evidence that the County was responsible for that R-T designation, the disparate impact claim against it cannot be based on any disparity between proposals under the R-M designation as opposed to the R-T designation.  Instead, the County can only be held liable with respect to disparate impact among proposals that conform with the R-T zoning requirements.  However, the Plaintiffs have submitted no evidence that the selection of Fairhaven Properties, Inc. bid had a disproportionate effect on minorities when compared to alternate proposals conforming to the strictures of the R-T zone.  Accordingly, the Plaintiffs have failed to establish a prima facie case of disparate impact as it relates to the County and the County is entitled to summary judgment dismissing that claim.

**D.  FHA Claims Against the County**

The Plaintiffs, including the Intervenor-Plaintiff NYCC, assert a second FHA claim, against only the County, arising under 42 U.S.C. § 3608 (Section 808 of the FHA), on the ground that the County has failed to affirmatively further fair housing while receiving federal grants conditioned on that action.  The County argues first, that this provision of the FHA is only applicable to federal agencies; second, that the provision does not create a private right of action; and third, that federal regulations actually prevent it from disbursing federal housing funds to Garden City and, therefore, it could not have run afoul of the FHA for any alleged complicity in the Garden City Defendants' zoning decisions.  As set forth

77

below, the Court finds that though this provision is indeed applicable to local agencies as they act on behalf of HUD, it does not provide a private right of action.  Thus, the Court need not address the substantive merits of the Plaintiffs' claim in this regard.

### 1.  **Legal Standard**

Section 3608(e)(5) provides that "the Secretary of Housing and Urban Development ["HUD"] shall – administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this title."  42 U.S.C. § 3608(e)(5); FHA § 808(e)(5).  To that end, any recipient of affordable housing assistance provided by HUD must "certif[y] to the satisfaction of the Secretary that – the grant will be conducted and administered in conformity with the Civil Rights Act of 1964 and the Fair Housing Act, and the grantee will affirmatively further fair housing."  42 U.S.C. § 5304(b)(2); FHA § 104.  Federal regulations specify that consortium fund recipients "affirmatively further fair housing" by "conduct[ing] an analysis to identify impediments to fair housing choice within the area, tak[ing] appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain[ing] records reflecting the analysis and actions in this regard."  24 C.F.R. § 91.425(a)(1)(i).  The Second Circuit has determined that the agencies administering grants have "an affirmative duty to encourage fair housing" and that an injured claimant may challenge "administrative violations of statutory duties."  See Evans v. Lynn, 537 F.2d 571, 578 (2d Cir. 1975).

**2.  As to the Plaintiffs' Section 3608 Claim**

**a.  Section 3608 Applies to Local Municipalities Administering HUD Funds**

The County first argues that Section 3608 is only enforceable against federal

agencies and not local municipalities and relies upon the Second Circuit's decision in

Acevedo v. Nassau County, 500 F.2d 1078 (2d Cir. 1974) in support of that proposition.

This argument is without merit, as the Acevedo decision does not preclude Section 3608

claims asserted against local agencies, but rather notes that a viable Section 3608 claim

against HUD does not necessarily constitute a valid Section 3604 claim against a

municipality administering Section 3608 funds based upon the same factual nexus.  See id.

at 1082 ("On the authority of [Section 3608] HUD might be justified in denying appellees

funding for other projects if they refuse to approve low income housing . . . .  But HUD's

discretionary powers under the [Fair Housing] Act extend beyond the duties imposed by

the Act on local housing plans.  HUD's action does not mean that [the County] ha[s]

violated section [36]04 of the Act.") (emphasis added).  Moreover, it is clear from case law

generated prior to and after the Acevedo decision that non-federal agencies administering

grants have "an affirmative duty to encourage fair housing."  See Evans, 537 F.2d at 578.

Specifically, the Second Circuit has stated:

> We agree with the parties and with the district court that the [New York City
> Housing] Authority is under an obligation to act affirmatively to achieve integration
> in housing.  The source of that duty is both constitutional and statutory.  Various
> discriminatory housing practices have been outlawed by judicial decree as violative
> of the Equal Protection Clause . . .  An additional source of the affirmative duty to
> integrate is found in the 1968 Fair Housing Act . . . § 3601, and, in § 3608 . . .  We
> are satisfied that the affirmative duty placed on the Secretary of HUD by §
> 3608(d)(5) and through him on other agencies administering federally-assisted
> housing programs also requires that consideration be given to the impact of

proposed public housing programs on the racial concentration in the area in which the proposed housing is to be built.

Otero v. New York City Housing Auth., 484 F.2d 1122, 1133-34 (2d Cir. 1973) (emphasis added); see also U.S. ex rel. Anti-Discrimination Ctr. of Metro New York, Inc. v. Westchester County, 495 F. Supp. 2d 375, 386 (S.D.N.Y. 2007) (recipients of HUD funds under Section 3608 such as Westchester County must "affirmatively further fair housing"); Langlois v. Abington Housing Auth., 234 F. Supp. 2d 33, 73 (D. Mass. 2002) ("The remaining question is whether the mandatory obligation imposed by § 3608(e)(5) on the Secretary of HUD can be enforced against the [public housing authorities]. When viewed in the larger context of Title VIII, the legislative history, and the case law, there is no way — at least, none that makes sense — to construe the boundary of the duty to affirmatively further fair housing as ending with the [HUD] Secretary."). Therefore, it is clear that Section 3608 is applicable to the County in the instant matter.

**b.   There is No Express or Implied Private Right of Action for Section 3608**

The County next argues that, even if applicable, there is no private right of action under § 3608, either express or implied. The Court agrees. Section 3613 of the FHA, entitled "Enforcement by private persons," provides that:

> An aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice, or the breach of a conciliation agreement entered into under this subchapter, whichever occurs last, to obtain appropriate relief with respect to such discriminatory housing practice or breach.

42 U.S.C. § 3613(1)(A); FHA § 813(1)(A). Section 3602(f), in turn, defines a "discriminatory housing practice" as "an act that is unlawful under section 3604, 3605,

3606, or 3617 of this title." Section 3608, the provision under which the Plaintiffs assert their claim against the County, is not mentioned. By its plain language, the FHA does not provide for an express private right of action under Section 3608 against any party implicated by the obligations created by that statute.

The Court must next determine whether Congress created an implied private right of action under Section 3608. Courts reviewing this statutory provision, as asserted against the <u>federal government</u>, have concluded that no such right exists. Specifically, they have noted that the proper vehicle for relief under Section 3608 lies not in a private right of action under the FHA, but rather through the Administrative Procedures Act. <u>See Latinos Unidos De Chelsea En Accion (Lucha) v. Sec'y of Hous. and Urban Dev.</u>, 799 F.2d 774, 791 (1st Cir. 1986) ("[I]t is unlikely that Congress absentmindedly forgot to mention an intended private action against HUD under section 3608(d).") (internal quotations omitted); <u>see also N.A.A.C.P. v. Sec'y of Hous. and Urban Dev.</u>, 817 F.2d 149, 152 (1st Cir. 1987) (no implied private right of action against HUD under Section 3608); <u>Jones v. Office of Comptroller of Currency</u>, 983 F. Supp. 197, 202-03 (D.D.C. 1997) (same); <u>Marinoff v. U.S. Dep't of Hous. and Urban Dev.</u>, 892 F. Supp. 493, 496 (S.D.N.Y. 1995) (same), <u>aff'd</u>, 78 F.3d 64 (2d Cir. 1996); <u>Pleune v. Pierce</u>, 697 F. Supp. 113, 119 (E.D.N.Y. 1988) (same).

However, in the instant case, the Plaintiffs seek relief against the County, a non-federal entity, and thus the Administrative Procedures Act ("APA") provides no recourse for their alleged injury. The relevant inquiry thus becomes whether "Congress meant to give an injured person a right himself to enforce the federal statute directly against the

nonfederal person or whether the injured person can do no more than ask the federal

government to enforce the statute." N.A.A.C.P., 817 F.2d at 152.  The Court concludes, for

two reasons, that this claim falls into the latter category, and no implied private right of

action exists.  First and foremost, any obligations imposed upon the County under Section

3608 are derived from those imposed upon HUD by the same statutory provision.  It

follows, then, that if Section 3608 is not enforceable through a private right of action

against HUD, it cannot be enforceable through that same vehicle against a non-federal

agency implementing the duties imposed upon HUD by the FHA.

Second, the application of the relevant test as described in Cort v. Ash, 422 U.S. 66,

78, 95 S. Ct. 2080, 2088, 45 L. Ed. 2d 26 (1975), weighs against a finding of an implied

right of action.  In that decision, the Supreme Court directed courts making such an inquiry

to ask:

> First, is the plaintiff one of the class for whose especial benefit the statute was
> enacted," that is, does the statute create a federal right in favor of the plaintiff?
> Second, is there any indication of legislative intent, explicit or implicit, either to
> create such a remedy or to deny one?  Third, is it consistent with the underlying
> purposes of the legislative scheme to imply such a remedy for the plaintiff?  And
> finally, is the cause of action one traditionally relegated to state law, in an area
> basically the concern of the States, so that it would be inappropriate to infer a cause
> of action based solely on federal law?

Id. at 78.  Here, Section 3608(e) does not identify a class which the provision is meant to

benefit, nor does it define a specific right conferred in favor of private plaintiffs.  Instead,

the section, under the heading "functions of the secretary," lists a variety of affirmative

duties placed upon the HUD Secretary, which include, but are not limited to: making

studies, publishing reports, cooperating with local agencies seeking to prevent or eliminate

discriminatory housing practices, and compiling annual reports for Congress.  See 42

U.S.C. § 3608(e).  As one court noted, "[t]he fact that th[e] duty [plaintiffs seek to enforce] appears in a section devoted solely to HUD's minsterial duties sharply undercuts plaintiffs' claim that Congress intended that duty to confer enforceable rights on them."  <u>Thomas v. Butzen</u>, No. 04 Civ. 5555, 2005 U.S. Dist. LEXIS 21525, at *35 (N.D. Ill. Sept. 26, 2005).

In addition, the legislative history contains no suggestion that a private right of action was considered for this section.  <u>See Otero</u>, 484 at 1134 n.14 ("[T]here was extended debate in the House, mostly regarding other provisions of the 1968 Civil Rights Act and especially other aspects of Title VIII, 114 Cong. Rec. 9553-9621, but virtually none regarding the affirmative duties placed on the Secretary under § 3608(d)(5).").  Moreover, authorizing a private right of action against a non-federal entity is clearly inconsistent with the legislative scheme of Section 3608, which places affirmative enforcement duties on the Secretary of HUD.  Finally, the issue presented is not traditionally addressed by state law so that finding a federal right of action would be inappropriate, but that factor is not dispositive in light of the aforementioned three <u>Cort v. Ash</u> factors which weigh against finding such a right.

Accordingly, it is clear to the Court that Congress did not intend for private citizens to enforce Section 3608 directly against a non-federal entity, but rather those enforcement responsibilities lie with the federal government.

### c.  Section 3608 May Not Be Enforced Through Section 1983

Having determined that Section 3608 does not provide for an express or implied private right of action, the Court must finally determine whether, as the Plaintiffs argue, rights granted by that statute may be advanced by a Section 1983 suit.  Courts within the

Second Circuit have yet to squarely address this issue, and district courts in other jurisdictions have divided.  Compare S. Middlesex Opportunity Council, Inc. v. Town of Framingham, No. 07 Civ. 12018, 2008 U.S. Dist. LEXIS 85764, at *51 (D. Mass. Sept. 30, 2008) (dismissing Section 3608 claims asserted through Section 1983 against state actor for failure to state a claim); Thomas, 2005 U.S. Dist. LEXIS 21525, at *35 (same); with Wallace v. Chicago Housing Auth., 298 F. Supp. 2d 710, 719 (N.D. Ill. 2003) ("we hold that Plaintiffs may sue under § 1983 to combat a violation of § 3608(e)(5) of the Fair Housing Act"); Langlois v. Abington Housing Auth., 234 F. Supp. 2d 33, 72-73 (D. Mass. 2002) (holding that Section 3608 confers rights that can be vindicated through Section 1983 against a state actor).  Having conducted its own analysis, as set forth below, the Court agrees with the Thomas and Framingham decisions and concludes that Section 3608 does not give rise to rights enforceable against state actors under Section 1983.

It is well-settled that "[s]ection 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere."  Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993).  A federal statute creates a cognizable claim against a state actor under Section 1983 when it meets the following three requirements:

> First, Congress must have intended that the provision in question benefit the plaintiff.  Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence.  Third, the statute must unambiguously impose a binding obligation on the States.  In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

Blessing v. Freestone, 520 U.S. 329, 340-41 (1997).  The Supreme Court stressed, in Gonzaga Univ. v. Doe, 536 U.S. 273 (2002), that "it is only violations of rights, not laws, which give rise to § 1983 actions."  Id. at 283 (emphasis in original).  The Court rejected

the notion that any decisions rendered since <u>Blessing</u> "permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983." <u>Id.</u> Therefore, "where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit." <u>Id.</u> at 286 (internal quotations omitted). Moreover, "[e]ven after this showing, 'there is only a rebuttable presumption that the right is enforceable under § 1983.' The defendant may defeat this presumption by demonstrating that Congress did not intend that remedy for a newly created right." <u>Racho Palos Verdes v. Abrams</u>, 544 U.S. 113, 120, 125 S. Ct. 1453, 1458, 161 L. Ed. 2d 316 (2005) (quoting <u>Blessing v. Freestone</u>, 520 U.S. 329, 341 (1997) and <u>Smith v. Robinson</u>, 468 U.S. 992, 1012, 104 S. Ct. 3457, 3469, 82 L. Ed. 2d 746 (1984)).

While the Plaintiffs may argue that <u>Gonzaga</u> is limited in its application to laws passed pursuant to Congress' spending power, a notion which underlies the holding in <u>Wallace</u>, this Court is not so persuaded, as <u>Gonzaga</u> expresses no such limitations. Furthermore, the Supreme Court had the opportunity to make such a clarification in the case of <u>Racho Palos Verdes v. Abrams</u>, but simply reiterated "that § 1983 does not provide an avenue for relief every time a state actor violates a federal law. As a threshold matter, the text of § 1983 permits the enforcement of rights, not the broader or vaguer benefits or interests." 544 U.S. 113, 119-20 (2005) (internal quotations omitted). Courts have interpreted this decision as confirmation that <u>Gonzaga</u> is not limited to violations of laws passed pursuant to the spending power. See <u>McCready v. White</u>, 417 F.3d 700, 703 (7th Cir. 2005) ("Any possibility that <u>Gonzaga</u> is limited to statutes that rest on the spending

power (as the law in <u>Gonzaga</u> did) has been dispelled by <u>Racho Palos Verdes v. Abrams</u>, which treats <u>Gonzaga</u> as establishing the effect of § 1983 itself."); <u>accord Town of Framingham</u>, 2008 U.S. Dist. LEXIS 85764, at *50-*51.

   In the instant case, the text and structure of the FHA demonstrate that Section 3608 does not give rise to an enforceable, individual right.  <u>See Town of Framingham</u>, 2008 U.S. Dist. LEXIS 85764, at *49 ("Section 3608 does not establish rights for aggrieved persons in the same clear manner in which §§ 3604 and 3617 do.").  As noted in the Court's discussion regarding a private right of action, Congress created an enforcement provision for private citizens to bring suit pursuant to specific sections of the FHA, and Section 3608 was not so included on that list.  <u>See id.</u>, 2008 U.S. Dist. LEXIS 85764, at *50-*51 ("After reviewing the structure of the FHA, I conclude that Congress did not intend to confer an individual right pursuant to § 3608.  Congress provided an enforcement mechanism in the FHA for private individuals to bring civil actions . . . .  Conspicuously missing from the list is § 3608."); <u>Thomas</u>, 2005 U.S. Dist. LEXIS 21525, at *33 ("The text and structure of the FHA clearly evince Congress' intent that section 3608(e)(5) not confer an enforceable, individual right . . . .  A housing authority's failure to further fair housing is not a discriminatory housing practice actionable under section 3613, nor is it the subject of a separate cause of action in the statute.  The existence of an express cause of action in the FHA that does not encompass section 3608(e)(5) strongly suggests that Congress did not intend section 3608(e)(5) to create enforceable rights.").  While the question of whether an implied right of action exists is distinct from the question of whether a statute may be enforced through Section 1983, "the inquiries overlap in one meaningful respect — in

either case we must first determine whether Congress <u>intended to create a federal right</u>."

<u>Gonzaga Univ.</u>, 536 U.S. at 283.

In addition, the Court agrees that the broad goal underlying this provision — an intent that HUD do more than simply not discriminate itself but rather use its grant programs to assist in ending discrimination and segregation — "speaks to administrative objectives for the benefits of the parties seeking housing and . . . such benefits do not necessarily translate into enforceable, individual rights."  <u>Town of Framingham</u>, 2008 U.S. Dist. LEXIS 85764, at *50; <u>see Thomas</u>, 2005 U.S. Dist. LEXIS 21525, at *34 ("The language of section 3608, itself, bolsters that conclusion.  The title of that section is 'Administration' . . . The fact that this duty [to affirmatively further fair housing] appears in a section devoted solely to HUD's ministerial duties sharply undercuts plaintiffs' claim that Congress intended that duty to confer enforceable rights on them.").  Finally, the Court concurs with the Northern District of Illinois when it stated that

> the right allegedly conferred by section 3608(e)(5) is [too] vague and amorphous to be enforceable . . . [because it] does not define HUD's duty to further fair housing or place any parameters on it.  If violations of that duty could be redressed via section 1983, virtually any act or omission of HUD with respect to housing would be subject to judicial review. Neither the federal nor the state judicial system has the authority, resources or expertise to become HUD's overseer, the position plaintiffs' interpretation of section 3608(e)(5) would impose on them.

<u>Id.</u> at *35.

The Court now holds that a Section 3608 claim may not be advanced through Section 1983, so that the Court need not address if there is a genuine issue of material fact as to whether the County fulfilled its duty to HUD to affirmatively further the purposes of the FHA in its receipt, administration, and disbursement of CDBG and HOME funds.

Having thus failed to satisfy the threshold requirement articulated by the Supreme Court in
Gonzaga, the Plaintiffs may not advance a Section 3608 claim against the County through
Section 1983 and the County's motion for summary judgment dismissing that claim is
granted.

**E.  Sections 1981, 1982 and 1983**

The Plaintiffs further present claims against all of the Defendants, pursuant to 42
U.S.C. §§ 1981, 1982 and 1983, related to the allegedly discriminatory zoning of the Social
Services site.  The causes of action under Sections 1981 and 1982 are asserted by all
Plaintiffs, including the Intervenor-Plaintiff NYCC.  However, the cause of action under
Section 1983 is not asserted by the Intervenor-Plaintiff NYCC.  As detailed below, the
Court finds that the Plaintiffs have raised genuine issues of material fact on all these claims
as asserted against the Garden City Defendants, but not the County.

**1.  Legal Standard**

"To establish a claim under § 1981, a plaintiff must allege facts in support of the
following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to
discriminate on the basis of race by the defendant; and (3) the discrimination concerned
one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue
and be sued, give evidence, [purchase, lease or otherwise hold or convey property,] etc.)."
Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993).

A plaintiff bringing a claim under 42 U.S.C. § 1982, which states that"[a]ll citizens
. . . shall have the same right . . . as is enjoyed by white citizens . . . to inherit, purchase,
lease, sell, hold, and convey real and personal property," must demonstrate that he was

intentionally deprived of his property on account of his race, for "[w]hile § 1982 does not use the phrase 'discrimination based on race,' that is its plain meaning." Gomez-Perez v. Potter, 553 U.S. 474, 479, 128 S. Ct. 1931, 1936, 170 L. Ed. 2d 887 (2008); see also Shaare Tefilia v. Cobb, 481 U.S. 615, 616 (1987) ("The section forbids both official and private racially discriminatory interference with property rights.").

　　　　To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws; (2) by a person acting under the color of state law.  42 U.S.C. § 1983.  As stated above, "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993).  In the instant case, the Plaintiffs have alleged that defendants deprived them of equal protection under the laws in violation of the Fourteenth Amendment to the Constitution and seek redress for that alleged injury by a Section 1983 cause of action.  The Supreme Court has made clear that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact . . . "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-65 (1977) (citing Washington v. Davis, 426 U.S. 229, 242 (1976)); see also Orange Lake Assocs., Inc. v. Kirkpatrick, 21 F.3d 1214, 1226 (2d Cir. 1994) ("In short, we will not strike down an even-handedly applied, facially neutral law as violative of the Equal Protection Clause unless the plaintiff can demonstrate discriminatory intent or purpose.").

**2.  As to the Plaintiffs' Sections 1981, 1982, and 1983 Claims**

As described above, Sections 1981, 1982 and 1983 all require proof of discriminatory intent.  While the constitutional and statutory standards for discrimination in housing differ, the basis for the present summary judgment motions all involve this shared element.  Thus, if there is no genuine issue of material fact with regard to the Defendants' discriminatory intent so that summary judgment should be granted in the context of the FHA, it should similarly be granted in the context of Sections 1981, 1982 and 1983.  See Wentworth v. Hedson, 493 F. Supp. 2d 559, 571 n.17 (E.D.N.Y. 2007) ("the prima facie elements of [plaintiffs' claims under 42 U.S.C. § 1982 ] do not differ substantially from those applicable to plaintiffs' FHA claims."); Huertas v. East River Hous. Corp., 674 F. Supp. 440, 454 (S.D.N.Y. 1987) (applying the elements of a prima facie FHA claim to claims under § 1981 and § 1982); see also McHaney v. Spears, 526 F. Supp. 566, 574 (W.D. Tenn. 1981) ("The plaintiffs have also alleged that the defendants' actions state a cause of action under 42 U.S.C. § 1982. The Court finds that the requirements necessary to establish a prima facie case, and carry the burden of proof is the same under this provision as it is under 42 U.S.C. § 3601 et seq.  Accordingly, the Court finds that the defendants are liable to the plaintiffs for their violation of Section 1982 based on the findings of fact and the conclusions of law discussed in this opinion.").  The Defendants argue that the Plaintiffs cannot satisfy this common element and, therefore, these claims must be dismissed.

The Court has determined that there are genuine factual disputes as to whether the Garden City Defendants discarded the R-M zoning designation in favor of the R-T zoning

designation to appease race-based community opposition to multi-family housing, thus displaying a discriminatory intent.  Accordingly, the Sections 1981, 1982, and 1983 claims survive the Garden City Defendants' motion for summary judgment.  On the other hand, because there are no issues of fact related to the County's alleged responsibility for that zoning decision, its motion for summary judgment dismissing the Sections 1981, 1982, and 1983 claims is granted.

In this regard, the Garden City Defendants further assert that the Plaintiffs cannot demonstrate that they were denied the right to "inherit, purchase, lease, sell, hold, and convey real and personal property" secured by Section 1982 because "no housing development exists for them to do so."  (GC Mem. at 40.)  However, "[a]lthough the full scope of § 1982 has never been made clear, it has long been held to be a viable provision for challenging exclusionary land use restrictions."  Jackson v. Okaloosa County, Fla., 21 F.3d 1531, 1539 (11th Cir. 1994) (citing Jones v. Alfred H. Mayer Co., 392 U.S. 409, 417-18 (1968)).  Thus, this additional ground to dismiss the Section 1982 claim against the Garden City Defendants is denied.

## F.  Section 2000d

Finally, the Plaintiffs, including the Intervenor-Plaintiff NYCC, claim that the County's alleged "discriminatory practices with regard to the administration of federal programs, including the federal CFBG and HOME programs" was motivated by malice and/or callous disregard for the Plaintiffs and violated Section 601 of Title VI of the Civil Rights Act of 1964, which states that:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

See 42 U.S.C. § 2000d, et seq.  The Supreme Court has clearly stated that "it is . . . beyond dispute that § 601 prohibits only intentional discrimination."  Alexander v. Sandoval, 532 U.S. 275 (2001); see Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 178 (2005) ("Sandoval held that private parties may not invoke Title VI regulations to obtain redress for disparate-impact discrimination because Title VI itself prohibits only intentional discrimination.").  In this case, the Court has determined that no genuine issues of material fact exist as to whether the County acted with discriminatory intent in selling the Social Services site to the highest bidder.  Thus, the County Defendant cannot be held liable under Section 2000d.

While it does not appear that the Plaintiffs are asserting this cause of action against the Garden City Defendants, such a claim would nevertheless be without merit because it is undisputed that Garden City does not receive federal housing funds, as it is not a participant in the Nassau County Urban Consortium.  Liability under Title VI is conditioned upon the receipt of such "Federal financial assistance," and the Garden City Defendants cannot be held liable under that statute for any alleged discriminatory zoning practices.

Accordingly, the Plaintiffs' Title VI claims against all the Defendants must fail, as a matter of law, and the County's motion for summary judgment dismissing the claim is granted.

## III. MOTION TO AMEND THE INTERVENOR COMPLAINT

**A.  <u>The Present Motion to Amend</u>**

In addition to the Defendants' motions for summary judgment that were addressed in this opinion, there is a pending motion filed by the Intervenor-Plaintiff NYCC for leave to file an amended complaint.

NYCC filed its original intervenor complaint on June 30, 2010, which NYCC recognizes as being virtually identical to the Plaintiffs' amended complaint filed on November 30, 2005.  The essence of the present motion is that NYCC seeks to assert an additional cause of action that was inadvertently not included in their original intervenor complaint.  In fact, the Court notes that NYCC's original complaint and NYCC's proposed amended complaint are precisely the same, except for the cause of action they now seek to assert, entitled "Violation of the Civil Rights Act of 1871, 42 U.S.C. §1983 and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States." This claim alleges that the "Defendants' discriminatory customs, patterns, practices, and usage in contravention of the Individual Plaintiffs' and NYCC's constitutional and federal statutory rights motivated by malice and/or callous disregard for their rights, deprive the Individual Plaintiffs of their right of equal access to housing and deprive NYCC of its right to make housing available under color of law in violation of the Federal Civil Rights Act of 1871, 42 U.S.C. § 1983, and its rights under the Equal Protection Clause of the United States Constitution with regard to housing."  This cause of action would be asserted against both the County Defendant and the Garden City Defendants.

### B.  Whether NYCC May Amend Under Fed. R. Civ. P. 15(a)

#### 1.  The Legal Standard

Rule 15(a) of the Federal Rules of Civil Procedure requires that courts freely grant leave to amend "when justice so requires." Fed. R. Civ. P. 15(a).  Rule 15(a)(2) states in pertinent part:  "Amendments Before Trial. . . . a party may amend its pleading only with the opposing party's written consent or the court's leave."  Id.  A court should deny leave to amend only upon "undue delay, bad faith or dilatory motive on the part of the [moving party], repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the [non-moving party,] . . . [or] futility."  Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962); see also Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 603–04 (2d Cir. 2005) ("a Rule 15(a) motion should be denied only for such reasons as undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party.") (internal quotations and citation omitted).  Amendments are generally favored because "they tend to facilitate a proper decision on the merits." Blaskiewicz v. County of Suffolk, 29 F. Supp. 2d 134, 137 (E.D.N.Y. 1998).  However it is ultimately "within the sound discretion of the court whether to grant leave to amend."  John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp., 22 F.3d 458, 462 (2d Cir. 1994) (citing Foman, 371 U.S. at 182, 83 S. Ct. 227).

#### 2.  Whether NYCC's Proposed Amendment is Futile

The Court first considers whether permitting NYCC's motion to amend their complaint would be futile.  In this Court's discretion, it may deny a proposed amendment which would be futile, or which does not establish a sufficient or cognizable claim, or

which has no merit.  Health-Chem Corp. v. Baker, 915 F.2d 805, 810 (2d Cir. 1990)

("[W]here ... there is no merit in the proposed amendments, leave to amend should be

denied.")  Accordingly, an amendment is futile where it is legally insufficient on its face so

that it could be defeated by a motion to dismiss.  Lucente v. IBM Corp., 310 F.3d 243, 258

(2d Cir. 2002).  However, when a motion to amend is made in response to a summary

judgment motion, a court can determine if the amendment is futile based upon whether the

evidence in support of the plaintiff's proposed new claim creates a triable issue of fact,

even if the amended complaint would state a valid claim on its face.  See Milanese v.

RustOleum Corp., 244 F.3d 104, 110 (2d Cir. 2001).

　　　　In the present case, NYCC seeks to add an identical cause of action based upon the

same allegations that were already made by the other Plaintiffs.  Thus, the Court's analysis

above with regard to the Section 1983 and Equal Protection claims is determinative of

whether NYCC's proposed amendment would be futile.  Accordingly, the Court now finds

that the amendment would be futile as to the County but would not be futile as to the

Garden City Defendants.

### 3.　Whether NYCC Exhibited Undue Delay in Bringing the Motion to Amend

　　　　Even though NYCC has stated a new and valid cause of action in its proposed

amended complaint as against the Garden City Defendants, the Court must still consider

the timeliness of the motion to amend.  "One of the most important considerations in

determining whether amendment would be prejudicial is the degree to which it would delay

the final disposition of the action."  H.L. Hayden Co. v. Siemens Med. Sys., 112 F.R.D.

417, 419 (S.D.N.Y. 1986) (collecting cases).  Length of time, in of and itself, does not

provide a basis to deny a motion to amend.  See Daniels v. Loizzo, 174 F.R.D. 295

(S.D.N.Y. 1997) (finding that the plaintiff's nine-year delay in submitting proposed

amendments to the complaint did not necessitate the denial of the motion to amend absent

evidence of prejudice to the defendants and in light of plaintiff's pro se status and former

inadequate representation); Rachman Bag Co., 46 F.3d at 234–35 (noting that a lengthy

delay alone, in the absence of prejudice or bad faith, is not a sufficient basis to deny a

motion to amend).

NYCC initially filed its intervenor complaint on June 30, 2010.  NYCC claims that

the alleged clerical oversight first came to the attention of NYCC's attorneys on May 23,

2011, when the Garden City Defendants filed a letter requesting a pre-summary judgment

motion conference.  Three months later, on August 24, 2011, NYCC contacted the

Defendants to seek their consent to the now requested amendment, which consent was

declined.  Two days later, NYCC filed the present motion to add the additional cause of

action.  Therefore, there was at least an eleven month delay before NYCC even recognized

this alleged clerical error, and then another three month delay before filing the present

motion to amend.

NYCC asserts that the delay is not excessive because it was only "a short period of

time" between when it first discovered the error on May 23, 2011 and it filed the instant

motion on August 26, 2011.  (NYCC Mem. at 4.)  The Garden City Defendants contend the

error should have been caught as early as March 11, 2011, when the Village served its

Local Rule 56.1 statement and pointed out the omission.  Nevertheless, even a five month

delay, without evidence of bad faith or prejudice, is not a sufficient basis to deny a motion

to amend.  See Rachman Bag Co. v. Liberty Mut. Ins. Co., 46 F.3d 230, 234-35 (2d Cir.

1995); Zoll v. Jordache Enters. Inc., No. 01 Civ. 1339, 2002 WL 485733, at *2 (S.D.N.Y.

March 29, 2002) ("The time between September, when defendant maintains that it

discerned the basis for the defense, and the end of January, when it filed the motion to

amend, constitutes a delay of not quite five months. This delay is hardly egregious . . .").

"Narrow pleading rules should not be applied to foil an honest plaintiff's efforts to gain

redress."  Middle Atl. Utils., Co. v. S.M.W. Dev. Corp., 392 F.2d 380, 384 (2d Cir. 1968).

In light of the Court's finding below that undue prejudice will not result, and because there

is no evidence of bad faith, the Court finds that this delay does not warrant denial of the

leave to amend.

### 4.    Whether the Defendants will be Prejudiced if NYCC is Permitted to Amend the Intervenor Complaint

In determining whether leave to amend should be granted, among the "most

important" issues to consider is prejudice to the opposing party.  AEP Energy Servs. Gas

Holding Co. v. Bank of America, N.A., 626 F.3d 699, 725 (2d Cir. 2010) (internal

quotations omitted).  In analyzing "prejudice," courts consider whether the amendment

would: (1) require the opponent to "expend significant additional resources to conduct

discovery and prepare for trial," (2) significantly prolong the resolution of the action, or (3)

"prevent the plaintiff from bringing a timely action in another jurisdiction."  Monahan v.

N.Y. City Dept. of Corr., 214 F.3d 275, 284 (2d Cir. 2000).  The main concern is undue or

substantial prejudice — when the nonmoving party shows that it would be unfairly

disadvantaged or deprived of the opportunity to present facts or evidence that it would have

offered.

Cognizant of the aforementioned considerations, the Court finds that there is no undue prejudice that would result from this amendment.  The new cause of action that NYCC now seeks to assert has been already pleaded by the other three Plaintiffs— MHANY (previously NYAHC), Devita, and McCray — throughout the entire course of this litigation.  Further, NYCC does not seek to make any factual allegations with regard to this cause of action that differ in any way from the allegations contained in the 2005 amended complaint.  The Garden City Defendants have been vigorously defending against this claim throughout the past six years of this litigation, and hence have had the ability to prepare a full defense.  The Garden City Defendants do not explain why their defense of this claim thus far, including relevant discovery, differs in any way by virtue of the fact that it is asserted by the Intervenor-Plaintiff as opposed to the other Plaintiffs.

Moreover, when the amended complaint was filed in 2005, one of the plaintiffs that asserted the Section 1983 cause of action was ACORN.  NYCC only intervened after ACORN disbanded and was terminated as a plaintiff, because NYCC was an organization with goals similar to those of ACORN.  This further supports the notion that the Defendants were on notice of this claim since the inception of this litigation.  Finally, the Garden City Defendants have now had the opportunity to twice brief and argue in support of summary judgment against the Plaintiffs to dismiss this cause of action, and both times the Garden City Defendants did not distinguish between any of the four plaintiffs.  This plainly demonstrates that the Defendants have had the ability to defend against this claim.  Accordingly, the Court does not find that the proposed amendment would require the Defendants to expend significant additional resources to conduct discovery and prepare for

trial.  The Court agrees with NYCC that "permitting what is essentially an administrative amendment to correct a clerical mistake will not delay these proceedings or prejudice [the Garden City Defendants] in any way."  (NYCC Mem. at 6.)

The Garden City Defendants also argue that if the Court permits the present motion to amend, then the current summary judgment motions would have to be withdrawn and a third summary judgment motion would necessarily need to be filed in order to address this new claim.  However, because the Court finds that this claim has already previously been asserted by the other Plaintiffs and fully defended by all of the Defendants, there is no need for the current summary judgment motions to be withdrawn and refiled in light of this new but duplicative claim by the Intervenor-Plaintiff.  To do so would be a waste of time and resources for this Court as well as for all of the parties involved, as the Court has already made a determination as to this claim.  Furthermore, there does not appear to be a need for the Garden City Defendants to refile their present summary judgment motion merely to defend against this claim by NYCC, because they do not state a basis for making new or additional arguments as to this claim in connection with this particular plaintiff.  This is demonstrated by the fact that the Garden City Defendants do not even address futility in their opposition to the motion to amend, likely because to do so would be to simply rehash the arguments in their summary judgment motion.  In addition, there is no need for the Garden City Defendants to file a new answer, as NYCC stipulates that the Defendants deny the claim, as they consistently have from the initial filing of this case as to every other Plaintiff's claim in this regard.  Thus, no new answer will be required.

Therefore, the Court grants NYCC's motion to amend the complaint only as against the Garden City Defendants in conformance with the rulings set forth in this Memorandum of Decision and Order to include an additional cause of action for violations of the Civil Rights Act of 1871, 42 U.S.C. §1983 and the Equal Protection Clause of the Fourteenth Amendment. NYCC is directed to file an amended complaint within 20 days of the date of this Order.

## IV. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the Defendant County's motion for summary judgment dismissing all claims against it is GRANTED; **and it is further**

**ORDERED** that the Garden City Defendants' motion for summary judgment dismissing all claims against it is DENIED in all respects; **and it is further**

**ORDERED** that the Inventor-Plaintiff NYCC's motion to amend the intervenor complaint to include a cause of action for violations of the Civil Rights Act of 1871, 42 U.S.C. §1983 and the Equal Protection Clause of the Fourteenth Amendment is GRANTED. NYCC is directed to file an amended complaint only as against the Garden City Defendants in conformance with the rulings set forth in this Memorandum of Decision and Order within 20 days of the date of this Order; **and it is further**

**ORDERED** that the Plaintiffs and the Garden City Defendants are directed to appear on Thursday, February 23, 2012 at 9:00am for a conference to set a trial date.

**SO ORDERED.**

Dated: Central Islip, New York
February 15, 2012

_____*/s/ Arthur D. Spatt*_____
ARTHUR D. SPATT
United States District Judge