UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------------x

MHANY Management, Inc., Vic DeVita, and Francine
McCray,

                                Plaintiffs,                Case No. 05-CV-2301
                                                               (ADS)(WDW)

      -and-

New York Communities for Change, Inc.,

                              Intervenor-Plaintiff,

      -against-

County of Nassau, Incorporated Village of Garden City,
and Garden City Board of Trustees,

                              Defendants.

----------------------------------------------------------------------X

## DEFENDANTS INCORPORATED VILLAGE OF GARDEN CITY AND THE GARDEN CITY BOARD OF TRUSTEE'S PRE-TRIAL BRIEF



CULLENandDYKMANLLP

Garden City Center
100 Quentin Roosevelt Boulevard
Garden City, New York 11530-4850
Telephone (516) 357-3700 • Facsimile (516) 296-9155

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

ARGUMENT ...........................................................................................................2

POINT I
     THERE IS NO DUTY TO BUILD AFFORDABLE OR
     LOW INCOME HOUSING OR TO ZONE AT MAXIMUM DENSITIES....................................2

POINT II
     PLAINTIFFS FAIL TO DEMONSTRATE THAT R-T ZONING
     HAS A DISPARATE IMPACT ON
     A PROTECTED CLASS..............................................................................................5

          A.     Disparate Impact Claims are not Cognizable under the FHA .............................. 5

          B.     Plaintiffs' Expert Fails to Correctly Analyze the Impact of
                R-T Zoning Upon a Protected Class..........................................................8

          C.     The Village had a Legitimate Governmental Interest in
                Enacting R-T Zoning............................................................................11

POINT III
     THERE IS NO EVIDENCE THE VILLAGE ACTED WITH
     DISCRIMINATORY INTENT WHEN ENACTING R-T ZONING ............................................13

          A.     The Sequence of Events Leading up to the R-T
                Zoning Decision................................................................................14

                1.     The Comments Made by Citizens do not Demonstrate
                        Discriminatory Intent ..................................................................16

                  2.     There is no Evidence that Racial Animus Played
                        Any Role in the Zoning Decision......................................................19

           B.     Whether R-T Zoning Weighs More Heavily on One
                  Group than Another............................................................................20

           C.     Plaintiffs Cannot Demonstrate Racial Animus Through
                  History of the Village.........................................................................20

           D.     Whether there were Substantive Departures from Normal
                  Zoning Procedures ............................................................................. 21

           E.     The Village had Legitimate Reasons for Enacting R-T Zoning......................... 22

POINT IV

    PLAINTIFFS CANNOT PREVAIL ON THEIR CONSTITUTIONAL CLAIMS ......................24

        A.    42 U.S.C. § 1981 ..............................................................................................24

        B.    42 U.S.C. § 1982 ..............................................................................................24

        C.    42 U.S.C. § 1983 ..............................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Acevedo v. Nassau County*, 500 F.2d 1078 (2d Cir. 1974) .................................................. 2, 3, 4, 5

*Brown v. City of Oneonta*, 221 F.3d 329 (2d Cir. 1999) .............................................................. 24

*Burgin v. Toys-R-Us Nytex, Inc.*,
1999 U.S. Dist. LEXIS 10073 (W.D.N.Y. June 30, 1999) ......................................................... 24

*Chinese Staff & Workers' Ass'n v. Burden*, 932 N.Y.S.2d 1 (2011) ........................................... 11

*Dews v. Sunnyvale*, 109 F. Supp. 2d 526 (N.D. Tex. 2000) ................................................... 17, 21

*Eureka V LLC v. Town of Ridgefield*,
2011 U.S. Dist. LEXIS 10878 (D. Conn. Feb. 4, 2011) ............................................................ 20

*Gallagher v. Magner*, 619 F.3d 823 (8th Cir. 2010) ................................................................... 5

*Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) ......................................................................... 6

*Hallmark Dev., Inc. v. Fulton County*, 466 F.3d 1276 (11th Cir. 2006) ..................... 3, 8, 9, 17, 19

*Henry v. Jefferson County Comm'n*, 637 F.3d 269 (4th Cir. 2011) ............................................. 4

*Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926 (2d Cir. 1988) .......... 6, 7, 8

*Jackson v. Univ. of New Haven*, 228 F. Supp. 2d 156 (D. Conn. 2002) ..................................... 22

*Jim Sowell Construction Co. v. City of Coppell*, 61 F. Supp. 2d 542 (N.D. Tex. 1999) ........ 18, 19

*Jones v. Mayor and Counsel of Hurlock*,
2012 U.S. Dist. LEXIS 110115 (D. Md. Aug. 7, 2012) ............................................................ 17

*LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412 (2d Cir. 1995) .................................................. 13, 19

*Magner v. Gallagher*, 132 S. Ct. 548 (2011) .............................................................................. 5

*McHaney v. Spears*, 526 F.Supp. 566 (W.D.Tenn. 1981) .......................................................... 24

*MHANY Mgmt. v. County of Nassau*, 05-CV-2301 (E.D.N.Y. Feb. 15, 2012) ............................. 10

*Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mt. Holly*, 658 F.3d 375 (3d Cir. 2011) ..... 5

*Orange Lake Assoc., Inc. v. Kirkpatrick*, 21 F.3d 1214 (2d Cir. 1994) ........................................ 25

*Oxford House, Inc. v. Babylon*, 819 F. Supp. 1179 (E.D.N.Y. 1993) ............................................ 12

*Palmieri v. Town of Babylon*, 2000 U.S Dist. LEXIS 27694 (E.D.N.Y. Jan. 6, 2006) ............... 13

*Quad Enters. Co., LLC v. Town of Southold*, 369 Fed. Appx. 202 (2d Cir. 2010) .................... 3, 8

*Robinson v. Paragon Foods, Inc.*, 2006 U.S. Dist. LEXIS 66298 (N.D. Ga. Sep. 15, 2006) ........ 6

*Scales v. Vill. of Camden*, 1990 U.S. Dist. LEXIS 11194 (N.D.N.Y Aug. 17, 1990) .................. 12

*Smith v. City of Jackson*, 544 U.S. 228 (2005) ......................................................................... 6, 7

*Smith v. Town of Clarkton*, 682 F.2d 1055 (4th Cir. 1982) ......................................................... 17

*Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565 (2d Cir. 2003) ...................................... 10, 11

*U.S. v. Yonkers Bd. of Educ.*, 837 F.2d 1181 (2d Cir. 1987) ...................................................... 13

*United States v. City of Birmingham*, 538 F. Supp. 819 (E.D. Mich. 1982) ................................ 16

*Vill. of Arlington Heights v. Metropolitan Dev. Corp.*, 429 U.S. 252 (1977) ............. 13, 14, 22, 25

*Vill. of Belle Terre v. Boraas*, 416 U.S. 1 (1974) ................................................................... 4, 23

*Westhab, Inc. v. City of New Rochelle*,
2004 U.S. Dist. LEXIS 9926 (S.D.N.Y. May 3, 2004) ............................................................... 12

## Statutes

Civil Rights Acts of 1866, 42 U.S.C. §§ 1981 ....................................................................... 1, 24

Civil Rights Acts of 1866, 42 U.S.C. §§ 1982 ....................................................................... 1, 24

Civil Rights Acts of 1866, 42 U.S.C. §§ 1983 ....................................................................... 1, 25

Equal Protection Clause of the Fourteenth Amendment, U.S. CONST. amend. XIV, §§ 1, 5 ......... 1

Fair Housing Act of 1968, 42 U.S.C. § 3604(a) (2006) .............................................................. 5

Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 (2006) ......................................... 1, 7

**State   Statutes**

N.Y. COMP. CODES R. & REGS. tit. 6, § 617.2 (2000) .................................................................. 11

**Local   Statutes**

N.Y. VILLAGE LAW § 7-730 (McKinney 2011) .......................................................................... 11

N.Y. VILLAGE LAW § 7-712-b(2)(B)(3) (McKinney 2011) ........................................................ 22

**Other Legislative Materials**

114 CONG. REC. 5643 ..................................................................................................................... 7

**Secondary Sources**

Pres. Ronald Reagan, Remarks on Signing the Fair Housing Amendments Act of 1988 (Sep. 13,

     1988), http://www.reagan.utexas.edu/archives/speeches/1988/091388a.htm. ........................... 7

This trial brief is respectfully submitted on behalf of defendants, the Incorporated Village of Garden City ("Village") and Garden City Board of Trustees ("Village"), by their attorneys, Cullen and Dykman LLP. This case was originally commenced in 2005 by ACORN (The New York Association of Community Organizations for Reform Now), which is now defunct, New York Acorn Housing Company, which has changed names to MHANY Management Inc. ("MHANY"), and five individuals, none of whom remain a party to this case. The two remaining organizational Plaintiffs, the intervenor-plaintiff New York Communities for Change ("NYCC") (which did not exist until more than five years after the events at issue) and MHANY allege that a facially neutral zoning ordinance enacted by the Village in 2004 violates the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 (2006) (the "FHA"), the Equal Protection Clause of the Fourteenth Amendment, U.S. CONST. amend. XIV, §§ 1, 5, and the Civil Rights Acts of 1866, 42 U.S.C. §§ 1981, 1982 and 1983 (2006).

## PRELIMINARY STATEMENT

The inevitable and self-fulfilling conclusion that more individuals with lower incomes—whether white or minority—can afford to live in a potential, but far from realized, rental development versus a potential, but again far from realized luxury, equity development is the issue upon which Plaintiffs seek to try and have this Court assess liability. Plaintiffs attempt to make this case about one potential development versus another when, in actuality, the only factual issue is the Village's thorough, well-supported decision to zone the Social Services Site ("Site") as a Residential Townhouse ("R-T") district. Admittedly, Plaintiffs would have preferred different zoning of the Social Services Site. However, no amount of subterfuge or misdirection by Plaintiffs through racially charged accusations, unsupported anecdotal history, or speculative expert opinion can substantiate their claims or, more critically, carry their burden at

1

trial. This is not a case where the Village denied Plaintiffs' building application.  This is not a case where the Village up-zoned property.  This is not a case where the Village re-zoned an area which permitted multi-family to one that limits development to large tracts such as one-acre lots. This is a case where the Village, at the request of Nassau County, re-zoned a limited "Public-Zone" (i.e., governmental use only) district to an R-T zone, which allows a host of housing options, including single-family residences, townhomes, and multi-family units, the development of which was to be determined by the seller (the County) and the buyer (the County's chosen developer).

The issues of discrimination and segregation are both critically important and emotionally sensitive—not only to the parties here but also to people and governments throughout the nation.  There is little question that there is work to be done on these fronts. However, the law is sacrosanct in its requirements, both procedural and substantive.  Burdens of proof and evidentiary showings required to affirmatively demonstrate liability must be met. Here, Plaintiffs cannot sustain the burdens that meet them at trial in regard to either their FHA or constitutional claims.

## ARGUMENT

## I.  THERE IS NO DUTY TO BUILD AFFORDABLE OR LOW INCOME HOUSING OR TO ZONE AT MAXIMUM DENSITIES

Necessarily underlying the Plaintiffs' claims here are the following fallacies: (1) the Village was obligated to re-zone the Site for housing; and (2) the Village was obligated to zone the Site for the greatest number of housing units.  Neither, however, is the law.  "The Fair Housing Act does not impose any duty upon a governmental body to construct or to 'plan for, approve and promote' any housing." *Acevedo v. Nassau Cnty.*, 500 F.2d 1078, 1081 (2d Cir. 1974). In *Acevedo*, plaintiffs argued that once defendant Nassau County had started to plan for

2

low income housing to be built at a particular site, such a plan could not be abandoned if doing so would have a disproportionate impact on minorities, unless the County could show a "compelling governmental interest" for such abandonment. *See id.* The Second Circuit held that plaintiffs were seeking to "impose on [defendants] an affirmative duty to construct housing," and found that no such duty existed under either the Constitution or the FHA. *See id.*; *see also Hallmark Dev., Inc. v. Fulton Cnty.*, 466 F.3d 1276, 1287 (11th Cir. 2006) (where the court refused to recognize a right to "increased housing choices and supply" as it would "effectively place an affirmative duty on governing bodies to approve all re-zoning applications wherein a developer sought to build housing within a particular price range").

Moreover, the FHA is not a portal by which zoning ordinances can be challenged in order for a particular developer to develop a particular property at their selected level of density. *See Quad Enters. Co., LLC v. Town of Southold*, 369 Fed. Appx. 202 (2d Cir. 2010). In *Quad Enters. Co.*, the Second Circuit, in affirming Judge Seybert of this Court, held that the Town's zoning did not have a disparate impact upon handicapped individuals because the plaintiffs had failed to show that "the development of handicapped-accessible units is fiscally unfeasible at the lower densities required by the current zoning." *Id.* at 207. *Quad Enters. Co.* thus stands for the proposition that a municipality is not liable under the FHA for the mere fact that it has not zoned for the greatest density possible. *See id.* It is the plaintiff's burden to demonstrate that a certain type of housing development is not possible under the enacted zoning. *See id.* Additionally, the court stated that "[s]imply proffering evidence that there is a shortage of handicapped-accessible housing in the Town of Southold compared to its handicapped population does not demonstrate that the neutral policy is the cause." *See id.* at 206. This is particularly relevant here, where Plaintiffs' evidence of disparate impact is simply that a greater proportion of minorities live in

3

rental units in Nassau County, that there is a shortage of rental housing in Nassau County, and that the neutral policy (the zoning) did not do <u>enough</u>—in Plaintiffs' view—to help alleviate that condition. This is not the law.

Additionally, Plaintiffs ask this Court to abrogate the state constitutionality protected discretion and deference afforded by federal courts to municipalities with regard to zoning decisions. *See Vill. of Belle Terre v. Boraas*, 416 U.S. 1, 5–6 (1974).  There is no mandate that any multi-family housing must be built upon a certain property. *See Henry v. Jefferson Cnty. Comm'n*, 637 F.3d 269, 279 (4th Cir. 2011) (stating that a developer "had no right to maximally develop his property").  Unlike the County in *Acevedo*, the Village did not abandon any plans for low-income housing—or any type of housing. The Village never owned the subject property and never had any plans to build anything at the Site. The Village neither denied nor even entertained development proposals.  It is undisputed that the re-zoning of the Site was commenced only when the Village was approached by the County so that the County could maximize its financial gain from its sale of the Site.  The initial use of the R-M zoning controls for the proposed, entirely new CO-5b zone was merely one of the numerous options contemplated over a two (2) year period by BFJ when considering various zoning options for the Site.   BFJ never recommended the Site be zoned for low-income housing, affordable housing, rental housing or equity (owner) housing.  There were never any plans submitted to the Village at any time to build low income, affordable, rental, and/or equity housing at the Site. Nevertheless, by ignoring the Village's obligations under New York State law and the Village Code, Plaintiffs are seeking to impose an affirmative duty on the Village to have zoned the Site, which it did not own or control, to require maximum density zoning in order to promote "affordable housing" to the greatest extent possible.  No such obligation exists under law.

4

## II.    PLAINTIFFS FAIL TO DEMONSTRATE THAT R-T ZONING HAS A DISPARATE IMPACT ON A PROTECTED CLASS

Based upon its plain language and legislative history, it is highly questionable whether disparate impact claims can be brought under the FHA.  Even if such claims were cognizable under the FHA, Plaintiffs cannot establish a viable cause of action for discriminatory impact since a single act of zoning cannot form the basis for such a claim.  Even if Plaintiffs could overcome this fatal flaw in their theory, Plaintiffs have not set forth—through expert testimony or otherwise—any evidence that the R-T zoning adopted by the Village would have a disproportionate or segregative effect.

### A. Disparate Impact Claims are Not Cognizable Under the FHA

Initially, the issue of whether a disparate impact claim is cognizable under the FHA is far from settled.  The FHA makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." Fair Housing Act of 1968, 42 U.S.C. § 3604(a) (2006).  The Supreme Court has never expressly ruled on whether the FHA's language permits a claim under the theory of disparate impact—though it certainly seems interested in doing so.  On November 7, 2011, the Supreme Court granted *certiorari* on this very question in the case of *Magner v. Gallagher*, 132 S. Ct. 548 (2011).  The City of St. Paul subsequently withdrew its appeal before the case could be heard. *See Gallagher v. Magner*, 619 F.3d 823 (8th Cir. 2010), *cert. dismissed*, 132 S. Ct. 1306 (2012).  Although the case was never heard, it is equally important that *certiorari* was granted, thereby evidencing the Court's interest in the issue.  Recently, appellants in a similar case, *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mt. Holly*, 658 F.3d 375 (3d Cir. 2011), have petitioned for *certiorari*.

While the Supreme Court has never interpreted the FHA as allowing for disparate impact claims, it has found in comparable cases that such claims are only permissible when the statute at issue unequivocally permits them. *See, e.g., Smith v. City of Jackson*, 544 U.S. 228 (2005); *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971). In both *Smith* and *Griggs*, the existence of a disparate impact claim turned on the statutory language of the ADEA and Title VII, respectfully. The ADEA, like Title VII, was held to authorize disparate impact claims because "the text focuses on the *effects* of the action on the employee rather than the motivation for the action." *City of Jackson*, 544 U.S. at 236 (emphasis in original). The Court made clear that it is the "otherwise adversely affect" language in the ADEA and Title VII that permits a claim of disparate impact. *Id.* at 235–36. It also made clear that the "because of" language in the ADEA and Title VII "does not encompass disparate impact liability," but rather envisions discriminatory intent. *Id.* at 236–38, 249 (O'Connor, J., concurring). *See also Robinson v. Paragon Foods, Inc.*, 2006 U.S. Dist. LEXIS 66298 (N.D. Ga. Sep. 15, 2006).

Therefore, when a statute does not contain language barring acts that "adversely affect" an individual, a claim for disparate impact is not contemplated. This requisite language is absent for the FHA. Rather, the FHA language is similar to those provisions in the ADEA and Title VII that address discriminatory intent only, as they prohibit adverse employment actions *because of* an individual's age or race, color, religion, sex, or national origin, respectively. *See City of Jackson*, 544 U.S. at 236–38; However, the FHA does not contain the "adversely affect" language present in Title VII and the ADEA which substantiates the viability of disparate impact claims.

The Second Circuit's holding in *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926 (2d Cir. 1988) permitting disparate impact claims und ether FHA is severely

6

undermined by the Supreme Court's subsequent decision in *City of Jackson* and the FHA's lack of requisite "adversely affect" language. The court in *Huntington Branch* even acknowledged that "Congress appears not to have resolved this precise question." *Id.* at 934.

As with the plain language, the legislative history of the FHA indicates that the law is limited to disparate treatment claims and does not contemplate disparate impact. For example, Senator Mondale, a proponent of the FHA, stated that it "permits an owner to do everything that he could do anyhow with his property . . . except to refuse to sell it to a person solely on the basis of color. That is all it does. It does not confer any right. It simply removes the opportunity to insult and discriminate against a fellow American because of his [race], and that is all." 114 CONG. REC. 5643 (1968) (Statement of Sen. Mondale). Moreover, when signing into law amendments to the FHA which extended the Act's prohibition of discrimination to new categories of persons, President Ronald Reagan stated:

> I want to emphasize that this bill does not represent any congressional or executive branch endorsement of the notion, expressed in some judicial opinions, that [FHA] violations may be established by a showing of disparate impact or discriminatory effects of a practice that is taken without discriminatory intent. [The FHA] speaks only to intentional discrimination.

Pres. Ronald Reagan, *Remarks on Signing the Fair Housing Amendments Act of 1988* (Sep. 13, 1988), http://www.reagan.utexas.edu/archives/speeches/1988/091388a.htm.

Therefore, while the legislative history demonstrates that the FHA permits claims of disparate treatment, support for disparate impact claims is conspicuously absent.

Section 3601 of the FHA states that the purpose of the Act is to "provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. §3601 (2006). The FHA, however, has not been interpreted to mean that every single act with a potentially disproportionate effect is a violation of the law. With it well-settled that

7

municipalities are afforded the right to make zoning decisions with certain neighborhood-oriented goals in mind, and additionally are not required to build any type of housing, the purpose of the FHA cannot be said to support discriminatory impact claims. Allowing such claims, especially in zoning cases, would create a duty for municipalities to build certain types of housing where such an obligation does not exist.

## B. Plaintiffs' Expert Fails to Analyze the Impact of R-T Zoning Upon a Protected Class

Assuming arguendo that it is cognizable under the FHA, a claim of discriminatory impact from an outwardly neutral practice may be demonstrated in two ways: either that it significantly disproportionately affects a protected class or that the decision has a segregative effect on the community at issue. *Huntington Branch*, 844 F.2d at 937. "In order to establish a prima facie case of disparate impact, the Plaintiffs must provide evidence showing: (1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportional impact on a protected class produced by Defendant's facially neutral practices." *Quad Enters. Co.*, 369 Fed. Appx. at 206. "Typically, a disparate impact is demonstrated by statistics." *Hallmark Dev.*, 466 F.3d at 1286. However, a disparate impact claim cannot be founded upon entirely speculative statistics. *Id.* (holding that plaintiff's expert's estimation of the impact of a zoning decision on minorities was "suspect" because it was based on the unfounded assumption that minorities would have lived in a particular development). Additionally, when a party challenges a zoning decision under the FHA on the ground of disparate impact, there is usually, if not always, a definitive development proposal thwarted by the decision. *See, e.g., Huntington Branch*, 844 F.2d at 937 (plaintiff's zoning application denied after purchase of real estate option).

Plaintiffs' expert, Nancy McArdle, compared the likely racial composition of the "pool" of apartment <u>renters</u> who would be able to afford rental units under NYAHC's four hypothetical

scenarios using the R-M zoning controls from the proposed CO-5b zone with the likely racial composition of the "pool" of single-family homebuyers who could afford units that would be potentially developed under R-T zoning by the ultimate purchaser of the property, Fairhaven Properties. *See* Declaration of Nancy McArdle, at 18–23. These "proposals" were not created in connection with the Village's zoning analysis and decision, which was adopted in June 2004, but were specifically created long after the zoning decision and after the County's tentative sale of the property to Fairhaven.

Here, Plaintiffs' disparate impact claim is based entirely on conjectural "what if's". There was never any guarantee that any one of NYAHC's proposals under the modified or hybrid R-M zoning controls it chose to utilize would have been approved by the County— especially since they were never submitted to the County. It is entirely possible, even probable, that the County could have accepted a proposal for a luxury apartment complex had the modified R-M zoning controls been adopted by the Village. It is certainly possible that the County could have accepted a proposal from a developer to build all single-family homes at the Site, as such homes would have been a permissible use under an R-M zoning control. The same holds for the construction of townhomes.   Any of the developments could have been rental, equity or a combination.   Moreover, even if one of NYAHC's proposals had been submitted and accepted, there is no evidence that the number of minorities estimated by McArdle would actually move to the Site. *See Hallmark Dev. Inc.*, 466 F.3d at 1287 ("Whether a person who currently owns a home or rents an apartment within the price ranges proposed by Hallmark for its development would purchase or rent one of Hallmark's homes is speculative.")

McArdle's conclusions are further flawed because she failed to analyze the R-T zoning. McArdle's attempt to show that R-T zoning had a disparate impact on minorities by comparing

9

one group's *possible* proposals created solely for this litigation under R-M zoning control (which, in fact, was merely a component of the proposed CO-5(b) zoning) with what *might* be built under the $56 million winning bid by Fairhaven under the enacted R-T zoning is simply insufficient. "In establishing 'discriminatory impact,' the plaintiff must demonstrate a 'causal connection between [a] facially neutral policy . . . and the resultant proportion of minority group members in the population at issue." *MHANY Mgmt. v. Cnty. of Nassau*, 05-CV-2301, at *71 (E.D.N.Y. Feb. 15, 2012). By only examining what could happen under zoning controls that were not enacted, McArdle did not, by definition, examine what could have happened under the facially neutral policy at issue, R-T. This failure is fatal.

"The basis for a successful disparate impact claim involves a comparison between two groups—those affected and those unaffected by the facially neutral policy. This comparison must reveal that, although neutral, the policy in question imposes a significantly adverse or disproportionate impact on a protected group of individuals." *See Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575–76 (2d Cir. 2003). The necessary and correct analysis of the impact of the facially neutral policy—the R-T zoning—on a protected class was not done here. Any consideration of NYAHC's proposals, or the fact that Nassau County awarded the winning bid to Fairhaven for $56 million, or what non-party Fairhaven may have developed under one of the many options available to it under R-T, is, at most, incomplete. Again, the impact of the *policy* itself must be considered—that is, the impact of the adoption of R-T zoning. R-T zoning permits the construction of 90 single-family houses or 150 townhouses <u>and</u> 36 multi-family units at the Site. McArdle failed to analyze, and indeed ignored, how many of these 90 single-family houses or 150 townhouses (or a combination thereof) and 36 multi-family units could be affordable. McArdle only states that if the successful bidder, Fairhaven, ever built luxury equity homes,

three to six minorities would occupy the space. Yet she did not analyze at all whether R-T zoning could support an affordable housing project and, if so, how many minorities were likely to inhabit the property. Without this analysis, Plaintiffs cannot establish disparate impact.

## C. The Village had a Legitimate Governmental Interest in Enacting R-T Zoning

Once a plaintiff has established a *prima facie* case of disparate impact, the burden then shifts to the defendant to demonstrate that the challenged action—in this case the enactment of R-T zoning—advanced a "legitimate, bona fide governmental interest" and there existed no alternative that could have proceeded with a less discriminatory effect. *See Tsombanidis*, 352 F.3d at 575. As noted above, R-T zoning was enacted because it was in keeping with the residential character of the area, it allowed for a transition from the commercial area of the Village to the residential area, and because it helped address resident concerns regarding school population and traffic. *See* Certified Transcript of Garden City Board of Trustees ("May 20, 2004 Minutes"), Exhibit JTX025, at p. 9. Such concerns are legitimate for a municipality to consider when making zoning decisions. *See, e.g.*, *Vill. of Belle Terre*, 416 U.S. at 9 (the "character" of a neighborhood constitutes a legitimate governmental concern in the face of allegations that a zoning decision violated the FHA); N.Y. COMP. CODES R. & REGS. tit. 6, § 617.2 (2000) (a municipality is legally obligated to consider the character of the neighborhood under SEQRA and the Village Law); N.Y. VILLAGE LAW § 7-730 (McKinney 2011) (when hearing a request for area variance relating to special use permits, the planning board must take into consideration the character of the neighborhood); *see also Chinese Staff & Workers' Ass'n v. Burden*, 88 A.D.3d 425, 431, 932 N.Y.S.2d 1, 4 (2011), *aff'd sub nom. Chinese Staff v. Burden*, 19 N.Y.2d 922, 973, N.E.2d 1277 (2012) (emphasizing that a city planning committee may consider "neighborhood character" when re-zoning property).

There are a number of reasons why CO-5(b) with the hybrid R-M zoning control would not meet these legitimate interests. If the hybrid R-M controls had been enacted, the potential development permutations permissible on the property may not have allowed for the "transition" from single-family to the adjoining public and commercial uses the Village's planner believed was appropriate and necessary at the Site. Moreover, the studies conducted by BFJ showed that it was likely that the types of developments permitted by R-M zoning controls would generate significantly more traffic than permitted under R-T zoning. *See* BFJ Notes for Discussion re Village of Garden City Zoning Discussion Social Services Site, Exhibit JTX018 and BFJ Memorandum from F. Fish and T. Yardley to Garden City Village Trustees re Revisions to the Proposed zoning of the Public "P" Zone, Exhibit JTX019.

Moreover, the phrase "character of the neighborhood" has been vilified by Plaintiffs throughout this litigation.  Plaintiffs do not understand basic New York zoning concepts as well as federal law on this issue.  "Before a Zoning Board may exercise its discretion and grant a variance, the record must show (1) that the land in question cannot yield a reasonable return if only used for a purpose allowed in that zone; (2) that the plight of the applicants was due to unique circumstances and not to the general conditions in the neighborhood; and (3) that the essential character of the neighborhood will not be altered by the use sought. *Scales v. Vill. of Camden*, 1990 U.S. Dist. LEXIS 11194, at *19–20 (N.D.N.Y Aug. 17, 1990)(internal citations omitted); *see Oxford House, Inc. v. Babylon*, 819 F. Supp. 1179, 1183, (E.D.N.Y. 1993) (taking into account the "residential character of neighborhood" when determining whether a town's zoning decision was in furtherance of the town's interest), *Westhab, Inc. v. City of New Rochelle*, 2004 U.S. Dist. LEXIS 9926, 41, 2004 WL 1171400 (S.D.N.Y. May 3, 2004) (stating that "[i]t is not irrational for the City to seek to protect the character of a residential area by enforcing the

12

Zoning Code."). The Village had a legitimate governmental interest in enacting R-T zoning, and it could not have accomplished these interests if it had adopted the hybrid R-M zoning controls for the entire Site.

## III.   THERE IS NO EVIDENCE THE VILLAGE ACTED WITH DISCRIMINATORY INTENT WHEN ENACTING R-T ZONING

In order to succeed in demonstrating a *prima facie* violation of the FHA under a theory of discriminatory intent, a plaintiff must prove that animus against a particular protected group played a significant role in the position taken by decision-makers in a municipality or those to whom such decision-makers were knowingly responsive. *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995); *see also Palmieri v. Town of Babylon*, 2000 U.S Dist. LEXIS 27694, at *40 (E.D.N.Y. Jan. 6, 2006). In analyzing the plaintiff's burden under an FHA claim, courts are to consider the totality of the circumstances surrounding the adoption of a zoning law in order to determine whether discriminatory intent existed with regard to a municipality's challenged action. *See Vill. of Arlington Heights v. Metropolitan Dev. Corp.*, 429 U.S. 252, 267–68 (1977), *LeBlanc-Sternberg*, 67 F.3d at 425. Under this totality of the circumstances analysis, a number of factors may be examined, including "the specific sequence of events leading up to the challenged decision 'such as zoning changes for a given site enacted upon the decision maker's learning of plans for the construction there of integrated housing' [and] 'contemporary statements made by members of the decision making body, minutes of its meetings, or reports.'" *U.S. v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1221 (2d Cir. 1987). Moreover, whether the zoning law "bears more heavily on one group than another" is another factor that may be considered by the Court. *LeBlanc-Sternberg*, 67 F.3d at 425. Only if there is a *prima facie* finding of discriminatory intent related to the enactment of a zoning ordinance, the burden shifts to the

13

defendant to demonstrate that, even if the "impermissible purpose" had not been considered, "the same decision would have resulted." *Vill. of Arlington Heights*, 429 U.S. at 270, n.21.

As will be demonstrated at trial, Plaintiffs cannot establish a *prima facie* violation of housing discrimination as there is neither sufficient direct nor circumstantial evidence that racial animus played any role in the Village's decision to enact R-T zoning. In alleging that the Village violated the FHA, Plaintiffs will seek to introduce hearsay, innocuous, neutral statements which, taken out of context, are purported to be "fierce" opposition to affordable housing motivated by racial animus. However, neither the statements made by the citizens of the Village nor the totality of the circumstances surrounding the zoning decision give rise to a showing of discriminatory intent.

**A. The Sequence of Events Leading up to the R-T Zoning Decision**

From the beginning of its work, BFJ contemplated an entirely new zoning district for the Site. It is important to note that BFJ's work, and the entire zoning process for that matter, was not limited to the Site but encompassed the entire eighty-four (84) acres of County-owned property. At first, BFJ proposed that a mixture of residential, retail, and/or office buildings be built upon the Site to be known as the CO-5b zone. May 2003 Draft of BFJ's "Zoning Study for the Public P District Containing the County Properties," Exhibit JTX003. After initial computations, BFJ calculated that up to 311 multi-family units or townhomes could be built upon the Site should the entire Site be dedicated exclusively to multi-family units. In doing so, it used a hybrid application of an existing residential zoning control under the R-M zone. No mention was ever made as to whether those units were going to be affordable, market rate, or luxury. Additionally, no mention was ever made on any report as to whether they would be rental or equity. However, BFJ's initial report, and all those subsequent, did contemplate mixed

14

housing types, including townhomes, multi-family, and single-family homes. It is undisputed that from the beginning of the process Nassau County's goal in selling the Site was to maximize its revenue and, accordingly, it was expected by the County that only "high end" housing would be built there. However, that was never a consideration of the Village in re-zoning the Site. Nor could it have been since it was not the owner. The County never sought to utilize the Site to promote or build "affordable housing" but rather to maximize profit. Additionally, the Village never had any plans to purchase or build on the Site. The Village's role was to re-zone the Site at the behest of the County.

The sequence of events does not include a sudden and dramatic change of direction. Rather, as the constant and consistent concerns regarding traffic, school impact, character of the neighborhood, and gradual transition from a residential area to the large commercial property evolved, BFJ gradually altered its initial proposal at almost every subsequent iteration. In fact, Plaintiffs ignore that the hybrid R-M zoning control was actually eliminated in the November 2003 report when BFJ increased the R-6 control to R-8; R-8 is not permitted under R-M controls. In March 2004, the commercial and office component of CO-5(b) was eliminated, virtually assuring the Site would only be utilized for housing (unless the County chose not to sell and maintained its current non-conforming use). In April 2004 BFJ recognized the need for a new name of the zone since the "C" and "O" in CO-5(b) stood for "commercial" and "office".

While Plaintiffs attempt to assert that there was an unscrupulous purpose behind the adoption of R-T zoning, this is entirely untrue. The Village, as required by law, held a number of public hearings at which residents expressed concerns as to the development of the Site. These concerns included the character of the surrounding neighborhood traffic, impact on schools, and aesthetics. During these hearings, not once did a resident raise opposition to any kind of housing

being built at the Site due to racially-based reasons.   Accordingly, the "sequence of events"
behind the Village's zoning decision did not contain any examples of discriminatory intent
underlying the opposition and concerns raised by citizens. Frank Fish, of BFJ, expressed the
reasons for the adoption of R-T zoning in numerous documents and at a public meeting in May,
2004 at the Site, including the need for physical transition:

> This was, this was a conscious decision, and I think those of
> you who might have been at the last two meetings, particularly
> the last two workshops this was discussed in quite a bit of
> detail, that there was, there was a concern that if the whole 25
> acres were developed for multi-family it would generate too
> much traffic and it didn't serve, it didn't serve as a true
> transition to the garages, if you will, over here by putting it
> along Washington (Avenue).

*See* May 20, 2004 Minutes, Exhibit JTX025, at p. 9.  This desire for "transition" is a widely
accepted and approved planning principle which BFJ recognized and applied here.  In fact, Mr.
Suozzi recognized the benefits of transition between differently zoned areas, noting his desire to
"create a transition from the single family housing to the commercial property and multi-family
housing."  Transcript of Public Hearing, Exhibit JTX012, at pp. 23–26.  That multi-family was
limited to a portion of the Site in order to promote transition and due to traffic concerns and
building size is not a sufficient basis for liability under the FHA.

### 1. The Comments Made by Citizens do not Demonstrate Discriminatory Intent

The Supreme Court has mandated that "a finding of discriminatory intent may not be
based solely upon the bigoted comments of a few citizens." *United States v. City of Birmingham*,
538 F. Supp. 819, 828 (E.D. Mich. 1982). Here there are no bigoted comments.  It is indisputable
that all of the alleged racially charged comments by Village residents are actually and completely
neutral on their face.  With nothing more, the analysis of citizen's comments should end here.

16

Nonetheless, Plaintiffs contend that Village residents expressed "racial animus" towards the potential building of multi-family housing at the Site by means of these outwardly neutral comments. Yet, when the comments of Village residents are compared to statements made by individuals actually deemed to be "discriminatory" by federal courts in other cases alleging zoning violations under the FHA, the baseless nature of Plaintiffs' claims are illustrated.

| Village Resident Comments | Comments that Demonstrate "Racial Animus" |
|---|---|
| *"It should remain R-8, it should be in the flavor and character of what Garden City is now."* | A Town Council member *"supported one-acre zoning because it kept the 'niggers' out of Sunnyvale." Dews v. Sunnyvale*, 109 F. Supp. 2d 526, 533 (N.D. Tex. 2000). |
| *"I moved here from Brooklyn so that when I walked out of my house I did not turn to my left and see apartment buildings."* | *"[I] don't want coons either next door or in the town." Smith v. Town of Clarkton*, 682 F.2d 1055, 1061 (4th Cir. 1982). |
| *"I would be opposed to any re-zoning other than R-8 in the social services area for a few reasons. One of them is that the traffic in the area is horrendous . . . Where are people going to park when they want to change this parking? They're going to park in the residential areas"* | Members of the community opposed affordable housing because *"they did not want African Americans in that vicinity." Jones v. Mayor and Counsel of Hurlock*, 2012 U.S. Dist. LEXIS 110115, at *8 (D. Md. Aug. 7, 2012). |
| *"And would everyone like to see Wyndham in their neighborhood. I don't think so."* (The Wyndham is a luxury, 316 unit, multi-family, equity, residential complex consisting of two high rise towers located in Garden City which Plaintiffs' own expert described as "obtrusive".) | Community leaders stated that they opposed re-zoning property for affordable housing because it would *"attract blacks"* and they did not want *"poor black people"* moving into the area. *Hallmark Dev., Inc. v. Fulton Co.*, 466 F.3d at 1279, 1288. |
| *"I can't have my kids in front of the house from 4:30 on because when those buildings get out the traffic is so fast."* | |

In this case, the record is utterly devoid of any comments evidencing a racial animus on the part of the Village residents with regard to zoning at the Site much less any actual derogatory language remotely comparable to cases in which liability was found under the FHA. As

exemplified above, these comments included residents' often stated concerns over issue such as traffic, aesthetics and neighborhood character.

When questioned at deposition about his comments Paul Ortton identified traffic as his only concern and explained his support for R-8 single family zoning: "[w]ell, with R-8 zoning there would also be less houses that would be built there. Less houses, less vehicles, less people maybe, I don't know, but that's the way I felt at the time. Ortton Dep. P. 45–46. He further explained: "I thought the R-8 zoning would have given less cars to the area. That's all I said, was I was concerned with the traffic. *Id.* P. 51. Gail Madigan, whose comments were cited by the Court in its decision denying the Village's motion for summary judgment, stated during her deposition that she was "not opposed" to affordable housing being built at the Social Services Site and described her concerns regarding the construction of apartment buildings as being related to traffic. ("You should come to my driveway and try and get out between 7 in the morning and 9:30 in the morning, I can sit there for ten minutes.") Madigan Dep. 35–36.

As a matter of law, comments regarding concerns such as traffic, impact on schools, building sizes and types are considered "neutral" and do not equate to racial animus. *See Jim Sowell Constr. Co. v. City of Coppell*, 61 F. Supp. 2d 542, 551 (N.D. Tex. 1999) (citizens "voiced their opposition to multi-family housing based on race-neutral reasons, such as the adverse impact that dense housing facilities have on public services, traffic, and child safety"). Even if such inquiries were based on factually incorrect information or lacking in foundation, these statements remain neutral and are completely unrelated to any perceived racial bias. People have a First Amendment right to express themselves even if they are inaccurate. Plaintiffs have no legitimate basis to twist the citizens' words, speculate as to their intent, and manufacture racial animus. The result for public comment would be chilling and frightening.

## 2.  **There is no Evidence that Racial Animus Played Any Role in the R-T Zone**

Furthermore, Plaintiffs cannot succeed in demonstrating a *prima facie* violation of the FHA under a theory of discriminatory intent unless they can prove that animus towards a particular protected group and, further, that such animus played a significant role in the position taken by decision-makers in a municipality or those to whom such decision-makers were knowingly responsive. *LeBlanc-Sternberg v. Fletcher*, 67 F.3d at 425.  Even if the record reflected that the comments made by citizens of a municipality were the manifestation of a bias against minorities (which it does not), such comments on their own cannot demonstrate that the municipality itself was motivated by a discriminatory purpose when it made a zoning decision. Statements made by residents "can demonstrate that public officials acted with bias only if the circumstances surrounding those statements strongly suggest that the public officials either adopted the citizens' biases or acted directly in response to the citizens' discriminatory desires." *Jim Sowell Constr. Co.*, 61 F. Supp. 2d at 551.

In *Hallmark Dev., Inc. v. Fulton Co.*, the court held that the plaintiffs had <u>failed</u> to prove intentional discrimination under the FHA because plaintiffs had not demonstrated that members of the decision-making body were aware of the bias of the citizens and thus the defendant County could not be charged with implementing the racist attitudes of residents in its decision not to re-zone a particular piece of land. 466 F.3d at 1279, 1283, 1288. The court rendered this decision despite the fact that the County Commissioner stated that he knew "a lot of . . . objections to projects [like Hallmark's] proposed development, is a black issue." *Id.* at 1281. Despite the County Commissioner's statement that he was aware of the racially-motivated objections to the potential re-zoning, this statement did not demonstrate that other decision-makers were aware of the racist attitudes of the community. *Id.* at 1284.

In *Eureka V LLC v. Town of Ridgefield*, 2011 U.S. Dist. LEXIS 10878, at *48 (D. Conn. Feb. 4, 2011), plaintiff had proposed a residential development consisting of 710 units, 30% of which would have been affordable housing. *Id.* at *8. In response to this plan, one of the members of the Town of Ridgefield's Board of Selectmen stated that Connecticut's "Affordable Housing Act is a 'horrible piece of legislation . . . and it's hurt communities, such as Ridgefield" because developers used it as a way to force approval of projects. *Id.* at *10. He also predicted that the development would result in "a true scar on our community forever." The Court, even considering the aforementioned statements, held that Plaintiff failed to state a FHA claim.

Here, the record does not contain any comments by decision-makers that demonstrate that the enactment of R-T zoning involved any discriminatory intent. There is simply nothing remotely analogous to the above which, nonetheless, were insufficient to demonstrate discriminatory intent under the FHA. The fact that former County Executive Suozzi stated his personal <u>opinion</u> that "Garden City . . . historically has been viewed as a community that didn't want to have affordable housing in it" is irrelevant and not attributable to the Village. It is merely a generalized statement of his opinion regarding what he believe "people" want.

**B.  Whether R-T Zoning Weighs More Heavily on One Group than Another**

Whether the zoning "weighs more heavily" on minorities is equivalent to an analysis under disparate impact. Defendants respectfully refer to the discussion in Point II which demonstrates the absence of evidence of disparate impact here.

**C.  Plaintiffs Cannot Demonstrate Racial Animus Through History of the Village**

Plaintiffs contend that the Village has a long history of "racial and housing discrimination." As evidence of this claim, Plaintiffs point to purported opposition in 1969 to the construction of a daycare center that would have primarily served African-American children, a

20

1989 building moratorium on all construction within the Village, and a 2005 study by the New York State Attorney General that alleged discrimination in Garden City parks. Even if such rank, historical hearsay is considered, it does not demonstrate the existence of racial animus with regard to the adoption of R-T zoning. Plaintiffs fail to proffer any evidence that the issues surrounding the daycare center and moratorium are in any way related to the 2004 zoning decision made with regard to the Site. Additionally, it is clear that any allegations made with regard to parks in the Village are wholly irrelevant to the zoning issue at hand in this matter. Try as they may, Plaintiffs cannot paint the history and decisions of the Village as comparable to cases such as *Dews v. Town of Sunnyvale*. There, direct evidence demonstrated that, over a long period of time, residents repeatedly raised opposition to changing the challenged one-acre zoning law and that, in fact, the entire town had actually been incorporated in an attempt to block affordable housing from being built. *Dews*, 109 F. Supp. 2d at 526. Nor do Plaintiffs' contentions regarding Ring Road demonstrate racial animus. Plaintiffs have failed to present any evidence that demonstrates that they made such an application for affordable housing or that it was denied by the Village. They merely refer to anonymous emails to argue that residents of the Village opposed the building of affordable housing on the basis of racial animus. What's more, they cannot be considered relevant to "history" when coming into existence after the subject zoning decision.

**D.  Whether there were Substantive Departures from Normal Zoning Procedures**

The Village's zoning of the Site is an example of appropriate, conscious planning in action. The Village's expert, Patrick Cleary, concluded that R-T zoning "appropriately fits within the Village's well established zoning and land use framework." The R-T zoning provided the least amount of impact of all three residential housing scenarios (multi-family, single-family, and

townhomes) while balancing the surrounding governmental, commercial, and residential interests. It also furthered the interests of the Village to offer townhomes (an entirely new housing option not previously codified by the Village) as an option for the Site while also permitting even more multi-family housing to augment its existing substantial stock. Additionally, Plaintiffs ignore that the challenged R-T zoning permits 150 townhomes and 36 multi-family (over 20% of the available housing) units in addition to single-family homes. Plaintiffs fail to explain how the Board's stated goals were not facilitated by townhome zoning—because it cannot. Plaintiffs contend that exclusively constructing multi-family homes on the entire Site provided the best use of the Site but do not once discuss how the townhomes and multi-family housing permitted by the R-T zoning do not.

**E.  The Village had Legitimate Reasons for Enacting R-T Zoning**

Even if Plaintiffs could demonstrate a *prima facie* case of discriminatory intent, Plaintiffs still cannot prevail on their FHA claim against the Village. Once a *prima facie* case of discriminatory intent has been established, the burden then shifts to the defendant to demonstrate that "the same decision would have resulted even had the impermissible purpose not been considered." *Vill. of Arlington Heights*, 429 U.S. at 270 n.21. These reasons must not simply be pretextual. *Huntington Branch, NAACP. v. Town of Huntington, N.Y.*, 668 F. Supp. 762, 776 (E.D.N.Y. 1987).

As set forth above, Frank Fish of BFJ clearly stated the reasons, both orally and in writing, as to why BFJ recommended the R-T zoning that was ultimately enacted by the Village. Creating a transition between the existing commercial and residential developments is a legitimate reason that is supported by both the Village Code and New York State Village Law. *See e.g.* N.Y. VILLAGE LAW § 7-712-b(2)(B)(3) (McKinney 2011) (considering "essential

character" of neighborhood); *Vill. of Belle Terre*, 416 U.S. at 9 (character of neighborhood legitimate concern). The Village was acting consistently with both the Village Code and state law when it considered the recommendation of its planner, weighed legitimate concerns, and adopted R-T zoning at the Site. Additionally, residents' concerns over traffic and school impact are, as a matter of law, facially neutral and legitimate concerns.

The zoning process is designed to be evolutionary. For example, BFJ recommended that office use be eliminated and that the amount of housing be reduced (not eliminated) due to traffic concerns. *See* BFJ Memorandum from F. Fish and T. Yardley to Garden City Village Trustees re Revisions to the Proposed zoning of the Public "P" Zone, Exhibit JTX019. Mr. Fish stated that the reasons for this change in suggested planning was that the changes would "provide a significant response to the concern that has been previously expressed over traffic. As we have mentioned at several meetings, office is the largest, single generator of traffic. It will generate 2-3 times more traffic than residential . . . Its elimination will considerably reduce the possible traffic generation from this site. Secondly, multi-family housing was the next highest generator of traffic." *See id.* The studies done by BFJ found that office use would generate 3,046 total vehicular trips a day, while 215 apartments would generate 1,423 vehicular trips a day, as opposed to 940 vehicular trips a day for 90 single family homes, or 920 vehicular trips a day for 150 townhomes. *See* BFJ Presentation: A Zoning Study for the Public P District, Exhibit JTX013. It is inexplicable how a concern regarding the traffic generated by apartment buildings is "irrational" when BFJ's study showed that apartments would generate 483 more vehicular trips a day than single family homes and 503 more vehicular trips than townhomes. *See id.*

## IV.   PLAINTIFFS CANNOT PREVAIL ON THEIR CONSITUTIONAL CLAIMS

The proof required for an FHA claim for disparate treatment is tantamount to proof required for Plaintiffs' constitutional claims. It follows that Plaintiffs' demonstrated inability to evidence a claim under the FHA necessarily results in an inability to establish civil rights claims. *McHaney v. Spears*, 526 F. Supp. 566, 574 (W.D. Tenn. 1981).

### A. 42 U.S.C. § 1981

A Section 1981 claim consists of the following elements: (1) membership in a racial minority; (2) an intention to discriminate on the basis of race by the defendants; and (3) discrimination concerning one or more of the activities enumerated in the statute. *See Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 1999).   Because intentional discrimination is required under Section 1981, the disparate impact theory of recovery is not available. *Jackson v. Univ. of New Haven*, 228 F. Supp. 2d 156, 162 (D. Conn. 2002).   As previously set forth above, Plaintiffs simply cannot establish that the Village acted with an intention to discriminate on the basis of race—either by direct or circumstantial evidence of such purported bias.

### B. 42 U.S.C. § 1982

Section 1982 provides that "all citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982 (2006).  "As is true of section 1981 claims, claims under section 1982 must make clear that the alleged mistreatment was a function of racial animus and intentional discrimination." *Burgin v. Toys-R-Us Nytex, Inc.*, 1999 U.S. Dist. LEXIS 10073, *11 (W.D.N.Y. June 30, 1999).  Plaintiffs are not seeking to purchase or lease any housing at the Site because no housing development exists for them to do so (nor is one even in the planning stages).  Thus, the purchase, sale, or conveyance of real property is not

24

at issue and Plaintiffs cannot state a claim thereunder.  Additionally, Plaintiffs have not alleged any facts supporting intentional racial discrimination.

## C.  42 U.S.C. § 1983

To prevail on an equal protection claim, "[p]roof of racially discriminatory intent or purpose is required." *Vill. of Arlington Heights.*, 429 U.S. at 265.  Courts "will not strike down an even-handedly applied, facially neutral law as violative of the Equal Protection Clause unless the plaintiff can demonstrate discriminatory intent or purpose." *Orange Lake Assoc., Inc. v. Kirkpatrick*, 21 F.3d 1214, 1226 (2d Cir. 1994).  In *Orange Lake*, plaintiff-developer argued that there was a need for affordable housing in the defendant-town.  The plaintiffs were unable to demonstrate that "the members of the Town Board were motivated by racial animus and fail[ed] to point to any evidence of such motivation." *Id.* at 1227.  In doing so the Court declined to apply a strict scrutiny analysis and instead applied a rational basis test. *See id.*  The appellate court affirmed the granting of summary judgment for defendant town, finding that the challenged zoning amendment served a legitimate goal and the plaintiffs failed to offer evidence creating an issue of fact as to whether or not the zoning amendment was enacted for something other than the legitimate reasons proffered.

Dated: June 15, 2013

CULLEN AND DYKMAN LLP

By: _____

James G. Ryan (JR9446)
Jennifer A. McLaughlin (JM5678)
Douglas J. Bohn (DB4618)
Cynthia A. Augello (CA3839)
Ariel E. Ronneburger (AR0739)
*Attorneys Defendants*
100 Quentin Roosevelt Boulevard
Garden City, New York 11530