UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

MHANY Management, Inc.,

                                Plaintiffs,                    Case No. 05-CV-2301
                                                                     (ADS)(WDW)

        -and-

New York Communities for Change, Inc.,

                                Intervenor-Plaintiff,

        -against-

County of Nassau, Incorporated Village of Garden City,
and Garden City Board of Trustees,

                                Defendants.

-----------------------------------------------------------------------x

## <u>DEFENDANTS INCORPORATED  VILLAGE OF GARDEN CITY AND THE GARDEN CITY BOARD OF TRUSTEE'S POST-TRIAL BRIEF</u>



**Garden City Center
100 Quentin Roosevelt Boulevard
Garden City, New York 11530-4850
Telephone (516) 357-3700 • Facsimile (516) 296-9155**

# **TABLE OF CONTENTS**

STATEMENT OF FACTS ...........................................................................................................2

    A.    The Site and the County's Request for Proposals....................................................2

    B.    The R-T Zoning..........................................................................................................3

    C.    The Parties..................................................................................................................4

    D.    The Village..................................................................................................................4

POINT I: PLAINTIFFS FAILED TO PROVE THAT THE VILLAGE ACTED WITH
DISCRIMINATORY INTENT ....................................................................................................5

    A.    Plaintiffs Failed to Demonstrate that the Village's Decision to Enact R-T
            Zoning was Motivated by Race ..............................................................................5

          1.    Plaintiff did not demonstrate that the Sequence of Events Leading to
               the Adoption of R-T Zoning amounted to Discriminatory Intent
               on Behalf of the Village..........................................................................7

               i.    BFJ Issues a Report Containing the CO5b Proposal, which Allows
                    for a Range of Development Options.......................................................7

               ii.    In accordance with Village Code, a Public Hearing on the
                    Proposed CO5b Zoning is held; Citizens Raise Numerous
                    Neutral Concerns ..................................................................................10

               iii.    BFJ Proposes R-T Zoning to Address the Citizen Concerns.................15

               iv.    Former Plaintiff ACORN First Appears and Attends a
                   May 20, 2004 Public Hearing................................................................18

               v.    R-T Zoning Does Not Prohibit Affordable Housing ..............................19

          2.    Plaintiffs did not Demonstrate that the Historical Background of
               the Decision Evidenced a Discriminatory Intent ..........................................22

          3.    Plaintiffs did not Demonstrate that the Village Departed from its
               Normal Substantive Criteria in Enacting R-T Zoning ..................................25

           4.    Plaintiffs did not Demonstrate that the Village Departed from its
               Normal Substantive Criteria in Enacting R-T Zoning ..................................26

           5.    Plaintiffs did not Demonstrate that R-T Zoning Impacted a Particular

i

Group more than Another..........................................................................27

    B.    The Village had Legitimate Reasons for the Enactment of R-T Zoning that
were not Pretextual ...............................................................................27

POINT II: PLAINTIFFS CANNOT SHOW DISPARATE IMPACT BASED ON THE
SINGLE ZONING DECISION FOR THE SITE ................................................28

    A.    Plaintiffs Challenged a Single, Isolated Decision Rather Than a Generally
Applicable Policy...................................................................................30

    B.    Plaintiffs Failed to Demonstrate the R-T Zone Caused a Significant Impact
on the Amount of Minority-Occupied Housing.......................................32

    C.    The Zoning Decision Furthered a Legitimate Interest and No Alternative Would
Have Served that Interest with Less Discriminatory Effect .....................35

POINT III: THIS COURT LACKS JURISDICTION BECAUSE PLAINTIFFS HAVE
NO STANDING AND THE CASE IS MOOT ...............................................36

    A.    This Case Is Moot Because Plaintiffs Have Not Been Injured and
Have Not Proven That They Will Suffer Repetition of the
Alleged Injury In the Future ..................................................................36

    B.    Plaintiffs Have Failed to Prove That They Were Injured, That the Injury
Was a Result of Garden City's Zoning Decision, or That the Relief They Seek
Would Likely Have Remedied the Injury At the Outset of This Suit.....................41

        1.    Injury In Fact .............................................................................42

        2.    Causal Connection .....................................................................47

        3.    Redressability............................................................................47

POINT IV: PLAINTIFFS CANNOT PREVAIL ON THEIR REMAINING
CONSITUTIONAL CLAIMS ........................................................................47

    A.    42 U.S.C. § 1981 ...................................................................................47

    B.    42 U.S.C. § 1982 ...................................................................................47

    C.    42 U.S.C. § 1983 ...................................................................................48

POINT V: PLAINTIFFS' CLAIMS AGAINST THE BOARD OF TRUSTEES
MUST BE DISMISSED ...............................................................................49

CONCLUSION....................................................................................................50

# TABLE OF AUTHORITIES

## Cases

*Abrahams v. MTA Long Island Bus*,
  10 Civ. 1535, 2010 U.S. Dist. LEXIS 51582 (E.D.N.Y. May 25, 2010) ................................ 30

*Abrahams v. MTA Long Island Bus*,
  644 F.3d 110 (2d Cir. 2011) ..................................................................................................30

*Alexander v. Yale Univ.*,
  631 F.2d 178 (2d Cir. 1980)..................................................................................................37

*Boyd v. Lefrak Org.*,
  509 F.2d 1110 (2nd Cir. 1975)............................................................................................... 14

*Brown v. City of Oneonta*,
  221 F.3d 329 (2d Cir. 1999)................................................................................................... 47

*Burbar v. Inc. Vill. of Garden City*,
  2:13-cv-01350, 2013 U.S. Dist. LEXIS 117029 (E.D.N.Y. Aug. 19, 2013) .......................... 49

*Burgin v. Toys-R-Us Nytex, Inc.*,
  1999 U.S. Dist. LEXIS 10073 (W.D.N.Y. 1999) .................................................................... 48

*C.B.H. Props. Inc. v. Rose*,
  205 A.D.2d 686 (2d Dep't 1994) ........................................................................................... 21

*C.B.H. Properties v. Rose*,
  84 N.Y.2d 808 (1994) ............................................................................................................ 21

*Carbajal v. Cnty. of Nassau*,
  271 F. Supp. 2d 415 (E.D.N.Y. 2003) ................................................................................... 49

*Comtel Techs., Inc. v. Paul H. Schwendener, Inc.*,
  2005 U.S. Dist. LEXIS 8370 (N.D. Ill. Feb. 22, 2005) .......................................................... 48

*Cook v. Colgate Univ.*,
  992 F.2d 17 (2d Cir. 1993)..................................................................................................... 37

*Drillis-Eizis v. Vill. of Orland Hills*,
  1995 U.S. Dist. LEXIS 2409 (N.D.  Ill. Feb. 28, 1995) ..........................................................50

*Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*,
  316 F.3d 357 (2d Cir. 2003).................................................................................................. 32

*Fulton Mkt. Cold Storage Co. v. Cullerton*,
  582 F.2d 1071 (7th Cir. 1978) ........................................................................ 48

*Gamble v. City of Escondido*,
  104 F.3d 300 (9th Cir. 1997) .......................................................................... 29

*Glacken v. Inc. Vill. of Freeport*,
  2012 U.S. Dist. LEXIS 35253 (E.D.N.Y. Mar. 15, 2012) .......................... 50

*Hack v. President and Fellows of Yale Coll.*,
  237 F.3d 81 (2d Cir. 2000)............................................................................. 29

*Hall v. City of White Plains*,
  185 F. Supp. 2d 293 (S.D.N.Y. 2002)....................................................... 49, 50

*Hamm v. City of Gahanna*,
  C-2-96-0878, 2002 WL 31951272 (S.D. Ohio Dec. 23, 2002) ................... 31

*Hamm v. City of Gahanna*, 109 Fed. Appx. 744 (6th Cir. 2004)
  109 F. App'x 744 (6th Cir. 2004) ................................................................. 31

*Huntington Branch, NAACP v. Town of Huntington*,
  844 F.2d 926 (2d Cir. 1988).................................................................... 29, 35

*Innovative Health Sys. v. City of White Plains*,
  117 F. 3d 37 (2d Cir. 1997) .................................................................... 12, 13

*Jackson v. University of New Haven*,
  228 F. Supp. 2d 156 (D. Conn. 2002)........................................................... 47

*James v. Valtierra*,
  402 U.S. 137 (1971)........................................................................................ 14

*Le Blanc-Sternberg v. Fletcher*,
  67 F.3d 412, (2d Cir. 1995)......................................................................... 5, 6

*Lewis v. Cont'l Bank Corp.*,
  494 U.S. 472 (1990).................................................................................. 36, 39

*Los Angeles v. Lyons*,
  461 U.S. 95 (1983).......................................................................................... 38

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)……………………………………………………...41, 42, 46, 47

*Mancuso v. Douglas Elliman, LLC*,
  808 F. Supp.2d 606 (S.D.N.Y. 2011).......................................................... 28

*McCleskey v.  Kemp*,
  *481 U.S. 279 (1987)*.................................................................... 22, 23

*McLaughlin v. Diamond State Port Corp.*,
  2004 U.S. Dist. LEXIS 26351 (D. Del. Dec. 30, 2004)............................ 23

*MHANY Mgmt. v. Inc. Vill. of Garden City*,
  843 F. Supp. 2d 287, 322 (E.D.N.Y. 2012) ........................... 27, 35, 38, 39

*Mkt. Square Props. Ltd. v. Town of Guilderland Zoning Bd of Appeals*,
  66 N.Y.2d 893 (1985) ................................................................... 21

*Monell v. Dep't of Soc. Servs.*,
  436 U.S. 658 (1978)..................................................................... 49

*New York City Employees' Ret. Sys. v. Dole Food Co.*,
  969 F.2d 1430 (2d Cir. 1992)..................................................... 39-40

*Newtown v. City of New York*,
  566 F. Supp. 2d 256 (S.D.N.Y. 2008).......................................... 49

*Nikolich v. Vill. of Arlington Heights*,
  870 F. Supp. 2d 556 (N.D. Ill. 2012) ........................................... 32

*North Carolina v. Rice*,
  404 U.S. 244 (1971)..................................................................... 37

*North Shore Steak House v. Bd. of Appeals of the Inc. Vill. of Thomaston*,
  30 N.Y.2d 238 (1972) ................................................................. 21

*Oklahoma City v. Tuttle*,
  471 U.S 808 (1985)..................................................................... 49

*O'Shea v. Littleton*,
  414 U.S. 488 (1974)..................................................................... 39

*Orange Lake Assoc., Inc. v. Kirkpatrick*,
  21 F.3d 1214 (2d Cir. 1994) ................................................... 14, 48

*Perkins v. New York City Dep't of Correction*,
  887 F. Supp. 92 (S.D.N.Y. 1995)................................................. 49

*Powell v. McCormack,*
   395 U.S. 486 (1969)................................................................. 36, 38

*Quad Enters. Co. v. Town of Southold,*
   369 F. App'x 202 (2d Cir. 2010)...............................................................34

*Reg'l Econ. Cmty. Action Program v. City of Middletown,*
   294 F.3d 35 (2d Cir. 2002)................................................... *passim*

*Retail Prop. Trust v. Bd. of Zoning Appeals of the Town of Hempstead,*
   98 N.Y.2d 190 (2002) ................................................................. 21

*Rivera v. Inc. Vill. of Farmingdale,*
   571 F. Supp. 2d 359 (E.D.N.Y. 2008) ....................................... 22

*Smith v. Town of Clarkton,*
   682 F.2d 1055 (4th Cir. 1982) .................................................12

*Spencer v. Kemna,*
   523 U.S. 1 (1998)............................................................ 37, 38, 39

*St. Mary's Honor Ctr v. Hicks,*
   509 U.S. 502 (1993)...................................................................... 6

*Sunrise Dev., Inc. v. Town of Huntington,*
   62 F. Supp.2d 762 (E.D.N.Y. 1999) ........................................12

*Tsombanidis v. W Haven Fire Dep't.,*
   352 F.3d 565 (2d Cir. 2003)................................................. *passim*

*Twp. Of Mt. Holly v. Mt. Holly Gardens Citizens in Action, Inc.,*
   133 S. Ct. 2824 (2013) ............................................................. 28

*United States v. City of Yonkers,*
   96 F.3d 600 (2d Cir. 1996)........................................................ 5

*United States v. DiMucci,*
   879 F.2d 1488 (7th Cir. 1989) ................................................ 39

*United States v. Suleiman,*
   208 F.3d 32 (2d Cir. 2000)...................................................... 36

*United States v. Yonkers Bd. of Educ.,*
   837 F.2d 1181, 1222-26 (2d Cir. 1987) .................................. 15

*Vietnamese Fishermen's Assoc. v. Knights of Ku Klux Klan*,
    518 F. Supp. 993 (S.D. Tex. 1981) ........................................................48

*Ventura Vill., Inc. v. City of Minneapolis*,
    318 F. Supp. 2d 822, 827-28 (D. Minn. 2004) ....................................... 30

*Ventura Vill., Inc. v. City of Minneapolis*,
    419 F.3d 725 (8th Cir. 2005) ................................................................ 30

*Vill. of Arlington Heights v. Metro. Dev. Corp.*,
    429 U.S. 252 (1977).................................................................... *passim*

*Warth v. Seldin*,
    422 U.S. 490 (1975)..................................................................... 43- 45

*White Oak Prop. Dev., LLC v. Washington Twp.*,
    606 F.3d 842 (6th Cir. 2010) ................................................................ 14

*Zahra v. Town of Southold*,
    48 F.3d 674 (2d Cir. 1995)................................................................... 49

**Statutes**

U.S. CONST. art. III, § 2 ..............................................................................36

42 U.S.C. § 3604(a) ...................................................................................33

42 U.S.C. § 1981 ....................................................................................1, 47

42 U.S.C. § 1982 ................................................................................1, 47, 48

42 U.S.C. § 1983 ................................................................................1, 48, 49

N.Y.S. VILL. LAW § 7-725-b ...................................................................... 21

N.Y.S. VILL. LAW § 7-706(1) ......................................................................35

VILL. OF GARDEN CITY CODE § 25-1 ...........................................................35

## THE VILLAGE DEFENDANTS' POST-TRIAL MEMORANDUM

Defendants, the Incorporated Village of Garden City and the Garden City Board of Trustees (collectively referred to herein as the "Village"), respectfully submit the following post-trial memorandum of law in support of their request that the Court grant judgment in the Village's favor as plaintiffs MHANY Management, Inc. ("MHANY") and New York Communities for Change, Inc. ("NYCC") (collectively referred to herein as "Plaintiffs") have failed to prove any violation by the Village of 42 U.S.C. § 3601 *et. seq.* (the "Fair Housing Act" or "FHA"), 42 U.S.C. §§ 1981, 1982, 1983, or the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

Plaintiffs' entire presentation of the facts of this matter in their Post-Trial Memorandum can be best summarized as a blatant mischaracterization and misrepresentation of the testimony and evidence presented at trial. Plaintiffs spent nine (9) days out of an eleven (11) day trial attempting to prove their underlying specious claim that the Village was motivated by "sustained and hostile opposition to affordable housing" when it enacted R-T zoning at the Social Services Site (the "Site"). Plaintiffs proved only that this entire action was grounded solely on their speculation, inference, innuendo, and conjecture. *See* Plaintiffs' Post-Trial Memorandum, at p. 1 (hereinafter "Plaintiffs' Post-Trial Memo"). In actuality, the trial crystalized that the Village's position throughout this action was truthful and accurate; the Village's enactment of R-T zoning was in no way influenced by discriminatory animus nor did it have a discriminatory impact.

Essentially, Plaintiffs assert that, since the Village did not enact zoning allowing for multifamily housing in the maximum density discussed in the initial report issued by its planner, the Village obviously intended to enact exclusionary zoning. Plaintiffs' argument would necessarily cause this Court to rule that (1) a municipality must always abide by their planner's

1

initial thoughts; and (2) if a municipality does not zone for the absolute maximum number of housing units, it has discriminated based on race and is *per se* liable under the FHA and associated civil rights statutes. As will be seen below, neither the applicable law nor the facts elicited at trial support this strained position.

<u>**STATEMENT OF FACTS**</u>

The following are dispositive facts confirmed during trial:

**A.   <u>The Site and the County's Request for Proposals ("RFP")</u>**

1.   Nassau County (the "County"), at all relevant times, owned the Site and it sought to sell the Site.

2.   The County requested the rezoning from the Village.

3.   The Site was **never** zoned R-M; rather, it was zoned "Public" ("P-Zone") and then R-T.

4.   The County's sole objective was to obtain the maximum price for the Site.

5.   The County Executive, Thomas Suozzi, did not believe affordable housing was appropriate for the Site.

6.   The Village had no input into the RFP process, including setting the price, reviewing the bidders or their proposed development plans, or selecting the winning bid.

7.   MHANY **never** submitted a formal RFP response to the County.

8.   Even after former Plaintiff NYAHC sent the County a non-conforming bid for a 2,000 unit development (the "Protest Proposal"), it **never** sent it to the Village.

9.   The Village did not see the "Protest Proposal" until discovery in this case.

10. NYCC did not exist during any of the relevant events in this case.

11.   Plaintiffs **never** filed a written request or application for a building permit, zone change or variance concerning the Site.

12.   MHANY and NYCC **never** indicated to the Village that they wished to build on the Site at any point before R-T zoning was enacted and **never** participated in the rezoning process.

13.   Neither MHANY nor NYCC ever had any property interest in the Site.

14.   The Village **never** had a property interest in the Site.

15.   When zoned as the P-Zone <u>immediately prior</u> to enacting R-T zoning, housing of any type was not permitted.

**B.   <u>The R-T Zoning</u>**

16.   Under the R-T zoning up to 186 units of housing may be built on the Site.

17.   Buckhurst, Fish and Jacquemart ("BFJ"), the Village's planners, never proposed zoning the Site R-M, but rather first <u>proposed</u> CO5b.

18.   CO5b zoning for the Site would have allowed commercial, office, courthouses, or residential areas, or a combination thereof.

19.   R-T zoning eliminated the possibility of commercial or office development and effectively guaranteed residential use.

20.   The R-T zoning created housing opportunities where none previously existed.

21.   The R-T zone had already been proposed and, in fact, was the subject of a public hearing when a single member of former plaintiff ACORN first appeared in the rezoning process by speaking at the May 2004 public hearing.

### C.  **The Parties**

22.  The claims of plaintiffs Vic DeVita and Francine McCray were dismissed with prejudice before the start of the trial. *See* Stipulation of Dismissal, Docket Entry 378; Trial Transcript ("Tr.") 5:15-21, 54:11-21. 1360:8-1361:2.

23.  Two (2) corporate Plaintiffs remain in this action: MHANY, formerly known as New York ACORN Housing Company, Inc. and Intervenor-Plaintiff NYCC. *See* Second Amended Joint Pre-Trial Order, Stipulated Facts, Docket Entry 376-2 (the "Stipulated Facts") at ¶¶ 4 and 6; Tr. 1359:17-1361:6.

24.  There is no legal entity separate and apart from the Village known as the "Board of Trustees" and, as such, the "Garden City Board of Trustees" is not a proper party herein.

25.  The owner of the Site at this time and at all relevant times herein, the County of Nassau, is not a party to this action, and did not participate in this trial.

26.  NYCC was never involved in any of the events at issue as it was not in existence in the relevant 2002-2004 time period, having only come into existence in 2009. Stipulated Facts at ¶ 6; Tr.  1353:16-1354:6, 1357:17-1358:2.

### D.  **The Village**

27.  The Village has approximately 7,600 dwellings: 6,485 single family and approximately 1,100 multifamily dwellings. Tr. 67:2-18.

28.  The Village has no record of, has not received, and as such, has not had reason to consider, any applications from any entity or individual to build affordable housing at the Site at any time.

# POINT I

## PLAINTIFFS FAILED TO PROVE THAT THE VILLAGE ACTED WITH DISCRIMINATORY INTENT

### A.    Plaintiffs Failed to Demonstrate that the Village's Decision to Enact R-T Zoning was Motivated by Race.

To demonstrate a *prima facie* violation of the FHA under a theory of discriminatory intent, a plaintiff must demonstrate that animus against a protected group played "a *significant* factor in the position taken by the municipal decision makers." *Le Blanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995) (internal quotations omitted). A plaintiff cannot make out a *prima facie* case simply by showing that municipal decision makers responded to facially-neutral concerns that, unbeknownst to the decision maker, were motivated by unlawful animus. Rather, a plaintiff can establish a *prima facie* case only by proving that "the defendants knew that a significant portion of the public opposition was racially inspired, and their public acts were a direct response to that opposition." *See United States v. City of Yonkers*, 96 F.3d 600, 613 (2d Cir. 1996) (internal citations omitted). Plaintiffs failed to establish any element at trial.

"If the plaintiffs make out a *prima facie* case, then the burden of production shifts to the defendants to provide a legitimate, nondiscriminatory reason for their decision." *Reg'l Econ. Cmty. Action Program v. City of Middletown*, 294 F.3d 35, 49 (2d Cir. 2002). As Plaintiffs have conceded, however, "[t]he defendant's burden is [only] one of *production* to 'provide a legitimate, nondiscriminatory reason for their decision.'" Plaintiffs' Pre-Trial Brief at 11. (quoting *Middletown*, 294 F.3d at 49) (emphasis added). Accordingly, "[i]f the defendant provides such a reason, the burden then shifts to the plaintiffs to 'prove that the defendant intentionally discriminated against them on a prohibited ground." *Id.* (quoting *Middletown*, 294 F.3d at 49). In other words, once a defendant identifies a facially nondiscriminatory reason for

the challenged action, this burden-shifting framework, "simply drops out of the picture [and] . . . the trier of fact proceeds to decide the ultimate question: whether plaintiff has proved that the defendant intentionally discriminated." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993) (internal quotations omitted). The ultimate standard is the same under the Fourteenth Amendment: to find liability, the Court must find that "the same decision would [not] have resulted . . . had the impermissible purpose not been considered." *Vill. of Arlington Heights v. Metro. Dev. Corp.*, 429 U.S. 252, 270 n.21 (1977).

In determining whether a plaintiff has met its burden under the FHA, courts consider the totality of the circumstances surrounding the adoption of a zoning law in order to determine the existence of discriminatory intent. *See id.*; *LeBlanc-Sternberg*, 67 F.3d at 425. Such an analysis requires that the court consider a number of factors, including (1) the specific sequence of events leading up to the challenged decision; (2) whether the historical background of the decision "reveals a series of official actions taken for invidious purposes"; (3) departures from normal procedure; (4) substantive departures, "particularly if the factors usually considered important by the decision maker strongly favor a decision contrary to the one reached"; and (5) whether the adopted zoning bears more heavily on one group than another. *See Arlington Heights*, 429 U.S. at 267-68; *Le-Blanc-Sternberg*, 67 F.3d at 425. Plaintiffs did not present evidence of a *prima facie* case of discriminatory intent at trial, let alone meet their ultimate burden of proving intentional discrimination.

1. **Plaintiff did not demonstrate that the Sequence of Events Leading to the Adoption of R-T Zoning amounted to Discriminatory Intent on Behalf of the Village.**

Plaintiffs create a sequence of events leading up to the enactment of R-T zoning that is replete with inaccuracies. They do so in part because they never looked at a prior rezoning project within the Village and compared that with the process utilized for the rezoning of the P-Zone. They simply focus on this one, single rezoning decision and attempt to argue that it is somehow out of sequence with itself. This argument is nonsensical. Plaintiffs concede that up until the public hearing in January and February 2004, they approved of the Village's process and procedures utilized in the rezoning efforts. Plaintiffs then contend that a new rezoning effort commenced which resulted in the R-T zone. Plaintiffs are wrong.  Simply put, Plaintiffs failed to show that the events leading up to the enactment of the R-T zoning suggest anything other than the careful deliberations and legitimate considerations of both BFJ and the Village which led to the evolution of the proposed CO5b zoning into the ultimately-adopted R-T zoning.

i. **BFJ Issues a Report Containing the CO5b Proposal, which Allows for a Range of Development Options.**

In or about May 2002, Thomas Suozzi, the Nassau County Executive, sought to sell County-owned properties in order to maximize revenues to support the County's existing operations ("the Plan").  Stipulated Facts at ¶¶ 9, 13. One of the properties considered under the Plan was the 25 acre Site. *Id.* at ¶ 10. At the time the County was devising the Plan, the Site was designated by the Code of the Village of Garden City as "P", which permitted only government and court buildings. Consequently, the County requested that the Village rezone the Site to permit commercial and/or residential uses since the P-Zone was incompatible with the County Executive's goal. *Id.* at ¶¶ 13, 15, 16.

7

In or about June 2002, in response to the County's request to rezone the Site, the Village Board created a sub-committee, the P-Zone Committee, and retained BFJ to propose zoning options for the Site. *Id.* at ¶¶ 17, 19. BFJ prepared a report containing various zoning proposals for the entire P-Zone and modified the report at various times through a number of subsequent iterations. Joint Exhibits 3, 7, 11. With regard to the Site, BFJ had always recommended an *entirely new* zone, named initially the "CO5b" zone. Tr. 1703:16-19. In the CO5b zone, a developer would have the choice to build commercial, offices, courtrooms, single family homes, townhouses, or multifamily units or any combination thereof. Tr. 367:5-368:13, 1662:18-20. While BFJ suggested that R-M zoning controls could be utilized for any potential residential housing that a developer chose to build, there was no requirement that a developer construct multifamily housing or, for that matter, any housing at all. Tr. 367:5-368:13.

The BFJ report does not refer to affordable housing or the expected or proposed price of any residential option. Joint Exhibits 3, 7, 11. While a 311-unit townhome or multifamily development (or any combination thereof) represented the potential maximum number of permissible units, or "max build," under the proposed CO5b zone, such a development was only one theoretical possibility among many. Tr. 375:23-376:16. The proposed CO5b zoning also permitted somewhat odd, incongruous combinations; for example, a development could have an office building facing Washington Avenue, single family homes behind it facing County Seat Drive and another office building across County Seat Drive. Tr. 367:25-370:1, 1662:18-1663:22. Such a random layout would not provide an aesthetically pleasing transition from the commercial buildings to the single family homes across Washington Avenue.

The CO5b proposal was continuously modified throughout 2003. For example, the original proposal allowed homes at an R-6 density, permitting one home per 6,000 square foot

lot. Joint Exhibit 3, 7; Tr. 318:24-319:1. However, this was later revised in November 2003 to allow for homes at an R-8 density, allowing one home per 8,000 square foot lot. Joint Exhibit 11; Tr. 318:24-319:1. The permissible Floor Area Ratio ("FAR") was also modified.  Tr. 318:3-16. It is noteworthy that this change was made after the issuance of the draft Environmental Assessment Form ("EAF"), which was completed in September 2003, and reflects that the draft EAF did not signal that the zoning proposal was in its final stages, but was simply just what it is called: a *draft* EAF for a *proposed* zoning devised by BFJ. Joint Exhibit 9.  There was no dispute that it was never finalized nor executed. This was an evolving process, which, as Village's expert Patrick Cleary testified, is typical of any planning project.  Tr. 1820:17-1821:4.

In late 2003, after receiving BFJ's November 2003 iteration of its report, the P-Zone Committee felt the CO5b proposal was at a stage such that it could be sent to the Board and considered by the public at a required hearing. However, nothing was final. Tr. 754:17-755:7, 916:10:917:23, 1663:23-1664:9. During his testimony, P-Zone Committee chairman Peter Bee made clear that the P-Zone Committee simply believed BFJ's November 2003 report could be considered by the Board and public hearings on the draft legislation could be held. Tr. 916:10:917:23. Furthermore, Village Building Superintendent Michael Filippon testified that he did not believe that the November 2003 report was a final recommendation from BFJ and that he understood that there could be subsequent changes made to the zoning proposal as it was an "ongoing process." Tr. 1663:23-1664:9. Mr. Cleary also agreed, testifying that, based upon his experience, the November report would not be considered final because "the process did not end with that report." Tr. 1853:19-1854:8.

**ii.      In accordance with Village Code, A Public Hearing on the Proposed CO5b Zoning is held; Citizens Raise Numerous Neutral Concerns.**

Plaintiffs' Post-Trial Memo includes an imaginary recitation of phantom "claims" about hostile public opposition to "R-M zoning controls" rooted in residents' anxiety that "R-M zoning controls would permit the development of affordable housing." Plaintiffs' Post-Trial Memo at p. 11. The documentary evidence and testimony presented at trial, or lack thereof, demonstrates just how unfounded and/or exaggerated these allegations truly are.

As is required by the Village Code and the New York State Village Law, before any new zoning law is adopted, a public hearing was held to obtain public comment and input with regard to the proposed CO5b zoning. Joint Exhibits 12, 24; Tr. 1660:7-10, Tr. 1820:8-11. As Mr. Cleary stated, "[t]here is no question about it that local input is necessary in ultimate land use or zoning decisions." Tr. 1821:2-4.

The first session of the public hearing regarding the proposed CO5b zone was held on January 8, 2004. Joint Exhibit 24. This was the first time that the public had an opportunity to officially be heard and ask questions about the proposed zoning. Tr. 63:5-10, 518:10-16, 519:7-9, 1688:8-22. While residents raised concerns over parking, traffic, taxes, and suggested that the Site should be developed with housing that met the needs of employees in the immediate area, not one resident mentioned opposition to affordable housing. Joint Exhibit 24; Tr. 687:3-690:25, 927:5-941:8. Plaintiffs claim that following this meeting, "rumors" regarding affordable housing "began to spread" and "[o]pposition to affordable housing gained momentum." Plaintiffs' main support for this contention is the minutes from an Eastern Property Owner's Association meeting held on January 20, 2004, in which it is stated that Mr. Bee, in response to a question posed by a resident, said that economics indicated that a developer would likely build high-end housing at the Site, but affordable housing would also be allowed. Plaintiffs' Exhibit 147.  This is the crux

of the "evidence" of the vehement opposition to affordable housing stemming from racism that led to what Plaintiffs claim was a "surge of anti-affordable housing sentiment."

According to Plaintiffs, this "surge" occurred at the February 5, 2004 continuation of the public hearing regarding the proposed CO5b zoning. Plaintiffs' Post-Trial Memo., at p. 12. At that meeting, *one* resident stated the following to then-County Executive Suozzi: "You said you wanted it to be upscale, from what I understand from what Peter Bee said the last time, is that they wanted it to be affordable housing." Joint Exhibit 12 at 905. This was the one and only time a resident used the term "affordable housing" at this public hearing. Contrary to Plaintiffs' assertions, residents did not "demand" a guarantee that the development would not be "low income" or request that deed restrictions be placed on the property. Rather, Mr. Suozzi, given the County's desire to sell the Site for as money much as possible, continually stated that the *County* did not want to put affordable housing at the Site. Joint Exhibit 12 at 906, 908. To the extent Plaintiffs attempt to rely on Mr. Suozzi's personal beliefs regarding Long Island residents' opinions on affordable housing generally, Mr. Suozzi actually testified that he did not know if the Village would have opposed an affordable housing proposal. Tr. 1031:3-11.

The citizen concerns actually discussed at the February 5, 2004 meeting, included, but were not limited to, traffic, the impact of development on small businesses in the Village, the aesthetics of placing an apartment building in a neighborhood that consists of single family homes, and the impact on schools. Joint Exhibit 12 at 907, 911, 912-914, 921-922, 923-24.  The public comments that night also included concerns that were raised previously at the January hearing regarding density, parking, the Wyndham, public services, and tax revenues. Joint Exhibit 12 at 907-08, 911, 912-14, 918-19, 924, and 930-31; Tr. 921:4-17, 940:17-941:8.  In fact, as opposed to the word "affordable," which was used only once by a single resident over the two

days of the hearing, the word "traffic" is used at least 68 times and the word "school" was mentioned 44 times. Joint Exhibits 12 and 24. Interestingly, and despite the sheer volume of times it was mentioned, Plaintiffs do not label the concerns about traffic as an "outcry." Yet, that single use of the word "affordable" by a resident somehow amounts to a "surge" of virulent opposition to affordable housing upon which Plaintiffs ground this case. This is not racism. It is not an outcry or a citizen revolt; it is democracy at work. There was no public comment from MHANY or ACORN during either session of the public hearing, and NYCC did not exist at the time. Joint Exhibits 12, 24; Stipulated Facts at ¶ 6.

To the extent that Plaintiffs have decided to act as trier of fact and conclude that numerous and varied concerns raised by citizens were merely "code" words for racism, this allegation is not supported by facts or the distinguishable case law cited in their Post-Trial Memo, which involve blatant examples of discrimination often directed specifically at a certain group of people. For example, in *Innovative Health Sys. v. City of White Plains*, citizens repeatedly and expressly referred to a protected class (those with drug and alcohol dependencies) as "'undesirable elements' who pose a real security risk." 117 F.3d 37, 42 n.3 (2d Cir. 1997). In *Smith v. Town of Clarkton*, decision makers within the defendant Town's government "knew that a significant portion of the public opposition [to public housing] was racially inspired, and their public acts were a direct response to that opposition." 682 F.2d 1055, 1058 (4th Cir. 1982). The Town's mayor even stated that said he was concerned about an influx of "undesirables" moving into low income housing. *Id.* at 1066-67. Moreover, in *Sunrise Dev., Inc. v. Town of Huntington*, opposition to a home for the disabled was met with documented opposition embracing specific "stereotypical notions" about those with disabilities, such as that they would "drain community services." 62 F. Supp. 2d 762, 768, 775 (E.D.N.Y. 1999).

However, unlike those cases, this is not a case where a key decision maker expressed opposition to "low income" housing based on animus toward minority or another protected status. Plaintiffs utterly failed to demonstrate that multifamily and affordable housing are synonymous or considered the same by the Village or its residents.  It is not a case where residents fought proposed housing for a protected class and expressed blatant discrimination in their opposition. This is a case in which multifamily housing, without regard to price, was just one of many commercial and residential possibilities under a proposed zoning scheme. Tr. 367:5-368:13, 1662:18-20.

Indeed, this case follows *a fortiori* from *Arlington Heights*.  The plaintiffs in that case attempted to build an affordable housing development, Lincoln Green, that could not occur unless the parcel was rezoned. 429 U.S. at 257. At three public meetings, "which drew large crowds," "many of those attending were quite vocal and demonstrative in opposition to Lincoln Green" and "[s]ome of the comments, both from opponents and supporters, addressed what was referred to as the 'social issue'—the desirability or undesirability of introducing at this location in Arlington Heights low- and moderate-income housing." *Id.* at 257-58. There the village in that case rejected the affordable housing because of the possibility that rezoning would "cause a measurable drop in property value for neighboring sites" and that multifamily zoning should be limited to areas that could serve as "serve as a buffer between single family development and land uses thought incompatible, such as commercial or manufacturing districts."  *Id.* at 258.  In fact,  "[i]n making its findings on this issue, the District Court noted that some of the opponents of Lincoln Green who spoke at the various hearings might have been motivated by opposition to minority groups. The Court, however, affirmed the finding of the district court that the evidence "does not warrant the conclusion that this motivated the defendants.'" *Id.* at 269.  Plaintiffs here

have offered far less evidence of racism by a decision maker than the evidence that was *insufficient* to find discrimination in *Arlington Heights*.

Further, while Plaintiffs contend that "low income" and "affordable" are synonyms for race, the courts have repeatedly held that they are not. *See Orange Lake Assoc. Inc. v. Kirkpatrick,* 21 F.3d 1214, 1225 (2d Cir. 1994) (rejecting argument that zoning intended to preclude affordable housing "classifies individuals on the basis of race"); *Boyd v. Lefrak Org.*, 509 F.2d 1110, 1112-13 (2nd Cir. 1975) ("The premise of plaintiffs' argument is that welfare recipiency must be seen as the 'functional equivalent' of race. Such an equivalency between race and income has been rejected by the Supreme Court.") (citing *James v. Valtierra*, 402 U.S. 137 (1971)) (internal quotation marks omitted); *see also White Oak Prop. Dev., LLC v. Washington Twp.*, 606 F.3d 842, 852 (6th Cir. 2010) ("White Oak cites no authority that a zoning prohibition against multifamily developments, particularly in a rural area, constitutes a *per se* Equal Protection violation, and no such authority exists.").

Additionally, Plaintiffs continually fail to understand, or simply ignore, that the law does not prohibit economic discussions or debate. Thus, an anonymous flyer that references "Garden City incomes" or citizen inquiry about the so-called "Balboni Bill" cannot be assumed to be racially discriminatory. In a failed attempt to equate economics and race, Plaintiffs called at trial two Garden City residents, Lauren Davies and Sheila DiMasso, who live across the street from the Site and who had handed out (but did not create) this flyer. Tr. 1208:6-7. While Plaintiffs questioned Ms. Davies and Ms. DiMasso extensively regarding their intentions, both residents stated that their concerns about the rezoning of the Site were motivated by issues such as safety and traffic, and had nothing to do with race. Tr. 1198:9-11, 1229:13-15. Additionally, Plaintiffs did not show that even economic-based concerns prompted the Village to act in any way. Even if

Plaintiffs had introduced evidence of racism or improper motive on behalf of a single or a few residents (which they clearly did not), to succeed in their FHA claim, Plaintiffs must show that the Village officials acted based on the animus of those residents. *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1222-26 (2d Cir. 1987).

Plaintiffs failed to present any evidence whatsoever that the decision makers or anyone else involved in the zoning process interpreted comments made by citizens to be racially motivated. In fact, Mr. Gerard Lundquist, Mr. Bee, and Mr. Filippon all testified that they did not understand *any* comments made by Village residents with regard to the rezoning of the Site to involve race. Tr. 826:8-11, 958:13-16, 1668:15-20, 1669:23-25. Thus, Plaintiffs failed to demonstrate that any Village official acted based on racial animus of any resident.

### iii.   BFJ Proposes R-T Zoning to Address the Citizen Concerns.

On April 1, 2004, BFJ modified its zoning proposal to reduce office density, minimize traffic impacts, and to modify the number of multifamily units to reduce population numbers. Joint Exhibit 18; Tr. 1670:4-1673:1. Three weeks later, in an April 22, 2004 presentation to the Village residents, BFJ demonstrated that 215 apartments at the Site would generate 1,423 vehicular trips per day, while 90 single family homes would generate 940 trips and 150 townhomes would generate 920 trips per day. Office use, however, generated the most traffic, with 3,046 trips per day. Joint Exhibit 13. Based on these statistics, for 311 multifamily units, the number of daily traffic trips, over 2,000, *is more than double* the amount of traffic generated by the proposed number of single family homes or townhomes. Tr. 399:14-401:25 (311/215 x 1,423 = 2,058). Obviously, and despite Plaintiffs' contention, these citizen concerns over traffic were clearly not irrational.

Further changes were then made to the zoning proposal in May 2004 to address traffic issues. Joint Exhibit 19. Specifically, on May 4, 2004, office use was completely eliminated from the Site, and multifamily housing was limited to the west side of County Seat Drive to "provide a significant response to the concern that has been previously expressed over traffic," since "office is the largest, single generator of traffic" and because "multifamily was the next highest generator of traffic." *Id*. Multifamily was also placed on this particular part of the Site to create a "marketable transition." *Id.*; Tr. 412:10-414:20. (At trial, Mr. Cleary, the Village's planning expert, testified as to the need for transitional zoning and that the Site "is a very good illustration of that." Tr. 1832:8-24.)   Due to the elimination of commercial and office use (and the incumbent impacts), CO5b was renamed "R-T" for "Residential-Townhouse." Joint Exhibit 19; Tr. 367:5-16. As with CO5b, there was absolutely nothing in the R-T zoning designation that prohibited the building of affordable housing. Joint Exhibit 19; Tr. 1693:4-6, 1829:17-23.

Despite Plaintiffs' claims that the Village had offered no reason for modifying the original CO5b proposal to the R-T zoning proposal, these reasons are clear from the record.  *See* BFJ's April 1, 2004 memorandum, April 22, 2004 PowerPoint presentation, May 4, 2004 memorandum, as well as Mr. Fish's lengthy explanation of the reasons for the R-T zoning that he set forth at the May 20, 2004 public hearing; Joint Exhibits 13, 18, 19, and 24 at pp. 2-24.

Additionally, Plaintiffs suggest that residents had no basis to fear that 311 apartments could produce a greater load on schools than the 150 townhomes or 90 single family homes and, therefore, this must have been a guise for their alleged racially motivated animus. Plaintiffs are doubly mistaken. First, simply because a statistic is purported to be true at a public meeting does not require a citizen to immediately understand and accept it. At the very least, questioning a statistic does not make one a racist. Second, the evidence showed that such concerns were

16

certainly reasonable. Plaintiffs rely on the estimate of Mr. Fish that single family homes would, on average, produce one (1) additional schoolchild per home while, "[w]ith a community aimed at *young couples and empty nesters* there could be as few as 0.2 to 0.3 public school children per unit." Joint Exhibit 22 at 691 (emphasis added). Thus, under Mr. Fish's estimates provided in connection with R-M zoning tools, 90 single family homes would have generated roughly 90 additional schoolchildren, while 311 multifamily homes would have generated roughly between 62 and 93 schoolchildren. However, if a different resident mix generated even slightly more schoolchildren per unit, the result could quickly be significant given the large number of potential multifamily units. For example, if 311 apartments simply generated 0.4 or 0.5 students per unit, the result would be 124 to 156 additional schoolchildren. The refusal of residents to take Mr. Fish's rough estimates as gospel, and the common sense conclusion that 311 homes may generate more schoolchildren than 90 homes, is hardly unreasonable and certainly creates no inference of racial animus.

Moreover, the only expert in the field who testified at trial, Mr. Cleary, stated why R-T zoning was a better option than CO5b. CO5b zoning "permitted a range of uses that . . . had the potential to create significant, potentially significant adverse impacts". Conversely, R-T zoning "eliminated the potential for those adverse impacts," allowed a better "transition of land use," "took into consideration the public hearing comments that were delivered during a review of the process"; and "provided for an expansion of the housing opportunities available in the Village of Garden City by facilitating the development of townhomes." Tr. 1855:1-1856:4.

Plaintiffs offered no competing zoning expert. Instead, Plaintiffs offered a list of unfounded accusations regarding the enactment of R-T zoning which consist solely of their own conclusions. Plaintiffs call R-T zoning an "empty shell of a law" and call the Village's procedure

"strange" even though they themselves have no zoning experience, did not call an expert in planning or zoning, and offered no evidence as to the Village's standard zoning procedures. Plaintiffs did not meet their burden. Plaintiffs' claim, based solely on their conjecture, must be disregarded in favor of what the Village demonstrated at trial: that the rezoning of the Site was an ongoing process; that various modifications were made during the process to address such concerns as impacts on school and traffic; and, as the only planning expert testified, that R-T zoning was a better fit for the Site than the originally proposed CO5b zoning. Joint Exhibits 3, 7, 11, 18, 19; Tr. 318:8-16, 1664:1-9, 1855:1-1856:4.

Finally, the R-T zoning proposal added in a definition of townhomes to the Village Code. Tr. 1772:18. Townhomes were a form of housing that was not available to prospective buyers or renters in the Village. Tr. 1773:11-1774:6. Mr. Filippon further testified that, while the BFJ reports stated that townhomes were allowed under the proposed CO5b zoning, these were not townhomes in the "usual sense of the word." Tr. 1662:18-1663:18.

### iv. Former Plaintiff ACORN First Appears and Attends a May 20, 2004 Public Hearing.

As noted, the Village held a public hearing with regard to the R-T zoning on May 20, 2004. At this time, the CO5b proposal was no longer under consideration. Tr. 1683:12-16. The only recorded statement of any individual asserting membership in ACORN occurred on May 20, 2004, at the end of the public hearing on the R-T zoning when a single resident of Hempstead expressed that "we're asking other communities is to share and build affordable housing in their community." Joint Exhibit 25 at p. 2505-07. He did not express a concern that R-T zoning eliminated the potential for affordable housing. He did not request that the Village re-consider its R-T zoning proposal. *Id*. He did not express ACORN's or the Plaintiffs' alleged desire to build at

the Site.  That citation in Joint Exhibit 25 is the sum total of the public comments by Plaintiffs or anyone arguably associated with Plaintiffs.

> **v.    R-T Zoning Does Not Prohibit Affordable Housing.**

Plaintiffs failed to prove the most vital piece of their case: that R-T zoning prohibited the building of affordable housing at the Site.

As established at trial, all three residential options permitted under R-T zoning—single family, townhouses, and multifamily—can be used to build affordable housing. Tr. 1399:15-23, 1354:16-21, 1879:17-23. Neither of the Plaintiffs, or representatives thereof, suggested at the May 20, 2004 hearing (in fact, neither appeared at that hearing) or at any time prior to the May 20, 2004 hearing, or even up to the enactment of R-T zoning on June 3, 2004, that the proposed R-T zoning would preclude them from building affordable housing at the Site. Tr. 1375:7-9, 1683:9-11. Again, there was nothing about the R-T zoning classification that prohibited the building of affordable housing. Tr. 426:25-427:1, 826:12-14, 953:12-16, 1399:15-22, 1693:25-1694:2. Ann Sullivan, the representative of NYCC and former plaintiff ACORN, admitted this. Tr. 1399:15-22. In fact, even though Ismene Speliotis of plaintiff MHANY opined that she determined that MHANY could not build a "measurable" amount of affordable housing under R-T zoning, her complete testimony and the actual facts presented during her testimony demonstrate otherwise.

Ms. Speliotis testified that, while she "believe[d]" she could not build affordable housing at the Site under R-T zoning, she actually did not know what another affordable housing developer could do. Tr. 1545:16-1546:4. She also testified that she only did an "initial" evaluation of what could be built under R-T zoning, and admitted that she never produced this documentation as part of this litigation. She did, however, produce a very detailed analysis of the

alleged affordable housing possibilities under the R-M zoning control component of the CO5b proposal. Joint Exhibit 30; Tr. 1546:22-6. The fact that Ms. Speliotis apparently analyzed the Site under both the CO5b proposal and the enacted R-T zoning, but yet only produced her lengthy documentary findings under the CO5b proposal is in and of itself suspect.

Moreover, her conclusion that she could not construct any significant amount of affordable housing at the Site is belied by her later affordable housing efforts at another site in the Village. Ms. Speliotis testified that she had submitted a proposal to the County (again not to the Village) to build *150 affordable townhomes* at the Ring Road site. However, she nevertheless maintained that there was still no way that she could build affordable housing at the Social Services Site, which not only allowed for 150 townhomes, but also 36 multifamily units. Tr. 1550:8-11, 1563:24-1564:3. She simply explained this with the unsubstantiated claim that, not including land costs, it would somehow have cost more than twice the amount to build one (1) unit of townhouse housing (over $500,000) at the Social Services Site as compared to Ring Road ($260,000). Tr. 1548:10-1550:10. MHANY chose not to produce any documentation to demonstrate this disparity for the Court (or the Village). Ms. Speliotis also repeatedly admitted that she did not produce any written analysis of her conclusions regarding the Site. Tr. 1564:24-1565:9. Plaintiffs also proffered no expert testimony on this point.

To the extent that Plaintiffs argue that a special permit requirement for multifamily housing under R-T zoning was designed to further restrict affordable housing, this contention was also completely disproven at trial. The requirements to obtain a special permit under R-T zoning address only the physical characteristics and location of the building, and have nothing to do with the economics of a proposed development. Joint Exhibit 15; Tr. 1687:14-19. Mr. Filippon explained that multifamily housing is a "permitted use" under R-T zoning even though

a special permit is required, and it allows the Village to give input into things such "as setbacks, layout of buildings . . . means of ingress and egress." Tr. 1680:12-24. Special permits are a commonly used zoning tool and had been utilized in the Village Code and New York State Village Law §7-725-b prior to the enactment of R-T zoning and, in fact, BFJ had at one time suggested the use of special permits for office use during the rezoning process at issue. Tr. 1680:12-1681:9, 1777:5-1778:10.

Additionally, pursuant to New York State Village Law § 7-725-b, a "special use permit" is an authorization of a particular land use which is permitted by zoning law, subject to reasonable requirements or conditions to assure that the proposed use is in harmony with local law and will not adversely affect the neighborhood if such requirements are met. The inclusion of a use in a zoning law as a special permit use is tantamount to a legislative finding that the permitted use is in harmony with the general zoning plan and will not adversely affect the neighborhood. *Retail Prop. Trust v. Bd. of Zoning Appeals of the Town of Hempstead*, 98 N.Y.2d 190, 195 (2002). An applicant's burden of proof is a relatively light one. *North Shore Steak House v. Bd. of Appeals of the Inc. Vill. of Thomaston*, 30 N.Y.2d 238, 244 (1972). If an applicant demonstrates compliance with the standards legislatively adopted, the Board is obligated to issue the permit. *C.B.H. Props. Inc. v. Rose*, 205 A.D.2d 686 (2d Dep't 1994), *lv. denied*, 84 N.Y.2d 808 (1994). General community objections would not be a ground to deny the permit. *Mkt. Square Props. Ltd. v. Town of Guilderland Zoning Bd of Appeals*, 66 N.Y.2d 893 (1985). The evidence clearly shows that, unlike Plaintiffs' assertions, the use of a special permit was certainly not to prevent affordable housing.

## 2.  **Plaintiffs did not Demonstrate that the Historical Background of the Decision Evidenced a Discriminatory Intent.**

Under the *Arlington Heights* analysis, a court may consider the "historical background of [the] decision . . . particularly if it reveals a series of official actions taken for invidious purposes." 429 U.S. at 267. Case law instructs that a challenged "*decision's* historical background" should be considered when determining the existence of discriminatory intent. *See Rivera v. Inc. Vill. of Farmingdale*, 571 F. Supp. 2d 359, 367 (E.D.N.Y. 2008) (emphasis added). Additionally, in *McCleskey v. Kemp*, cited by Plaintiffs, the Supreme Court held that "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value." 481 U.S. 279, 298 n.20 (1987).

Plaintiffs argue that fifteen (15) years prior to the enactment of R-T zoning, a developer had approached the Village, during a moratorium on all building construction, with a plan to possibly build workforce housing at a piece of land known as the Doubleday site. The only evidence of this that Plaintiffs could produce was a newspaper article, which discussed a developer's apparent *future* intentions to file a formal application for a development. Plaintiffs' Exhibits 359 and 359.1. Mr. Filippon, who has been Building Superintendent of the Village since 1983, testified that he never reviewed an application for housing at the Doubleday site in or around 1989, and to his knowledge, no such application was ever filed. Tr. 1652:21-1655:5, 1656:6-11, 1657:7-1658:6.

Plaintiffs never called the developer or any other witness from Doubleday to testify on this issue. However, Plaintiffs nonetheless incredibly suggest that the Village destroyed such an application prior to adopting a records retention policy. This malicious hypothesis has no basis in fact. The testimony presented at trial demonstrated that since Mr. Filippon began his tenure with the Village Building Department in 1983, it has not purged its records of building permit,

variance, or zone change applications. Tr. 1656:17-25. Additionally, the Village searched these records in connection with this lawsuit and found that no such application for housing at the Doubleday site had been received. Tr. 1656:6-25. Thus, Plaintiffs completely failed to demonstrate that the Village rejected an affordable housing proposal at Doubleday. Regardless, an event that purportedly occurred in 1989 is irrelevant to a zoning decision made in 2004. *See McCleskey*, 481 U.S. at 298 n.20.

Plaintiffs also point to an issue concerning park access and contend that this demonstrates a "history" of discrimination in the Village. Even if tangentially relevant, this accusation is incorrect. Plaintiffs presented nothing at trial to demonstrate that the Village was found to be acting in a discriminatory manner except the uncorroborated testimony of Ann Sullivan, who essentially offered her opinion on what the Village's policy "seemed to be." Tr. 1321:25-1322:23. However, Ms. Sullivan's opinions and beliefs are not evidence of racial animus. Further, as to an Attorney General investigation related to Village parks, this Court has already determined that, "[w]e are not concerned with investigations. Investigations can happen with no real reason." Tr. 649:7-10. To the extent that Plaintiffs argue that the adoption of a policy by the Village signals evidence of discrimination (which the Village strenuously disputes), this contention is simply wrong as a matter of law. To hold that a municipality's adoption of a "non-discrimination" policy suggests it had been acting contrary to that policy would have a chilling effect on any entity's willingness to enact similar guidelines. *See McLaughlin v. Diamond State Port Corp.*, 2004 U.S. Dist. LEXIS 26351, at *11 (D. Del. Dec. 30, 2004) ("[A] defendant's attempt to reverse allegedly discriminatory practices should also be inadmissible. It would be perverse indeed if attempts to reverse discrimination could be used to condemn a defendant. Such use of evidence would only serve to discourage reform and the court will not permit it.").

Finally, throughout the trial, Plaintiffs repeatedly referenced Ring Road, located by Roosevelt Field Mall, and certain events that occurred in 2006, *two (2) years after* the zoning change in this action, concerning the possible sale of that property by the County. Tr. 655:1-9. The Court stated that this property was not relevant to the zoning decision at issue in this matter. Tr. 732:15-733:8. Plaintiffs' use of the Ring Road property to try to demonstrate a "historical background" of discrimination in the Village is misguided. First, as noted above, Plaintiffs' position is inherently contradictory since MHANY posits it could build affordable townhouses at Ring Road but not at the Site. Plaintiffs allege that while the County issued an RFP and (unlike the Social Services Site) called for affordable housing to be built at Ring Road, the Village "never rezoned it to R-M" from commercial. Plaintiffs' Post-Trial Memo at p. 29. However, Plaintiffs knew that this land was owned by the County and that there was never a request made to the Village by anyone to change the zoning there. Tr. 655:25-656:1, 817:23-25, 1545:4-9. Thus, while MHANY submitted a proposal <u>to the County</u> to build 154 townhomes at Ring Road, it never won the bid nor requested a zone change. Yet, Plaintiffs seek to somehow use the fact that the Village did not rezone Ring Road as evidence of discrimination. Tr. 1544:6-1545:12. This, like so many of Plaintiffs' arguments, is utterly nonsensical.

The totality of Plaintiffs' evidence of a historical background of discrimination is as follows: (1) a purported future application for a workforce housing development that the Village never received; (2) Ms. Sullivan's own conclusions and opinions about her observations in Village parks; and (3) the County's attempt to sell land at Ring Road for which a zoning change request was never made to the Village. None of those events demonstrate that there has ever been any "official action" taken for an "invidious purpose" and thus, Plaintiffs have failed to prove discriminatory intent under *Arlington Heights.* 429 U.S. at 267.

**3.** **Plaintiffs did not Demonstrate that the Village Departed from its Normal Substantive Criteria in Enacting R-T Zoning.**

As noted at length above, in asserting that the Village departed from its "normal procedural sequences," Plaintiffs offer an inaccurate description of the events leading up to the enactment of R-T zoning, and additionally did not demonstrate exactly what the "normal procedural sequences" were that they believe the Village failed to follow.

Plaintiffs attempt to create two (2) distinct zoning decisions out of the single rezoning process. Plaintiffs' praise of part of the process used by the Village until the public hearing in January and February 2004 on the CO5b proposal is unabashed. Plaintiffs' Post Trial Memo at pp. 7-11. Plaintiffs, however, conclude that the development of R-T zoning proposal as another part of that same process did not follow the same "careful, deliberative process" as the proposed CO5b. *Id.* at 24. Plaintiffs clearly ignore that both zoning proposals were part of the same "careful, deliberative process"; that the proposed CO5b was modified over time, and evolved into the enacted R-T zoning for which a *final* EAF was prepared. Joint Exhibit 19; Tr. 318:24-319:1, 1664:1-9, 1670:4-1673:1.

Plaintiffs, without ever providing evidence of what the "normal" Village zoning procedures were in other rezoning matters, embark on what amounts to a baseless discussion about how "normal" procedures were not followed, and how the development and enactment of R-T zoning was "slapdash." Plaintiffs' Post-Trial Memo at pp. 24-25. If Plaintiffs failed to demonstrate what was "normal," they cannot speculate as to what was "slapdash." In any event, the evidence demonstrates that the continued development of the zoning from CO5b to R-T was a single, solitary, but evolving, process during which BFJ and the Village considered a number of different factors of concern, such as parking, traffic, schoolchildren, character of the neighborhood, and transition. Joint Exhibits 3, 7, 11, 18, 19; Tr. 1664:1-9. In sum, Plaintiffs

failed to prove any departure from normal procedures and, in fact, failed to even offer a shred of evidence as to the normal procedures in the Village.

   4. **Plaintiffs did not Demonstrate that the Village Departed from its Normal Substantive Criteria in Enacting R-T Zoning.**

Plaintiffs opine that the Village departed from its normal substantive criteria because the Board's planning goals would have been "well, if not better, facilitated by R-M zoning." Plaintiffs' Post-Trial Memo at pp. 25-26. Plaintiffs are not planning experts and deliberately chose not to offer their planning expert at trial. Thus, they are certainly not in a position to critique, let alone decide, what is best for the Site and the Village.

The reasons why the Village chose to enact R-T zoning were discussed numerous times at trial and throughout this Memorandum. Expert Patrick Cleary stated why R-T zoning was better than BFJ's originally proposed CO5b zoning: it eliminated the potential for adverse impacts that CO5b would have allowed. Tr. 1855:1-1856:4. It eliminated office use and reduced the number of multifamily units, the two biggest generators of traffic. Joint Exhibit 19. It eliminated the possibility of a mishmash of simultaneous uses on the Site, e.g., an office building, homes, and a courthouse could be built on the parcels. It ensured a transition zone, whereas it was possible that the proposed CO5b zoning would not create a transition at all. Tr. 1855:1-1856:4; *see also* Tr. 1772:6-9.

It was established at trial that R-T zoning met the planning principles set forth by BFJ. Tr. 409:13-410:16. It was further established that R-T zoning met these principles *better* than the proposed CO5b zoning. Joint Exhibit 19; Tr. 399:14-401:25, 1853:7-11, 1855:1-1856:4. Plaintiffs' argument that the never-enacted CO5b zoning better suited the Village's "substantive criteria" is thus completely contradicted by the expert testimony and evidence presented by the Village. Joint Exhibit 19; Tr. 1772:6-9, 1855:1-1856:4.

**5.   Plaintiffs did not Demonstrate that R-T Zoning Impacted a Particular Group more than Another.**

Because none of the other *Arlington Heights* factors support a finding of disparate treatment, the possibility that R-T zoning caused a disparate impact clearly cannot, by itself, create disparate treatment liability. If that were so, the other factors would be irrelevant and there would be no need to attempt to prove discriminatory intent as distinct from disparate impact. In any event, as described in Point II below, Plaintiffs also failed to demonstrate that R-T zoning disproportionately impacted a protected class.

**B.   The Village had Legitimate Reasons for the Enactment of R-T Zoning that were not Pretextual.**

As discussed above, Plaintiffs failed to make out a *prima facie* case of discrimination under the FHA. However, even if the Plaintiffs did succeed in making such a case, this Court has already decided that the Village had legitimate reasons for the enactment of R-T zoning. *MHANY Mgmt. v. Inc. Vill. of Garden City*, 843 F. Supp. 2d 287, 322 (E.D.N.Y. 2012) ("[T]he Court finds that [the Village] [has] satisfied [its] minimal burden of offering a nondiscriminatory reason for [its] zoning decision.") The reasons for the enactment of the R-T zone were set forth at length here and at trial.

Suffice to say that, while the Plaintiffs conclude that the Village "utterly failed to prove their decision to adopt R-T zoning was solely motivated by residents' nondiscriminatory concerns," it is Plaintiffs who could not demonstrate that *any* discriminatory concerns were even expressed by residents, nevermind adopted by the Trustees. Moreover, the Village showed that the proposed CO5b zoning did not adequately address concerns over traffic nor created a proper transition between the commercial area and residential area that surround the Site—rather, as discussed at length above, the R-T zoning accomplished these goals. Tr. 1855:1-1856:4. Thus,

27

the R-T zone reduced the traffic and school impacts. *Id.* The R-T zoning additionally met the Village's stated goals of respecting the character of the existing neighborhoods and addressed the numerous concerns of Village residents. Joint Exhibit 1; Tr. 1855:1-1856:4. Overall, the proposed R-T zone met each of the goals of the Village better than any of the previous options presented by BFJ. Tr. 1855:1-1856:4. Plaintiffs' assertion that the only "thing R-T zoning accomplished . . . was to effectively eliminate the possibility of affordable housing" is a blatant fabrication, as it was demonstrated that R-T zoning does not prohibit or limit the possibility of affordable housing. Tr. 426:25-427:1, 826:12-14, 953:12-16, 1829:11-16. Plaintiffs' own witness, Ann Sullivan, also admitted this. Tr. 1399:15-22.

It was Plaintiffs' burden to prove at trial that the Village's legitimate reasons for enacting R-T zoning are merely pretext for discrimination. *See Mancuso v. Douglas Elliman, LLC*, 808 F. Supp. 2d 606, 620 (S.D.N.Y. 2011). Instead, Plaintiffs completely failed to demonstrate that the Village's reasons for enacting R-T zoning were anything more than a well-deliberated, balancing of legitimate considerations.

## POINT II

### PLAINTIFFS CANNOT SHOW DISPARATE IMPACT BASED ON THE SINGLE ZONING DECISION FOR THE SITE

Initially, the viability of any disparate impact claim under the FHA is far from certain. The Supreme Court has never expressly ruled on whether the FHA's language permits a claim under the theory of disparate impact. It is, however, poised to do so through its recent granting of *certiorari* in *Twp. of Mt. Holly v. Mt. Holly Gardens Citizens in Action, Inc.*, 133 S. Ct. 2824 (2013). The Village strongly contends that disparate impact claims are not available under the FHA based upon its plain language (*i.e.* absence of "otherwise adversely affected") and legislative history.

However, in applying *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926

(2d Cir. 1988), the Second Circuit has proffered a burden shifting framework to govern disparate

impact claims under the FHA:

> To establish a *prima facie* case under this theory, the plaintiff must show: "'(1)
> the occurrence of certain outwardly neutral practices, and (2) a significantly
> adverse or disproportionate impact on persons of a particular type produced by the
> defendant's facially neutral acts or practices.'" *City of Middletown*, 294 F.3d at
> 52-53 (quoting *Gamble v. City of Escondido*, 104 F.3d 300, 306 (9th Cir. 1997)). .
> . .When establishing that a challenged practice has a significantly adverse or
> disproportionate impact on a protected group, a plaintiff must prove the practice
> "actually or predictably results in ... discrimination." *Hack v. President & Fellows
> of Yale Coll.*, 237 F.3d 81, 90 (2d Cir. 2000) (quoting *Town of Huntington*, 844
> F.2d at 934). A plaintiff has not met its burden if it merely raises an inference of
> discriminatory impact. *See Gamble*, 104 F.3d at 306. Furthermore, the plaintiff
> must show a causal connection between the facially neutral policy and the alleged
> discriminatory effect. *See Hack*, 237 F.3d at 90-91. If a plaintiff makes a *prima
> facie* showing, the burden shifts to the defendant to "prove that its actions
> furthered, in theory and in practice, a legitimate, *bona fide* governmental interest
> and that no alternative would serve that interest with less discriminatory effect."
> *Town of Huntington*, 844 F.2d at 936.

*Tsombanidis v. W. Haven Fire Dep't.*, 352 F.3d 565, 574-75 (2d Cir. 2003). Plaintiffs have not

established the elements of a *prima facie* case for two reasons. First, they have not challenged

any "facially neutral **policy**" or general practice. *Id.* at 575 (emphasis added). To the contrary,

Plaintiffs have simply challenged a single zoning decision which they argue was an isolated

*departure* from the Village's normal zoning policy. Second, they have not and cannot show "a

*causal connection* between the facially neutral policy and the alleged discriminatory effect,"

such that the Village's single decision "actually or predictably result[ed]" in a significant

disparate impact. *Id.* (emphasis added); *Hack v. President and Fellows of Yale Coll.,* 237 F.3d

81, 90 (2d Cir. 2000). Moreover, even had Plaintiffs made out a *prima facie* case, the Village has

met its burden to rebut any inference of discrimination.

### A.    Plaintiffs Challenged a Single, Isolated Decision Rather Than a Generally Applicable Policy

The very premise of disparate impact liability under the FHA is that the defendant has adopted "facially neutral *policies or practices*," that, when applied in the aggregate, have a "discriminatory effect." *Tsombanidis*, 352 F.3d at 574 (emphasis added). Accordingly, the Second Circuit has squarely held that a disparate impact challenge cannot be based on a single, facially neutral decision. In *City of Middletown*, a community action program sued a municipality under the FHA after the municipality denied its application for a special use permit to construct a halfway house. 294 F.3d at 35. The court held that the City's single decision to deny the application could not be the basis for a disparate impact claim. As the court explained:

> A disparate impact analysis examines a *facially-neutral policy or practice*, such as a hiring test or zoning law, for its differential impact or effect on a particular group. . . . For example, a handicapped person might challenge a zoning law that prohibits elevators in residential dwellings. That neutral law might have a disproportionate impact on such a plaintiff and others with similar disabilities, depriving them of an equal opportunity to use and enjoy dwellings there. Here, by contrast, [plaintiff] does not challenge a facially neutral *policy or practice*; it challenges *one specific act*: the denial of a special-use permit for the Formisano property. No comparison of the act's disparate impact on different groups of people is possible. [Plaintiff] therefore fails to allege a cognizable cause of action under a disparate impact theory . . . .

*Id.* at 52-53 (emphasis added). This principle is supported by a legion of indistinguishable cases. *See Abrahams v. MTA Long Island Bus*, 10 Civ. 1535, 2010 U.S. Dist. LEXIS 51582 (E.D.N.Y. May 25, 2010), *aff'd on other grounds*, 644 F.3d 110 (2d Cir. 2011) (rejecting putative disparate impact claim because "plaintiffs [did] not allege that Defendant ha[d] a facially neutral policy or procedure that ha[d] a disproportionate impact on disabled persons [and i]nstead, they challenge[d] a single action taken by Defendant"); *Ventura Vill., Inc. v. City of Minneapolis*, 318 F. Supp. 2d 822, 827-28 (D. Minn. 2004), *aff'd*, 419 F.3d 725 (8th Cir. 2005) (holding that, because "plaintiffs challenge[d] a single act undertaken by the City," they "therefore fail[ed] to

establish the 'policy or practice' element of their disparate impact claim.") (citing *City of Middletown*, 294 F.3d at 52-53); *Hamm v. City of Gahanna,* C-2-96-0878, 2002 WL 31951272 (S.D. Ohio Dec. 23, 2002), *aff'd*, 109 F. App'x 744 (6th Cir. 2004) ("[P]laintiffs challenge defendants' single act of denying plaintiffs' request for a zoning variance. As a result, plaintiffs fail to state a claim of disparate impact.").

Here, Plaintiffs do not contend that there was anything improper about the Village's zoning code or the general principles the Village uses for zoning—that the development be "consistent with the existing character," "not overburden roads, utilities, and schools," have a consistent "scale and design," and "not tend to depreciate the value of property in the Village." *See* Plaintiffs' Post-Trial Memo at pp. 8-11. As testified to at trial by Mr. Cleary, the planning principles utilized by the Village are "common" and "typical" of those utilized by municipalities in their approach to zoning. Tr. 1808:16-18; 1821:5-1823:2. Indeed, without actually discussing what they are, Plaintiffs endorse the "long, careful, deliberate process and formal procedures" usually followed for zoning in Garden City and complain that the decision to adopt R-T zoning invalidly *departed* from these acceptable policies and practices. Plaintiffs' Post-Trial Memo at p. 24.

As numerous courts have explained, allowing a "disparate impact" challenge to a single decision is simply incoherent, because, without assessing the effect of a general policy in the aggregate, "[n]o comparison of the act's disparate impact on different groups of people is possible." *City of Middletown*, 294 F.3d at 52-53. That is:

> [I]f plaintiffs could proceed under a disparate impact theory challenging solitary zoning decision[s,] nearly every zoning denial would be a source of potential liability. Every denial would by definition impact the group of people applying and not other groups, so that disparate impact on a protected class could always be shown if most of the proposed residents, customers or owners shared some protected characteristic.

*Nikolich v. Vill. of Arlington Heights,* 870 F. Supp. 2d 556, 564 (N.D. Ill. 2012). Any contrary rule would require that *every* zoning decision made by a municipality regarding *every* parcel within its borders result in the maximum possible housing on that parcel to avoid a *prima facie* case under the FHA. Here, for example, the decision to change from the P-Zone (which provided no housing opportunities) to the R-T Zone at the Site, in fact, *increased* the possibility of housing opportunities in Garden City, including minority-occupied housing. However, Plaintiffs claim "disparate impact" because they propose an allegedly alternative creating *even more* housing. By that logic, however, the Village was required to zone to encompass the *2,000 unit* "Protest Proposal" submitted to the County because that could potentially increase the minority population even more than the 311 unit maximum zoning capacity under CO5b. The FHA clearly does not mandate such pervasive race-conscious behavior. *See Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 366 (2d Cir. 2003). Rather, the FHA precludes unjustified policies with a demonstrated significant exclusionary impact; it does not require maximum mathematical density for every isolated decision.

### B.     Plaintiffs Failed to Demonstrate the R-T Zone Caused a Significant Impact on the Amount of Minority-Occupied Housing.

As its name implies, FHA "disparate impact" claim requires that the challenged policy actually have an *impact* on housing for a protected class. *See Tsombanidis*, 352 F.3d at 574 ("[A] plaintiff must prove the practice 'actually or predictably results in ... discrimination,' not "merely [that it] raises an inference of discriminatory impact"). In fact, the impact must be "significant." This requirement follows directly from the text of the FHA, which is violated only where someone "make[s] *unavailable or den[ies]*, a dwelling to any person because of race." 42 U.S.C.

§ 3604(a) (emphasis added). Thus, to the extent a challenged decision does not have a significant effect on the availability of a dwelling, there can be no violation of the FHA.

Here, Plaintiffs have failed to show that Garden City's zoning decision "actually or predictably results" in a significant disparate impact. *See Tsombanidis*, 352 F.3d at 574.  The undisputed facts demonstrate that, based upon the County's sales position, an affordable housing bid would not have been successful. Moreover, Plaintiffs have failed to show that the Village's zoning decision "actually or predictably results" in a significant disparate impact. *See Tsombanidis*, 352 F.3d at 574. Even assuming that affordable housing could have been built on the site under CO5b with R-M zoning controls, Plaintiffs offered no evidence to allow a valid comparison between the minority-occupied housing that was possible under CO5b zoning and the minority-occupied housing possible under R-T zoning. In short, Plaintiffs completely failed to conduct a proper, complete analysis under R-T.

Instead, Plaintiffs speculatively hypothesized and compared the amount of minority-occupied housing that could result under CO5b zoning, *assuming a rental development designed to the absolute maximum density*, with the amount of minority-occupied housing that could result from the *market-rate equity development plan submitted by Fairhaven properties* under R-T zoning. This is a distorted and self-serving comparison. Having estimated the amount of minority-occupied housing under CO5b zoning based on a hypothetical, non-competitive bid for the maximum density of housing, Plaintiffs could only show a disparate impact by applying *the same approach* under R-T zoning. It is undisputed that Plaintiff failed to do so.

Plaintiffs' proffered demographics expert, Nancy McArdle, fully acknowledged at trial that she did no analysis of R-T other than "looking at the Fairhaven bid." Tr. 188:4-6. Ms. McArdle was not aware that under the County's RFP for the Site and R-T zoning that 150

townhomes or 90 single family homes together with 36 multifamily units could be developed at the Site. Tr. 189:1-12. In order to demonstrate the alleged disparate impact of R-T zoning Plaintiffs were required, at the very least, to have assumed 150 townhomes as well as 36 multifamily houses in their analysis. Yet Plaintiffs have never offered this evidence. Ms. McArdle specifically testified that she did not do any analysis concerning the development of potential affordable housing or market-priced housing using 150 townhome and 36 multifamily units. Tr. 189:13-16. This ignorance is fatal.

Even if the Plaintiffs' analysis of the Fairhaven bid "raises an inference of discriminatory impact," that alone is insufficient absent proof that a development of maximum density under R-T "actually or predictably result[ed] in" significant disparate impact relative to CO5b zoning with R-M controls. *Tsombanidis*, 352 F.3d at 574; *see also Quad Enters. Co. v. Town of Southold*, 369 F. App'x 202, 206 (2d Cir. 2010) (noting that plaintiffs could not show disparate impact simply by showing that their non-compliant development would remedy "a shortage of handicapped-accessible housing" without proving that "the neutral policy at issue is the cause"). Ultimately, Ms. McArdle admitted at trial that she was not attempting to predict who would actually live in any development at the Site.  Tr. 203:7-19, 204:2-7.

Further, Ms. Speliotis testified that, while she "believe[d]" she could not build affordable housing at the Site under R-T zoning, she actually did not know what another affordable housing developer could do. Tr. 1545:16-1546:4. She only did an "initial" evaluation of what could be built under R-T zoning, and admitted that she never produced this documentary evaluation as part of this litigation.

In fact, it was established at trial that there was nothing about R-T zoning that prohibited the building of affordable housing at the Site. Tr. 426:25-427:1, 826:12-14, 953:12-16, 1399:15-

22, 1693:25-1694:2. Ann Sullivan, the representative of NYCC and former plaintiff ACORN, admitted this. Tr. 1399:15-22. Even though Ms. Speliotis opined that she determined that *MHANY* could not build a "measurable" amount of affordable housing under R-T zoning, as discussed above, the actual facts presented during her testimony demonstrate otherwise and suspiciously absent from those facts was any analysis on why MHANY would not be able to build a "measurable" amount of affordable housing under R-T zoning.

### C.   The Zoning Decision Furthered a Legitimate Interest and No Alternative Would Have Served That Interest With Less Discriminatory Effect.

Even if Plaintiffs had established a *prima facie* case, the Village has clearly shown that "its actions furthered, in theory and in practice, a legitimate, *bona fide* governmental interest and that no alternative would serve that interest with less discriminatory effect." *Town of Huntington*, 844 F.2d at 936. Again, and most importantly, this Court has already decided that the Village had legitimate reasons for the enactment of R-T zoning. *MHANY Mgmt., Inc. v. Inc. Vill. of Garden City*, 843 F. Supp. at 322 ("[T]he Court finds that [the Village] [has] satisfied [its] minimal burden of offering a nondiscriminatory reason for [its] zoning decision.").

As fully described above, the Village residents raised questions about development of the Site, including potential increased traffic and impacts on schools as well as concerns about density, character and aesthetics, among other issues. Village residents are not Article III courts. They did not need to find by a preponderance of the evidence that development on the Site would produce more traffic, more burden on schools, and lower property values before having a legitimate interest and taking precautions to address these concerns. As, again, testified to by Mr. Cleary, it was "absolutely" appropriate to obtain public comment on the zoning of the Site. Tr. 1846:20-1847:15. Indeed, it is mandated by both § 25-1 of the Village Code for any amendment to the Code, as well as § 7-706(1) of the New York State Village Law. Mr. Cleary reviewed the

citizen comments in connection with his work in this case and testified he considered them in determining that the decision to zone the Site R-T was appropriate. Tr. 1850:11-1851:24.

## POINT III

### THIS COURT LACKS JURISDICTION BECAUSE PLAINTIFFS HAVE NO STANDING AND THE CASE IS MOOT

Although Plaintiffs argue at length that the Village's zoning decision violated the FHA, this Court has no jurisdiction to consider that claim. The Constitution grants federal courts authority to decide only justiciable "cases" or "controversies." U.S. Const. art. III, § 2. For two independent reasons, there is no such case or controversy here. First, even assuming that Plaintiffs had standing to initiate this suit, the case clearly became moot once Nassau County independently chose not to sell the Site. Second, Plaintiffs have not met their burden to prove that they have ever had standing.

### A.    This Case Is Moot Because Plaintiffs Have Not Been Injured And Have Not Proven That They Will Suffer Repetition Of The Alleged Injury In the Future.

Even if Plaintiffs could show that the Village's zoning decision injured them by denying them affordable housing, Nassau County's subsequent decision to not sell the land for any housing—affordable or otherwise—mooted any claim that Defendants' acts injured Plaintiffs or discriminatorily denied them housing.

"[F]ederal courts may adjudicate only actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). Thus, "[t]he parties must continue to have a 'personal stake in the outcome' of the lawsuit" at all stages of the litigation. *Id.* at 478 (citations omitted). "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *United States v. Suleiman*, 208 F.3d 32, 36 (2d Cir. 2000) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).

It is undisputed that Nassau County decided not to sell the Site. Stipulated Facts at ¶ 69. This decision mooted the case because the only controversy that ever existed between the parties, the only alleged violation of the FHA, and the only alleged injury to Plaintiffs concerned that Site. Plaintiffs' suit is premised on the contention that, but for R-T zoning decision, an affordable housing developer would have placed a winning bid for the Site, and that minority members of NYCC would reside in that affordable housing. It is undisputed that the Village took no other action that allegedly injured the Plaintiffs. Thus, where there is no controversy between the parties, there can be no injury to Plaintiffs, and there can be no remediable violation of FHA.

A legion of cases clearly establish that there is no Article III jurisdiction in such circumstances. *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) ("[T]hroughout the litigation, the plaintiff "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.") (internal quotation marks omitted); *North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (Article III denies federal courts the power "to decide questions that cannot affect the rights of litigants in the case before them" and allows adjudication only of "real and substantial controversy admitting of specific relief . . . as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."); *Cook v. Colgate Univ.*, 992 F.2d 17, 19  (2d Cir. 1993) ("The mootness doctrine ensures that the litigant's interest in the outcome continues to exist throughout the life of the lawsuit.").

If Nassau County had decided not to sell the Site before Plaintiffs filed suit, the Complaint would obviously have been dismissed for lack of a justiciable controversy. It is axiomatic, however, that there needs to be the same live controversy at the time of the *decision* as there is at the outset of litigation. *Alexander v. Yale Univ.*, 631 F.2d 178, 183 (2d Cir. 1980) ("It is also mandatory that [the elements of standing] be satisfied throughout the course of

adjudication by the courts. This 'time element of standing' comes under the rubric of mootness doctrine.").

Indeed, the prior decisions in this very case establish that Nassau County's "no sale" decision precludes any live controversy and renders the case moot. The Village's Motion to Dismiss was denied precisely because Plaintiffs' opposition papers *distinguished* cases where "plaintiffs did not have any particular site to build," thus confirming that the absence of a site upon which to build housing precludes resolving whether there has been a discriminatory denial. Motion to Dismiss Opposition at p. 13, Docket Entry 31. The summary judgment decision similarly indicated that Nassau County's decision may well have "rendered moot" the "relief requested as to the site." *MHANY Mgmt. v. Inc. Vill. of Garden City*, 843 F. Supp. 2d at 310. The Court nonetheless concluded that the case was still alive because, if one "form of relief" "subsequently becomes moot," courts may still enter different relief, such as damages or "affirmative action" relief to remedy "vestiges of prior discrimination." *Id.* at 311 (quoting *Powell*, 395 U.S. at 496, n.8). But if the legal <u>injury</u> complained of is not present at the time of trial, then the entire case is moot and no relief is possible.

That is, courts can make plaintiffs whole for prior discrimination by either providing them monetary relief, such as damages, to retroactively compensate them for that discrimination, or by prospectively ordering that they be given what they have been discriminatorily denied, such as an injunction requiring affordable housing on the site to redress a defendants' alleged discriminatory denial. *See, e.g.*, *Spencer*, 523 U.S. at 7 ("Once the convict's sentence has expired, however, "[s]ome concrete and continuing injury other than the now-ended incarceration or parole . . . must exist if the suit is to be maintained."); *Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) ("That Lyons may have been illegally choked by the police [in the past],

while presumably affording Lyons standing to claim damages . . . does nothing to establish a real and immediate threat [justifying a prospective injunction.]"); *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."). But if, as here, Plaintiffs have not requested any retroactive monetary relief, then past injury provides no justiciable controversy unless it has an ongoing effect at the time of trial. As the Court correctly noted in its summary judgment opinion, "affirmative injunctive relief may be awarded for past discriminatory practices 'where the trial Court believes that the vestiges of prior discrimination *linger* and *remain to be eliminated*.'" *MHANY Mgmt., Inc. v. Inc. Vill. Of Garden City*, 843 F. Supp. 2d at 311 (quoting *United States v. DiMucci*, 879 F.2d 1488, 1498 (7th Cir. 1989)) (emphasis added).

Conversely, where, as here, there can be no "linger[ing]" effects or "vestiges" that "remain to be eliminated" (because any alleged discriminatory decision by the Village was rendered meaningless by Nassau County's subsequent "no sale" decision), then a court cannot resolve the controversy because it cannot *remedy* effects that *do not exist*. These basic principles, again, are extremely well-established. *Lewis v. Cont'l Bank Corp*., 494 U.S. at 478 (where plaintiff challenged Florida's denial of an application to open a bank, but a subsequent federal statute created a separate bar to opening the bank, the case was moot).

Likewise, Plaintiffs cannot rely on the exception to mootness for cases that are "capable of repetition yet evading review." That exception is available only when the plaintiff proves that "(1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the *same* complaining party [will] be subject to the *same* action again." *See Spencer*, 523 U.S. at 17; *New York City Employees' Ret.*

*Sys. v. Dole Food Co.*, 969 F.2d 1430, 1434 (2d Cir. 1992). Yet, Plaintiffs have not carried their burden of proving either element. Here, there is no conceivable "expectation," or even any allegation, that the "same complaining parties" will be discriminatorily denied affordable housing in the Village by the "same action," since Plaintiffs do not even attempt to identify an available site where such affordable housing is possible. To the extent Plaintiffs suggest that the Village has the burden to show that the alleged injury will not be repeated, they are conflating that "capable of repetition yet evading review" doctrine with the "voluntary cessation" exception. The latter is a distinct exception, which applies a more lenient standard for the plaintiff where the defendant attempts to render the case moot by ceasing the challenged conduct. That exception does not apply here because the mootness in this case was caused by Nassau County's decision not to sell the Site, not by the Village.

In their Post-Trial Memo, Plaintiffs now seem to make a half-hearted effort to avoid this clear mootness problem, by indirectly implying that the Village's zoning decision somehow *caused* Nassau County's "no sale" decision, and therefore invalidating that zoning decision would somehow result in Nassau County reversing itself and selling the Site for residential housing.  *See* Plaintiffs' Post-Trial Memo at p. 46 ("The County was prevented from selling the Site—as it had every intention to do. (Tr. 988:3-23, 1001:11-14, 1004:5-8)—for multifamily housing development.") However, the portions of the transcript cited by Plaintiffs simply involve testimony by Thomas Suozzi indicating that the County desired to sell the Site for the highest amount possible. Mr. Suozzi nowhere suggests that he reconsidered his decision to sell the Site after the Village adopted R-T zoning. Moreover, it is not remotely plausible that R-T zoning played a role in the County's decision. After Garden City adopted R-T zoning in June 2004, the County proceeded with its RFP process and did not change course until the election of a new

County executive in 2010—*6 years* after the zoning change. There is simply no evidence that this change of course was caused by the R-T zoning decision years earlier.

> **B.      Plaintiffs Have Failed to Prove That They Were Injured, That the Injury Was A Result of Garden City's Zoning Decision, or That the Relief They Seek Would Likely Have Remedied the Injury at the Outset of This Suit.**

Even assuming Nassau County's decision to retain the Site did not definitively end any cognizable controversy between the parties, there is still no Article III jurisdiction because Plaintiffs fail to show that they had standing even before Nassau County mooted the controversy. Proof that a plaintiff has standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). This "irreducible constitutional minimum of standing," contains three elements, all of which must be established for a case to proceed:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 560-61 (internal quotation marks and citations omitted).

Since these constitutional minima "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. Therefore, although this Court held that Plaintiffs had pleaded sufficient facts to establish standing at the pleading stage, and identified a factual dispute over standing at the summary judgment stage, these conclusions do *not* support standing for final judgment. *Id.* Rather, at this final stage of litigation, standing

41

"must be supported adequately by the evidence adduced at trial." Here, Plaintiffs have not proven *any* of the necessary elements of standing.

##### 1. <u>Injury In Fact</u>

<u>NYAHC / MHANY Management</u>: At the Motion to Dismiss stage, the Court found standing based on NYAHC's complaint allegations that "it has developed specific proposals to build multifamily low income housing that would conform to the Proposed Zoning and be financially viable" and "it was prepared to develop the Social Services Site if the defendants did not discriminate against it by rejecting the Proposed Zoning in favor of the Special Zoning." Motion to Dismiss Opposition at 9. The trial has shown that these allegations were false. Plaintiffs have offered no evidence that NYAHC would have submitted a qualifying bid for the Social Services Site but for the Village's zoning decision. The vast majority of Plaintiffs' Post-Trial Memo citations for the proposition that they intended to submit a qualifying bid for the Site, refer to the "Protest Proposal" to lease the Site from the County and build 2,000 units of rental housing. Plaintiff's Post-Trial Memo at p. 45. But this proposal was concededly never a serious one, for multiple reasons having nothing to do with the decision to adopt R-T zoning. *First*, the proposal, which suggested that NYAHC would *lease* the property from the County, with an upfront payment of *$5 million*, did not comply with the terms of the RFP, which required the purchase of the property and minimum bid of $30 million. Joint Exhibit 29 at 452. *Second*, the proposal of 2,000 rental units (in a Village that contains 7,600 housing units in total) was not even close to the 311 maximum units allowed under the CO5b zoning. Id.; Tr. 67:2-18, 1364:1-1365:12. *Third*, as Ms. Speliotis testified, "The letter was not intended to comply with the requirements of the RFP"; rather, "[W]e submitted it - I think we used the word as a protest,

really trying to say this is just not a good use and a good plan for this really, really substantial piece of property. It's really going to be unutilized." Tr. 1486:15-16, 1489:16-20.

Apart from the purely symbolic "Protest Proposal," the only pieces of evidence Plaintiffs cite are "*pro formas*"—*i.e.*, financing estimates—that Ms. Speliotis drafted in 2005, months after the conclusion of the County's RFP. Joint Exhibit 30. Moreover, Ms. Speliotis made clear that these were simply calculations intended to assess the feasibility of affordable housing in general, and never suggested that NYAHC desired or intended to follow through on these hypothetical "proposals." Tr. 1520:10-15.

<u>NYCC</u>:  The only remaining basis for standing in this case is the claim that NYCC's minority members were deprived of the opportunity to reside in affordable housing at the Site. To establish such an injury, Plaintiffs must prove, first, that the Site could have been developed for affordable housing and, second, that some of NYCC's minority members would then have occupied that housing.  *See Warth v. Seldin*, 422 U.S. 490, 504 (1975) (minority plaintiffs "must allege facts from which it reasonably could be inferred that, absent the respondents' restrictive zoning practices, there is a substantial probability that *they* would have been able to purchase or lease [affordable housing] and that, if the court affords the relief requested, the asserted inability of petitioners will be removed") (emphasis added).

Plaintiffs have not identified any developer who was even *considering* a qualified bid on the Site had the CO5b classification gone forward. MHANY certainly could have expressed its interest in the Site when CO5b was under consideration for the Site. MHANY did not do so and there is simply no basis to assume that a developer would have attempted to develop such housing at the Site.

Of course, it is even more speculative to assume that some of NYCC's minority members would obtain housing in this hypothetical affordable housing on the Site. Ann Sullivan, of NYCC, testified that NYCC has only 1,000 members living on Long Island and that many of these members are minorities. Tr. 1243:8-10. Yet NYCC has not provided any evidence regarding whether any of these members (a) have incomes that qualify them for affordable housing, (b) do not already live in affordable housing, and (c) would apply for affordable housing in the Village if it became available. None of Ms. McArdle's work in this case directly concerned NYCC members. Assuming standing based on an injury to NYCC's membership would be particularly unfounded, moreover, because NYCC did not intervene in this suit until April 14, 2010, *at which point the County had already decided not to sell the Site at all*. Thus, at the time NYCC joined this suit, its injury was dependent on the assumption that an *unidentified* developer would develop a *non-existent plan* for affordable housing on a property *that was not for sale*, and that some unspecified number of members from low income, minority households would ultimately obtain this affordable housing at the Social Services Site. That chain of reasoning crosses over from the wildly speculative to the absurd.

Plaintiffs have thus offered far less than the showing deemed *insufficient* for standing in *Warth v. Seldin.* With regard to the plaintiff homebuilders association, the Court found no standing because "[t]here is no averment that any member has applied to respondents for a building permit or a variance with respect to any current project. Indeed, there is no indication that respondents have delayed or thwarted any project currently proposed by Home Builders' members." *Warth,* 42 U.S. at 516. Although the plaintiff association of affordable housing developers identified one member that had applied for a specific zoning variance in 1969, the complaint "does not allege that the . . . project remained viable in 1972 when this complaint was

filed." *Id.* at 517.  Accordingly, there was no standing because it was not clear that "respondents' actions continued to block a then-current construction project." *Id.*

Moreover, in *Warth* the individual plaintiffs had no standing because, although they had identified two specific housing developments that they claimed were blocked by the Town's zoning rules, they had failed to allege that they would have been able to obtain housing in those developments absent the zoning restrictions.  *Id.* at 505-06.  Thus, the individual plaintiffs were unable to show that "the plaintiffs challenged zoning restrictions [prevented] particular projects that would supply housing within their means, and of which they were intended residents." *Id.* at 507.  Instead, they "rel[ied] on little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had [defendants] acted otherwise, and might improve were the court to afford relief." *Id.* Regardless, there are no individual plaintiffs in this case.

### 2.      Causal Connection

To establish standing, Plaintiffs must also show that a bid for affordable housing at the Site (under CO5b zoning) *would have been successful*.  Without proof that an affordable housing developer would have actually *purchased* the Site under CO5b zoning, the Village's decision to select R-T zoning could have had no effect on Plaintiffs.  Plaintiffs have not offered a shred of evidence to suggest that, had an affordable housing developer placed a bid under CO5b zoning, it would actually have been accepted by the County.  Rather, Plaintiffs have stipulated that the County intended to sell the Site to the highest bidder.  *See* Tr. 57:8-11 ("The County intended to sell the Social Services Site to a private developer" and its goal "was to maximize the value of the Social Services Site").  As County Executive Thomas Suozzi stated, "[w]e were trying to propose a project that would generate the most revenues for the County."  Tr: 996:2-11.

Plaintiffs, however, conveniently ignore this undisputed fact. Ms. Speliotis submitted four "*pro formas*" analyzing hypothetical developments that could be built on the Site under R-M zoning controls.  Joint Exhibit 30. These *pro formas* show that, as the percentage of affordable housing *decreases*, the bid that can be supported by the project *increases*. For example, the two hypothetical projects with 25% affordable housing and 75% "market" housing could both support acquisition costs of $31.1 million. However, a project with 20% affordable housing and 80% market could support acquisition costs of $43.6 million. *Id.* In other words, as the number of affordable housing units decrease, the purchase price increases creating an *inverse correlation* between the degree of affordable housing and the maximum bid a developer could submit to acquire the Site. In light of the oft-stated and indisputable fact that the County was going to accept the highest bid, it cannot be factually concluded that MHANY (or any affordable housing builder) would have possibly won the bid on the Site. For this reason, Plaintiffs did not even *attempt* to show that their various *pro forma* affordable housing estimates would have exceeded or been remotely competitive with competing bids had the Village adopted their preferred alternative of CO5b zoning.

It was not the Village's decision concerning the *number* of units allowed on the Site that precluded affordable housing, but the *price* required by Nassau County. At an absolute minimum, Plaintiffs have completely failed to meet their burden of showing that their hypothetical affordable housing proposal likely would have been chosen over market housing alternatives. Thus, Plaintiffs here cannot establish that the failure of their (hypothetical) housing development was "fairly trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560-61.

3.     **Redressability**

Because Plaintiffs' inability to benefit from affordable housing on the Site was not caused by the Village, Plaintiffs also cannot show that any remedy against the Village would redress that injury. Even if the Village were ordered to adopt CO5b zoning for the Site, it would still not be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id*. (internal quotation marks and citations omitted).

**POINT IV**

**PLAINTIFFS CANNOT PREVAIL ON THEIR
REMAINING CONSTITUTIONAL CLAIMS**

A.     **42 U.S.C. § 1981**

A Section 1981 claim consists of the following elements: (1) membership in a racial minority; (2) an intention to discriminate on the basis of race by the defendants; and (3) discrimination concerning one or more of the activities enumerated in the statute. *See Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 1999). Because intentional discrimination is required under Section 1981, the disparate impact theory of recovery is not available. *Jackson v. Univ. of New Haven*, 228 F. Supp. 2d 156, 162 (D. Conn. 2002). As previously set forth above, Plaintiffs simply cannot establish that the Village acted with an intention to discriminate on the basis of race, either by direct or circumstantial evidence of such purported bias.

B.     **42 U.S.C. § 1982**

Section 1982 provides that "all citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."  42 U.S.C. § 1982 (2006) (emphasis added).  "As is true of Section 1981 claims, claims under Section 1982 must make clear that the alleged

47

mistreatment was a function of racial animus and intentional discrimination." *Burgin v. Toys-R-Us Nytex, Inc.*, 1999 U.S. Dist. LEXIS 10073, *11 (W.D.N.Y. June 30, 1999). Plaintiffs are not seeking to purchase or lease any housing at the Site because no housing development exists for them to do so (nor is one even in the planning stages). Thus, the purchase, sale, or conveyance of real property is not at issue and Plaintiffs cannot state a claim thereunder. Additionally, Plaintiffs have not alleged any facts supporting intentional racial discrimination.

Further, Plaintiffs are not **citizens** under the statute and thus have no standing to maintain a Section 1982 claim. *See Comtel Techs., Inc. v. Paul H. Schwendener, Inc.*, 2005 U.S. Dist. LEXIS 8370, at *20 (N.D. Ill. Feb. 22, 2005) (in which the court was "compelled to enforce § 1982 [claims] as written—limiting its protection to 'citizens,' a category that does not include . . . private corporations."); *see also Fulton Mkt. Cold Storage Co. v. Cullerton*, 582 F.2d 1071, 1079 (7th Cir. 1978) (holding that a corporation is not a "citizen" within the meaning of the Constitution's privileges and immunities clause); *Vietnamese Fishermen's Assoc. v. Knights of Ku Klux Klan*, 518 F. Supp. 993 (S.D. Tex. 1981) (holding that a class of fishermen could not bring a Section 1982 claim because it was not a "citizen").

## C.  42 U.S.C. § 1983

To prevail on an equal protection claim, "[p]roof of racially discriminatory intent or purpose is required." *Arlington Heights*, 429 U.S. at 265. Courts "will not strike down an even-handedly applied, facially neutral law as violative of the Equal Protection Clause unless the plaintiff can demonstrate discriminatory intent or purpose." *Orange Lake Assoc., Inc.*, 21 F.3d at 1226.

Further, it is well established that, in order for a municipality to be held liable under Section 1983, "a plaintiff is required to plead and prove three elements (1) an official policy or

custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (a municipality can be liable under Section 1983 only when that municipality's official policy inflicts injury); *Perkins v. New York City Dep't of Correction*, 887 F. Supp. 92, 94 (S.D.N.Y. 1995) (in order to prove a violation of Section 1983, "a plaintiff must plead and prove a municipal policy or custom which caused an alleged constitutional violation.")

A "policy or custom" cannot be demonstrated by proof of a single instance. *See Oklahoma City v. Tuttle*, 471 U.S 808, 823-24 (1985) (plurality opinion); *Newtown v. City of New York*, 566 F. Supp. 2d 256, 271 (S.D.N.Y. 2008). Here, Plaintiffs point to only a single instance—the adoption of R-T zoning—to allege a Section 1983 violation. They have not, as discussed in detail above, demonstrated the existence of an official policy or custom of the Village that violates the Constitution. As such, Plaintiffs have failed to prove a viable Section 1983 claim.

**POINT V**

**PLAINTIFFS' CLAIMS AGAINST THE BOARD OF
TRUSTEES MUST BE DISMISSED**

As this Court recently held in *Burbar v. Inc. Vill. of Garden City*, "[A]s an initial matter, the Village of Garden City is a municipal government in New York State." 2:13-cv-01350, 2013 U.S. Dist. LEXIS 117029, at *19 (E.D.N.Y. Aug. 19, 2013) (Spatt, J.); *see also Carbajal v. Cnty. of Nassau*, 271 F. Supp. 2d 415, 418 (E.D.N.Y. 2003) ("Hempstead Village is a municipality in New York State"). "Under New York law, departments which are merely administrative arms of a municipality, do not have a legal identity separate and apart from the municipality and cannot sue or be sued." *Hall v. City of White Plains*, 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002) (internal citations omitted). For example, "[a] police department is an administrative arm of the

municipal corporation." *Id.* (internal citations omitted). Here, the Board is not and was not proven to be a separate legal entity from the Village. *See Glacken v. Inc. Vill. of Freeport*, 2012 U.S. Dist. LEXIS 35253, at *1-2 (E.D.N.Y. Mar. 15, 2012) (dismissing the Board of Trustees of the Village of Freeport because it "is not a suable entity."); *see also Drillis-Eizis v. Vill. of Orland Hills*, 1995 U.S. Dist. LEXIS 2409, at *4 n.1 (N.D. Ill. Feb. 28, 1995) (holding that a village board of trustees is not a separate, suable entity). As such, the claims against it should be dismissed.

## CONCLUSION

After extensive motion practice and eleven (11) days of trial, it is apparent that Plaintiffs have utterly failed to prove that the Village's adoption of the R-T zoning amendment violated the FHA or any other law. The Village at all times followed proper procedures under law, and their decisions were clearly based on permissible municipal planning criteria. Plaintiffs have offered no evidence to the contrary. Plaintiffs also clearly lack standing in this case, and there is no justiciable controversy since the decision of Nassau County, a non-party to this case, not to sell the real property at issue precludes any possibility of affordable housing (or any housing) being built on the Site. For the reasons contained in this memorandum of law, judgment should be rendered for the Village.

Dated: September 5, 2013                    CULLEN AND DYKMAN LLP


                                   By:  /s/ James G. Ryan
                                       James G. Ryan (JR9446)
                                       Thomas B. Wassel (TW8147)
                                       Jennifer A. McLaughlin (JM5678)
                                       Douglas J. Bohn (DB4618)
                                       Cynthia A. Augello (CA3839)
                                       Ariel E. Ronneburger (AR0739)
                                       *Attorneys for the Village*