**FILED**
**CLERK**

12/6/2013 10:51 am

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
MHANY MANAGEMENT INC.,

                        Plaintiff,

    -and-

NEW YORK COMMUNITIES FOR CHANGE,
INC.,

                      Intervenor-Plaintiff,

         -against-

INCORPORATED VILLAGE OF GARDEN
CITY AND GARDEN CITY BOARD OF
TRUSTEES,

                      Defendants.
--------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
05-CV-2301 (ADS)(WDW)

**<u>APPEARANCES:</u>**

**Law Offices of Frederick K. Brewington**
*Attorneys for the Plaintiffs*
556 Peninsula Blvd.
Hempstead, New York 11550
      By:    Frederick K. Brewington, Esq., of Counsel

**Lawyers' Committee for Civil Rights Under Law**
*Attorneys for the Plaintiffs*
1401 New York Avenue, NW
Suite 400
Washington, DC 20005
      By:    Joseph D. Rich, Esq.
             Linda H. Mullenbach, Esq.
             Abigail E. Shafroth, Esq., of Counsel

**Hogan Lovells US LLP**
*Attorneys for the Plaintiff Mhany Management Inc.*
875 Third Avenue
New York, New York 10022
      By:    Stanley J. Brown, Esq.
             Peter J. Dennin, Esq.
             Chava Brandriss, Esq.
             Andrew J. Sein, Esq.he h
             Sarah J. Gregory, Esq.

1

Benjamin A. Fleming, Esq., Of Counsel

**Cullen and Dykman, LLP**
*Attorneys for the Defendants Incorporated Village of Garden City and Garden City Board of Trustees*
100 Quentin Roosevelt Boulevard
Garden City, NY 11530
      By:    James G. Ryan, Esq.
                  Ariel E. Ronneburger, Esq.
                  Thomas B. Wassel, Esq.
                  Cynthia Ann Augello, Esq.
                  Douglas J. Bohn, Esq.
                  Jennifer A. McLaughlin, Esq., of Counsel

**SPATT, District Judge**.

In 2005, several individual plaintiffs and organizations commenced a lawsuit against the County of Nassau, the Incorporated Village of Garden City (the "Village" or "Garden City"), and the Garden City Board of Trustees. Briefly, the Plaintiffs allege that the Defendants discriminatorily re-zoned two parcels of Nassau County-owned land that were located in Garden City to prevent the building of low-and middle-income housing on that site. The Plaintiffs further allege that this decision was part of a long-standing racially discriminatory policy maintained by the Defendants. Based on these allegations, the Plaintiffs assert claims pursuant to the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 et seq.; 42 U.S.C. § 1981; 42 U.S.C. § 1982; 42 U.S.C. § 1983; and 42 U.S.C. § 2000d et seq. The Plaintiffs seek injunctive and declaratory relief, costs, and attorneys' fees. In response, the Defendants deny any wrongdoing and assert that they have no racially discriminatory policies.

Currently, only the corporate Plaintiffs, MHANY Management, Inc. ("MHANY"), formerly known as New York ACORN Housing Company, Inc. ("NYAHC") and the Intervenor-Plaintiff New York Communities for Change, Inc. ("NYCC"), the practical successor to former Plaintiff, the New York Association of Community Organizations for Reform Now ("New York

ACORN"), remain as plaintiffs.  Also, the case against the County of Nassau was dismissed by a summary judgment decision and thus only the Incorporated Village of Garden City and the Garden City Board of Trustees (the "Garden City Defendants") remain as defendants.

The Court has jurisdiction over this case pursuant to 42 U.S.C. § 3613 and 28 U.S.C. §§ 1343 and 2201.  The Court conducted an 11-day bench trial commencing on June 17, 2013. Having considered the evidence and the arguments submitted at the trial and the written submissions of the parties, the Court concludes that the Plaintiffs have established the liability of the Garden City Defendants under (1) the FHA based on a theory of disparate treatment and disparate impact; (2) 42 U.S.C. § 1981; (3) 42 U.S. C. § 1983; and (4) the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

This opinion will first state the Court's findings of fact which will essentially be a history of the events leading to the subject zoning decision of the Village of Garden City.  Next, the Court will briefly review the complicated procedural history of this case.  Finally, the opinion will close with this Court's conclusions of law and choice of remedies.

## I.  FINDINGS OF FACT

A.  The Parties

MHANY is a not-for-profit community-based developer of affordable housing incorporated in New York and, at all times relevant to the allegations in the amended complaint was known as NYHAC.  The former Plaintiff New York ACORN is a former local chapter of a nationwide nonprofit corporate entity that was called the Association of Community Organizations for Reform Now organized and existed under the State of Arkansas which disbanded in or about December 2009.  NYCC is a non-profit entity formed in December 2009, and which intervened in this action on June 30, 2010.

The Village of Garden City is a municipal corporation organized under the laws of the State of New York.  It is located in New York State in the County of Nassau.  The Garden City Board of Trustees is an elected governing body in Garden City.

B.  The Racial Makeup of Nassau County and Garden City

The Plaintiffs' expert Nancy McArdle, who conducted an analysis of racial change and segregation in Nassau County, testified that, as of the year 2000, the minority population share of the total population in Nassau County was 20.3%.  McArdle defined minority as all persons identifying their ethnicity as Hispanic or African-American.  The minority population in Garden City increased from 2.9% in 1980 to 4.1% in the year 2000.

C.  The Affordable Housing in Nassau County

Former Nassau County Executive Thomas Suozzi testified that a lack of affordable housing has been a problem in Nassau County. (Tr. at 977-78.).  The parties defined affordable housing as that which is financially attainable – namely, no more than 30% of a household's income is spent on housing – for households earning 80% or less of the Area Median Income for the Nassau-Suffolk Metropolitan Statistical Area. (Tr. at 493-94.)

In the year 2000, although only 14.8% of all households in Nassau County were African-American or Hispanic, 41.4% of "very low" income elderly renter households in the County were African-American and Hispanic, as were 53.1% of "very low" income non-elderly renter households.  (Tr. at 148.)  In 2000, African-American people comprised 88% of the waiting list in Nassau County for Section 8 housing. (Tr. at 164-65.)  "Section 8" housing refers to federally subsidized rental assistance paid to private landlords pursuant to Section 8 Housing Act of 1937, 42 U.S.C. § 1437f on behalf of low income renters.

4

D.  The Racial Makeup of Garden City

As of the year 2000, Garden City had a population of 21,672 people.  Garden City is 5.3 square miles in size.  In 2011-2012, Garden City contained the following types and numbers of residential dwelling places:  Single-Family homes, 6,845, Condominiums, 410, Apartments or Co-ops, 691. (Tr. at 67.)

McArdle testified that, as of the year 2000, the percentage of minority population in Garden City was 4.1%, up from 2.9% in 1980.  McArdle further noted that 61% of the Village's African-American population was living in dormitories in 2000, and thus, excluding this population would significantly alter these statistics.  If one examined only people living in households and not in dormitories in 2000, the minority population in Garden City was just 2.6% of the population, as opposed to the 4.1% stated above, and as compared to 15.3% of the County. (Tr. at 139.)

In 2000, 2.3% of the households in Garden City were headed by an African-American or Hispanic person, compared to 15.3% of the Nassau County households. (Tr. at 144-45.)  If minorities comprised the same share of Garden City households as they did of Nassau County households, Garden City would have 1,333 African-American or Hispanic households, as opposed to the actual total of 167.

E.  The Affordable Housing Options in Garden City

Village Administrator Robert Schoelle testified that, to his knowledge, Garden City, unlike other parts of Nassau County, contained no affordable housing, nor does it to this day. (Tr. at 494.)  Garden City has declined to join the Nassau County Urban Consortium, a group of

5

municipalities in Nassau County that are eligible to receive federal funding to support affordable housing development. (Tr. at 494.)

In May 2006, the County announced that it intended to sell a parcel of land, the Ring Road Site, located in Garden City for the purpose of developing affordable housing in Garden City and Nassau County.  The County issued a Request for Proposals ("RFP") for the purchase of the "Ring Road" site in Garden City.  This was a mixed-use development which was characterized as "mixed income" and would have included affordably priced residential units. (Tr. at 1013.)  However, Garden City residents expressed opposition to the construction of affordable housing in the community.  To date, nothing has been built on the property. (Tr. at 658.)

F.  Evidence of Discriminatory Acts in Garden City

The Village Administrator Schoelle testified that, in 1989, a developer proposed constructing fifty one units of affordable housing at the former Doubleday & Co. site on Franklin Avenue in Garden City.  The Garden City Defendants deny having any record indicating that any such application has ever been filed.  In any event, the Plaintiffs contend that a building moratorium in Garden City in the late 1980s prevented such construction.  Recently, a luxury development was approved for the Doubleday site. (Tr. at 645.)

In February 2004, ACORN released a study entitled "Whites Only" – which involved "actual testing" by sending "Caucasian testers and sending African[-]American or Latino testers into real estate companies and documenting the results of how they were treated, what they were given, what they were told." (Tr. at 1268-72.)

In 2005, the New York State Attorney General determined that Garden City enforced a local requirement limiting the use of its parks to Garden City residents in a racially

6

discriminatory manner.  In the wake of this investigation, Garden City adopted policies and

procedures to ensure that local regulations were not enforced in a racially discriminatory manner.

G.  The County's Real Estate Consolidation Plan

In May 2002, the County, under the leadership of then County Executive Suozzi, began

drafting a Real Estate Consolidation Plan (the "Plan").  The purpose of the Plan was to identify

what property the County needed to operate its government.  The balance of the other properties

that the County owned would be sold in order to maximize revenue to fund renovations for the

County's existing operations.

One of the properties considered under the Plan was a parcel of land located within the

boundaries of the Village of Garden City in its Public or "P" Zone.  This property encompasses

numerous County buildings, including the Nassau County Police Headquarters and the County

Executive Building.  It also included the Nassau County Supreme Court building, the Social

Services Building, and parking lot areas for the Court and the Social Services Building.  The P-

Zone did not permit residential housing.  The entire parcel encompasses 84.76 acres.  The

portion of the "P" Zone site at issue in this case is an approximately 25 acre site which, currently

and at all times relevant to the allegations in the amended complaint, houses the parking lots for

the Supreme Court of Nassau County, the former Social Services building, a garage, an ancillary

building, and additional parking facilities (the "Social Services Site").  The Social Services Site

is property owned by the County.  However, Garden City retained the right to zone the property.

The Social Services Site consists of 21.44 acres located on the eastern side of County

Seat Drive, on which the Social Services building and a parking lot are situated, and an

additional 3.03 acres located on the western side of County Seat Drive, on which are located a

County owned building and parking garage.  The County intended to sell the Social Services Site

to a private developer and aimed to maximize the sale value of the Social Services Site. In this regard, the County hoped to receive at least $30 million for the property.

H.   The Re-Zoning of the Social Services Site

In June 2002, at the County's request, the Village created a sub-committee charged with retaining a planner and reviewing zoning options for the entire 84.76 acre P-Zone, including the Social Services Site (the "P-Zone Committee"). The P-Zone Committee consisted of Village Trustees Peter Bee, Peter Negri, and Gerard Lundquist. Trustee Bee was the chairman of the P-Zone Committee.

The Village also retained the firm of Buckhurst Fish and Jacquemart ("BFJ") to provide a recommendation with regard to the rezoning of the Social Services site. Over the course of Garden City's decades-long relationship with BFJ, the Village had come to respect BFJ's work and generally adopted its recommendations. (Tr. at 230-31.) The Village also hired attorney John Kiernan to advise it on the rezoning process. (Tr. at 498.)

During the re-zoning process, Schoelle served as a liaison between the P-Zone Committee and the Board of Trustees. (Tr. at 1096.) The P-Zone Committee also kept Garden City's four Property Owners Associations ("POAs") apprised of the rezoning process. (Tr. at 490, 838-39.) The POAs, in turn, acted as liaisons between Garden City and the citizens who lived within their respective "jurisdictions." (Tr. at 488-90.) The Social Services Site is located within the "jurisdiction" of the Eastern Property Owners' Association. (Tr. at 490-91.)

On September 13, 2002, BFJ sent a facsimile to Garden City outlining the general planning principles for redevelopment of County properties in Garden City. These principles included that "[a]ny rezoning associated with the proposed development should be in accordance with the goals and parameters set forth in the zoning code [in Garden City]." (Tr. at 239.)   In

particular, these principles provided that any development should "be consistent with the existing character and surrounding neighborhoods of Garden City"; "not overburden roads, utilities, and schools"; "be consistent with the surrounding neighborhood in terms of scale and design and with the densities permitted in the Zoning Code"; "not tend to depreciate the value of property in the village"; "be in accordance with the goals and parameters set forth in the Zoning Code"; and "protect[] . . . the environment [in terms of traffic, visual effects, or burdens on public facilities] . . . through compliance with the State Environmental Quality Review (SEQR)." (Tr. at 239-41.)

By memorandum dated November 15, 2002, entitled "Potential Approach to 'P' Zone Changes," and addressed to the P-Zone committee, BFJ recommended that Garden City borrow from its already existing zoning regulations and apply something similar to the "CO-2" zone, allowing for commercial and office use, as well as residential use on the southern part of the property. (Plf's Exh 386.)  Specifically, BFJ suggested that the residential use include a maximum density of one unit per 2,300 square feet of area, which would permit as many as 440 units on the property.

By memorandum dated April 29, 2003, BFJ proposed to the P-Zone Committee the creation of a "CO-5(b)" zone for the Social Services Site and Co-5(a) zone for the remaining 63.32 acres of the P-Zone.  BFJ also proposed applying "multi-family residential group" ("R-M") zoning controls to the residential component of the proposed CO-5(b) zone.  This would have allowed for up to 311 residential units to be built at the Social Services Site.  The proposed R-M zoning controls also permitted the construction of multi-family housing.

In May 2003, BFJ again proposed R-M zoning to the P-Zone Committee, which contemplated single-family homes and apartments for the residential component of the Social

Services Site.  The May 2003 report states that BFJ's zoning proposal would "be likely to generate a net tax benefit to the Village."

On May 29, 2003, BFJ made a PowerPoint presentation of the May 2003 Report to the Village at a public forum.  Under the proposed zoning, single family homes and apartments would be permitted at the Social Services Site.  At the forum, several residents expressed concern about the impact of 311 residential units on traffic and the schools.

In July 2003, BFJ issued a revised version of its study, which again included the proposal that Garden City zone the Social Services site under the "CO–5 zone, which would permit residential development of either 311 apartment units or approximately 75 single-family homes." Responding to some of the residents' concerns, the July 2003 report states that "[t]here would be a smaller number of school children generated by the new development than with the development of single-family homes."  At this time, the P-Zone Committee "adopted [BFJ's] final report for recommendation to the Village Trustees" containing the proposed R-M zoning. (Tr. at 281.)

In September 2003, BFJ issued a draft Environmental Assessment Form ("EAF").  The EAF proposed that R-M zoning controls be used for the residential component of the Social Services Site.  The EAF concluded that the proposed zoning "will not result in any large and important impact(s) and, therefore, is one which will not have a significant impact on the environment, therefore a negative declaration will be prepared." (Tr. at 288-290.)  Specifically, according to the EAF, multi-family housing at the Site would: (1) not "result in the generation of traffic significantly above present levels" (Tr. at 290.); (2) have a minimal impact on schools. (Tr. at 299-300.);  (3) create a transition zone between the surrounding single-family and office uses; (4) maximize existing zoning tools; (5) respect the character of surrounding neighborhoods;

10

and (6) have positive aesthetic impacts. (Tr. at 301.)  The impacts of the proposed zoning were so minimal that a full Environmental Impact Statement was not required. (Tr. at 289.)  Frank Fish of BFJ and Superintendent of the Garden City Buildings Department Michael Filippon agreed with the conclusions reached in the EAF. (Tr. at 1720-1721.)

On October 17, 2003, a notice was placed in the Garden City News entitled, "Tell Them What You Think About the County's Plan for Garden City," which stated:

> Where is the Benefit to Garden City? Are We Being Urbanized? . . . The County is asking the Village to change our existing zoning – P (Public use) ZONE – to allow the County to sell the building and land . . . now occupied by the Social Services Building, to private developers.  Among the proposed [sic] plans: Low-density (high-rise?) housing – up to 311 apartments . . . These proposals will affect ALL of Garden City.

(Plf's Exh. 45.)

On October 23, 2003, at a second public forum, BFJ made another PowerPoint presentation to the Village summarizing the Co-5b zoning, including the R-M zone for the residential component.

In November 2003, BFJ presented its third report to the P-Zone Committee, again confirming its proposal for the R-M designation that allowed for a possible 311 apartment units on the Social Services site.  The November 2003 report set forth a draft zoning text for the CO-5B district and R-M controls for the residential component of the Social Services Site.

On November 20, 2003, the Board accepted the P-Zone Committee's recommendations. (Tr. at 514-15.)  On December 4, 2003, the Board made a finding pursuant to New York's State Environmental Quality Review Act that the zoning incorporated in the proposed Local Law 1-2004 would have "no impact on the environment" and moved the law to a public hearing.  Local Law 1-2004 would create a new CO-5b zone which would include the Social Services Site,

allowing residential use as well as office and courtroom use.  The residential use in the new CO-5b zone would allow both single family as well as multi-family units at the Social Services Site.

On January 8, 2004, Garden City held a public hearing for the purpose of considering Local Law 1-2004.  At the hearing, residents voiced concerns that multi-family housing would generate traffic, parking problems, and school children.  In response, Filippon stated "If I could just add on this point of traffic . . . You have to remember that the existing use on that site now generates a certain amount of traffic, a fair amount of traffic.  That use is going to be vacated. The two residential uses that are being proposed as one of the alternates, each of which on their face automatically generate far less traffic than the existing use.  That is something to consider also." (Joint Exh. 24, at 875.)

On January 20, 2004, the Eastern Property Owners Association held a meeting at which Trustee Bee discussed BFJ's recommendation for the Social Services Site.  A summary of the meeting reports that "Trustee Bee answered many questions from the floor" and, in doing so, expressed the opinions that "Garden City demographically has a need for affordable housing" and that "he would keep an open mind but he still felt the recommended zoning change were appropriate." (Pls.' Ex. 147.) Although Suozzi did not attend the January 20, 2004 meeting, he met with the Trustees earlier that evening to discuss the most recent plans for the Social Services Site.  The summary states that "Suozzi was reminded that he pledged not to do anything that Garden City residents objected to.  Mr. Souzzi's [sic] commitment still stands." (Id.)

On February 5, 2004, Suozzi attended a public hearing for the residents of Garden City at which time he presented the Plan.  At the hearing, one resident asked whether Trustee Bee's statement "last time" about affordable housing was true. (Joint Exh. 12, at 905.)  Trustee Bee responded that "neither the County nor the Village is looking to create a so-called affordable

housing at that spot." An unidentified speaker then asked whether Trustee Bee could "guarantee" that the housing on the Social Services Site would be "upscale" rather than affordable and expressed concerns about multi-family housing "depress[ing] the market." (Id. at 906)

The residents further voiced their opposition to multi-family housing at the Social Services site. Id. at 918 ("Brian Gemmel" [to Suozzi]: "I don't think you are hearing a lot of the people. We're not against residential, we're against multi-level residential."); id. at 921 ("Suozzi: You would probably like to see single family housing I presume. Unidentified Speaker: Single family. (Applause)."); id. at 921-922 ("Gail Madigan: I moved here from Brooklyn so that when I walked out of my house I did not turn to my left and see apartment buildings."); id. at 922 ("Suozzi: Mayor out of respect, let me stipulate the facts here. The public of Garden City especially from the eastern civic association does not want to see multi-family housing here. They'd rather see single-family housing."); id. at 923 ("David Piciulo: I don't hear a compelling argument from anyone here tonight as to why we should have multi-dwelling homes. Can we take it out of the proposal?")

Similarly, one resident urged officials to adopt zoning "in the flavor and character of what Garden City is now." (Id. at 912.) Residents further objected to "full families living in one bedroom townhouses, two bedroom co-ops," resulting in "overburdened and overcrowded" schools and "overrun" sanitation, a "multi-housing community . . . [with] four people or ten people in an apartment," and "that whole section of people" who use the bus to access the Department of Social Security. (Id. at 912, 929, 944.)

13

However, Suozzi clarified that the County is "absolutely not interested in building affordable housing there and there is a great need for affordable housing, but Garden City is not the location." (Id. at 905.)  He further stated that developers

> would love to build upscale housing in Garden City. . . . We would be willing to put deed restrictions on any property that we sold. The Village would have control of their zoning requirements.  We would put on restrictions whatsoever, no ifs ands or buts, that it can't be anything but upscale housing.  Put it this way, we generate more revenues for the County by selling it for upscale housing.

(Id. at 906.)  Also, at one point, Suozzi stated bluntly that a resident's concern about traffic was "irrational." (Id. at 908.)  Fish testified that residents who claimed to prefer single-family homes because of school impacts were "simply wrong." (Tr. at 316.)

Thereafter, a flyer distributed in Garden City asked: "WILL GARDEN CITY PROPERTY VALUES DECREASE IF OVER 300 APARTMENTS ARE BUILT AT THE SITE OF THE SOCIAL SERVICES BUILDING?"  It further stated:

> The Garden City Trustees are close to voting on how to zone this property.  They might choose to zone it for multi-family housing (If Senator Balboni's current bill passes in June, as many as 30 of those apartments would be considered 'affordable housing.'  According to this bill, 'Affordable workforce housing means housing for individuals or families at or below 80% of the median income for Nassau Suffolk primary metropolitan statistical area as defined by the Federal Department of housing and urban development.' . . . NOT JUST GARDEN CITY INCOMES! . . .)

(Pls.' Ex. 17.)  The flyer reached Schoelle, who faxed it to Fish and at least one member of the Board of Trustees. (Tr. 662-63.)  The record reflects that the flyer was brought to Trustee Lundquist's attention as well. (Tr. at 767-68.)  On the other hand, Trustee Negri claimed that he had never seen nor had any conversations about this flyer. (Tr. at 1080-81.)

At a Board meeting on March 18, 2004, residents raised concern about the Balboni Bill.  Schoelle's notes from that meeting indicate that residents expressed concern that

14

the Balboni Bill might apply "retroactive[ly]." (Tr. 551-553.)  One resident urged decision-makers to "play it safe" with respect to the Balboni Bill and "vote for single family homes." (Tr. at 550.)  The following month, Trustee Negri told residents at a Central Property Owners Association meeting that he and other Village officials met with state representatives to discuss the Balboni Bill, noting that a family of four making $67,000 per year would qualify for housing under the proposed legislation.  (Plfs' Exh. 379, at 522.)

Fish testified that, by the spring of 2004, the public was beginning to have an influence on the decision-making process.  (Tr. at 331, 333-34.)  On April 1, 2004, BFJ modified its zoning proposal to reduce office density, minimize traffic impacts, and to lower the number of multifamily units to reduce population numbers. (Tr. at 1670-1673.)

On April 22, 2004, BFJ made a PowerPoint presentation to the Village residents.  Under the proposed zoning contemplated by this presentation, single-family homes and apartments would be permitted at the Social Services Site.  However, this time, only 215 apartments would be permitted.

By memorandum dated May 4, 2004 and addressed to the Board, BFJ proposed eliminating the CO-5b zone altogether, and with it, the potential for multi-family housing on the 21.44 acres of land of the Social Services located east of County Seat Drive.  Specifically, BFJ stated:

> [W]e reviewed the public comments with Robert Schoelle, Michael Filippon and [Garden City counsel] Gary Fishberg.  Based upon these discussions we would recommend for your consideration two basic refinements to the recommendations: (1) Elimination of office use for the 101 County Seat Drive area; (2) Provide for multi-family housing in the 101 County Seat Drive area only by special permit and limited to the West Side of County Seat Drive.

(Joint Exh. 19.)  BFJ suggested renaming the proposed zoning designation as "Residential–Townhouse" ("R–T"), which essentially limited the development of multi-

15

family housing to less than 15% of the Social Services site, and only by special permit. BFJ's proposed description of the R-T zone defined "townhouse" as a "single-family dwelling unit."

In May 2004, BFJ issued its final EAF, which proposed a R-T district to replace the previously proposed CO-5b District.  No draft EAF was ever issued for the R-T Zone, even though Fish affirmed that the R-T zoning proposal was a significant change to the Co-5b zoning proposal with R-M controls. (Tr. at 341.)

On May 20, 2004, proposed Local Law No. 2–2004, which deleted the P–Zone and replaced it with CO–5 and R–T districts, the latter of which encompassed the Social Services site, was considered at a public hearing.  There, a member of the New York ACORN expressed concern about the need for affordable housing on Long Island and asked that Garden City consider building affordable housing in their community.  Indeed, responding to an inquiry regarding multi-family housing with a special permit under R–T zoning, Fish stated that "[t]he P Zone Committee had been considering this and the Trustees on the entire site, it wasn't an after thought.  This was, this was a conscious decision . . . there was a concern that if the whole 25 acres were developed for multi-family it would generate too much traffic  . . ." (Joint Exh. 25, at 35.)

At the hearing, Fishberg explained that the required referral to the Nassau County Planning Commission (the "NCPC") had already been made, and that the NCPC would be addressing the new law the following week.  (Joint Exh. 25, at 25.)  ACORN members subsequently attended the NCPC meeting and again expressed opposition to the R-T zoning. (Tr. at 1288-89.)  At the same time, NYAHC sent a letter to the NCPC strongly

opposing R-T zoning and warning that the new zone would "ensure that developers cannot create affordable multi-family housing." (Plf's Exh. 156, at 467.)

I.    Garden City adopts the R-T Zone for the Social Services Site

On June 3, 2004, Garden City adopted the new R-T zoning and the Social Services Site was rezoned R-T.  As enacted, Local Law No. 2–2004 limited construction on the Social Services site to one dwelling unit for each 6,000 square feet of total plot devoted to such use.

In July 2004, the County issued a Request for Proposals (the "County's RFP") concerning the Social Services Site under the R-T zoning designation.  The RFP stated that the County would not consider bids of less than thirty million dollars.  The County's RFP required that all proposals be received on September 10, 2004 before 12:00 noon.

The Plaintiffs assert that under this RFP, it would have been virtually impossible to build affordable housing and, therefore, it would have been futile for them to submit an affordable housing response to the RFP that complied with the new zoning.  Indeed, Ismene Speliotis, Executive Director of NYAHC/MHANY, analyzed the R-T zoning at that time and concluded that it was not financially feasible to build affordable housing under those zoning restrictions at any acquisition price. (Tr. 1470-75.)  Suozzi concurred with that assessment. (Tr. at 1036.)

Thus, NYAHC contacted the County to work on a proposal that would include multi-family affordable housing, and urged the County to withdraw or modify the RFP to require some part of the property to be affordable housing.  NYAHC and New York ACORN met with Suozzi and other County officials to discuss the proposal and the possibility of constructing affordable housing on the Social Services site.  However, the County did not reissue the RFP.

J.    NYAHC submits a Bid

On September 10, 2004, NYAHC submitted a "protest" proposal to the County for

17

development of the Social Services Site that did not conform to the technical requirements set forth in the RFP.  Specifically, the NYAHC proposal contemplated NYAHC leasing the Social Services Site from the County, with an upfront payment of $5 million.  However, the NYAHC proposal did not utilize R-T zoning.  Rather, the proposal contemplated a development of 2,000 apartment units, of which about two-thirds would be at below market rents for families making between 40% and 120% of the Nassau County median income, and 35% would be at market rents (Joint Exh. 29).  The Plaintiffs maintain that NYAHC's proposal did not follow the specifications laid out in the RFP because the RFP made the construction of affordable housing on the Social Services site virtually impossible.  Specifically, NYAHC's proposal stated:

> As the County knows from previous meetings, telephone conversations and correspondence with NYAHC and LI ACORN, NYAHC is unable to respond to the County's Request for Proposals (RFP) of July 2004 related to the 25 County-owned parcel in Garden City (the Parcel) due to the restrictive zoning adopted by the Village of Garden City in connection with the County's sale of the Parcel.

(Id.)  The County ultimately awarded the contract to develop the Social Services Site to Fairhaven Properties, Inc. ("Fairhaven") for $56.5 million, the highest bid.

After the contract was awarded to Fairhaven, NYAHC prepared four proposals for development at the Social Services site under the R–M zoning designation, with the percentage of affordable and/or Section 8 housing units of the 311 total rental units ranging from 12.5% to 25%.  McArdle evaluated each proposal in conjunction with the racial/ethnic distribution of the available pool of renters and determined that, had NYAHC been able to building housing under any of the four proposals in accordance with the rejected R–M zoning designation, the pool of renters likely to occupy all units, including market rate, affordable and Section 8 units, would have likely been between

18% and 32% minority with minority-households numbering between 56 and 101. (Tr. at 157.)

McArdle further analyzed the likely racial composition of the pool of homeowners who could afford to purchase units potentially developed by Fairhaven based on their proposal as well as available information regarding Garden City property values.  She determined that between 3 and 6 minority-households could afford such a purchase. (Tr. at 169.)  In this regard, McArdle testified that whereas the NYAHC proposals would likely increase racial diversity in Garden City, the Fairhaven proposal would likely leave the racial composition of Garden City "unchanged" (Tr. at 182.)

However, McArdle admitted that she was not attempting to predict who would actually live in any development at the Site. (Tr. at 203-04.)  Nor did McArdle conduct any analysis under the R-T zoning actually enacted, concerning the development of potential affordable housing, or market-priced housing using 150 townhomes and 36 multifamily units. (Tr. at 189.)

K.    Current Status of the Social Services Site

On January 1, 2010, Suozzi was succeeded by the present County Executive Edward P. Mangano.  The Mangano Administration decided to relocate the County's Family Court building, currently located in Westbury, New York, to the Social Services site.  The transaction with Fairhaven never closed.  Thus, although the prior County administration planned to sell the Social Services site to a private developer, the site is currently no longer for sale.  The Plaintiffs contend, and Garden City does not dispute, that the County has since taken no action at the Site.

## II. PROCEDURAL HISTORY

On May 12, 2005, ACORN, NYAHC, and several individual Plaintiffs filed the instant action, which was initially assigned to United States District Judge Leonard D. Wexler.  The

19

Plaintiffs asserted claims pursuant to the "FHA", 42 U.S.C. § 3601 et seq.; 42 U.S.C. § 1981; 42

U.S.C. § 1982; 42 U.S.C. § 1983; and 42 U.S.C. § 2000d et seq.  On February 9, 2006, this case

was reassigned to United States District Judge Joseph F. Bianco.  On March 10, 2006, the

County, and the Garden City Defendants moved separately to dismiss the action for lack of

standing and failure to state a claim.

By Memorandum and Order dated July 21, 2006, Judge Bianco denied both motions in

their entirety and directed the parties to conduct discovery in accordance with the Individual

Rules of United States Magistrate Judge William D. Wall.  See ACORN v. County of Nassau,

No. 05 Civ. 2301(JFB)(WDW), 2006 WL 2053732 (E.D.N.Y. July 21, 2006).  In March 2009,

both the County Defendant and the Garden City Defendants moved for summary judgment.

On March 2, 2010, Judge Bianco recused himself in this case.  Thereafter, the case was

reassigned to this Court for all further proceedings.  Consequently, all pending motions were

denied without prejudice and with leave to refile in accordance with this Court's individual

motion practice rules.

On April 14, 2010, NYCC filed a motion to intervene as a plaintiff pursuant to Federal

Rule of Civil Procedure 24(b), which the Court subsequently granted on June 15, 2010, 270

F.R.D. 123 (E.D.N.Y. 2010).  On June 30, 2010, NYCC filed its intervenor complaint.  On June

25, 2010, Magistrate Judge Wall granted the Plaintiffs' request to reopen discovery.

On July 29, 2011, motions for summary judgment were again filed by both the Garden

City Defendants and the County.  In addition, on August 26, 2011, NYCC filed a motion to

amend its intervenor complaint pursuant to Rule 15(a)(2) to include an additional cause of action

for violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983, and its rights under the Equal

Protection Clause of the Fourteenth Amendment.

By Memorandum and Order dated February 15, 2012, the Court (1) granted the County's motion for summary judgment dismissing all the claims against it; (2) denied Garden City's motion for summary judgment dismissing all claims against it; and (3) granted NYCC's motion to amend the intervenor complaint. <u>MHANY Mgmt. Inc. v. Cnty. of Nassau</u>, 843 F. Supp. 2d 287 (E.D.N.Y. 2012).

Prior to the trial, the claims of the Individual Plaintiffs Vic DeVita and Francine McCray were dismissed with prejudice. (Docket Entry No. 378, Tr. at 5.)  Thus, at the trial, the only remaining Plaintiffs were MHANY and NYCC, and the only remaining Defendants were the Garden City Defendants, namely the Incorporated Village of Garden City and the Garden City Board of Trustees.  The only remaining causes of action were the claims under (1) the FHA; (2) 42 U.S.C. §§ 1981, 1982, and 1983, and (3) the Equal Protection Clause of the Fourteenth Amendment.  The claim under 42 U.S.C. §2000d had been asserted only against the County.  On June 17, 2013, the Court commenced a bench trial that spanned 11 days.

### III. CONCLUSIONS OF LAW

A.  <u>Is the Garden City Board of Trustees Subject to this Lawsuit?</u>

The Garden City Defendants argue for the first time that the Board of Trustees is not a suable legal entity separate from the Village.  In support of this assertion, the Garden City Defendants rely on <u>Glacken v. Inc. Vill. of Freeport</u>, CV 09-4832 (DRH)(AKT), 2011 WL 7546425 (E.D.N.Y. June 27, 2011), <u>report and recommendation adopted</u>, 09 CV 4832 (DRH)(AKT), 2012 WL 895392 (E.D.N.Y. Mar. 15, 2012).  There, United States Magistrate Judge A. Kathleen Tomlinson found that "[a]lthough no cases conclusively hold that a board of directors of a village is not a suable entity or is redundant when the village is also a named defendant, the Court finds that the relevant case law supports such a conclusion." 2011 WL

21

7546425, at *2.  Judge Tomlinson determined that cases that have barred suits against a city or

village police department as opposed to the municipality itself apply with full force to suits

against the Board, here, an administrative arm or governing body of the Village.

Although the Court finds <u>Glacken</u> persuasive as a logical conclusion, the Court declines

to dismiss the Board of Trustees where, as here, the Garden City Defendants failed to previously

raise this issue.  Indeed, the <u>Glacken</u> court dismissed the Board of Directors at the motion to

dismiss stage. <u>Id.</u> at *1 ("no <u>evidence</u> has been offered to support the propositions that the Board

is a suable entity or that the naming of the Board as a party is not duplicative of the Village being

named as a party.")(emphasis added).

Here, by contrast, the Court heard no proof regarding whether the Board is a separate

legal entity from the Village.  Although, in all likelihood, any recovery against the Board would

be the obligation of the Village, the Court declines to dismiss the Board without any evidence or

further notice to NHYAC and NYCC.  Also, absent relevant case law, the Court declines to find

non-waivable the defense that a Board of Trustees of a Village is not a suable entity separate

from the Village so that the Court is obligated to consider this newly-raised argument.

B.  <u>As to the Article III Standing of the Plaintiffs</u>

Under Article III of the United States Constitution, standing to bring a lawsuit in federal

court is limited to a plaintiff who "show[s] that the conduct of which he complains has caused

him to suffer an 'injury in fact' that a favorable judgment will redress." <u>Elk Grove Unified</u>

<u>School Dist. v. Newdow</u>, 542 U.S. 1, 12, 124 S. Ct. 2301, 159 L. Ed. 2d 98 (2004); <u>see</u> <u>also</u>

<u>Ziemba v. Rell</u>, 409 F.3d 553, 555 (2d Cir. 2005).  Further, among other standing requirements,

"a plaintiff's alleged injury must be an invasion of a concrete and particularized legally protected

interest." <u>McConnell v. Fed. Election Comm'n</u>, 540 U.S. 93, 227, 124 S. Ct. 619, 157 L. Ed. 2d

491 (2003) (opinion of Rehnquist, C.J., for a majority of the court); see also Ziemba, 409 F.3d at 554.

A plaintiff alleging "exclusionary zoning practices must allege specific, concrete facts demonstrating that the challenged practices harm him, and that he personally would benefit in a tangible way from the court's intervention." Warth v. Seldin, 422 U.S. 490, 508, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975); Jaimes v. Toledo Metropolitan Hous. Auth., 758 F.2d 1086, 1097 (6th Cir. 1985). The harm does not have to be economic, indeed, of relevance here, "an interest in making suitable low-cost housing available in areas where such housing is scarce" can "support a plaintiff's standing." Vill. of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 262-63, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977).

In Fair Housing in Huntington Comm. Inc. v. Town of Huntington, 316 F.3d 357 (2d Cir. 2003), the Second Circuit held that "to demonstrate the type of 'particularized injury' necessary for standing [in alleged discriminatory zoning cases,] plaintiffs 'must allege facts from which it reasonably could be inferred' that, absent defendants' challenged conduct, there is a 'substantial probability' that housing with greater minority occupancy would have been built in the [town]." Id. at 363 (quoting Warth, 422 U.S. at 504, 95 S. Ct. 2197, 45 L. Ed. 2d 343). Although the government has no constitutional duty to provide low income housing, it may not obstruct "private projects beneficial to minority groups." Acevedo v. Nassau County, 500 F.2d 1078, 1080-81 (2d Cir. 1974),

At the motion to dismiss stage, the Court found that the Plaintiffs properly plead standing. However, "it sometimes remains to be seen whether the factual allegations of the complaint necessary for standing will be supported adequately by the evidence adduced at trial." Gladstone, Realtors v. Vill. of Bellwood, 441 U.S. 91, 115 n. 31, 99 S. Ct. 160160 L. Ed. 2d 66

23

(1979); see also Alexander v. Yale Univ., 631 F.2d 178, 183 (2d Cir. 1980)("It is also mandatory that [these elements] must be satisfied throughout the course of adjudication by the courts.") Accordingly, the Court now addresses the Garden City Defendants' arguments challenging the Plaintiffs' Article III standing.

    1.  NYAHC/MHANY

At the motion to dismiss stage, the Garden City Defendants contended that NYAHC lacked standing because it failed to allege that it attempted in any way to acquire a permit, submit a bid, or communicate with the Defendants regarding the RFP for the Social Services Site. Judge Bianco rejected this argument, noting that NYAHC alleged that immediately after receiving the RFP, NYAHC met with County officials and submitted a Proposed Plan, only to have the County ignore the Plan. Judge Bianco observed that while no formal proposal or financing had been reviewed by the Garden City Defendants, "these types of uncertainties always exist in housing development cases, and should not be used as a means to defeat standing." 2006 WL 2053732, at * 10. Judge Bianco further noted that "[t]he law of standing is not so rigid so as to deny a developer standing, no matter how significant the 'injury in fact,' merely because it failed to submit a non-conforming proposal, knowing it will be summarily rejected." Id. at *9.

The Garden City Defendants now contend that NYAHC failed to prove at the trial the necessary elements of standing, asserting that the Plaintiffs have offered no evidence that NYAHC would have submitted a qualifying bid for the Social Services Site but for the Village's zoning decision. The Garden City Defendants also note that the "protest" proposal NYAHC submitted to the County was admittedly not "serious" and it did not comply with the terms of the RFP or CO5b zoning.

24

In response, NYAHC cites to testimony by Ismene Speliotis that NYAHC would have bid on the property had it been available in 2004 under the R-M designation. NYAHC also cites the four alternative development scenarios created by Speliotis to assess the feasibility of affordable housing at three different land-acquisition costs for which NYAHC could have obtained funding.

In the Court's view, NYAHC proved injury in fact at the trial notwithstanding that it did not submit a proposed bid during the RFP process. In this regard, NYAHC proved "that submitting its admittedly non-compliant proposal in response to the RFP would have been futile because the [shift to R-T zoning] made it financially impossible to build low income housing on the Social Services Site." ACORN v. Cnty. of Nassau, 2006 WL 2053732, at *9; LeBlanc–Sternberg v. Fletcher, 67 F.3d 412, 424-25 (2d Cir. 1995) (holding that the plaintiff had standing to bring an FHA claim challenging an ordinance, even before the government entity had applied the ordinance against the plaintiff). To be sure, whether the shift to R-T zoning was discriminatory in nature under federal law presents a question, distinct from the issue of standing, which issue will be addressed later.

The Garden City Defendants further contend, without authority, that the Plaintiffs must establish that a bid for affordable housing at the site under CO5b zoning would have been successful. However, first, "a court is not required to engage in undue speculation as a predicate for finding that the plaintiff has the requisite personal stake in the controversy." Vill. of Arlington Heights, 429 U.S. at 261-62, 97 S. Ct. 555, 561, 50 L. Ed. 2d 450. Second, one of alternatives Speliotis projected contemplated a $56.1 million purchase price, which would have been directly competitive with the winning bid. (Joint Exh. 28 at 696, Plfs Exh. 179.)

Finally, the Garden City Defendants assert that because the Plaintiffs' inability to benefit from affordable housing on the Site was not caused by the Village, the Plaintiffs cannot show that any remedy against the Village would redress that injury.  However, the Court finds this argument unavailing because the shift to R-T zoning by the Village, whether discriminatory or not, caused injury to NYHAC because, as explained later, the high cost to develop single-family housing under R-T zoning made it financially impossible to build low income housing on the Site.

2.  NYCC

At the motion to dismiss stage, Judge Bianco determined that the Plaintiffs sufficiently alleged that members of ACORN, which asserted claims only on behalf of its members rather than itself, had an injury in fact and that the Defendants discriminatorily changed the proposed zoning, thereby preventing NYAHC from being able to build multifamily affordable housing on the Social Services site.  Subsequent to Judge Bianco's order denying the motion to dismiss and, after ACORN disbanded, NYCC intervened in this action, as a practical but not legal successor, to ACORN.

The Garden City Defendants now challenge NYCC's standing.  To have standing to bring suit to redress its members' injuries, an association must establish that (1) its members would otherwise have standing to sue in their own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claim nor the relief requested requires the participation of individual members in the lawsuit. See United Food & Commercial Workers Union Local 751 v. Brown Group, 517 U.S. 544, 552–53, 116 S. Ct. 1529, 134 L. Ed. 2d 758 (1996).

The Court finds that the Plaintiffs proved that NYCC's members would have been eligible for and would have an interest in obtaining affordable housing in Garden City. (Tr. at 1228, 1432.)  Indeed, Ann Sullivan, one of NYCC's deputy directors, testified that ACORN members, many of whom subsequently became NYCC members, desired to live in affordable housing in Garden City and provided the names of three such members. (Tr. at 1372-73.) Further, the fact that NYCC intervened after the County decided not to sell the Social Services Site is immaterial to NYCC's associational standing because the injury NYCC's members suffered allegedly occurred previously when the Board shifted from R-M zoning to R-T zoning.

C.  As to the Statutory Standing of the Plaintiffs

In addition to challenging the constitutional standing of the Plaintiffs, the Garden City Defendants argue, apparently for the first time, that the Plaintiffs, as corporate entities, lack statutory standing to bring an action under 42 U.S.C. § 1982.

Section 1982 provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."  Unlike §§ 1981 and 1983 which apply to "persons," § 1982 protects the property rights of "citizens of the United States."

Here, the Garden City Defendants argue that Section 1982 permits actions by "citizens" and that corporations are not "citizens."  In support of that assertion, the Garden City Defendants cite Comtel Technologies, Inc. v. Paul H. Schwendener, Inc., 04 C 3879, 2005 WL 433327 (N.D. Ill. Feb. 22, 2005).  Prior to that case, some courts presumed that corporations could bring § 1982 claims, see e.g., Park View Heights Corp. v. City of Black Jack, 467 F.2d 1208, 1214 (8th Cir. 1972)(allowing corporate plaintiffs standing to bring claims under both § 1981 and § 1982). However, some courts presumed that they could not bring such a claim, see e.g., American Civil

Rights Investigations, Inc. v. O'Connor & Tushla, 1989 U.S. Dist. LEXIS 17771, at *4 (W.D. Mich. 1989)(dismissing plaintiff corporation's § 1982 claim because only citizens have claims under the statute).  Also, as to this subject, the Comtel court observed that "no court ha[d] provided much analysis of the issue." Comtel, 2005 WL 433327 at *5.  In Comtel, the court "note[d] the difference [between "persons" and "citizens"] and [found that it was] compelled to enforce § 1982 as written-limiting its protection to "citizens," a category that does not include the private corporations." Id. at *6.

While the Garden City Defendants contested the standing of NYHAC and ACORN at the motion to dismiss stage, they couched their arguments in constitutional rather than statutory terms.  Statutory standing arguments, unlike constitutional standing arguments, can be waived. See Gribben v. United States (In re Gribben), 158 B.R. 920, 921–22 (S.D.N.Y. 1993) (the Government's failure to raise issue of standing in proceedings before bankruptcy court waived any argument on appeal that debtor lacked statutory standing to seek turnover of tax refunds.) Accordingly, the Court deems the Garden City Defendant's statutory standing arguments under Section 1982 to be waived.

D.  As to Mootness

The Garden City Defendants also assert that, even if the Plaintiffs had standing to initiate the suit, the Plaintiffs lost that standing after the County decided not to sell the site.  Indeed, the Garden City Defendants note that NYCC did not intervene until after the County decided not to sell the Site.  This argument is identical to the mootness claim previously rejected by the Court at the summary judgment stage. Alexander, 631 F.2d at 183 ("Th[e] 'time element of standing' comes under the rubric of mootness doctrine.")  The Garden City Defendants did not seek reconsideration of that decision and such a motion would now be untimely.

However, even were the Court to consider this issue, the Court would adhere to its prior determination that "[a]lthough the relief requested as to the site may have been rendered moot, the broad injunctive relief sought by the Plaintiffs is certainly still a potential outcome of this case." 843 F. Supp. 2d at 30. Indeed, the Plaintiffs request non-site related injunctive relief and a declaratory judgment. In fact, the Court previously noted that it may be possible for the Court to grant some relief as to the Social Services Site. The County acknowledged in its opposition to NYCC's motion to amend the intervenor complaint that "the County needs finality on the issue of whether plaintiffs' demand for injunctive relief will bar the construction where the decision to build has been made final." Thus, even the County appeared to concede that the Court's injunctive relief as to the Site itself is still a plausible outcome. As the Plaintiffs observe, the County has yet to take action at the Site, and thus this decision may furnish determinative issues in the future.

Relatedly, the Garden City Defendants contend that if the County had decided not to sell the Social Services Site prior to commencement of this suit, the complaint would have been dismissed for lack of a justiciable controversy. The Court disagrees. Again, the injury resulting from the change in the proposed zoning preceded the County's decision not to sell the site. The "no sale" decision had no effect on the Plaintiffs' injuries; rather, the County's decision simply may have mooted certain types of relief that could be awarded based on those injuries.

The Garden City Defendants also contend that the Plaintiffs failed to prove that Garden City's zoning decision somehow caused the County's "no sale" decision. In this regard, the Garden City Defendants observe that after Garden City adopted R-T zoning in June 2004, the County proceeded with its RFP process and did not change course until the election of a new County Executive in 2010, 6 years after the zoning change. However, even if the Garden City's

zoning change had nothing to do with the County's "no sale" decision, the Plaintiffs are not foreclosed from recovery. As previously stated, the Plaintiffs' injuries occurred at the time of the zoning change, prior to the County's "no sale" decision.

As to the mootness issue, notwithstanding the fact that the Social Services Site is no longer being used, there are issues in the case that are not moot. As stated by the Court in its summary judgment decision, 843 F. Supp. 2d 287, in the prayer for relief seeking an injunction are the following: "(8) enjoin all Defendants and their agents, employees, successors and assigns, from engaging in any other discriminatory acts that perpetuate or contribute to segregation in Garden City and Nassau County; and (9) order all Defendants to take and/or fund affirmative steps, supervised by this Court, to overcome the effects of past discriminatory practices, including the funding of remedial activities necessary to overcome the perpetuation of segregation in Nassau County and Garden City." The complaint also seeks a declaratory judgment and such other relief that the Court deems reasonable and necessary with regard to the request set forth above.

Therefore, there are two specific instances of injunctive relief sought by the Plaintiffs against the Defendants that do not relate specifically to the Special Services site itself. First, the Plaintiffs seek to enjoin the Defendants from engaging in any other discriminatory acts that perpetuate or contribute to segregation in Garden City. Second, the Plaintiffs seek an order that the Defendants take and/or fund affirmative steps, supervised by this Court, to overcome the effects of past discriminatory practices, including the funding of remedial activities necessary to overcome the perpetuation of segregation in Garden City. This is in addition to the declaratory relief and any other relief that the Court deems reasonable, necessary and just.

In this regard, the Court found that this controversy is not rendered moot solely because the Social Services Site is no longer susceptible to the zoning laws that were alleged to be discriminatory. See, e.g., U.S. v. Mass. Maritime Acad., 762 F.2d 142, 157 (1st Cir. 1985) ("Given the evidence of persistent past discrimination, the district court was entitled to enter an injunction permanently enjoining any repeat discriminatory conduct even if the illegal conduct had by then ceased."); South-Suburban Hous. Ctr. V. Greater South Suburban Bd. of Realtors, et al., 935 F.2d 868, 881 (7th Cir. 1991) (finding that an FHA challenge to street plan for damages, declaratory relief, and injunctive relief was not rendered moot although homes were sold prior to trial, in part because there was still a viable claim for declaratory and injunctive relief).

This affirmative action can be appropriate even though the effects of the alleged discrimination cannot be resolved at the particular Social Services site. See Baltimore Neighborhoods, Inc. v. LOB, Inc., 92 F. Supp. 2d 456, 462 (D. Md. 2000) (finding that affirmative action relief was appropriate because although the effects of the discrimination could not be solved at the particular site, it was possible to seek affirmative action "elsewhere in the Odenton area").

Also, as stated by the Court in its summary judgment decision:

> In this regard, the Court finds that a determination of whether or not the County and the Village's past conduct violated the Constitution or applicable federal laws remains very much an open question. A legal dispute still exists as to whether any discriminatory practices took place by the Defendants, and whether an injury is still ongoing for every day there is an alleged lack of affordable housing, and hence a lack of racial integration, in the Village of Garden City . . .". See Young v. Pierce, 628 F. Supp. 1037, 1059-60 (E.D. Tex. 1985) (finding that part of the heavy burden of demonstrating that discontinuance of the challenged activity has destroyed any controversy between the parties "includes the necessity of showing that there are no present effects of past conduct that require undoing.") (citing Vitek v. Jones, 445 U.S. 480, 487, 100 S. Ct. 1254, 1260, 63 L. Ed. 2d 552 (1980)).

. . .

Therefore, because there still is relief that is obtainable by the Plaintiffs against the Defendants, the Court finds that there remains a live controversy in spite of the fact that the Social Services site will no longer be sold. Thus, the case has not been rendered moot and the Court can proceed to analyze the substantive merits of the action.

E.  <u>As to Liability</u>

1.  <u>FHA Claims Against the Garden City Defendants</u>

 Congress enacted the FHA, or Title VIII of the Civil Rights Act of 1968, to "provide, within constitutional limits, for fair housing throughout the United States." 42 U.S.C. § 3601. The law provides that it shall be unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." <u>Id.</u> § 3604 (a).  The Second Circuit has determined that "[c]onduct prohibited by this section includes discriminatory zoning practices." <u>Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, N.Y.</u>, 316 F.3d 357, 366 (2d Cir. 2003); <u>see</u> <u>Le Blanc–Sternberg v. Fletcher</u>, 67 F.3d 412, 424 (2d Cir. 1995); <u>Huntington Branch, N.A.A.C.P. v. Town of Huntington</u>, 844 F.2d 926, 938 (2d Cir. 1988) <u>aff'd in part sub nom. Town of Huntington, N.Y. v. Huntington Branch, N.A.A.C.P.</u>, 488 U.S. 15, 109 S. Ct. 276, 102 L. Ed. 2d 180 (1988).  A claimant may demonstrate that discriminatory zoning practices were employed by presenting either proof of disparate treatment or disparate impact. <u>See</u> <u>Huntington Branch. N.A.A.C.P.</u>, 844 F.2d at 934–35; <u>see also</u> <u>LeBlanc–Sternberg</u>, 67 F.3d at 425.  In the instant case, the Plaintiffs advance their FHA claim against the Garden City Defendants under both theories of liability, which the Court will address in turn.

32

i. <u>Disparate Treatment Legal Standard</u>

"The framework of burdens fashioned in Title VII cases is fully applicable to [FHA] housing discrimination cases." <u>Cabrera v. Jakabovitz</u>, 24 F.3d 372, 383 (2d Cir. 1994); <u>see</u> <u>also</u> <u>id.</u> at 381-82 (describing "the three-step formulation of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and <u>Texas Dep't of Community Affairs v.</u> <u>Burdine</u>, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)" in the context of fashioning jury instructions).

Under the theory of disparate treatment, "a plaintiff can establish a prima facie case by showing that animus against the protected group 'was a *significant* factor in the position taken' by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." <u>LeBlanc–Sternberg</u>, 67 F.3d at 425 (quoting <u>United States v. Yonkers</u> <u>Bd. of Educ.</u>, 837 F.2d 1181, 1217, 1223, 1226 (2d Cir.1987), <u>cert. denied</u>, 486 U.S. 1055, 108 S. Ct. 2821, 100 L. Ed. 2d 922 (1988)) (emphasis added); <u>see also</u> <u>Innovative Health Sys. Inc. v.</u> <u>City of White Plains</u>, 117 F.3d 37, 49 (2d Cir. 1997) ("[A] decisionmaker has a duty not to allow illegal prejudices of the majority to influence the decisionmaking process.  A . . . discriminatory act [is] no less illegal simply because it enjoys broad public support.").

Discriminatory intent may of course be demonstrated by direct evidence.  However, as such evidence is rarely available to plaintiffs, it may also be inferred through factors such as: "[t]he impact of the official action whether it 'bears more heavily on one race than another,' " "[t]he historical background of the decision," "[t]he specific sequence of events leading up to the challenged decision," "[d]epartures from the normal procedural sequence," "[s]ubstantive departures . . ., particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached," and "contemporary statements by

members of the decisionmaking body, or reports." Vill. of Arlington Heights, 429 U.S. at 267–68, 97 S. Ct. 555, 50 L. Ed. 2d 450; see also Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991) (noting that perpetrators of discrimination rarely leave a "smoking gun," and, therefore, "[a] victim of discrimination is . . . seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence.").

Once a plaintiff presents a *prima facie* case of discrimination based on the Vill. of Arlington Heights factors, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for its actions. Reg'l Econ. Cmty. Action Program v. City of Middletown, 294 F.3d 35 at 49 (2d Cir. 2002).

At the third stage of the McDonnell Douglas test, "the sole remaining issue [is] 'discrimination *vel non*.'" Byrnie v. Town of Cromwell, 243 F.3d 93, 101-02 (2d Cir. 2001) (citations omitted), and "the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." James v. New York Racing Ass'n, 233 F.3d 149, 156 (2d Cir. 2000); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

    ii.  As to the Plaintiffs' Theory of Disparate Treatment

        a.  As to Whether the Zoning Bore More Heavily on One Race Than Another

The Plaintiffs have presented evidence that indicates that the subject zoning designation "[bore] more heavily on one race than another." Washington v. Davis, 426 U.S. 229, 242, 96 S. Ct. 2040, 2049, 48 L. Ed. 2d 597 (1976). This evidence typically "involves statistical data supporting either a finding of perpetuation of segregation or of disproportionate impact." Thornton v. City of Allegan, 863 F. Supp. 504, 509 (W.D. Mich. 1993). Not surprisingly, the parties' analysis of this issue dovetails with their respective analyses of the theory of disparate

impact.  For that reason, the Court will discuss this issue in greater detail in the disparate impact section.

For now, it is sufficient to note that McArdle, the Plaintiffs' statistical expert, set forth evidence that the original R-M zoning proposal, as proffered by BFJ and endorsed by the P-Zone Committee, would have created a pool of potential renters with a significantly larger percentage of minority households than the pool of potential renters for the zoning proposal ultimately adopted as law by Garden City.  In this regard, the Plaintiffs established that the change from the proposed R-M zoning to the adopted R-T zoning affected minority residents to a greater degree. See e.g., Jim Sowell Const. Co., Inc. v. City of Coppell, 61 F. Supp. 2d 542, 547 (N.D. Tex. 1999) (finding that evidence from an expert demonstrating a disproportionate amount of African–American potential residents lived in multi-family housing "demonstrate[d] that African–American families are much more likely to reside in apartment complexes than are Caucasian families.  By rezoning certain tracts of land from multifamily to single family use . . . the City decreased the number of apartment units available to new residents.  Because African–Americans are more likely to reside in such housing, this reduction in multifamily units had a statistically greater impact on African–American families than on Caucasian families.").

b.  As to the Historical Evidence of Racism in the Village of Garden City

Under Vill. of Arlington Heights, "[t]he historical background of the decision [at issue] is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." 429 U.S. at 267, 97 S. Ct. 555.  As this Court previously pointed out in its summary judgment order, in Vill. of Arlington Heights, the Supreme Court explicitly distinguished between the "historical background" of a decision and the "specific antecedent events" leading up to it, indicating that courts should consider the historical background of a zoning decision in a

35

"broad[] sense." 843 F. Supp. 2d at 317; see Dews v. Town of Sunnyvale, Tex., 109 F. Supp. 2d 526, 571 (N.D. Tex. 2000) (concluding, after a bench trial on the merits, that defendant town's decisions, over the years, to adopt one acre zoning, prohibit multi-family housing, and refuse proposed cooperation agreements with local housing authority demonstrated "history of discouraging African–Americans from moving within its borders.").

Here, the totality of evidence concerning the historical background of discrimination is as follows: (1) the unsuccessful application for affordable housing at the Doubleday site; (2) the adoption of an anti-discrimination policy after an Attorney General investigation into discrimination at Garden City parks; and (3) the failed attempt to institute affordable housing at the Ring Road Site.

Although each of these events could tend to suggest that racial discrimination has historically been a problem in Garden City, the Court declines to place significant weight on them for various reasons. First, the Doubleday application was apparently filed in 1989, approximately 15 years prior to the underlying events here. After Vill. of Arlington Heights, the Supreme Court has cautioned that historical evidence not "reasonably contemporaneous" with the challenged decision has "little probative value." McCleskey v. Kemp, 481 U.S. 279, 298, 107 S. Ct. 1756, 1770, 95 L. Ed. 2d 262 (1987); cf. Hunter v. Underwood, 471 U.S. 222, 228-233, 105 S. Ct. 1916, 1920-1922, 85 L. Ed. 2d 222 (1985) (relying on legislative history to demonstrate discriminatory motivation behind a state statute).

Second, the Court declines to place much weight on the adoption of the anti-discrimination policy at the Garden City parks because, as the Plaintiffs note, to do so would have a chilling effect on any entity's willingness to enact similar guidelines. In fact, in McLaughlin v. Diamond State Port Corp., C.A.03-617 (GMS), 2004 WL 3059543 (D. Del. Dec.

36

30, 2004), the court excluded such evidence as analogous to subsequent remedial measures under Federal Rule of Evidence 407.  In this case, while the Court did not exclude such evidence, the Court finds the reasoning in McLaughlin persuasive and therefore accords little weight to the adoption of the anti-discrimination park policy.

To be sure, the Court considers the underlying complaints at the parks, which, of course, involve behavior not to be encouraged.  In any event, the underlying complaints at the parks, while relevant, appear too attenuated from the subject zoning decision to carry much weight.

Third, the Court declines to consider the opposition to the Ring Road site because this event occurred in 2006, two years after the zoning change in this action, and therefore would have little relevance to whether the Garden City Defendants evinced discriminatory intent in 2004.

c.  As to the Sequence of Events

The Court finds that the sequence of events leading up to the implementation of the R-T Zone give rise to an inference of race-based animus by the Garden City Defendants.  Garden City retained BFJ to create a zoning proposal for the Social Services Site.  BFJ, in turn, proposed the R–M designation, which permitted the development of up to 311 multi-family units.  Both the County and the Board supported this proposal and, specifically, the inclusion of multi-family housing.  Trustee Bee is a member of the Board as well as the Committee.  As reflected in a summary of a meeting with local property owners, Trustee Bee expressed the opinions that "Garden City demographically has a need for affordable housing" and that "he would keep an open mind but he still felt the recommended zoning change was [sic] appropriate."

However, when it became clear at the public meetings that residents pointedly opposed the development of multi-family housing, BFJ and the Board reversed course.  Not long after

representing at a January 20, 2004 meeting that the village had a "need" for affordable housing, Trustee Bee stated at the February 5, 2004 public meeting that "neither the County nor the Village is looking to create a so-called affordable housing."  Soon thereafter, the Board and BFJ endorsed a new proposal which banned the development of multi-family housing on all but a small portion of the Social Services Site, and then only by special permit.

The Garden City Defendants repeatedly insist that nothing in the R-T zoning designation specifically prohibited the building of affordable housing.  However, this is just another way of saying that the R-T zoning was facially neutral.  As mentioned above, the absence of overt discrimination does not defeat a claim of disparate treatment. Furthermore, as explained later, many times a facially neutral law lies at the heart of a claim of disparate impact.

In addition, the Garden City Defendants characterize the recommendation by BFJ for R-M zoning as BFJ's "initial thoughts"; describe the zoning process here as "evolutionary" and "ongoing;" and contend that there was no abrupt shift from R-M zoning to R-T zoning.  Indeed, the Garden City Defendants contend that the R-M zoning proposal was "continuously modified throughout 2003."  However, in the Court's view, the Garden City Defendants are seeking to rewrite history.  The Garden City Defendants only cite two changes to BFJ's proposal: a decrease in floor-to-area ratio and a change from R-6 to R-8 controls for single-family homes.  Neither adjustment altered BFJ's multi-family recommendation.  Moreover, the Garden City Defendants ignore the P-Zone Committee's consistent recommendation and public comment over eighteen months studying the Social Services Site.  A review of the record reveals that the Board and the BFJ's consideration of R-T zoning spanned a matter of weeks, and was not nearly as

38

deliberative as that for R-M zoning. <u>Sunrise Dev., Inc. v. Town of Huntington, New York</u>, 62 F. Supp. 2d 762, 774 (E.D.N.Y. 1999) (Spatt, J.)(" The Town simply asserts its desire to comply with the Comprehensive Plan as the reason for the Local Law's enactment without pointing to a single reason to support the expedited passage of the Local Law some five years after the plan's effective date.").

After a final public presentation on the proposed R-M zoning in April 2004, Schoelle, Filippon, and Fishberg met with BFJ to review the public comments. For an unexplained reason, members of the P-Zone Committee did not participate in this meeting, and neither did zoning counsel Kiernan.

In addition, the Garden City Defendants' description of citizen reactions to the R-M proposal mischaracterizes the record. The Garden City Defendants assert that the January 2004 public hearing constituted the first time the public enjoyed an opportunity to comment on the proposed zoning. However, in actuality, two public sessions were held with regard to R-M zoning in May and October of 2003.

The Garden City Defendants insist that, in any event, they simply responded to legitimate concerns about the effect of R-M zoning, including traffic, taxes, and school children. The Garden City Defendants note that, whereas the word "affordable" was used only once by a single resident at the February 5, 2004 meeting, the word "traffic" was used 68 times and the word "school" was mentioned 44 times. However, the Garden City Defendants are silent regarding the expression, albeit in a single instance, of concerns about changing the Village's "character" and "flavor."

Further, as the Court has previously held, "[i]n a discrimination action, a court cannot be satisfied that the absence of overtly discriminatory remarks proves an absence

39

of discrimination." Huntington Branch, N.A.A.C.P. v. Town of Huntington, N.Y., 668 F.

Supp. 762, 786 (E.D.N.Y. 1987), rev'd on other grounds, 844 F.2d 926 (2d Cir. 1988)

(noting that findings of discrimination cannot "be avoided by careful use of code

words."); Sunrise Dev., Inc., 62 F. Supp. 2d at 775 (finding substantial likelihood of

discriminatory intent under FHA and Americans with Disabilities Act when residents of

community voiced opposition to construction of assisted living facility, including by

criticizing the "appearance and activity" of such facilities and asserting that such facilities

would "alter the residential character."); Atkins v. Robinson, 545 F. Supp. 852, 871-72

(E.D. Va. 1982) (finding statement that she "feared the projects 'would degenerate to

slum-like conditions, with an abundance of crime' " to be a veiled reference to race); but

see Generally Boyd v. Lefrak Org., 509 F. 2d 1110, 1112 (2d Cir. 1975)("The premise of

plaintiffs' argument is that '(w) elfare recipiency . . . must be seen as the 'functional

equivalent' of race.'  Such an equivalency between race and income has been rejected by

the Supreme Court.")(citing James v. Valtierra, 402 U.S. 137, 91 S. Ct. 1331, 28 L. Ed.

2d 678 (1971) (internal quotation marks and citations omitted); Forty-Second Street Co.

v. Koch, 613 F. Supp. 1416, 1423 (S.D.N.Y. 1985) (class-biased plan seeking to attract

affluent customers does not prove that plan sought to remove African-Americans or

hispanics which comprise a disproportionate segment of the low-income population).

 The inference of discrimination is not defeated by the fact that the Plaintiffs

declined to rely on the expert testimony of Dr. Peter Marcuse, a professor of urban

planning, who both the Plaintiffs and the Court cited to heavily at the summary judgment

stage.  Marcuse found in his expert report, not in evidence at the trial, that euphemisms

for race-based bias in housing situations can demonstrate discriminatory intent.

However, the Court need not rely on Marcuses's expertise to characterize aspects of the opposition to affordable housing at the Social Services Site.  The Court acknowledges that the Plaintiffs overstate their case in describing the opposition to affordable housing in terms of a "surge" and "outcry."  Nevertheless, the Court evaluates this real opposition in light of (1) the racial makeup of Garden City; (2) the lack of affordable housing in Garden City; and (3) the likely number of minorities that would have lived in affordable housing at the Social Services Site.  Set against this background, the Court concludes that at least some of the expressions by Garden City residents of disapproval for affordable housing reflected race-based animus or at least could have been construed as such by the Board.

      d.  <u>As to Whether There Were Departures from Normal Procedural Sequences</u>

The Court next considers whether there were departures from normal procedural sequences in Garden City's zoning decision. <u>See</u> <u>Sunrise Dev., Inc.</u>, 62 F. Supp. 2d at 775-76  (concluding that "[a]lthough the Town did commission the [Citizens' Advisor Committee] to undertake a study and issue recommendations on senior housing, when the time came to enact the Local Law, the Town disregarded the CAC's recommendations," which suggested that "defendants likely were swayed by the anti-disabled animus present in the community"); <u>Dews</u>, 109 F. Supp. 2d at 571  ("[The Defendant]'s history of ignoring the recommendations of its planners and proceeding in the face of sound legal and planning advice" weighed towards finding of discriminatory intent).

Here, as previously mentioned, the Court finds that the consideration of R-M zoning proposal involved much greater deliberation than that for the R-T zoning.  It is also true that Local Law 2-2004 was moved to a public hearing even though no zoning

text had been drafted and no environmental analysis of the law's impact had been conducted.  However, the record is bereft of any evidence regarding the <u>customary</u> zoning procedures, and therefore Court cannot determine whether there was a departure from such procedures.

    iii. <u>As to the Defendants' Burden against the Disparate Treatment Claim</u>

Once a plaintiff presents a *prima facie* case of discrimination based on the <u>Vill. of Arlington Heights</u> factors, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for its actions. <u>Reg'l Econ. Cmty. Action Program</u>, 294 F.3d at 49.

Here, the Garden City Defendants submit that legitimate concerns prompted the Board to reject the initial proposal offered by BFJ and endorsed by the P-Zone Committee.  Indeed, the Garden City Defendants contend that R-T zoning met the planning principles set forth by BJF better than did the proposed R-M zoning.

In this regard, the Garden City Defendants point to the testimony of their zoning expert Patrick Cleary that R-M zoning "permitted a range of uses that . . . had the potential to create significant, potentially significant adverse impacts" whereas R-T zoning "eliminated the potential for those adverse impacts," namely that R-T zoning eliminated office use and reduced the number of multifamily units, the two biggest generators of traffic.  (Tr. at 1855.)  The Garden City Defendants also point to the April 22, 2004 presentation to the Village Residents, in which BFJ demonstrated that 215 apartments at the Site would generate 1,423 vehicular trips per day, while 90 single family homes would generate 940 trips and 150 townhomes would generate 920 trips per day. (Joint Exh 13.)  Based on these statistics, for 311 multifamily units, the number of

daily traffic trips, over 2,000, is more than double the amount of traffic generated by the proposed number of single family homes or townhomes. (Tr. at 399-401.)

Cleary also stated that R-T zoning "provided for an expansion of the housing opportunities available in the Village of Garden City by facilitating the development of townhomes." (Tr. 1856.)  Indeed, Filippon testified that, while the BFJ reports suggested that townhomes were allowed under the CO-5b zoning, R-M zoning did "[n]ot directly" provide for townhomes "in the usual sense of the word." (Tr. at 1662-63.)  Rather, Filippon noted that the R-T zoning proposal, for the first time, defined "townhomes" in the Village Code. (Tr. at 1772.)

As to additional school children, Fish estimated that, under R-M zoning controls, single family homes would, on average, produce one additional school child, whereas "[w]ith a community aimed at young couples and empty nesters there could be as few as 0.2 to 0.3 public school children per unit [of a multi-family home.]" (Joint Exh. 22, at 691.)  Thus, under Fish's estimates, 90 single family homes would have generated roughly 90 additional school children, while 311 would have generated roughly between 62 and 93 school children.  In opposition, the Garden City Defendants correctly emphasize that even a slight change in the resident mix would have significantly altered these numbers.

Taken together, the Court finds that the Garden City Defendants have satisfied their minimal burden of offering a nondiscriminatory reason for their zoning decision. See Reeves, 530 U.S. at 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105("[The burden of providing a legitimate, nondiscriminatory reason] is one of production, not persuasion; it

can involve no credibility assessment.")(quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)).

    iv.  The Plaintiffs' Burden

Having satisfied their burden of production, the presumption of discrimination no longer applies against the Garden City Defendants, so that the sole remaining issue for the Court is "discrimination *vel non*." Reeves, 530 U.S. at 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (citation omitted), and "the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." James v. New York Racing Ass'n, 233 F.3d 149, 156 (2d Cir. 2000).

Here, the parties present conflicting evidence regarding whether the R-M or R-T controls would have resulted in greater traffic flow. The Plaintiffs dispute that traffic concerns motivated the opposition to multi-family housing at the Social Service Site. Indeed, the Plaintiffs cite the September 2003 EAF, which concluded that the proposal would not generate traffic significantly above present levels. Further, Fish testified that, even using a conservative approach, the elimination of multi-family housing only reduced peak-traffic by about 3%. (Tr. at 449, 453.) At the February 5, 2004 meeting, Suozzi described a resident's concern about traffic as "irrational." (Joint Exh. 12, at 908.).

The Plaintiffs also dispute that townhomes could not be built under the proposed R-M zoning controls. Fish, and Flippon, a witness for the Garden City Defendants, testified that townhomes would be allowed under the proposed R-M zoning controls. (Tr. at 274, 405-06, 1732.)

Other justifications for R-T zoning are not just disputed, but unsupported by the record.  Indeed, the Garden City Defendants assert that the R-M proposal would "not provide an aesthetically pleasing transition" from commercial to single-family homes. (Garden City Defs' Post-Trial Mem, at 8, 16.)  Yet, Cleary conceded that R-M would also have provided a form of transition. (Tr. at 1882.)  Indeed, the May 2003 study stated that the R-M zone "is seen as a transitional area between existing single-family homes neighborhoods and current commercial development."

Finally, the Garden City Defendants note that, although the Board ostensibly sought to "maximize the use of existing zoning tools," BFJ always recommended an entirely new zone, named initially the "CO5b" zone.  (Tr. at 1703.)  However, the Court notes that, unlike the R-T zone, the Co-5 B zone contained existing components of the Garden City zoning code, including R-M.  Further, the EAF found that R-M zoning maximized existing zoning tools.

That said, the Court is "mindful of the general proscription that 'federal courts should not become zoning boards of appeal to review nonconstitutional land[-]use determinations by the [C]ircuit's many local legislative and administrative agencies.'" Zahra v. Town of Southold, 48 F.3d 674, 679-80 (2d Cir. 1995) (quoting Sullivan v. Town of Salem, 805 F.2d 81, 82 (2d Cir. 1986) (alterations in Zahra)).  Accordingly, the Court is reluctant to second-guess citizens and decision-makers' legitimate concerns about traffic and the promotion of townhomes, even if those concerns may have been ill-founded.

However, finding that the Board acted based on legitimate concerns about traffic and the promotion of townhomes does not foreclose a finding that impermissible

discriminatory intent <u>also</u> played a role in the Board's decision-making process.  In fact, it is clear from the record that there were many different factors – some of which reflected race-based opposition -- surrounding the enactment of the R-T zoning.  <u>Cabrera</u>, 24 F.3d at 382-82 (under the FHA, plaintiff need prove only that an impermissible consideration was a motivating factor, not the only motivating factor).

Given (1) the sequence of events involved in the Board's decision to adopt R-T zoning instead of R-M zoning after it received public opposition to the prospect of affordable housing in Garden City and (2) the considerable impact that this zoning decision had on minorities in that community, the Court finds that the Garden City Defendants acted with discriminatory intent.  <u>See</u> <u>Valley Hous. LP v. City of Derby</u>, 802 F. Supp. 2d 359, 386-87 (D. Conn. 2011) (stating that a defendant's "drafting of the decision to deny plaintiffs' appeal before the meeting without discussion with the other ZBA members and without showing them a draft prior to reading it into the record . . . support a conclusion of discriminatory decision-making" and indicating that a Zoning Board's reliance upon an interpretation of the zoning regulations without having probed the research supported a finding of discrimination).  Further, "[t]he events leading up to the enactment of the Local Law lead the court to conclude that the defendants likely were swayed by the anti-[minority] animus present in the community." <u>Sunrise Dev</u>, 62 F. Supp. 2d at 775; <u>Wentworth v. Hedson</u>, 493 F. Supp. 2d 559, 567 (E.D.N.Y. 2007)("In cases involving 'vague remarks,' context and timing are everything").

The question then becomes which party prevails in this type of "mixed motive" case under the FHA.  "Mixed motive" discrimination deals with situations, as in this case, in which the evidence shows that the defendant used both legitimate and illegitimate

considerations in making a decision.  The Supreme Court has yet to address "mixed motive" discrimination in a disparate treatment case under Title VIII.  Rather, the <u>Vill. of Arlington Heights</u> involved mixed motive discrimination in housing based on the Equal Protection Clause of the Fourteenth Amendment.

Therefore, before considering "mixed motive" cases under the FHA, the Court will examine the evolution of "mixed motive" cases under Title VII.  Indeed, the Supreme Court and several lower courts have relied on Title VII precedents to interpret Title VIII. <u>See</u> <u>Trafficante v. Metro. Life Ins. Co.</u>, 409 U.S. 205, 93 S. Ct. 36434 L. Ed. 2d 415 (1972); <u>DiCenso v. H.U.D.</u>, 96 F.2d 1004, 1008-09 (7th Cir. 1996); <u>Huntington Branch, N.A.A.C.P.</u>, 844 F.2d at 935; <u>Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights</u>, 558 F.2d 1283, 1288-89 (7th Cir. 1977), <u>cert. denied</u>, 434 U.S. 1025 (1978); <u>see generally</u> Robert Schwemm, Housing Discrimination Law and Litigation § 7:4 (2001).

In 1989, the Supreme Court decided <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 109 S. Ct. 1775, a Title VII employment discrimination case.  There, the Supreme Court held that, in a "mixed motive" analysis, the plaintiff's burden of proof is satisfied if (1) the evidence shows that the employer relied on any unlawful considerations in making its decision and (2) improper consideration of the employee's gender or other protected status played a motivating part in the employment decision.  The burden of persuasion then shifts to the defendant to show that the employer would have made the same decision if it had not taken the illegitimate factor into account.  The employer would not be held liable if it satisfied its burden of persuasion on the "same decision" issue, which the plurality characterized as an affirmative defense.

Congress responded to Price Waterhouse and a handful of other Supreme Court employment discrimination decisions with what eventually became the Civil Rights Act of 1991, which "expressly overruled the basic premise that an employer could avoid all liability under Title VII by establishing the absence of 'but for' causation." Costa v. Desert Palace, Inc., 299 F.3d 838, 850 (9th Cir. 2002) aff'd, 539 U.S. 90, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003).  Now, under Title VII, the use of a prohibited characteristic such as race, color, religion, sex, or national origin as simply "a motivating factor" in an employment action is unlawful. 42 U.S.C. § 2000e-2(a)(1).  However, Congress added one safety valve: an employer can escape damages and orders of reinstatement, hiring, promotion and the like – but not attorney's fees or declaratory or injunctive relief – by proving the absence of "but for" causation as an affirmative defense. Id. § 2000e-2(m).

Prior to Price Waterhouse, lower courts agreed that the FHA is violated even if only one of the factors that motivated the defendant was unlawful. Schwemm, supra note 3, at 10-22; Hanson v. Veterans Admin., 800 F.2d 1381, 1386 (5th Cir. 1986) (Title VIII is violated if race "was a consideration and played some role in the real estate transaction"); Jordan v. Dellway Villa, Ltd., 661 F.2d 588, 594 (6th Cir. 1981) (a plaintiff should recover if race "played a part" in his rejection of housing); Robinson v. 12 Lofts Realty, Inc., 610 F.2d 1032, 1042-43 (2d Cir. 1979) (Title VIII is violated if race "is even one of the motivating factors," and considerations of race must not "play any role in the decision to deny [the plaintiff's] application"); United States v. Pelzer Realty Co., Inc., 484 F.2d 438, 443 (5th Cir. 1973) (race need only be "one significant factor" that the defendant considered in order to find liability).

After Price Waterhouse, "defendants in housing discrimination cases [could] avoid liability where they could show that the illegitimate factor was only a partial reason for the denial of housing, so long as they could show that they would have made the same decision absent the illegitimate factor." Note, Cassandra A. Giles, Shaking Price Waterhouse: Suggestions for A More Workable Approach to Title VIII Mixed Motive Disparate Treatment Discrimination Claims, , 828 (2004)(citing Cato v. Jilek, 779 F. Supp. 937, 944 (N.D. Ill. 1991)) .

The Civil Rights Act of 1991 amended only Title VII, not Title VIII.  Therefore, those courts that have addressed the issue have held that the "undiluted Price Waterhouse standard continues to control in Title VIII 'mixed-motive' cases." Cato, 779 F. Supp. at 943 n. 19; see also H.U.D. v. Denton I, 1991 WL 442794 at *8 (H.U.D. A.L.J.)(a defendant "may avoid a finding of liability only by proving that it would have made the same decision even if it had not allowed [the forbidden factor] to play such a role.")(citing Price Waterhouse); H.U.D. v. Denton II, 1992 WL 406537, at *8 (H.U.D. A.L.J)(rejecting the argument that the Civil Rights Act of 1991 overruled Price Waterhouse as applicable to mixed motive Title VIII cases).

In Denton II, the Administrative Law Judge (ALJ) stated that, although Congress overruled the result of Price Waterhouse through the Civil Rights Act of 1991, that piece of legislation "did not address the Price Waterhouse Court's analysis for determining liability in a mixed motive case where the language of a statute proscribes conduct 'because of' certain unlawful factors." Denton II, at *8.  For that reason, the ALJ "conclude[d] that the causation analysis formulated in Price Waterhouse remains apt for Fair Housing Act cases" despite the Civil Rights Act of 1991. Id.  Thus, "although

Congress sought to remedy the perceived evils of <u>Price Waterhouse</u>, courts in applying Title VIII are still using this case to determine liability in mixed motive housing discrimination cases." Giles, 37 Ind. L. Rev. at 829.

Consistent with these post-Civil Rights Act of 1991 decisions, the Second Circuit has reaffirmed the rule that, in a FHA case, although the plaintiff need only prove that an impermissible factor played a role in the defendant's housing decision, the "defendant can prevail if it sustains its burden of proving its affirmative defense that it would have taken the adverse action on the basis of the permissible reason alone." <u>Cabrera</u>, 24 F.3d at 383 (2d Cir. 1994)(citing <u>Price Waterhouse</u>). The Second Circuit, by citing <u>Price Waterhouse</u> and not mentioning the Civil Rights Act of 1991, implied that the former survived the latter for purposes of FHA cases.

Therefore, in this Circuit, although a defendant in an FHA case can escape liability entirely if it proves it would have rendered the same decision had it not considered impermissible reasons, a defendant in a Title VII case can only reduce monetary damages and avoid certain injunctive relief based on liability if it makes the same showing. To be sure, this more defendant-friendly standard under the FHA cuts against the broad remedial interpretation typically accorded to the FHA, <u>Trafficante</u> 409 U.S. at 211, 93 S. Ct. 364, 34 L. Ed. 2d 415 (describe the language of the FHA as "broad and inclusive" and stating that the FHA effectuates a "policy that Congress considered to be of the highest priority") and the general rule that Title VII and the FHA be construed in a similar manner.

However, absent contrary authority from the Supreme Court or the Second Circuit, the Court is bound by <u>Cabrera</u>, and therefore the Garden City Defendants can

50

escape liability <u>if</u> they proved that they would have shifted from R-M to R-T zoning even if they had not considered impermissible reasons.

Turning to that precise issue, the Plaintiffs contend that "[t]he *only thing* R-T zoning accomplished . . . was to effectively eliminate the possibility of affordable housing." (Plf's Post-Trial Memo, at 32.)  The Garden City Defendants counter that the R-T zone met each of the goals of the Village better than did the R-M proposal.

As supported by the record, the Court previously recognized some of the justifications – namely, concerns about traffic and townhomes – for shifting from R-M to R-T zoning.  In that regard, the case at bar is not a "pretext" case, where it is assumed that a single reason motivated the adverse action and the issue is whether the unlawful consideration or legitimate consideration was actually the basis for the action.  Rather, as borne out by the record and despite language regarding "pretext" in this Court's summary judgment decision, the Court is presented with a "mixed motive" case.

Nevertheless, the Court considers the jurisprudence in "pretext" cases relevant to "mixed motive" cases inasmuch as the former sheds light on how much weight to place on legitimate justifications for adverse actions, even if those justifications are not entirely invalid.  Critically, those cases are relevant for the concept that "[t]iming alone may be sufficient to establish pretext." <u>Wentworth</u>, 493 F. Supp. 2d at 570; <u>see</u> <u>also</u> <u>O'Neal v. State University of New York</u>, No. 01 Civ. 7802 (DGT), 2006 WL 3246935, at *15 (E.D.N.Y. Nov.8, 2006) ("Temporal proximity between adverse actions and a plaintiff's complaint of discrimination can be sufficient to show pretext.") (citing <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 770 (2d Cir. 1998)); <u>Bouley v. Young-Sabourin</u>, 394 F. Supp. 2d 675, 678 (D. Vt. 2005) (the timing of the eviction and statements in the eviction

51

letter could lead a reasonable jury to conclude that the lease violation was a pretext and unlawful discrimination was the real reason for the eviction).

In this case, the Court notes that, while residents raised traffic concerns prior to increase in public opposition to affordable housing, the figures concerning traffic relied upon by the Garden City Defendants derive from the April 2004 presentation, given <u>after</u> the increase in public opposition against affordable housing and immediately before the change to R-T zoning.  Also, it is not clear that traffic under R-M zoning would be significantly worse than under R-Z zoning, if worse at all.

The Court also notes that there is no indication in the record that, prior to the increase in public opposition, Garden City desired to make townhouses available in their community.  The Court also observes that Garden City could have provided for townhouses more specifically in the R-M zoning.

Thus, although the Court finds that these otherwise legitimate concerns played a role in the Board's shift to from R-M zoning to R-T zoning, the Court finds that the Plaintiffs have established that discrimination played a determinative role.  In other words, the Court declines to hold that, based on these concerns, the Board would have shifted from R-M zoning to R-T zoning even if discrimination played no role.

Accordingly, because the Court finds that (1) the Plaintiffs have proved that discrimination played a significant factor in the Board's decision to enact R-T zoning instead of R-M zoning and (2) the Garden City Defendants failed to prove that they would have made the same decision absent discriminatory considerations, the Court finds that the Plaintiffs have established liability under § 3604(a) of the FHA based on a theory of disparate treatment.

v. <u>Disparate Impact</u>

The Court now turns to the Plaintiffs' FHA § 3604(a) claim brought under a theory of disparate impact.  The Supreme Court has not previously answered and has recently granted a writ of certiorari on the question: "Are disparate impact claims cognizable under the Fair Housing Act?" <u>Mt. Holly Gardens Citizens in Action, Inc. v. Township of Mount Holly</u>, 658 F.3d 375 (3d Cir. 2011), <u>cert.</u> <u>granted</u>, __ U.S. __, 133 S. Ct. 2824, __ L. Ed. 2d __ (2013). However, that case was ultimately settled before oral argument.

http://www.nytimes.com/2013/11/14/us/fair-housing-case-is-settled-before-it-reaches-supreme-court.html?_r=0 (last visited November 18, 2013)

All of the circuits, including the Second Circuit, have held that the statute affords the Plaintiffs the ability to prove FHA violations on the theory of disparate impact. <u>See</u> <u>e.g.</u> <u>Tsombanidis v. W. Haven Fire Dep't</u>, 352 F.3d 565, 574–75 (2d Cir. 2003) (internal quotations omitted).  Moreover, on February 15, 2013, the United States Department of Housing and Urban Development issued a final rule establishing that disparate impact claims are cognizable under the FHA. 78 Fed. Reg. 11460 (Feb. 15, 2013) (codified at 24 C.F.R. § 100.500 (2013)).

In establishing a *prima facie* case for such a claim, a "plaintiff must show: (1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." <u>Tsombanidis</u>, 352 F.3d at 574–75 (internal quotations omitted).  A claimant need not provide proof of discriminatory intent, but must demonstrate that "the challenged practice of the defendant 'actually or predictably results in racial discrimination; in other words that it has a discriminatory effect." <u>Huntington Branch, N.A.A.C.P.</u>, 844 F.2d at 934 (quoting <u>U.S. v. City of Black Jack, Missouri</u>, 508 F.2d 1179, 1184–85 (8th Cir. 1974), <u>cert.</u>

denied, 422 U.S. 1042, 95 S. Ct. 2656, 45 L. Ed. 2d 694 (1975)) (further noting that sometimes "[facially neutral] rules bear no relation to discrimination upon passage, but develop into powerful discriminatory mechanisms when applied").  "The discriminatory effect of a rule arises in two contexts: adverse impact on a particular minority group and harm to the community generally by the perpetuation of segregation." Huntington Branch, N.A.A.C.P., 844 F.2d at 937.

In establishing "discriminatory impact," the plaintiff must demonstrate a "'causal connection between [a] facially neutral policy . . . and the resultant proportion of minority' group members in the population at issue." Hack v. President & Fellows of Yale Coll., 237 F.3d 81, 90–91 (2d Cir. 2000) (quoting Brown v. Coach Stores, Inc., 163 F.3d 706, 712 (2d Cir. 1998)).

The Second Circuit has set forth two factors that weigh in this analysis; first, although discriminatory intent is not required to establish a *prima facie* case of disparate impact housing discrimination, "there can be little doubt that if[, as here,] evidence of such intent is presented, that evidence would weigh heavily on the plaintiff's side of the ultimate balance." Huntington Branch, N.A.A.C.P., 844 F.2d at 936.  Second, if the plaintiff is suing "only to require a governmental defendant to eliminate some obstacle to housing that the plaintiff itself will build," the government must provide a more substantial justification for its actions than would be the case if a plaintiff was suing to compel the government to construct housing. Id.

Once a plaintiff has presented a *prima facie* case of disparate impact, "the burden shifts to the defendant to 'prove that its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect.'" Tsombanidis, 352 F.3d at 575 (quoting Huntington Branch, N.A.A.C.P., 844 F.2d at 936).

vi. <u>As to the Plaintiffs' Theory of Disparate Impact</u>

As noted above, McCardle testified that minority households comprised 41.4% of very-low income renters in need of affordable housing, even though they comprised only 14.8% of all households in Nassau County. (Tr. at 146-48.)  Since the R-T zone largely eliminated the potential for the type of housing that minorities were disproportionally likely to need – namely, affordable rental units (Tr. at 149), the Court finds that minorities bore the brunt of the negative impacts of the R-T zone. <u>See</u> <u>Tsombanidis</u>, 352 F.3d at 575–76 (2d Cir. 2003) ("The basis for a successful disparate impact claim involves a comparison between two groups – those affected and those unaffected by the facially neutral policy.  This comparison must reveal that although neutral, the policy in question imposes a significantly adverse or disproportionate impact on a protected group of individuals. . . . Statistical evidence is also normally used in cases involving fair housing disparate impact claims.") (internal quotations omitted).

In particular, McArdle testified that, under the initial Fairhaven bid for 156 townhomes, between 1.9% and 3.8% of minority homebuyers in Nassau County could have afforded to purchase a home at the Site.  Expressed in absolute terms, minority households could afford only 3 to 6 of the 156 proposed townhouse units at the Fairhaven development.

Similarly, Speliotis calculated that any development on the Social Services Site would cost at least $500,000 per single-family unit to develop under R-T zoning (whether single-family townhome or single family detached home), without including any acquisition cost for the land. (Tr. at 1472-74.)  Accordingly, she concluded that "one could not build any measurable number of affordable housing units under that [R-T] Zoning." (Tr. at 1474-75; Joint Exh. 29, at 451.) Indeed, Speliotis wrote in 2004 and testified at the trial that the types of dwelling places "encouraged by the [R-T] zoning" were "luxury townhouses." (Tr. at 1479).

55

Conversely, Speliotis determined that it was possible to develop affordable housing under the rejected R-M controls.  (Tr. at 1466-67, 1490-91.)   In particular, Speliotis concluded that it would have been financially feasible to build 45 to 78 affordable housing units on the Social Services Site under the R-M controls – including up to approximately 78 Section 8 subsidized rental housing units – at the Site at a cost ranging from $30 million (the County's minimum bid price) to $56 million (the approximate final accepted bid amount.) (Tr. at 1496-97, 1505-06, 1512.)  Under these circumstances, Speliotis' estimated that under R-M development proposals for the Site, between 56 (18% of the households) and 101 (32% of the households) minority households would have been able to afford such housing.

Moreover, by blocking Section 8 Housing from being built on the Social Services Site, the Court finds that R-T zoning prevented the overwhelmingly African-American and Hispanic households on the Nassau County Section 8 waiting list from being able to live in Garden City. (Tr. at 157, 165-66, 182-83.).  Again, African-American and Hispanic households comprised 88% of the Section 8 rental housing waiting list in Nassau County, even though they comprised only 14.8% of the households in Nassau County.  Under MHANY's alternative proposals developed under the R-M zoning controls, up to 78 section 8 units could have been built (Plf's Exhs. 179, 406, 407.), and up to 69 minority families could have afforded to live there.

The Plaintiffs also established that the R-T zone's restriction on the development of multi-family housing perpetuates segregation generally because it decreases the availability of housing to minorities in a municipality where minorities constitute approximately only 4.1% of the overall population, according to the Census taken closest in time to the events in question, and only 2.6% of the population living in households. Huntington Branch, N.A.A.C.P., 844 F.2d 926, 928 (2d Cir. 1988)(the "overwhelmingly white suburb's zoning regulation" which resulted

in a disproportionate harm to African-Americans and segregative impact on the rest of the

municipality violated the Fair Housing Act); Vill of Arlington Heights, 558 F.2d 1283, 1286-87

(7th Cir. 1977) (failure to rezone perpetuates racial segregation); City of Black Jack, Missouri,

508 F.2d at 1186 (exclusion of multi-family housing perpetuates segregation).

McArdle's expert testimony also showed that, had the originally proposed R-M

zoning been adopted at the Site, the segregation in Garden City could have been alleviated.  The

four mixed-income housing proposals designed by MHANY for the Site would have likely been

occupied by 18% to 32% minority households. (Tr. at 156-57.)  Two of the four proposals

contained a significant number of Section 8 units. (Tr. 154-56.)   Finally, McArdle's testimony

showed that, under R-T zoning, the share of minority households who could have afforded to

buy homes in the proposed Fairhaven development was so low that the underlying racial

composition of the Village would not have changed. (Tr. at 169, 182.)  Notably, the Garden City

Defendants make no argument or comment in their post-trial memorandum as to whether the

shift from R-M to R-T perpetuates segregation in Garden City.

This set of facts is comparable to Huntington Branch, N.A.A.C.P., where the Second

Circuit found that a proposed but unrealized development "with [a] goal of 25% minorities"

would have desegregated a neighborhood that was 98% white. 844 F. 2d at 937.  There, the

Second Circuit held that the trial court erred by "fail[ing] to take the next logical step and find

that" the zoning ordinance in question perpetuated segregation. Id.

The Garden City Defendants contend that the Plaintiffs' disparate impact claims fails

because they have not challenged any facially neutral "policy" or "general practice."  However,

contrary to the Garden City Defendants' contention, the zoning law at issue here is not one

specific act similar to the denial of a variance of a particular parcel of property.  In that regard,

the Garden City Defendants' reliance on <u>Reg'l Econ. Cmty. Action Program, Inc. v. City of</u>

<u>Middletown</u>, 281 F.3d 333, 351 (2d Cir. 2002), <u>opinion corrected and superseded</u>, 294 F.3d 35

(2d Cir. 2002) is misplaced.  There, the Second Circuit held that a disparate impact claim fails if

"[n]o comparison of the act's disparate impact on different groups of people is possible." <u>Id.</u>

However, the Second Circuit specifically distinguished the facts in that case – namely, the denial

of a single-use permit – from a situation, such as here, involving the enactment of a generally

applicable zoning law.

The Garden City Defendants further assert that the decision to change from the P-Zone

which provided no housing opportunities to the R-T zone at the Social Site, in fact, increased the

housing for minorities in Garden City.  However, as set forth in the motion to dismiss order and

the summary judgment order, "the relevant inquiry here focuses on the housing opportunities

available under the rejected R–M designation versus the approved R–T designation," not P-Zone

versus R-T zone. 843 F. Supp. 2d at 330.  Framed in this manner, a finding of disparate impact

here would not, as the Garden City Defendants insist, impose a requirement in the FHA to

maximize minority density for every zoning decision.

The Garden City Defendants also fault the Plaintiffs for failing to conduct a proper

analysis of potential affordable housing under the R-T designation.  However, Speliotis credibly

testified that such an analysis would have been futile because it was not possible to build any

measurable number of affordable housing units under R-T zoning. (Tr. at 1474-76.)  While

Speliotis did not produce any documentary evidence of her initial analysis of R-T zoning, she

persuasively testified about the cost of a single-family townhome or a single family detached

home under R-T zoning.  Although not its burden to do so, Garden City could have called an

affordable housing expert to analyze the Social Services Site, its zoning, and the economics of building affordable housing there.

Taken together, the Court concludes that the Plaintiffs have established, by a preponderance of the evidence, that the rejection of the R–M zone in favor of the R–T zone significantly decreased the potential pool of minority residents likely to move into housing developed at the Social Services Site in proportion to the number of non-minorities affected and, therefore, the enactment of the R–T zone actually resulted in racial discrimination.

vii. <u>The Garden City Defendants' Burden</u>

As the Court finds that the Plaintiffs have established a *prima facie* case of disparate impact, the burden shifts to the Garden City Defendants to demonstrate that the rejection of the R–M zone for the R–T zone advanced a "legitimate, bona fide governmental interest . . . that no alternative would serve . . . with less discriminatory effect." <u>Tsombanidis</u>, 352 F.3d at 575.  In this regard, the Plaintiffs are not required to prove that Garden City's stated justifications were pretextual. <u>See</u> <u>Rivera v. Inc. Vill. of Farmingdale</u>, 784 F. Supp. 2d 133, 145 (E.D.N.Y. 2011). In addition, "[a]lthough the plaintiff is not required to prove discriminatory intent in order to show discriminatory effect, in balancing disparate impact against a governmental interest, evidence of such intent[, as in this case,] weighs heavily in the plaintiff's favor." <u>Oxford House, Inc. v. Town of Babylon</u>, 819 F. Supp. 1179, 1184 (E.D.N.Y. 1993)(citing <u>Huntington Branch N.A.A.C.P.</u>, 844 F.2d at 936).

For the reasons explained previously, the Court finds that the enactment of R-T zoning advanced certain legitimate, bona fide government interests – namely, reducing traffic and providing for the construction of townhomes.  However, the Court finds that the Garden City Defendants did not establish the absence of a less discriminatory alternative. <u>Batiste v. City of</u>

New Haven, 239 F. Supp. 2d 213, 224 (D. Conn. 2002)("The defendants offered little evidence to prove that there are no less discriminatory alternatives than building the Prince-Welch School at the Kossuth Street Site."); Sunrise Dev., Inc., 62 F. Supp. 2d at 776 ("the Town has not offered evidence to support a finding that no less discriminatory alternative to the Local Law would serve the Town's interest in complying with the Comprehensive Plan.").  Indeed, R-M zoning would have reduced traffic significantly as compared to the P-zone.  Further, the Court finds that R-M zoning could have provided for the construction of townhomes in addition to the substantial increase in minorities able to live in the R-M housing.

In sum, the Court concludes that Plaintiffs have established, by a preponderance of the evidence, the liability of the Garden City Defendants under § 3604(a) of the FHA by proving that the Village's acts had both an adverse impact on minorities and tended to perpetuate segregation, and that even though some of Garden City's offered justifications are bona fide and legitimate, less discriminatory alternatives to the current zoning ordinance existed.

2.   Other Federal Civil Rights Causes of Action

The Court also concludes that the Plaintiffs have established liability under 42 U.S.C. §§ 1981, 1983, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by proving that Garden City acted with discriminatory intent.  The Plaintiffs have also established the other statutory requirements; for example, there is no dispute that Garden City is a municipality covered by Section 1983.

With respect to the § 1983 cause of action, the Garden City Defendants suggest that the adoption of R-T zoning – that is, the enactment of a zoning ordinance – does not qualify as a "policy or custom" supporting a violation of that provision.  The Court disagrees.  It is well-settled that "municipalities may be sued directly under § 1983 for constitutional deprivations

inflicted upon private individuals pursuant to a governmental custom, policy, *ordinance*, regulation, or decision." Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983)(citing Monell v. Dep't of Soc. Servs., 436 U .S. 658, 690–91, 98 S. Ct. 2018 (1978))(emphasis added).

However, with respect to 42 U.S.C. § 1982, to state such a claim, a plaintiff must allege intentional deprivation of a property right because of race.  Perez v. de la Cruz, 09 CIV. 264 (JPO), 2013 WL 2641432, at *12 (S.D.N.Y. June 12, 2013).  Here, the Court finds that, as a matter of law, the Plaintiffs fail to identify a cognizable property interest in as yet-built or planned affordable housing.  Accordingly, the Court dismisses the Plaintiffs § 1982 cause of action.

## IV.   REMEDIES

Having found that the Garden City Defendants are liable under the FHA, 42 U.S.C. §§ 1981 and 1983, and the Equal Protection Clause of the Fourteenth Amendment, the Court is now required to determine a remedy for those violations through the imposition of appropriate injunctive relief.

The FHA expressly authorizes courts to award injunctive relief:

> if the court finds that a discriminatory housing practice has occurred . . . the court may . . . grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).

42 U.S.C. § 3613(c)(1).  "The Court must craft injunctive relief with a view toward the statute's goals of preventing future violations and removing lingering effects of past discrimination.  The scope of the injunction is to be determined by the nature and extent of the legal violation." United States v. Space Hunters, Inc., 2004 WL 2674608, at * 8 (S.D.N.Y. Nov. 23, 2004) (citing Rogers v. 66–36 Yellowstone Blvd. Coop. Owners, Inc., 599 F. Supp. 79, 83 (E.D.N.Y. 1984)).

"[T]he two most common forms of injunctive relief requested under the FHA seek either to prohibit the offending party from engaging in future acts of housing discrimination or to impose upon that party certain affirmative duties to atone for past discrimination and prevent recurrence of such acts." Ueno v. Napolitano, 2007 WL 1395517, at * 6 (E.D.N.Y. May 11, 2007).  In determining whether or not to grant a request for injunctive relief, "[t]he critical question . . . is whether a sufficiently flagrant violation of the plaintiffs' civil rights – the guidepost for granting FHA injunctive relief – has occurred." Id. at * 4.

In the Court's view, at a minimum, prohibitive injunctive relief enjoining future FHA violations is appropriate.  Rogers, 599 F. Supp. at 85-86 (approving prohibitive relief, i.e. ., forbidding a defendant from disobeying the law, and requiring "defendants to take definite steps via education and advertising towards sustained lawful conduct").  Indeed, the Court anticipates that the Garden City Defendants may be willing to consent to this relief. See United States v. Hylton, 3:11-CV-1543 (JCH), 2013 WL 3927858, at *6 (D. Conn. July 26, 2013)(noting the federal government's acceptance of a general injunction prohibiting it from violating the FHA in the future).

However, because such an injunction merely prohibits what is already prohibited, further relief, perhaps in the form of affirmative relief, appears appropriate.  Analogizing to affirmative equitable relief ordered for Title VII violations, courts have looked to traditional principles of equity for guidance. See Park View Heights Corp., 605 F.2d 1033 (directing the district court to take affirmative steps in its efforts to bring low-income housing to the City of Black Jack, but also suggesting that the court meet with the parties to ensure that the relief not be more intrusive on governmental functions than is necessary to achieve the goals of the FHA); see also United States v. City of Parma, Ohio, 661 F.2d 562, 577 (6th Cir. 1981)("The requirements that the City

take whatever action may be necessary to permit construction of public housing, adopt a plan to utilize an existing section 8 program and take required steps for submitting an acceptable application for CDBG funds are reasonable."); Metropolitan Housing Development Corp. v. Village of Arlington Heights, 616 F.2d 1006, 1015 (7th Cir. 1980) (affirming the district court's approval of a consent decree ordering site-specific relief).

In Huntington Branch, N.A.A.C.P., 844 F.2d at 942, the Second Circuit directed the district court to order the Town (1) to rezone the Plaintiff's parcel of land and (2) to strike the challenged portion of its zoning ordinance.  In determining the appropriate relief, the Second Circuit pointed to the protracted nature of the litigation and the Town's proven track record of stalling efforts to build low-income housing.  Certainly, the present case reflects another example of protracted litigation and, if not a history of opposition to affordable housing in Garden City, certainly a lack of affordable housing in Garden City.  For that reason, a directive requiring Garden City to join the Nassau Urban Consortium appears eminently reasonable as a starting point. See Smith v. Town of Clarkton, 682 F.2d 1055, 1065 (4th Cir. 1982)(ordering the Defendant found liable under the FHA to rejoin a regional housing cooperative).

That said, the Court is cognizant of the general reluctance of the judiciary to impose affirmative relief.  "If the court orders a FHA defendant to provide affirmative relief, such as to pass policies or rules, build housing or take other affirmative steps toward non-discriminatory housing, then such mandates require serious justification," Robinson v. Parkshore Co-op., 01 C 2103, 2002 WL 1400322, at *4 (N.D. Ill. June 27, 2002), because it is a "massive judicial intrusion on private autonomy." Vill. of Arlington Heights, 558 F.2d at 1293.  Indeed, there is no constitutional or statutory right for individual citizens to have housing comply with a particular standard, nor is there a concomitant duty on the part of political entities to provide housing.

Lindsey v. Normet, 405 U.S. 56, 92 S. Ct. 862, 31 L. Ed. 2d 36 (1972).  However, "[a]t the same time, municipalities cannot frustrate the underlying policy of providing fair housing within their communities." Macone v. Town of Wakefield, 277 F.3d 1, 8 (1st Cir. 2002)

In light of these principles, the Court requires further input from the parties on the appropriate remedies in this case.  Thus, within thirty days of the date of this order, the Court directs the Plaintiffs to submit a proposed remedial plan to be incorporated in the final judgment in this case.  The Garden City Defendants shall then have thirty days to respond with objections, including an alternative remedial plan.  In this regard, "[t]he [C]ourt encourages the parties to work cooperatively[, where possible] in formulating a remedial plan so that as many potential objections as possible can be resolved before the plan is submitted to the [C]ourt for consideration and approval." Inclusive Communities Project, Inc. v. Texas Dep't of Hous. & Cmty. Affairs, 860 F. Supp. 2d 312, 332 (N.D. Tex. 2012).

## V.  CONCLUSION

For the foregoing reasons, the Court find that the Plaintiffs have not established liability on the part of the Garden City Defendants under 42 U.S.C. § 1982 and the amended complaint is dismissed as to that cause of action.

However, the Court finds that the Plaintiffs have established by, a preponderance of the evidence, the liability on the part of the Garden City Defendants under (1) the FHA, 42 U.S.C. § 3601 et seq., based on a theory of disparate treatment and disparate impact; (2) 42 U.S.C. § 1981; (3) 42 U.S.C. § 1983; and (4) the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

As noted above, the Court finds that the Garden City Defendants acted with discriminatory intent when they eliminated R-M zoning and endorsed R-T zoning after they

received public opposition to the prospect of affordable housing in Garden City.  The Court notes that R-T zoning banned the development of multi-family housing on all but a small portion of the Social Services site --  the 3.03 acres located on the western side of County Seat Drive – and then only by special permit.  The Court also notes the negative remarks by Garden City residents at public hearings and the flyer against multi-family housing on the Social Services Site.  Set against the underlying sequence of events and the considerable impact that this zoning decision would have had on minorities in that community, the Court concludes that some of the expressions by Garden City residents of disapproval for affordable housing reflected race-based animus or at least could have been construed as such by the Board.

Furthermore, the Court finds that the adoption of R-T zoning instead of R-M zoning had a disparate impact on minorities in Garden City and tended to perpetuate segregation in that community.

Accordingly, the Court directs the Plaintiffs to submit a proposed remedial plan to be incorporated in the final judgment in this case – within thirty days of the date of this order.  The Garden City Defendants shall then have thirty days to respond with objections.  The Plaintiffs shall then have 15 days to reply to the Garden City Defendants' objections.

**SO ORDERED.**
Dated: Central Islip, New York
December 6, 2013

                   *Arthur D Spatt*
                  ARTHUR D. SPATT
            United States District Judge