**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
MHANY MANAGEMENT, INC.,

                          Plaintiff,                  **MEMORANDUM OF**
                                                **DECISION & ORDER**
           -and-                          05-cv-2301 (ADS)(ARL)

NEW YORK COMMUNITIES FOR CHANGE,
INC.,

                        Intervenor-Plaintiff,

           -against-

COUNTY OF NASSAU, INCORPORATED
VILLAGE OF GARDEN CITY, and GARDEN
CITY BOARD OF TRUSTEES,

                        Defendants.
----------------------------------------------------------X

<u>**APPEARANCES:**</u>

**Hogan Lovells LLP**
*Co-Counsel for the Plaintiffs*
875 Third Ave
New York, NY 10022
        By:    Stanley J. Brown, Esq.
                 Ira M. Feinberg, Esq.,
                 Chava Brandriss, Esq.,
                 Benjamin A. Fleming, Esq., Of Counsel

**Law Offices of Frederick K. Brewington**
*Co-Counsel for the Plaintiffs*
556 Peninsula Boulevard
Hempstead, NY 11550
        By:    Frederick K. Brewington, Esq., Of Counsel

**Lawyers' Committee for Civil Rights Under Law**
*Co-Counsel for the Plaintiffs*
1401 New York Avenue, NW
Suite 400
Washington, DC 20005
        By:    Joseph D. Rich, Esq.,
                 Thomas Silverstein, Esq., Of Counsel

**Cullen and Dykman, LLP**
*Attorneys for the Defendants Incorporated Village Of Garden City, And Garden City Board Of Trustees*
100 Quentin Roosevelt Blvd.
Garden City, NY 11530
      By:    Douglas J. Bohn, Esq.,
             James G. Ryan, Esq.,
             Jennifer A. McLaughlin, Esq., Of Counsel

**Nassau County Attorney's Office**
*Corporation Counsel for the Defendant County of Nassau*
One West Street
Mineola, NY 11501
      By:    Ralph J. Reissman, Esq., Of Counsel

**SPATT, District Judge**:

This housing discrimination action has long been before this Court. After an eleven-day bench trial held in June and July of 2013, this Court found that the Defendants—the Incorporated Village of Garden City and the Garden City Board of Trustees (collectively, "Garden City" or the "Village")—were liable under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* (the "FHA") based on disparate impact and disparate treatment; 42 U.S.C. § 1981; 42 U.S.C. §1983; and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, based on the Village's decision to change the zoning in a certain area of Garden City.

After the Court's final entry of judgment, the parties cross-appealed—the Plaintiffs appealed this Court's grant, before trial, of summary judgment dismissing the claims against the Defendant County of Nassau (the "County"); and Garden City appealed from the Court's post-trial findings. The Second Circuit affirmed the majority of the Court's conclusions, but remanded the case on two points, one of which is addressed in this opinion.

The Second Circuit held that the Court applied an incorrect standard in addressing the Plaintiff's FHA disparate impact claims. The Circuit Court remanded with instructions that this

Court determine whether the Plaintiffs MHANY Management, Inc. and New York Communities For Change, Inc. (collectively, the "Plaintiffs") proved at trial that the "substantial, legitimate, non-discriminatory interests" proffered by Garden City in support of its zoning shift "could be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c)(3).

The Circuit Court also vacated this Court's grant of summary judgment to the County on the Plaintiffs' "steering" claims under Section 804(a) of the FHA and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VII"), and remanded for reconsideration of those claims. Those claims are not addressed in this opinion, because unlike the disparate impact claims, the parties have agreed that further discovery is required.

For the reasons that follow, the Court finds that the Plaintiffs met their burden at trial in demonstrating, by a preponderance of the evidence, that Garden City's proffered reasons for its chosen zoning change could have been met by another practice that had a less discriminatory effect.

## I. BACKGROUND

### A. Factual Background

The facts of this case are well-known to the parties and the Court. The Court's post-trial memorandum of decision and order, *MHANY Mgmt. Inc. v. Inc. Vill. of Garden City*, 985 F. Supp. 2d 390, 396 (E.D.N.Y. 2013) (ECF No. 413), as well as the Second Circuit's decision, *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581 (2d Cir. 2016), comprehensively state the facts. Therefore, the Court will not engage once again in a complete factual recitation. However, the Court briefly summarizes the facts that are relevant to this opinion.

At issue is the decision by Garden City to rezone a parcel of land, the "Social Services Site," that was previously occupied by numerous governmental offices. The Social Services Site

was previously zoned for Public Use ("P") and was part of an area known as the "P zone." The planning firm hired by Garden City to propose a new zoning plan, Buckhurst Fish and Jacquemart ("BFJ"), recommended a "CO-5(b)" zone with multi-family residential group ("R-M") restrictions. In effect, the firm recommended R-M zoning controls. The R-M zoning would have allowed for the construction of up to 311 residential units, including the development of multi-family housing such as apartment buildings. After many residents complained to public officials on several occasions about the effect of high rise buildings on traffic and schools, Garden City relented and rezoned the Social Services Site "Residential-Townhouse" ("R-T"), which was an entirely new zoning classification. Townhouses were defined as single family dwelling units, and the development of multi-family dwellings was limited to less than 15% of the Social Services Site.

The Plaintiffs complained that the R-T zoning would not allow for any affordable multi-family housing. Nevertheless, MHANY, which was then known as New York Acorn Housing Company ("NYAHC"), submitted a bid to build a non-conforming multi-family development on the Social Services Site, "in protest." The County awarded the development contract to a developer of single-family homes. The winning bid, for $56.5 million, proposed to build 87 single-family detached homes on the site. Notably, the proposal did not include any townhouses.

After the contract was awarded to another development company, NYAHC prepared four proposals under the R-M zoning control. NYAHC would have been able to pay $56.1 million for a proposal that would have included affordable housing and it is estimated that 18% of the units would have been occupied by minorities.

**B. Relevant Procedural History**

**1. The Court's Post-Trial Decision**

On June 3, 2013, the Court concluded an eleven day bench trial, and issued its findings of fact and conclusions of law on December 6, 2013. As stated above, among other issues of liability, the Court found that the Village was liable under the FHA based on disparate impact.

In its decision, the Court employed the burden-shifting analysis outlined in the Second Circuit's decision in *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003). Under that standard, a plaintiff is required to prove a *prima facie* case of disparate impact by showing "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Id.* (quoting *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 52–53 (2d Cir. 2002)). If a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "prove that its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect." *Id.* (quoting *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 936 (2d Cir. 1988)).

The Court found that the Plaintiffs met their *prima facie* burden; that Garden City identified several legitimate non-discriminatory interests—namely, eliminating office use; reducing traffic; facilitating the development of townhouses; and controlling overcrowding in public schools; and that Garden City failed to meet its burden in demonstrating "the absence of a less discriminatory alternative." *MHANY Mgmt.*, 985 F. Supp. 2d at 427–28. To that end, the Court found that R-M zoning was a less discriminatory alternative that would have reduced traffic and provided for the construction of townhouses.

The Court entered its final judgment on April 22, 2014. Garden City filed its appeal on May 5, 2014.

## 2. The Second Circuit's Decision

On March 23, 2016, the Second Circuit issued its decision. On the issue of disparate impact, the Second Circuit held that this Court employed the incorrect burden-shifting standard. Instead of employing the *Huntington Branch* standard, the Circuit stated that the Court should have utilized the standard announced by the Secretary of Housing and Urban Development ("HUD") in 2013, *see* Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11,460 (Feb. 15, 2013) (codified at 24 C.F.R. § 100.500), because that standard abrogated the Second Circuit precedent. *See Mhany Mgmt.*, 819 F.3d at 618–20 (citing, *inter alia*, *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984) (holding that where Congress is silent on the question at issue, courts must defer to an agency's reasonable interpretation of a statute)). The Circuit court found that the statute was ambiguous on the relative burdens of the parties, and therefore HUD's interpretation was entitled to deference. *Id.* at 619.

Under HUD's framework, the first two steps of the burden-shifting analysis are "substantially the same as in our case law . . . ." *Id.* at 617. At the first step, the plaintiff must present a *prima facie* case of disparate impact. The burden then shifts to the defendant to demonstrate that the "challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant." 24 C.F.R. § 100.500(c)(1)–(2). Of importance, at the third step, unlike in *Huntington Branch*, the burden shifts back to the plaintiff to prove that the defendant's "substantial, legitimate, nondiscriminatory

interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.* at § 100.500(c)(3).

The Circuit court held that the "[P]laintiffs more than established a *prima facie* case[,] . . . [and the] Defendants identified legitimate, bona fide governmental interests, such as increased traffic and strain on public schools." *Mhany*, 819 F.3d at 620. However, the Court remanded the case "for consideration of whether [the] Plaintiffs satisfied their burden of proving an available alternative practice that has less disparate impact and serves [the] Defendants' legitimate, nondiscriminatory interests." *Id.* at 619.

## II. DISCUSSION

### A. As to Which Issues Are Before This Court

#### 1. As to the Plaintiffs' *Prima Facie* Case

Garden City contends that "this Court must [] re-examine the Plaintiff's *prima facie* disparate impact case under 24 C.F.R. [§] 100.500(c)(1) as well as [] (c)(3)." (Defs.' Mem. of Law in Opp'n to Pls.' Suppl. Post-Trial Memorandum of Law ("Defs.' Mem of Law") (ECF No. 514) at 10). However, the Plaintiffs argue that the issue is not before the Court on remand. The Court finds that is unable to re-examine the Plaintiffs' *prima facie* case because the Second Circuit explicitly affirmed this Court's finding that the Plaintiffs met their *prima facie* burden, and the law of the case prevents the Court from relitigating the issue.

The law of the case doctrine has two parts. The first, applicable here, is the mandate rule. "The mandate rule 'compels compliance on remand with the dictates of the superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court.'" *United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001) (quoting *United States v. Bell,* 5 F.3d 64, 66 (4th Cir. 1993) (alterations omitted)). "[T]o determine whether an issue remains open for

reconsideration on remand, the trial court should look to both the specific dictates of the remand order as well as the broader 'spirit of the mandate." *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 671 F.3d 261, 270 (2d Cir. 2012) (internal citations and quotation marks omitted).

Here, the Second Circuit explicitly stated that it "agree[d] with the district court's assessment that plaintiffs more than established a *prima facie* case[,] . . . [and] that Defendants identified legitimate, bona fide governmental interests, such as increased traffic and strain on public schools. But . . . we remand for consideration of whether Plaintiffs met their burden under § 100.500(c)(3)." *Mhany*, 819 F.3d at 620. In its conclusion, the Second Circuit reiterated that on remand the Court was to consider "whether [P]laintiffs have met their burden of proving that the 'substantial[,] legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect.'" *Id.* at 624–25 (quoting 20 C.F.R. § 100.500(c)(3)).

The Court also disagrees with Garden City's contention that this Court must reevaluate the Plaintiffs' *prima facie* case in light of the Supreme Court's decision in *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.,* —— U.S. ——, 135 S. Ct. 2507, 2518, 192 L. Ed. 2d 514 (2015). The Second Circuit was aware of *Inclusive Communities*, as it had been decided before the Second Circuit issued its decision, and the Circuit court cited to *Inclusive Communities* in its decision. The Second Circuit also requested additional briefings from the parties on the issues raised in *Inclusive Communities*, but nevertheless found that the Plaintiffs more than established a *prima facie* case, and remanded for this Court to consider solely whether the Plaintiffs met their burden under 24 C.F.R. §100.500(c)(3).

Therefore, because this Court is confined to the issues remanded by the Second Circuit and is obliged to follow that Court's rulings on issues explicitly decided, the Court cannot reexamine the Plaintiffs' *prima facie* case.

### 2. As to the Defendants' Substantial, Legitimate, Nondiscriminatory Interests

The Second Circuit found that Garden City met its burden at step two. Therefore, the Court need not reengage in an analysis of whether the Village met its burden at step two. Specifically, the Circuit court said that the "Defendants identified legitimate, bona fide governmental interests, such as increased traffic and strain on public schools." *Mhany*, 819 F.3d at 620. As the Village only needed to show that "that the challenged practice is necessary to achieve *one or more* substantial, legitimate, nondiscriminatory interests," 24 C.F.R. §100.500(c)(2) (emphasis added), it has more than met its burden.

The Second Circuit remanded the case solely for the Court to consider whether the Plaintiffs met their burden at step three. Therefore, the Court will follow the mandate of the appellate court, and will not reexamine whether Garden City met its burden at step two.

### B. As to Whether the Plaintiffs Met Their Burden Under 24 C.F.R. § 100.500(c)(3) at Trial

Garden City initially contends that the Plaintiffs did not prove that R-M zoning is a less discriminatory alternative. Furthermore, Garden City contends that the R-M zoning controls would not have met the Village's interests in controlling traffic; minimizing school overcrowding; developing townhouses; maintaining the character of the area; and creating a transition zone. The Village bases these arguments on its interpretation of the HUD standard, which it asks this Court to follow. The Village states that the HUD standard requires the Plaintiffs to prove that the R-M zoning would serve the Village's "legitimate interests to at least the same or a greater degree." (Defs.' Mem. of Law at 5). In opposition, the Plaintiffs argue that only two of the Village's

interests were validated by the Second Circuit's decision; namely, controlling overcrowding in schools, and decreasing traffic. The Plaintiffs vociferously dispute the Village's position that the less discriminatory alternative must be equally effective; instead, they contend that they must prove that the Village's interests "could be served" by the less discriminatory alternative, and would "effectively address [the Village's] concerns." 78 Fed. Reg. 11,460, 11,473. To that end, the Plaintiffs state that they met their burden at trial as to *each* of the Village's proffered interests. The Court finds that the Plaintiffs have met their burden in showing that R-M zoning would have served the Defendants' interests in not overburdening public schools, and reducing traffic—which were the only two of the Defendants' interests which survived the Second Circuit's decision. *See infra* Section B.2.

### 1. As to Whether R-M Zoning Controls Would Have A Less Discriminatory Effect Than R-T Zoning Controls

This Court previously held that R-M zoning would have provided for a significantly larger percentage of minority households than the pool of potential renters in the R-T zoning. As the Court said in its post-trial decision, "[i]n this regard, the Plaintiffs established that the change from the proposed R–M zoning to the adopted R–T zoning affected minority residents to a greater degree." *MHANY Mgmt.*, 985 F. Supp. 2d at 415; *see also id.* at 425 ("Since the R–T zone largely eliminated the potential for the type of housing that minorities were disproportionally likely to need—namely, affordable rental units, the Court finds that minorities bore the brunt of the negative impacts of the R–T zone." (internal citations to the record omitted)).

In this regard, the Court referenced testimony by Ismene Speliotis ("Speliotis"), the Executive Director of NYAHC/MHANY, who testified that "one could not build any measurable number of affordable housing units under that [R-T] zoning[,]" (Tr. at 1474–75; Joint Ex. 29, at 451), while it would have been financially feasible to build 45 to 78 affordable housing units under

the R-M controls.  The Court accepted the Speliotis testimony as credible, including her statement

that minority households would have been able to afford the affordable housing units.  Further, the

Court stated:

> by blocking Section 8 Housing from being built on the Social Services Site, the
> Court finds that R–T zoning prevented the overwhelmingly African–American and
> Hispanic households on the Nassau County Section 8 waiting list from being able
> to live in Garden City.   Again, African–American and Hispanic households
> comprised 88% of the Section 8 rental housing waiting list in Nassau County, even
> though they comprised only 14.8% of the households in Nassau County.  Under
> MHANY's alternative proposals developed under the R–M zoning controls, up to
> 78 section 8 units could have been built, and up to 69 minority families could have
> afforded to live there.

*MHANY Mgmt.*, 985 F. Supp. 2d at 426.

The Court therefore found that the R-M zoning would create more affordable housing units

available to minorities than the R-T zoning.  The Court finds no reason to depart from its previous

findings, and accordingly holds that R-M zoning controls would have a less discriminatory effect

than R-T zoning controls.  The Court now turns to whether R-M zoning controls would serve

Garden City's legitimate, substantial, non-discriminatory interests.

### 2.  As to Which Interests This Court May Consider

Garden City argues that this Court must evaluate whether the Plaintiffs met their burden as

to each of the interests advanced by the Village.  The Village bases this contention on the Second

Circuit's statement that the "Defendants identified legitimate, bona fide governmental interests,

such as increased traffic and strain on public schools."  *Mhany*, 819 F.3d at 620.  The Village

interprets this to mean that "[t]he Second Circuit's use of the term 'such as' clearly implies that all

of the Village's concerns were legitimate." (Defs.' Mem. of Law at 14).  The Village further states

that even if this Court implicitly rejected several of its interests in its post-trial decision, the Court

must now reevaluate each of the interests.  The Court finds that the Second Circuit either explicitly

or implicitly indicated that the Village's interests related to transition, townhouses, and character were either not actual interests, or were not legitimate, substantial, or non-discriminatory interests.

While this Court found that Garden City's interest in creating townhouses was substantial and legitimate, and that R-T zoning was necessary for their creation, *MHANY Mgmt.*, 985 F. Supp. 2d at 419, the Second Circuit disagreed. As to the development of townhouses, the Court said:

> there is minimal evidence in the record that Garden City had any real interest in adding townhouses as a residential form prior to the rise in public opposition to R–M zoning. . . . R–T zoning was not actually necessary to further this goal, nor did it actually accomplish it. Fish and Filippon both testified that townhouses would have been permissible as a residential form even under R–M zoning. Similarly, R–T zoning did not actually "promote" townhouses, as Fairhaven, the winning bidder for the Social Services Site, planned to develop single-family homes.

*Id.* at 614. Therefore, the Second Circuit explicitly held that building townhouses was not a legitimate interest of Garden City, and that R-T zoning was not necessary to achieve it. Although the Plaintiffs engage in an analysis of the Village's interest in townhouses, this Court finds that such an analysis is unnecessary because of the Second Circuit's holding. Accordingly, this Court cannot consider the Village's interest in creating townhouses.

Similarly, the Circuit court found that R-T zoning was not necessary to achieve a transition zone, and that Garden City's actions showed that it was not a legitimate interest. Specifically, the Circuit court said, "[t]he same logic also undermines Garden City's purported interest in using R–T as a transition zone between single-family homes and the commercial district abutting the Social Services Site. Multi-family housing would have provided a similar transition and the ultimate selection of Fairhaven meant no transition at all." *Id.* That is, R-T zoning was not necessary to create a transition zone because R-M also accomplished it, and Garden City cannot now state that it had an interest in transition if its eventual plan did not include transition. Therefore, the Court cannot consider Garden City's interest in creating a transition zone at step three.

Finally, the Court reads the Second Circuit's opinion to hold that maintaining the character of a neighborhood is not a substantial, legitimate, nondiscriminatory interest, because the Second Circuit implicitly found that it was a discriminatory interest in this instance. The Circuit court stated that the "comments of Garden City residents employ recognized code words about low-income, minority housing," *Mhany*, 819 F.3d at 609, and specifically referenced the residents' use of the word "character," *id.* at 609 n.5 ("Indeed, *Yonkers I* implicitly recognized the relevance of code words in the context of legislators acting responsively to citizen animus by specifically invoking residents' use of words like "character." (citing *United States v. Yonkers Bd. of Educ.* ("*Yonkers I*"), 837 F.2d 1181, 1192 (2d Cir. 1987)); *see also id.* at 611 ("[E]mploying the code words apparently employed by Garden City residents, Trustee Negri testified that housing occupied by low-income minorities is not consistent with the '*character*' of Garden City. . . . [T]he district court was entitled to conclude, based on the *Arlington Heights* factors, that something was amiss here, and that Garden City's abrupt shift in zoning in the face of vocal citizen opposition to *changing the character* of Garden City represented acquiescence to race-based animus." (emphasis added, internal citation omitted)). Therefore, because the Second Circuit found that Garden City's interest in maintaining the character of a neighborhood was a veil for race-based animus, it is necessarily not a substantial, legitimate, nondiscriminatory interest and this Court is foreclosed from considering it.

As stated earlier, "to determine whether an issue remains open for reconsideration on remand, the trial court should look to both the specific dictates of the remand order as well as the broader 'spirit of the mandate." *Parmalat Capital Fin.*, 671 F.3d at 270 (internal citations and quotation marks omitted). Although the Second Circuit did not clearly analyze the Village's interest in maintaining the character of the neighborhood in the portion of its decision discussing

the Village's substantial, legitimate, non-discriminatory interests, the appellate court's decision nevertheless compels the conclusion that the proffered character interest does not meet that standard. It is clear that the spirit of the Second Circuit's mandate is for this Court to exclude from its consideration the proffered interest in maintaining the character of the neighborhood.

It is also irrelevant that the Second Circuit's analysis of the above interests was conducted in its evaluation of this Court's mixed motive analysis of the Plaintiffs' disparate treatment claims. The Court can only consider interests advanced by the Defendants that are substantial, legitimate, and non-discriminatory. Those interests "must be supported by evidence and may not be hypothetical or speculative." 20 C.F.R. § 100.500(b)(2). The Second Circuit held that the above interests did not meet those standards, and it is immaterial that it did so while separate and apart from its analysis of the Plaintiffs' disparate impact claims.

Accordingly, the Court will only consider the Village's interests in minimizing traffic and school overcrowding in determining whether the Plaintiffs met their burden at the third step of the burden shifting analysis, codified at 20 C.F.R. § 100.500(c)(3).

### 3. As to Whether the Less Discriminatory Alternative Must be "Equally Effective" in Meeting the Defendants' Interests as the Challenged Practice

The Defendants ask this Court to analyze whether R-M zoning would have been as equally effective as R-T zoning in serving the Village's interests. In opposition, the Plaintiffs urge this Court to follow the language of the statute and evaluate whether R-M zoning would have served the Village's interests. The Court finds that it must follow the clear language of the statute and HUD's interpretation.

In determining the Plaintiffs' burden at step three, the Court first looks to the plain language of the statute. It states that:

> If the respondent or defendant satisfies the burden of proof set forth in paragraph (c)(2) of this section, the charging party or plaintiff may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect.

24 C.F.R. § 100.500(c)(3). The operative term in the statute, for the purposes of the current analysis is "could be served."

The Court also looks to HUD's interpretation and implementation of the FHA discriminatory effects standard. *See* Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11,460. In its implementation statement, HUD expressly rejected the standard which Garden City asks this Court to apply. HUD stated that:

> HUD does not believe the rule's language needs to be further revised to state that the less discriminatory alternative must be "equally effective," or "at least as effective," in serving the respondent's or defendant's interests; the current language already states that the less discriminatory alternative must serve the respondent's or defendant's interests, and the current language is consistent with the Joint Policy Statement, with Congress's codification of the disparate impact standard in the employment context, [citing 42 U.S.C. 2000e-2(k)(1)(A)(i) ("the concept of 'alternative employment practice'" under Title VII "shall be in accordance with the law as it existed on June 4, 1989"); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 95 S. Ct. 2362, 45 L. Ed. 2d 280 (1975) ("[I]t remains open to the complaining party to show that other tests or selection devises, without a similarly undesirable racial effect, would also serve the employer's legitimate interest.")], and with judicial interpretations of the Fair Housing Act. [citing *Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.*, 417 F.3d 898, 906 (8th Cir. 2005) ("plaintiffs must offer a viable alternative that satisfies the Housing Authority's legitimate policy objectives while reducing the [challenged practice's] discriminatory impact"); *Huntington Branch*, 844 F.2d at 939 (analyzing whether the "[t]own's goal . . . can be achieved by less discriminatory means"); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 159 (3d Cir. 1977); (it must be analyzed whether an alternative "could be adopted that would enable [the defendant's] interest to be served with less discriminatory impact.")]. The additional modifier "equally effective," borrowed from the superseded *Wards Cove* case, is even less appropriate in the housing context than in the employment area in light of the wider range and variety of practices covered by the Act that are not readily quantifiable. For a similar reason, HUD does not adopt the suggestion that the less discriminatory alternative proffered by the charging party or plaintiff must be accepted unless it creates an "undue hardship" on the respondent or defendant. The "undue hardship" standard,

which is borrowed from the reasonable accommodation doctrine in disability law, would place too heavy a burden on the respondent or defendant.

*Id.* at 11,473. HUD's interpretation could not be clearer that a plaintiff's burden under 24 C.F.R. §100.500(c)(3) is not to show that the less discriminatory practice would be equally effective, but merely that it must serve a defendant's legitimate interests. *See Prop. Cas. Insurers Ass'n of Am. v. Donovan*, 66 F. Supp. 3d 1018, 1052 (N.D. Ill. 2014) ("[I]n *Wards Cove,* the Supreme Court held that any alternative practice the plaintiff offered in the third step must be 'equally effective' as the challenged practice. HUD, on the other hand, has determined that an 'equally effective' standard is inappropriate."). While HUD's interpretation says that the less discriminatory alternative "must serve" a defendant's interests, it is clear that this is guidance on the level of certainty, or the level of proof, that a plaintiff must show. That is, as HUD also stated in its Rules and Regulations, "a less discriminatory alternative must serve the respondent's or defendant's substantial, legitimate nondiscriminatory interests, must be supported by evidence, and may not be hypothetical or speculative." 78 Fed. Reg. at 11,473. As explicitly stated in HUD's interpretation, this does not mean that the less discriminatory alternative must be equally effective in serving the defendant's interests.

As stated in the quoted language above, HUD clarified that the language of the statute was consistent with the Joint Policy Statement on Discrimination in Lending (the "Joint Policy"), 59 Fed. Reg. 18,266. The Joint Policy similarly states that "if a policy or practice that has a disparate impact on a prohibited basis can be justified by business necessity, it still may be found to be discriminatory if an alternative policy or practice could serve the same purpose with less discriminatory effect." *Id.* at 18,269. Surprisingly, the Village states that "[t]his is the only instance where HUD . . . can garner support for [its] interpretive argument of Section 100.500(c)(3)." (Defs.' Mem. of Law at 7). By that statement, it appears that Garden City asks

this Court to disregard the agency interpretation of the statute. That is, the Village asks this Court to find that the Plaintiffs must prove that R-M zoning would have been equally effective in meeting the Village's interests as R-T zoning, despite HUD's statement that such a standard is inappropriate in a housing discrimination case. The Court declines to do so. The Second Circuit explicitly stated that, on the issue of disparate impact under the FHA, "[b]ecause we did not hold that the statute was unambiguous, we are obliged to defer to the more recent HUD regulations." *Mhany Mgmt.*, 819 F.3d at 619 (citing *Tsombanidis,* 352 F.3d at 575; *Huntington Branch,* 844 F.2d at 936). The same holds true here. HUD's reasonable interpretation is entitled to deference.

Finally, contrary to Garden City's assertions, courts have not imposed a heightened standard on plaintiffs at the third step in disparate impact cases under 24 C.F.R. § 100.500. Indeed, courts have followed the plain language of the statute. *See Inclusive Communities Project*, 135 S. Ct. at 2518 ("[B]efore rejecting a . . . public interest[,] a court must determine that a plaintiff has shown that there is 'an available alternative . . . practice that has less disparate impact and serves the [entity's] legitimate needs.'" (quoting *Ricci v. DeStefano,* 557 U.S. 557, 578, 129 S. Ct. 2658, 174 L. Ed. 2d 490 (2009))); *Keller v. City of Fremont*, 719 F.3d 931, 949 (8th Cir. 2013) ("[W]hether plaintiffs can show that 'a viable alternative means was available to achieve the legitimate policy objective without discriminatory effects.'" (quoting *Gallagher v. Magner*, 619 F.3d 823, 834 (8th Cir. 2010))); *Theodora Rescue Comm. v. Volunteers of Am. of Washington*, No. C14-0981RSL, 2014 WL 5782328, at *4 (W.D. Wash. Nov. 6, 2014) ("Even if the Court assumes that the Ninth Circuit will ultimately allow plaintiffs to rebut a showing of business necessity simply by identifying an alternative act or practice that *would serve the identified interests with less discriminatory impact*, plaintiff has not made that showing." (internal citations omitted, emphasis added)); *Oviedo Town Ctr. II, L.L.L.P. v. City of Oviedo, Florida*, No.

616CV1005ORL37GJK, 2017 WL 3621940, at *4 (M.D. Fla. Aug. 23, 2017) ("If the defendant satisfies its burden, the plaintiff may still prevail by proving that the defendant's interests could be served by another practice that has a less discriminatory effect." (citing 24 C.F.R. § 100.500(c)(3)); *Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, No. 3:17-CV-206-K, 2017 WL 3498335, at *9 (N.D. Tex. Aug. 16, 2017) ("If the defendant meets its burden, the plaintiff must then show that the defendant's interests could be served by another practice that has a less discriminatory alternative" (citing 24 C.F.R. § 100.500(c)(3))).

Therefore the Court will not consider whether R-M zoning would be as equally effective as R-T zoning in serving Garden City's interests. Instead, the Court will follow the language of the statute and the case law, and consider whether R-T zoning would have served Garden City's interests.

### 4. As to Whether R-M Zoning Would Serve Garden City's Interest in Minimizing School Overcrowding

The Plaintiffs contend that the evidence is clear that R-M zoning would have produced fewer schoolchildren than R-T zoning. In opposition, Garden City asks the Court to find that R-M zoning would not have met Garden City's interest because there would have been more school children than under the R-T zoning.

Initially, the Court must inquire into what was the precise nature of Garden City's interest. When BFJ outlined the initial principles for the redevelopment of the P zone, it stated that any development should "not overburden roads, utilities, and schools." (Tr. at 239–41). During community hearings, residents expressed concerns about the impacts of residential units on schools. At the February 5, 2004 hearing, residents objected to, among other items, "overburdened and overcrowded" schools. (*Id.* at 912).

The Second Circuit referred to the interest as the "strain on public schools." *Mhany Mgmt.*, 819 F.3d at 620. Garden City classified the interest in its memorandum of law as the "impact on schools." (Defs.' Mem. of Law at 16).

The Court notes that this interest is somewhat different than the analysis regarding traffic, because there were no school age children living in the Social Services Site. As the Social Services Site was used for government buildings, any change in zoning that resulted in the development of residential units would necessarily increase the number of school children in the area. This is distinct from the traffic situation discussed later in this opinion, because the Social Services Site generated a significant amount of traffic.

Therefore, Garden City's interest was ensuring that public schools would not be overburdened or strained. In the Court's view, the Plaintiffs proved at trial that R-M zoning would not have overburdened or strained public schools.

There was substantial evidence in the record so support this conclusion. In July 2003, BFJ issued a revised study comparing the development of 311 apartment units or 75 single-family homes. The July 2003 report stated that "[t]here would be a smaller number of school children generated by the new development than with the development of single-family homes." (Joint Ex. 7). The September 2003 Environmental Assessment Form ("EAF") similarly stated that 133 single family homes would generate 133 students, while 355 apartments would generate between 71 and 107 students. (Joint Ex. 9 at 575; *see also* Tr. at 300 (Fish testified that it was true and still held true at the time of trial that R-M zoning would generate fewer school children than single family homes)). The EAF concluded that multi-family housing at the Social Services Site would have a minimal impact on schools.

BFJ and Fish based those numbers on the estimate that each multifamily unit would generate approximately 0.2 to 0.3 schoolchildren per unit. (*See* Joint Ex. 22 at 691 ("With a community aimed at young couples and empty nesters there could be as few as 0.2 to 0.3 public school children per unit.")). In comparison, Fish estimated that single family homes would, on average, produce one school child per home. Therefore, under Fish's estimates, 90 single family homes would have produced 90 additional schoolchildren, while 311 multifamily units would have generated between 62 and 93 schoolchildren.

The record is clear that in 2003, the Village's schools could have accommodated as many as 565 additional students. (Joint Ex. 14 at 140; Tr. at 353–54). Therefore, neither R-M zoning nor R-T zoning would have overburdened or strained the public schools.

Garden City's argument centers on a hypothetical—"what if" the residential mix in the multifamily units changed ever so slightly to produce 0.4 to 0.5 schoolchildren per unit. While it was not their burden, Garden City did not produce any evidence showing that such a ratio was likely. That is, Garden City does not offer any proof to rebut the Plaintiffs' statistical evaluation. BFJ's statistical estimate of 0.2 to 0.3 was higher than the ratio of .05 to .075 that Fish and BFJ had originally proposed at the outset of the development process. The latter ratio was "[b]ased upon [BFJ's] experience with other high-end condo and rental developments (e.g. Avalon)." (Pls.' Ex. 386 at 745 (which projected that 440 multifamily residential units would produce about 50 public school children)). There was also evidence that the Wyndham development in Garden City had a ratio of 0.06 schoolchildren per unit—there were fewer than 20 schoolchildren in 312 apartment units. (Joint Ex. 12 at 924). Trustee Bee similarly reiterated at community meetings that the Board and BFJ had reasonably predicted that multifamily housing would have less of an

impact on schools than single family housing because relatively few schoolchildren lived in multifamily developments in Garden City, such as the Wyndham development.

However, if the Court were to engage in the hypothetical put forward by Garden City the public schools would still not be overburdened; 0.4 to 0.5 schoolchildren per unit in a 311 unit building would produce 124 to 156 additional students. As stated above, Garden City public schools had the capacity to handle 565 additional students.

Therefore, the Court finds that the Plaintiffs met their burden at trial in proving that R-M zoning could have served Garden City's interest in not overburdening schools.

**5. As to Whether R-M Zoning Would Serve Garden City's Interest in Controlling Traffic**

With regard to this interest, Garden City urges the Court to analyze whether R-M zoning would have created more traffic than R-T zoning. Conversely, the Plaintiffs argue that the correct analysis is whether R-M zoning would have less traffic than the P zone. The Court finds that Garden City's interest, in reducing traffic from the levels that existed under the P zone, could have been served by R-M zoning.

Again, the Court will first attempt to discern the precise nature of Garden City's interest. It is clear that the Court must engage in this inquiry, because Garden City was unable to clearly articulate its precise interest in this regard in its memorandum of law. At different points in its memorandum, the Village referred to the interest in various ways: namely as "reduction in traffic," (Defs.' Mem. of Law at 12), "concern about traffic," (*id.* at 15), "interest in minimizing traffic," (*id.*), and "controlling traffic," (*id.* at 16).

As to the evidence of this interest in the record, it appears that one of the first references, if not the first reference to traffic was in the September 2002 fax. In that fax, which outlines BFJ's principles of development, BFJ stated that the goals of the zoning change included not

overburdening roads.  At community hearings, residents complained about the possible impact of the apartment buildings on traffic.  At the January 8, 2004 hearing residents voiced concerns about the generation of traffic.  After residents complained about the possible traffic problems at community hearings, BFJ modified its zoning proposal to "minimize traffic impacts."

The Court notes that the Village's initial concerns related to controlling traffic—both the residents and BFJ wanted to ensure that traffic would not increase.  However, once residents began complaining about traffic and the character of the neighborhood, BFJ changed its proposal to indicate that it wanted to "minimize traffic impacts."  Said differently, it is not clear to the Court that "minimizing traffic" was a substantial interest of Garden City's until residents voiced their concerns, which the Second Circuit found were thinly veiled racial complaints.  Instead, the record shows that Garden City was always interested in not increasing traffic or overburdening the roads as a result of the redevelopment.  Apparently, "minimizing traffic," rather than not increasing traffic, became a post-hoc rationale for adopting R-T zoning instead of R-M in response to resident concerns.  The Second Circuit summarized this situation:

> While the district court recognized this evidence, it also noted that traffic concerns became important to Garden City officials only after the increase in public opposition to affordable housing. Indeed, when residents raised questions regarding traffic from R–M zoning in 2003 and early 2004, Garden City officials repeatedly dismissed these concerns. Indeed, Suozzi, agreeing with Garden City officials at earlier presentations, criticized traffic-related concerns regarding R–M zoning as "irrational."

*Mhany Mgmt.,* 819 F.3d at 614.  Again, the Court sees no reason to depart from its earlier findings.

As to the precise nature of the Village's substantial, legitimate, *non-discriminatory* interest with respect to traffic, the Second Circuit classified it as "increased traffic."  *Id.* at 620.  This Court interprets "increased traffic" to mean that Garden City was concerned that R-M zoning would create more traffic than the P zoning, which is this Court's finding that Garden City's interest is in

"reducing traffic" as compared to P zoning. *MHANY Mgmt.*, 985 F. Supp. 2d at 427 (finding that the Defendants had not met their burden in establishing the absence of a less discriminatory alternative because, inter alia, "R–M zoning would have reduced traffic significantly as compared to the P-zone."). The Court finds no reason to depart from its previous analysis, or from the implicit guidance of the Second Circuit. Therefore, the Court will analyze whether either R-M or R-T zoning would have reduced traffic in relation to the conditions under the P zone, consistent with its prior holding and the Second Circuit guidance.

As stated above, this Court found in its post-trial decision, "R-M zoning would have reduced traffic significantly as compared to the P-zone." *Id.* at 428. The evidence supported this conclusion. The EAF stated that a multifamily development at the Social Services Site would not result in the generation of traffic significantly above levels present under P zoning. (Tr. at 290). At the February 5, 2004 public hearing, Suozzi told residents that their concerns about traffic were "irrational." (*Id.* at 908). On October 23, 2003, BFJ told residents that traffic would be reduced relative to existing uses. On January 8, 2004, at a public hearing, Filippon responded to citizen concerns about traffic by saying, "If I could just add on this point of traffic . . . You have to remember that the existing use on that site now generates a certain amount of traffic, a fair amount of traffic. That use is going to be vacated. The two residential uses that are being proposed as one of the alternates, each of which on their face automatically generate far less traffic than the existing use." (Joint Ex. 24, at 875).

Garden City's zoning expert, Patrick Cleary, testified that the two biggest generators of traffic are office buildings and multi-residential housing. To that end, Cleary also testified that Garden City did not need to enact R-T zoning to eliminate office  buildings—that R-M zoning controls, without CO-5(b) zoning, would also have eliminated office buildings. (Tr. at 1880).

Furthermore, Fish testified at the trial that, using conservative estimates, eliminating multi-family housing only reduced peak traffic by 3%. Therefore, the elimination of the government office buildings and the development of residential housing would have reduced traffic, whether the residences were single or multi family. As the Second Circuit stated, "any decrease in traffic between R–M and R–T zoning was de minimis." *Mhany Mgmt.,* 819 F.3d at 614. While the Village points to the April 22, 2004 BFJ presentation to show that R-M zoning would have resulted in twice as many car trips as R-T zoning, the Court previously questioned the credibility of that presentation. In any event, the Court notes that the BFJ study showed that office use generated 50% more traffic than the planned multi residential use. As the Second Circuit pointed out, the BFJ presentation "was only prepared after the public meetings, and the district court reasonably questioned the credibility of figures potentially created to justify a particular result." *Id.*

As stated above, the question under the FHA and HUD's regulations is not whether R-M zoning is equally effective in reducing traffic as R-T zoning. Instead, the Plaintiffs burden was to show that R-M zoning would have served the Village's interests. 24 C.F.R. 100.500(c)(3); *Inclusive Communities Project*, 135 S. Ct. at 2518; 78 Fed. Reg. 11,460, 11,473. Said differently, in the Court's view, in order for the Plaintiffs to meet their burden, they did not have to show that R-M zoning would reduce traffic as much as R-T zoning, just that it would reduce traffic below the levels that existed under P zoning. The Plaintiffs have established that. Garden City wanted to build a new development and reduce traffic. The Court finds that both the R-M zoning and the R-T zoning would have reduced traffic below the levels at the P zone.

Therefore, the Court finds that the Plaintiffs met their burden at trial in proving that R-M zoning could have served the Village's interest in reducing traffic.

### III. CONCLUSION

For the foregoing reasons, the Court finds that the Plaintiffs met their burden at trial in establishing that Garden City's legitimate, substantial, non-discriminatory interests in not overburdening public schools and reducing traffic could have been served by R-M zoning. The Court confirms its finding, that the adoption of R-T zoning instead of R-M zoning had a disparate impact on minorities in Garden City. This matter is respectfully referred to Magistrate Judge Arlene R. Lindsay for the conclusion of discovery on the Plaintiffs' "steering" claims under the FHA and Title VII.

It is **SO ORDERED:**

Dated: Central Islip, New York

September 19, 2017

_____/s/ Arthur D. Spatt_____

ARTHUR D. SPATT

United States District Judge